UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION, :
                                                                  :
                                        Plaintiff,                :
                                                                  :
        -against-                                                 :
                                                                  :
CLEAN CARE TECHNOLOGIES, INC.,                                    :
EDWARD KLEIN, AL NAZON and                                        :        08 Civ.  01719 (HB)
ANIL VARUGHESE,                                                   :        ECF CASE
                                                                  :
                                        Defendants,               :
                                                                  :
                        and                                       :
                                                                  :
CLEAN CARE SYSTEMS, LLC,                                          :
                                                                  :
                                Relief Defendant.                 :
-----------------------------------------------------------------------x


MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AS TO DEFENDANTS EDWARD KLEIN, AL NAZON AND ANIL VARUGHESE



SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 400
New York, NY  10281-1022
Michael D. Birnbaum
Valerie A. Szczepanik
Attorneys for Plaintiff
(212) 336-0523 (Birnbaum)
(212) 336-1319 (fax)
birnbaumm@sec.gov

## TABLE OF CONTENTS

PAGE

I. PRELIMINARY STATEMENT.................................................................... 1

II. STATEMENT OF FACTS....................................................................... 3

    A. Background................................................................................. 3

        1. Pre-Clean Care History............................................................. 4

        2. The Creation of CCT................................................................ 5

        3. The Creation of Systems............................................................ 5

    B. Defendants' Violations of Section 5 of the Securities
       Act and Section 15(a) of the Exchange Act .................................... 7

    C. Defendant's Misrepresentations and Omissions of Material Facts .................... 8

        1. Misrepresentations in the CCT POM................................................8

        2. Additional Misrepresentations Made to Investors in Clean Care Securities ......... 9

III. ARGUMENT................................................................................ 10

    A. The Court Should Grant Summary Judgment in Favor of the Commission and
       Against Defendants Klein, Nazon and Varughese ....................................... 10

        1. Summary Judgment Standard ......................................................... 10

        2. Defendants Violated Federal Securities Laws in Connection with Their
          Offer and Sales of Unregistered Securities............................................. 11

            *a.*    *Defendants have violated Sections 5(a) and 5(c) of the*
                 *Securities Act by Offering and Selling Securities in Unregistered*
                 *Transactions* ................................................................. 11

            *b*    *Nazon and Varughese Have Violated Section 15(a) of the*
                 *Exchange Act By Acting As Unregistered Broker/Dealers*............... 12

            *c.*    *Klein Aided and Abetted Nazon's and Varughese's Section 15(a)*
                 *Violations*.................................................................. 14

3.  Defendants Violated Federal Securities Laws in Connection with Their
    Material Misstatements .................................................................. 15

    a.  *Defendants Misrepresented Essential Aspects of The Clean Care
        Entities' Business* ................................................................. 16

    b.  *Defendants Collected Undisclosed Commissions* .......................... 17

    c.  *Defendants' Press Releases Boasted of Non-Existent
        Sales Agreements* ............................................................. 18

    d.  *CCT's POM Included False Profit Projections* ........................... 19

4.  Defendants' Scienter in Making Material Misrepresentations and
    Omissions is Incontrovertible ....................................................... 20

    a.  *Klein's Scienter* ............................................................... 21

    b.  *Nazon's and Varughese's Scienter* ......................................... 22

B.  The Court Should Permanently Enjoin Defendants From Future Securities
    Law Violations, Issue a Penny Stock Bar and Order Disgorgement and Civil
    Monetary Penalties ...................................................................... 23

    1.  The Court Should Issue a Permanent Injunction ..................................... 23

    2.  The Court Should Impose a Penny Stock Bar on the Defendants ................. 24

    3.  The Court Should Order Defendants to Disgorge Their Ill-Gotten
        Gains and Order Payment of Prejudgment Interest. ................................ 25

    4.  The Court Should Order Defendants to Pay Civil Monetary Penalties. .......... 27

IV.  **CONCLUSION** ................................................................................. 29

## TABLE OF AUTHORITIES

**Cases**

Aaron v. SEC, 446 U.S. 680 (1980) ........................................................................... 15

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ............................................. 11

CFTC v. Commonwealth Chemical Secs., Inc., 574 F.2d 90 (2d Cir. 1978) .............. 25

Chill v. General Elec. Co., 101 F.3d 263 (2d Cir. 1996) ........................................... 16

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976) ................................................... 16

Fustok v. Conticommodity Serv., Inc., 873 F.2d 38 (2d Cir. 1989) ........................... 26

Gabriel Capital, L.P. v. NatWest Fin., Inc., 122 F. Supp. 2d 407 (S.D.N.Y. 2000) .................... 20

Herman & MacLean v. Huddleston, 459 U.S. 375 (1983) ......................................... 16

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ................. 10

Nat'l Executive Planners, Ltd., 503 F. Supp. 1066 (M.D.N.C. 1980) ........................ 14

P. Stolz Family Partnership L.P. v. Daum, 355 F.3d 92 (2d Cir. 2004) ..................... 19

Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38 (2d Cir. 1978) ...................... 17, 21

SEC v. Benson, 657 F. Supp. 1122 (S.D.N.Y. 1987); ................................................ 25

SEC v. Cavanagh, 445 F.3d 105 (2d Cir. 2006) ................................................... 11, 12

SEC v. Coven, 581 F.3d 1020 (2d Cir. 1978) ............................................................ 15

SEC v. Dimensional Entertainment Corp., 493 F. Supp. 1270 (S.D.N.Y. 1980) ........ 26

SEC v. First Jersey Securities, Inc., 101 F.3d 1450 (2d Cir. 1996) ............ 15, 25, 26, 27

SEC v. First Pacific Bancorp, 142 F.3d 1186 (9th Cir. 1998) .................................... 25

SEC v. Haligiannis, 470 F. Supp. 2d 373 (S.D.N.Y. 2007) ....................................... 28

SEC v. Hansen, No. 83 Civ. 3692, 1984 WL 2413 (S.D.N.Y. Apr. 6, 1984) ............. 13

SEC v. Inorganic Recycling Corp., No. 99 Civ. 10159 (GEL), 2002 WL 1968341 (S.D.N.Y. Aug. 23, 2002) ................................................................................... 25, 29

SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082 (2d Cir. 1972) ......................... 25

SEC v. Martino, 255 F. Supp. 2d 268 (S.D.N.Y. 2003) ....................................... 12, 23

SEC v. McCaskey, No. 98 CIV. 6153 (SWK), 2001 WL 1029053 (S.D.N.Y. Sept. 6, 2001) ..... 23

SEC v. McNulty, 137 F.3d 732 (2d Cir. 1998) ................................................. 16, 20, 21

SEC v. Milan Capital Group, Inc., No. 00 Civ. 108 (DLC), 2000 WL 1682761 (S.D.N.Y. Nov. 9, 2000) ....................................................................................................... 14

SEC v. Moran, 944 F. Supp. 286 (S.D.N.Y. 1996) .................................................... 28

SEC v. Opulentica, LLC, 479 F. Supp. 2d 319 (S.D.N.Y. 2007) ............................... 28

SEC v. Patel, 61 F.3d 137 (2d Cir. 1995) .................................................................. 25

SEC v. Ramoil Mgmt., Ltd., No. 01 Civ. 9057 (SC), 2007 WL 3146943 (S.D.N.Y. Oct. 25, 2007) ............................................................................................................................. 14

SEC v. Research Automation Corp., 585 F.2d 31 (2d Cir. 1978) ................................. 23

SEC v. Stephenson, 732 F. Supp. 438 (S.D.N.Y. 1990)............................................... 27

SEC v. UN Dollars Corp., No. 01 Civ. 9059 (AGS), 2003 WL 192181 (S.D.N.Y. Jan. 28, 2003) ............................................................................................................................. 12

SEC v. United Monetary Servs., Inc., [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,284 (S.D. Fla. May 18, 1990) ............................................................................................. 13

SEC v. Warde, 151 F.3d 42 (2d Cir. 1998)................................................................... 27

Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6 (1971)....................... 16

TSC Industries v. Northway, Inc., 426 U.S. 438 (1976)............................................... 15

United States v. Naftalin, 441 U.S. 768, 772, 778 (1979) ........................................... 15

## Statutes

15 U.S.C. § 77d.............................................................................................................. 12
15 U.S.C. § 77e(a, c)................................................................................................ 3, 11
15 U.S.C. §77q(a) ............................................................................................................ 3
15 U.S.C. § 77t(d)................................................................................................ 3, 27, 29
15 U.S.C. § 77u(d)............................................................................................... 3, 27, 29
15 U.S.C. § 78j(b)............................................................................................................ 3
15 U.S.C. §78o(a) ..................................................................................................... 3, 13

## Rules

17 C.F.R. § 240.10b-5...................................................................................................... 3

Plaintiff Securities and Exchange Commission (the "Commission") submits this memorandum of law in support of its motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56, as to Defendants Edward Klein, Al Nazon and Anil Varughese (the "Defendants").

## I.    PRELIMINARY STATEMENT

This case concerns the fraudulent sale of securities in two related entities, Clean Care Technologies, Inc. ("CCT") and Clean Care Systems, LLC ("Systems"), through a sham offering that raised approximately $1.9 million dollars from at least 26 unsuspecting investors. CCT and Systems (collectively, the "Clean Care Entities") both claimed to be the exclusive North American distributors of the "Eyegiene" self-cleaning toilet seat and accompanying cleaning fluid. The marketing and sale of these securities (collectively, "Clean Care Securities") were conducted entirely by Defendants and certain individuals acting at their instruction in violation of the federal securities laws.

In their respective Answers and sworn testimony, Defendants admit to facts demonstrating each and every element of the securities law violations alleged in the Commission's Complaint. Specifically, Defendants admit to selling Clean Care Securities in an unregistered offering through brokers who were neither registered as, nor affiliated with, broker-dealers authorized to market and sell securities. Furthermore, they admit to making material misrepresentations and omissions to induce investors into purchasing Clean Care Securities. Among the most egregious of these – all of which are admitted by each Defendant – are:

- claims in CCT's private offering memorandum ("POM") that CCT was the "exclusive distributor" of the Eyegiene self-cleaning toilet seats when, in fact, CCT did not possess any such exclusive distribution rights;

- representations that CCT employed registered broker-dealers to sell Clean Care Securities when, in fact, no such broker-dealers were ever employed by CCT and all shares were sold by the unregistered Defendants in this action;

- statements in CCT's POM that alternately (and contradictorily) stated (i) "[t]here will not be any commissions" paid in connection with the CCT offering and (ii) commissions to registered brokers would not exceed 10 percent when, in fact, Nazon and Varughese – who were not registered broker-dealers – received commissions exceeding 10 percent;

- announcements, published in press releases and email, of numerous finalized sales agreements when, in fact, CCT had not entered into any such deals; and

- sales and revenue projections included in CCT's offering memorandum that contradicted the company's sales plans and were "unrealistic" at the time they were distributed to many investors.

Furthermore, Defendants' misrepresentations and omissions obfuscated essential aspects of Clean Care's business. Defendants failed to disclose to investors in Clean Care Securities that they had created two separate Clean Care Entities – CCT and Systems – that enabled Defendants to raise money from two sets of investors, each of whom were told that they were investing in a company licensed to be the exclusive distributor of the Eyegiene seats and cleaning fluid. Of course, both companies could not be the "exclusive" distributor of the same products, but this sleight of hand helped Defendants raise more than $700,000 from investors in CCT while raising approximately $1.2 million from Dr. Sheldon Schwartz, the sole investor in Systems. Unbeknownst to investors in either Clean Care Entity, Defendants freely commingled funds raised from Schwartz and CCT investors, using money in Systems' accounts to pay CCT's bills, and using CCT investors' money to cover certain of Systems' obligations.

The record unequivocally demonstrates all of the foregoing facts, leaving no dispute as to any element of the securities law violations pleaded in the Commission's Complaint. These facts, as well as the additional factual record detailed below, overwhelmingly support judgment on all claims as a matter of law against each Defendant. Accordingly, the Commission

2

respectfully submits that the Court should grant summary judgment in favor of the Commission and against Defendants Klein, Nazon and Varughese.

The Commission requests that the Court enter summary judgment against Klein, Nazon and Varughese: (a) permanently enjoining them from future violations of the federal securities laws – namely, Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)], and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5]; (2) holding them jointly and severally liable for their ill-gotten gains and prejudgment interest thereon; (3) barring them from participating in any offering of penny stock; and (4) imposing civil penalties against each of them in an amount to be determined by the Court pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 77u(d)(3)].

## II.    **STATEMENT OF FACTS**

### A.    **Background**

In or around November 2005, Defendants created Clean Care Technologies, Inc. ("CCT"), purportedly as a vehicle to sell self-cleaning toilet seats and accompanying cleaning fluid.[1]  (SoF ¶1.)[2]  To raise sufficient seed money for their toilet seat business, Defendants relied

---

[1] Records produced by Defendant Klein suggest that CCT was first established as a limited liability company on November 14, 2005 and was later incorporated as CleanCare Technologies, Inc. on or around March 8, 2006. For purposes of this memorandum, Clean Care Technologies, LLC and CleanCare Technologies, Inc. are treated as one company and identified as CCT.

[2] "SoF ¶__" shall refer to paragraphs in the Commission's accompanying statement of undisputed facts, submitted pursuant to Local Rule 56.1. "Schwartz Tr. at __," "Varughese Tr. at __," "Nazon Tr. at __" and "Klein Tr. at __" shall refer to the transcripts of Schwartz's, Varughese's, Nazon's and Klein's testimony, taken on April 24, 2008, May 13, 2008, May 15, 2008 and May 20, 2008, respectively.  Cited transcript pages are attached to the June 16, 2008

on two primary sources of funds. Defendants offered shares of CCT to the public through a $10 million offering commenced early in 2006. (SoF ¶2.) The CCT offering raised more than $700,000 from at least 26 investors. (Id.) At approximately the same time, Defendants created a partnership called Clean Care Systems, LLC ("Systems"), organized under New Jersey law (SoF ¶3.), and sold an interest in that partnership to a Dr. Sheldon Schwartz, who invested approximately $1.2 million in Systems before commencing a lawsuit against Klein and CCT claiming, *inter alia*, that Schwartz had been defrauded. (SoF ¶¶4, 18.) As the Defendants admit, Schwartz was never made aware of the existence of CCT, or of the fact that his investments would be used to pay CCT's expenses, and CCT investors were never told anything about Systems or about the use of CCT funds to support certain Systems operations. (Klein Tr. at 85-90; Schwartz Tr. at 38, 91-93; Nazon Tr. at 79-80.).

    1. Pre-Clean Care History

    The circumstances that brought Klein, Nazon and Varughese together help explain how Defendants came to create two Clean Care Entities to raise money for one toilet seat venture. Before Nazon and Varughese ever met Klein, they had already spent nearly a decade selling securities through unregistered offerings for several different companies, often through a boiler room, known as "Focus Marketing," that Nazon and Varughese created. (Nazon Tr. at 11-27, 32-34.)[3] In or around August 2005, Nazon and Varughese were first introduced to Klein to discuss the prospect of working together to sell self-cleaning toilet seats for a company called

---

Declaration of Michael Birnbaum, with Schwartz's, Varughese's, Nazon's and Klein's transcript excerpts attached as Exhibits 21, 22, 23 and 24, respectively.

[3] Nazon and Varughese apparently created two companies, "Focus 4 Marketing" and "Focus 44 marketing." Nazon and Varughese seemed to use these names interchangeably, and checks from CCT were written simply to "Focus Marketing." (Nazon Tr. at 33-35; SoF ¶ 6.) For the purposes of this memorandum, the entities will be referred to as "Focus Marketing."

ASC International Holdings, LLC. (Id. at 55.) ASC, a company established by a Mr. Paul

Schmidt, raised money by employing Nazon and Varughese – both of whom used the fake name

"Robert Clark" when dealing with any potential investors – to solicit investments through "cold-

calls" to various "leads." (Id. at 30, 46; Varughese Tr. at 102-103, 61-63.) It was Mr. Schmidt

who first introduced Varughese and Nazon to Klein, but soon after that August 2005 meeting,

Mr. Schmidt apparently absconded with all of ASC investors' funds, leaving Nazon and

Varughese – as well as any investors – unable to reach him, let alone recover any investments in

ASC. (Varughese Tr. at 76-80.)

### 2. The Creation of CCT

When Varughese and Nazon found they were unable to reach Schmidt, they met in New

York with Klein for a second time in or around October 2005 to discuss the creation of a new

toilet seat venture. (Varughese Tr. at 76; Nazon Tr. at 61; Klein Tr. at 31.) Defendants decided

that shares of the new venture would be given for free to ASC investors to persuade them to walk

away from any claims they may have had stemming from investments made through Varughese

and Nazon in ASC. (Varughese Tr. at 76-78, 84-85; Nazon Tr. at 61-62; Klein Tr. at 117-118.)

CCT's offering memorandum failed to mention that free shares were awarded to ASC investors.

(Varughese Tr. at 84-85; SoF ¶10.) In November 2005, Klein filed papers with the State of New

Jersey to establish CCT. (SoF ¶1.) Soon thereafter, Varughese and Nazon began cold-calling

investors from a boiler room they established in an office at 111 John Street, New York, New

York. (Varughese Tr. at 25-26, 31-33.)

### 3. The Creation of Systems

Dr. Sheldon Schwartz – referred to in the Commission's Complaint as "Investor A" –

invested $300,000 in ASC. (Schwartz Tr. at 25.) Schwartz testified – and Defendants confirmed

– that he did not accept shares of CCT in exchange for his ASC investment. (Id. at 30-31;

Varughese Tr. at 133-34.) Instead, after Nazon (still operating as Robert Clark) contacted Schwartz to solicit additional funds for a new toilet seat venture, Schwartz met with and ultimately entered into an agreement with Klein to fund a partnership, Systems, which Klein represented owned the exclusive North American distribution rights to the Eyegiene self-cleaning toilet seat. (Nazon Tr. at 65; Schwartz Tr. at 29-32.)

Schwartz invested in Clean Care Securities with the understanding that he would be the only investor in any Clean Care Entity, a condition Klein specifically recalled Schwartz expressing. (Klein Tr. at 85-86.) Despite Schwartz's wishes in this regard, and unbeknownst to Schwartz, Defendants, at the same time, were raising money for a separate Clean Care venture, CCT, based on representations that CCT owned exclusive Eyegiene distribution rights. (Id. at 89; Schwartz Tr. at 91-93.) In addition to hiding CCT's existence from Schwartz, Defendants never informed Schwartz that 10 percent of all funds he contributed to Systems were paid as "commissions" to Nazon and Varughese. (Klein Tr. at 90-91; Varughese Tr. at 202.) Likewise, Defendants' use of Schwartz's investment to cover expenses incurred by CCT was never disclosed to Schwartz. (Klein Tr. at 24, 89-90.)

By secretly creating two separate Clean Care Entities, Defendants ensured that, at best, the two companies would share in any profits earned from the sale of Eyegiene seats and cleaning solution, even though investors were never told that profits would be shared with any other company. In short, Defendants orchestrated a system under which (i) Systems would purchase seats and cleaning solution from the Eyegiene manufacturer; (ii) CCT would pay Systems a premium for those products; then (iii) CCT would try to sell the seats and solution to the public. (Klein Tr. at 101-106.) This plan was not only never disclosed to investors in CCT or Systems, but it also necessarily limited the profit potential for both companies, as any

6

premium CCT paid to Systems would represent profits lost to CCT, and any profits that CCT earned by selling seats to the public would represent profits Systems would never see.

In August 2007, Schwartz commenced a lawsuit in New Jersey State Court against Klein and CCT alleging, among other things, that Klein had "been diverting substantial monies from Clean Care Systems for his own improper use" and "surreptitiously formed Clean Care Technologies for the apparent and unlawful purpose of diverting the assets of Clean Care Systems." (SoF at ¶18.) This lawsuit, which Schwartz brought on behalf of Systems as well as on his own behalf, was settled in November 2007. (SoF at ¶19.) Under the terms of the settlement, CCT received $225,000 from Schwartz (through Systems) in exchange for, among other things, all of CCT's toilet seat and cleaning solution inventory and Klein's surrender to Schwartz of any interest in Systems. (Id.)

## B.    Defendants' Violations of Section 5 of the Securities Act and Section 15(a) of the Exchange Act.

There is no dispute that Defendants, in Nazon's words, "acted as brokers [and] solicited an unregistered offering." (SoF ¶11.) There is also no dispute that Defendants neither were registered broker-dealers nor were they affiliated with any registered broker-dealers. (Nazon Tr. at 86; Varughese Tr. at 120-21.) Defendants raised money by operating a boiler room known as Focus Marketing, from which Nazon and Varughese and others employed by them "cold-called" potential investors to solicit funds for CCT. (Varughese Tr. at 29-32.) Defendants solicited and collected funds from investors throughout the United States, utilizing interstate mail and the means of interstate commerce. (Klein Tr. at 36-37; Varughese Tr. at 25-33.) Through Focus Marketing, Varughese and Nazon were paid commissions of up to 15 percent of monies they raised, despite CCT's representations in its POM that no commissions would be paid in

connection with the offering. (SoF ¶30; Klein Tr. at 58; Varughese Tr. at 176-78; Nazon Tr. at 96-97.)

Defendant Klein freely admits that he "aided and abetted" Nazon and Varughese in their sales efforts. (SoF at ¶26.) Moreover, Klein admits that he never asked whether Nazon, Varughese or any of their associates were registered broker-dealers, and had no real understanding of how Nazon and Varughese would raise money for CCT. (Klein Tr. at 34-35; SoF ¶27.) In fact, Klein testified that when he hired Nazon and Varughese to raise money for CCT, he did not know of any experience or expertise either person had in raising capital other than the duo's work raising money for ASC, the toilet venture Klein knew had collapsed when the company's president disappeared with the money Varughese and Nazon had collected from some of the same investors they planned to target for investment in Clean Care Securities. (Klein Tr. at 116-117.)

## C.    Defendants' Misrepresentations and Omissions of Material Facts

As the Defendants have freely admitted, investments in the Clean Care Entities were solicited on the backs of numerous and repeated material misrepresentations and omissions. These falsehoods can be found, among other places, in the CCT POM, press releases and emails sent to investors and numerous oral representations.

### 1.  Misrepresentations in the CCT POM

All of the Defendants took part in drafting the POM sent to potential and actual CCT investors (Varughese Tr. at 118; 154-55; Nazon Tr. at 78; Klein Tr. at 38.), and each Defendant admits that the POM contained patently false information. (See, e.g., SoF ¶29.) Perhaps most egregiously, the POM misinforms investors that CCT "exclusively distributes and markets Eyegiene Seat." (SoF ¶33.) To the extent that CCT had any potential value whatsoever, that

value would lie in its purportedly exclusive rights concerning the Eyegiene seat. But the Defendants admit that CCT did not, in fact, possess the distribution rights claimed in CCT's POM. (Nazon Tr. at 78-79; Klein Tr. at 51-52; Varughese Tr. at 140.)

The POM is replete with additional misrepresentations that significantly altered the total mix of information available to investors. For example, Page One of the POM informs investors that the sale of securities through the CCT offering was "made through broker-dealers who are registered with the National Association of Securities Dealers." (SoF ¶34.) But Varughese, when confronted with this text, admitted that CCT never "use[d] any broker/dealers to sell any shares of Clean Care Technologies." (Varughese Tr. at 122.) Page Eight of the POM states that "[t]here will not be any commissions payable or paid in connection [with the offering]." (SoF ¶30.) This too, proved to be false. (Id. at 176-78; Klein Tr. at 58.)

CCT's financial projections are similarly misleading. The Defendants testified that part of CCT's business model was to give away a large proportion of its inventory of seats for free, based on the hope that CCT would recoup any losses when satisfied purchasers bought cleaning fluid from CCT in the months and years ahead. (Klein Tr. at 46-47; Nazon Tr. at 82-83.) Nevertheless, the financial projections sent to potential CCT investors were based on sales of seats for an average $30 profit – an assumption that runs entirely counter to CCT's purported business model. (SoF at ¶35.) Nazon testified that, at some point during 2006, he knew that the projections contained in the POM "wouldn't be realistic," but Defendants continued to send investors the same projections regardless of their falsity. (Nazon Tr. at 86.).

2. Additional Misrepresentations Made to Investors
   in Clean Care Securities

Additional material misrepresentations can be found in the press releases CCT published and emails sent to Schwartz by Klein. For example, CCT announced in a January 5, 2007 press

release that "CCT has signed on numerous dealers including the Las Vegas Towel and Linen Company ... Liberty Paper and Janitorial, Walsh Chemical and M & J Industrial Supply." (SoF at ¶36.) Only three days earlier, Klein had emailed Schwartz about sales of seats to the very same M & J Industrial Supply. (Klein Tr. at 66-67; SoF at ¶ 36.) But no Clean Care Entity had signed on any dealers identified in the press release or email. (Klein Tr. at 62-63.)

Similarly, a July 1, 2006 press release specifically identified sales of dozens of seats to several different companies, stating that "a subsidiary of AmeriChem has bought 64 seats and 256 bottles [of cleaning fluid]," a janitorial supply company "bought 16 seats to test in Wyndham Hotel," and Ace Janitorial and Surgical Supply company ... bought 70 seats and 280 bottles of solution as their initial order." (SoF at ¶37.) Klein described some of the same sales in a June 15, 2006 email to Scwhartz. (Id.) But no such sales had been made. (Varughese Tr. at 179-183; Klein Tr. at 71-73.)[4] Indeed, the Defendants all admit that the foregoing representations about purportedly finalized deals were false. (Klein Tr. at 62-63; Nazon Tr. at 92-93; SoF ¶37.)

### III.    ARGUMENT

**A.    The Court Should Grant Summary Judgment in Favor of the Commission and Against Defendants Klein, Nazon and Varughese**

#### 1.    Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered forthwith if the pleadings and collected discovery, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to

---

[4] Defendants do not dispute that the January 5, 2007 press release was sent to CCT investors. Varughese, in his Answer, claims that the July 1, 2006 press release relied upon in the Commission's Complaint was merely a "draft," but acknowledged that the "draft" release did not differ from the version the Commission obtained from a CCT investor. (Varughese Tr. at 181.)

a judgment as a matter of law. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To be a "genuine" issue of fact, the evidence must be such that a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Commission is entitled to summary judgment on all claims against Defendants Klein, Nazon and Varughese.

     2.      Defendants Violated The Federal Securities Laws In Connection
              With Their Offer and Sales of Unregistered Securities

          a.      *Defendants have violated Sections 5(a) and 5(c) of the Securities*
                  *Act by Offering and Selling Securities in Unregistered Transactions*

"Section 5 [of the Securities Act] requires that securities be registered with the SEC before any person may sell or offer to sell such securities." SEC v. Cavanagh, 445 F.3d 105, 111 n.13 (2d Cir. 2006).[5] "To state a cause of action under Section 5, one must show (1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer

---

[5] The text of Section 5 states, in relevant part:

(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly –

    1.  to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
    2.  to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

                        *       *       *

(c) **Necessity of filing registration statement.** It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security . . . . 15 U.S.C. § 77e (emphasis in original).

or sale." Id. (internal quotation marks and citation omitted). "[S]cienter is not an element of a Section 5 violation." SEC v. UN Dollars Corp., No. 01 Civ. 9059 (AGS), 2003 WL 192181, at *2 (S.D.N.Y. Jan. 28, 2003).

Here, Defendants do not dispute that they "did not file a registration statement for their sales of securities, and a registration statement was not otherwise in effect." (See SoF ¶23.). That Defendants utilized interstate mails and means of interstate commerce to market and sell Clean Care Securities also is not in dispute. (Klein Tr. at 36-37; Varughese Tr. at 25-33.)

"Once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption." Cavanagh, 445 F.3d at 11 n.13 (citation omitted). Here, Defendants cannot possibly meet that burden. See 15 U.S.C. § 77d (listing circumstances, inapposite here, under which a party may be exempt from Section 5). Indeed, the only statement offered by Defendants in purported defense of CCT's failure to comply with Section 5 is Varughese's claim that a "[l]ate registration was already under way (sic) when the Commission Staff had started [its] informal inquiry." (SoF ¶22.) But any plan for a "late registration" – which, notably, never came to fruition – merely underscores Defendants' failure to properly comply with Section 5 in the first instance. Varughese testified that he told Klein "right from the get-go that in order to sell shares in the company the company needed to be registered." (Varughese Tr. at 220.) Varughese was correct; however, no one – including Varughese himself – heeded this advice, and Defendants' failure to register CCT's offering warrants summary judgment on the Commission's Section 5 claims.

> b.    *Nazon and Varughese Have Violated Section 15(a) of the Exchange Act By Acting As Unregistered Broker/Dealers*

Section 15(a) makes it unlawful for any "broker or dealer" to make use of any means of interstate commerce "to effect any transactions in, or to induce or attempt to induce the purchase

or sale of, any security" without registering as a broker with the Commission. SEC v. Martino, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003), citing 15 U.S.C. § 78o(a)(1). Here, there are no facts in dispute concerning Nazon's and Varughese's Section 15(a) violations.

Nazon and Varughese expressly admit that neither of them has ever registered with the Commission. (Nazon Tr. at 86; Varughese Tr. at 120-21.) And they cannot dispute that they acted as "brokers" for the purposes of Section 15(a). In SEC v. Hansen, No. 83 Civ. 3692, 1984 WL 2413 (S.D.N.Y. Apr. 6, 1984), the court identified factors relevant to determine whether an individual acted as a broker within the meaning of Section 15(a). Those factors include whether the individual: (1) was an employee of the issuer; (2) received commissions as opposed to salary; (3) sold or previously sold the securities of other issuers; (4) was involved in negotiations between the issuer and the investor; (5) made valuations as to the merits of the investment or gives advice; and (6) was an active rather than passive finder of investors. Id., at *10. The record here is clear. Nazon and Varughese received commissions tied to their sales of Clean Care Securities (Klein Tr. at 58; Varughese Tr. at 176-78; Nazon Tr. at 96-97); previously sold securities of numerous other issuers (Nazon Tr. at 11-13, 27-30; Varughese Tr. at 42-43, 62); were at the center of negotiations between the Clean Care Entities and investors, including Schwartz (see, e.g., Schwartz Tr. at 29-30); advised potential investors as to the merits of purchasing Clean Care Securities (id.), and actively pursued investors through a boiler room they personally established (Nazon Tr. at 69-70).

The only purported "defense" Nazon and Varughese offer is that they believed they were "finders," not brokers, and therefore did not know they were violating Section 15(a). (See Nazon and Varughese Answers, Exhibits 11 and 12, respectively, to the accompanying Birnbaum Declaration.) But even if this were true, it would not present any obstacle to summary judgment,

as the Commission is not required to prove scienter when alleging a violation of Section

15(a)(1). SEC v. United Monetary Servs., Inc., [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH)

¶ 95,284 at 96,302 (S.D. Fla. May 18, 1990) (citing Nat'l Executive Planners, Ltd., 503 F. Supp.

1066, 1073 (M.D.N.C. 1980).)

c.    *Klein Aided and Abetted Nazon's and Varughese's*
      *Section 15(a) Violations*

"Under Section 20(e) of the Exchange Act, the Commission may prosecute individuals

who aid and abet primary violations of the federal securities laws." SEC v. Ramoil Mgmt., Ltd.,

No. 01 Civ. 9057 (SC), 2007 WL 3146943, at *11 (S.D.N.Y. Oct. 25, 2007) (holding defendant

liable for aiding and abetting Section 15(d) of the Exchange Act). Liability for aiding and

abetting exists where a defendant: (1) acted knowingly; (2) provided substantial assistance; and

(3) a primary violation of the federal securities law occurred." SEC v. Milan Capital Group,

Inc., No. 00 Civ. 108 (DLC), 2000 WL 1682761, at *8 (S.D.N.Y. Nov. 9, 2000). Here, Klein

admits that, in his words, he "aided and abetted" Nazon and Varughese in their sales efforts.

(SoF ¶26.) Though Klein claims this assistance was "unknowing[]," the record unequivocally

belies Klein's claim.

Klein testified: "For some ungodly reason, I never bothered to ask [whether Varughese

and Nazon were licensed], which was naïve on my part. Without a doubt, I should have

consulted with an attorney before I hired them." (SoF ¶26.) Klein further admits that, upon

reflection, Varughese's and Nazon's contributions to CCT's POM "should have raised a red

flag." (SoF ¶32.) Klein's testimony makes clear that he (i) failed to ask Nazon or Varughese

whether they were registered broker-dealers; (ii) knew, when he hired Nazon and Varughese, of

only one previous job either individual had held, and that was with a company whose principal

had recently "disappeared" with investors' money; and (iii) failed to contact any references of

14

Nazon and Varughese or otherwise conduct any background check. (Klein Tr. at 116-17.) Viewing all facts most generously to Klein, he was at best willfully ignorant and deliberately blind to the obvious fact of Nazon's and Varughese's status as unlicensed brokers. Accordingly, Klein should be found culpable as a matter of law of aiding and abetting of Nazon's and Varughese's Section 15(a) violations. See SEC v. Coven, 581 F.2d 1020, 1028 (2d. Cir. 1978) (negligence standard appropriate for aiding and abetting violation where primary violation requires no more than negligence).

### 3. Defendants Violated Federal Securities Laws in Connection with Their Material Misstatements

Defendants' sales of Clean Care Securities also ran afoul of the anti-fraud provisions of both the Securities Act and the Exchange Act. Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 prohibit fraud in connection with the purchase or sale of securities. United States v. Naftalin, 441 U.S. 768, 772, 778 (1979). To establish a violation of Section 10(b) and Rule 10b-5, the Commission must show (i) a misrepresentation or omission regarding material facts or other fraudulent conduct, (ii) made with scienter, (iii) in connection with the purchase or sale of a security. SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (citation omitted). With respect to Section 17(a)(1) of the Securities Act, essentially the same elements must be established in connection with the offer or sale of a security, though no showing of scienter is required under subsections 17(a)(2) or (a)(3). See Aaron v. SEC, 446 U.S. 680, 696-97, 701-02 (1980).

A statement or omission is material if a reasonable investor would view its disclosure as significantly altering the 'total mix' of information available. TSC Industries v. Northway, Inc., 426 U.S. 438, 449 (1976). Summary judgment on matters of materiality in a securities fraud case is appropriate when the omissions and misrepresentations in question are "so obviously

important to the investor that reasonable minds cannot differ." Id., 426 U.S. at 450. The requirement under Section 10(b) and Rule 10b-5 that a fraud be perpetrated "in connection with" the sale of securities is satisfied when the fraud touches the sale of securities. Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12-13 (1971).

Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 also require proof of scienter, or "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976). Proof of scienter can be inferred from circumstantial evidence. Herman & MacLean v. Huddleston, 459 U.S. 375, 390-91 n.30 (1983). Scienter also "may be established through a showing of a reckless disregard for the truth." SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998) (citation omitted). An egregious refusal to see the obvious, or to investigate the doubtful, may give rise to an inference of recklessness. Chill v. General Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996). In this case, Defendants' repeated publication of material facts they knew to be false easily satisfies the anti-fraud provisions' scienter requirements.

Defendants all admit that CCT's "POM misrepresented, and failed to disclose, material information," and that "Defendants also issued false press releases that contained numerous falsehoods ... ." (See SoF ¶ 31.) Among Defendants' many material misstatements and omissions, several stand out as particularly egregious.

> a.    *Defendants Misrepresented Essential Aspects of The*
> *Clean Care Entities' Business*

CCT was marketed to investors as a company with the potential to earn great profits based on its purported "exclusive" right to sell and distribute the Eyegiene self-cleaning toilet seat and related cleaning solution. (SoF ¶33.) CCT's purportedly exclusive rights were advertised unambiguously in the company's POM, the primary marketing document Defendants

sent to potential investors. (Id.) But CCT was not – and never was – the exclusive distributor of any self-cleaning seats or cleaning fluid. Defendants all testified under oath that the POM's claim of exclusive distribution rights was simply false. (Nazon Tr. at 78-79; Klein Tr. at 51-52; Varughese Tr. at 140.) To the contrary, those rights belonged to Systems, a company whose existence was hidden from CCT investors. (Klein Tr. at 51.)

Investing in Systems was no fair deal either. In addition to failing to disclose to Schwartz, Systems' sole investor, that distribution rights licensed to Systems were being used to benefit CCT, Defendants also secretly took Systems' funds to pay CCT's expenses, including salaries and rent (Klein Tr. at 15, 21-24), and Defendants devised a distribution system that offered Systems only "minimal" profits even though Systems was the company that owned all Eyegiene distribution rights in the United States (Klein Tr. at 101).

Furthermore, though investors in both Clean Care Entities were led to believe that the company in which they invested would reap any and all profits from the sale of Eyegiene seats and solution, the secret organizational structure Defendants set up left any profits to be split between Systems and CCT. Undoubtedly, CCT investors would have wanted to know that the company was paying another related entity a premium for seats and solution; likewise, Schwartz certainly would have wanted to know that CCT was in a position to collect a portion of any profits on seats and solution ultimately sold to the public.

### b. *Defendants Collected Undisclosed Commissions*

Notwithstanding the different contractual rights that CCT and Systems possessed, investors in both Entities shared at least one thing in common: unbeknownst to the investors, Nazon and Varughese claimed 10-15% of all money invested in any Clean Care Securities as "commission payments," thereby managing to pocket tens of thousands of dollars investors were

led to believe were to be used in operating a toilet-seat distributorship. (SoF ¶¶ 16, 30.) These commission payments were expressly disclaimed in written materials sent to CCT investors. Investors in CCT received a POM stating, alternately, that no commissions would be paid in connection with the CCT offering and, in a separate section of the POM, that commissions would be paid to registered broker-dealers but would be capped at 10 percent. (SoF ¶30.)[6] Both of these statements are unambiguously false. (Klein Tr. at 58.) In fact, Klein paid Nazon and Varughese up to 15 percent of funds raised from CCT investors. (Id.)

Schwartz's investments in Systems were skimmed to benefit Nazon and Varughese as well, even though the only contact Schwartz ever had with either of individual concerning Clean Care had been a phone call from one of them pretending to be "Robert Clark," during which Schwartz was referred to Klein to discuss a potential investment. (Schwartz Tr. at 29-32.) Schwartz, whose uncontroverted testimony establishes that he believed 100 percent of his investment would go to the operating of Systems (Schwartz Tr. at 47), was clearly never told that ten percent of his investment would go to Nazon or Varughese (Klein Tr. at 90).

        c.     *Defendants' Press Releases Boasted of Non-Existent Sales Agreements*

For a company that purported to be in the sole business of selling toilet seats and cleaning solution, there might be no more significant data that an investor would want to consider as part of the total mix of information than actual sales of toilet seats and cleaning fluid. Thus, when Defendants published false reports of significant sales agreements with numerous prominent

---

[6] Defendants' failure to sell CCT Securities through registered broker-dealers (or individuals affiliated with such broker-dealers) is, as discussed above, by itself a violation of federal securities laws. Defendants compounded this error by falsely boasting in CCT's POM that the CCT offering was "made through broker-dealers who are registered with the National Association of Securities Dealers." (SoF ¶34.)

customers, they painted a particularly misleading picture of CCT's health. In a January 5, 2007 press release, CCT announced to investors that the company had "signed on numerous dealers," specifically identifying "the Las Vegas Towel and Linen Company ... Liberty Paper and Janitorial, Walsh Chemical and M & J Industrial Supply." (SoF at ¶36.) Notably, Klein sent an email to Schwartz on January 2, 2007, only three days earlier than the date of the January 5 press release, offering Schwartz some of the same representations. (Id.; see also Klein Tr. at 66-67.) Each Defendant was asked about the representations found in CCT's January 5 press release, and each admitted that CCT never actually did sign on any of the dealers identified therein. (Klein Tr. at 62-63; Nazon Tr. at 92-93; Varughese Tr. at 184-186; SoF ¶37.)

CCT's July 1, 2006 press release likewise offers investors patently false, and unquestionably material, information. The July 1 release expressly states that numerous companies purchased, in total, scores of seats and hundreds of bottles of cleaning solution. Specifically, the release announced that "a subsidiary of AmeriChem has bought 64 seats and 256 bottles [of cleaning solution]," a janitorial supply company "bought 16 seats to test in Wyndham Hotel," and Ace Janitorial and Surgical Supply company ... bought 70 seats and 280 bottles of solution as their initial order." (SoF at ¶37.) On June 15, 2006, Klein sent an email to Schwartz boasting of many of the same sales. (Id.) But no such sales had been made. (Varughese Tr. at 179-183; Klein Tr. at 71-73.)

> d.    *CCT's POM Included False Profit Projections*

Defendants included, as part of the POM they sent to potential CCT investors, what Defendants called an "Eight (8) Year Gross Profit Projection." (SoF ¶35.) CCT warned that the projections are subject to certain "uncertainties," and are based on "a number of assumptions, including "the success of [CCT's] business strategy." (Id.) What the POM did not explain,

however, is that the numbers included in CCT's projections assumed a business plan that was entirely different from the plan Defendants actually intended to implement. See P. Stolz Family Partnership L.P. v. Daum, 355 F.3d 92, 97 (2d Cir. 2004) (cautionary language is aimed at warning investors that bad things may come to pass in dealing with the unforeseen future; it does not apply to "historical or present fact-knowledge within the grasp of the offeror."); see also Gabriel Capital, L.P. v. NatWest Fin., Inc., 122 F. Supp. 2d 407, 419 (S.D.N.Y. 2000) (cautionary language does not insulate defendant where defendant knew its statement was false when made).

CCT's projections "assumed" a profit of $30 per toilet seat sale in CCT's first year of operation. (SoF ¶35.) But Klein testified that, from day one, CCT's plan had been to offer seats to vendors and end-users at prices below the cost to CCT (and sometimes to offer seats for free), with the hope that users would ultimately purchase enough cleaning solution to compensate for the loss CCT would necessarily take in discounting the seats. (Klein Tr. at 45-46; see also Nazon Tr. at 82-83.).

Nazon admits that the projections found in CCT's POM do not represent what the company actually expected to achieve, but rather indicated "the company's potential." (Nazon Tr. at 84.) Furthermore, at some time during CCT's first year of operations, Nazon "realized that [CCT's] projections wouldn't be realistic," but Defendants continued to send potential investors the same POM without disclosing this critical information. (Nazon Tr. at 84-86.)

4.    Defendants' Scienter in Making Material
      Misrepresentations and Omissions is Incontrovertible

To the extent Defendants offer any defense at all to the Commission's claims, that defense appears to be that each Defendant did not always intend to mislead investors. But the record unequivocally demonstrates otherwise, easily satisfying the standard for scienter, which

"may be established through a showing of a reckless disregard for the truth." SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998).

    *a.*  *Klein's Scienter*

   Klein testified that nobody "at Clean Care Technologies [was] responsible for reviewing the substance of the offering memorandum before it was sent out to investors." (Klein Tr. at 37-38.) Asked whether he took "any efforts whatsoever to come to [his] own opinion as to whether or not the materials sent to investors were truthful," Klein testified that he only reviewed parts of the POM, some of which he found to be inaccurate, but otherwise simply assumed – in Klein's words, "like a fool" – that the POM was accurate. (Klein Tr. at 38.) Moreover, despite Klein's contention that he does "not have the education, knowledge, or experience when it comes to matters like [securities offerings]," Klein did not employ anyone with expertise in this area to assist in drafting CCT's POM or other public statements. (SoF ¶29.) Instead, Klein claims he left the drafting of much of the POM to Nazon and Varughese, two "kids" – in Klein's estimation – whose experience raising capital was limited, as far as Klein knew, to raising money for ASC – money that had disappeared, along with ASC's principal, Paul Schmidt, without any explanation. (Klein Tr. at 27-30, 36-38.) At best, Klein's conduct was "'highly unreasonable'" and "represent[ed] 'an extreme departure from the standards of ordinary care,'" which this Circuit has made clear satisfies the scienter requirements applicable here. SEC v. McNulty, 137 F.3d at 741, quoting Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 46-47 (2d Cir. 1978).

   Regarding misstatements and omissions outside of CCT's POM, the record concerning Klein's scienter is similarly unequivocal. The record is clear that Klein was central to creating two separate Clean Care Entities and that he never disclosed to investors the existence of the two companies. (SoF ¶¶ 1, 3; Klein Tr. at 88-89.) Furthermore, Klein is responsible for numerous

misrepresentations in the press releases and by email, as described above. (See supra, Sec.
III.C.3.) Though he claims never to have seen the final releases, the record reflects
contemporaneous correspondence to Schwartz repeating certain of the very same
misrepresentations included in the bogus press releases. (Id.)

              b.     *Nazon's and Varughese's Scienter*

Evidence of Nazon's and Varughese's intent to deceive is overwhelming. Varughese,
who falsely signed his name "Varughese, M.D." when it suited his needs (SoF ¶13), admits to a
primary role in drafting the POM and press releases that the Defendants admit contained
numerous falsehoods. Varughese admits that when he drafted the language in the CCT POM
describing CCT's "exclusive" distribution rights, he did not believe CCT to have any such
exclusive rights at that time. (Varughese Tr. at 142-146.) Varughese also admits that he, along
with Nazon, devised a plan to give away some number of CCT stock for free to aggrieved ASC
investors, but never disclosed this free distribution to CCT investors. (Id. at 77-78, 84.)
Additionally, Varughese admits to drafting sales projections assuming a $30 average profit on
toilet seats he knew would be sold at a discount, or even given away for free. (Id. at 155-58,
170.). Varughese also admits to reviewing CCT's January 5, 2006 press release that boasted of
sales Varughese testified he knew had not occurred. (Id. at 199.)

Like Varughese, Nazon was right in the middle of the Clean Care Entities' dissemination
of false information. Nazon knew of, but never disclosed to investors, the existence of two
distinct Clean Care Entities. (Nazon Tr. at 79-80.) Nazon knew the projections sent to potential
investors were not "realistic." (Id. at 85.) He also was aware that CCT employed only
unregistered brokers making up to 15 percent commissions – in fact, he, along with Varughese,
ran the company, Focus Marketing, through which CCT paid any commissions – but

nevertheless sent investors a POM stating that CCT did not pay any commissions and employed

only registered broker-dealers. (Id. at 32, 96-97.)  In short, Nazon was acutely aware of the

falsity of Defendants' material misrepresentations, and intentionally disseminated these

falsehoods nonetheless.

**B.    The Court Should Permanently Enjoin Defendants From Future
       Securities Law Violations, Issue a Penny Stock Bar and Order
       Disgorgement and Civil Monetary Penalties**

   1.    The Court Should Issue a Permanent Injunction

   "A District Judge is vested with a wide discretion when an injunction is sought to prevent

future violations of the securities laws." SEC v. Martino, 255 F. Supp. 2d 268, 289 (S.D.N.Y.

2003) (citations omitted).  Furthermore, permanent injunctions against future violations of the

security laws may be granted on the Commission's motion for summary judgment. See SEC v.

Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978).  "[T]o award a permanent

injunction a court must find (1) past violations of the securities laws and (2) a reasonable

probability of future violations." SEC v. McCaskey, No. 98 CIV. 6153 (SWK), 2001 WL

1029053, at *5 (S.D.N.Y. Sept. 6, 2001).

   "In addressing the probability of future infractions, the Second Circuit has articulated

several relevant factors including: (1) scienter; (2) the isolated or persistent nature of the past

fraudulent acts; (3) the defendant's recognition of the wrongful nature of the past conduct; and

(4) the defendant's ability to commit future violations." Id. (citations omitted).  Here,

Defendants' scienter is clear.  (See supra, Sec. III.A.4.)

   Defendants' admitted conduct demonstrates that Defendants acted with a high degree of

scienter to defraud investors of nearly $2 million.  Nazon's and Varughese's history preceding

their involvement in Clean Care is rife with the sale of unregistered securities.  As Klein stated:

"It is now apparent that both Nazon and Varughese have been unlawfully selling securities for many years prior to Clean Care." (SoF ¶27.) Varughese sold securities in unregistered offerings for at least three companies before Clean Care (Varughese Tr. at 42-43, 62-63), and Nazon did the same for at least four previous entities. (Nazon Tr. at 11-27, 32-34.) Thus, Nazon's and Varughese's violations are only the most recent in what was a continuous pattern of securities laws violations.

As for Klein, not only did he orchestrate the fraudulent scheme, but he has continued to solicit investments into the Clean Care Entities even after he was made aware of the securities laws he was violating by his actions. (See Varughese Tr. at 220.) Klein's conduct shows blatant disregard for the wrongful nature of his actions, just as Varughese's and Nazon's repeated securities violations make clear their continuing disregard for the law.

     2.    <u>The Court Should Impose a Penny Stock Bar on the Defendants</u>

The Commission also seeks penny stock bars against the Defendants. Defendants here "participat[ed] in an offering of penny stock," as defined in Section 20(g)(2) of the Securities Act and 21(d)(6)(B) of the Exchange Act, because they engaged in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of CCT securities.[7]

When deciding to impose a penny stock bar, the court looks at essentially the same factors that govern the imposition of an injunction. These factors are (1) the egregiousness of the

---

[7] CCT securities are penny stocks because they do not fit within any of the exceptions from the definition of penny stock established by Section 3(a)(51) of the Securities Exchange Act of 1934 and Rule 3a51-1 thereunder. For instance, the respective issuers had net tangible assets and average revenue below the thresholds of Rule 3a51-1(g), the securities were priced at less than $5 (Rule 3a51-1(d)(1)), and the securities were not, among other things, NMS stocks as described in Rule 3a51-1(a).

underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur. SEC v. First Pacific Bancorp, 142 F.3d 1186, 1193 (9th Cir. 1998). For the reasons discussed in Section II.B.1, supra, the Commission respectfully submits that all of these factors favor awarding a penny stock bar in this matter.

3.       The Court Should Order Defendants to Disgorge Their Ill-Gotten Gains and Order Payment of Prejudgment Interest.

The Commission seeks disgorgement of all Defendants' profits from the fraud perpetrated on the CCT and Systems investors, in addition to prejudgment interest thereon. It is well settled that the Commission may seek, and courts may order, disgorgement of ill-gotten gains in Commission injunctive actions. See First Jersey, 101 F.3d at 1475 ("A district court has broad discretion in determining whether to order disgorgement and in calculating the amount of disgorgement."). Disgorgement is an appropriate means of "forcing a defendant to give up the amount by which he was unjustly enriched." CFTC v. Commonwealth Chemical Secs., Inc., 574 F.2d 90, 102 (2d Cir. 1978). Indeed, "the deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits. SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1104 (2d Cir. 1972).

The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation." First Jersey, 101 F.3d at 1475 (citation omitted). Once the SEC has shown the existence of a fraudulent scheme, defendants bear the burden of demonstrating they received less than the full amount allegedly misappropriated. SEC v. Benson, 657 F. Supp. 1122, 1133 (S.D.N.Y. 1987); see also SEC v. Patel, 61 F.3d 137, 139-140 (2d Cir. 1995) (any uncertainty in calculating disgorgement falls on the wrongdoer whose illegal

conduct created that uncertainty); SEC v. Inorganic Recycling Corp., No. 99 Civ. 10159 (GEL), 2002 WL 1968341, at *2 (S.D.N.Y. Aug. 23, 2002). Deductions from disgorgement for a defendant's overhead, commissions and other expenses incurred while conducting the fraudulent scheme are not warranted. SEC v. Dimensional Entertainment Corp., 493 F. Supp. 1270, 1283 (S.D.N.Y. 1980).

A court may enter a default judgment without conducting an evidentiary hearing when the evidentiary record is sufficient to establish the quantum of damages. Fustok v. Conticommodity Serv., Inc., 873 F.2d 38, 40 (2d Cir. 1989). Here, the record shows that Defendants were unjustly enriched by $1,933,403.75 –$716,927 contributed by CCT investors and $1,216,475.75 contributed by Systems' investor.[8] (SoF ¶38.) As co-participants in the fraudulent scheme, Defendants should be held jointly and severally liable for the full amount of disgorgement plus prejudgment interest thereon. SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1474 (2d Cir. 1996) ("[W]here a firm's . . . owner and chief executive officer has

---

[8] Pursuant to Rule 502 of Regulation D, the CCT and Systems offerings should be integrated. Rule 502(a) delineates the relevant factors in a determination as to whether an offering should be integrated: (1) whether the sales are part of a single plan of financing; (2) whether the sales involve issuance of the same class of securities; (3) whether the sales have been made at or about the same time; (4) whether the same type of consideration is being received; and (5) whether the sales are made for the same general purpose. As explained above, Clean Care Securities were sold pursuant to one combined financing scheme, were sold over the same period of time, for the same kind of consideration in order to fund one fraudulent toilet seat venture.

The issuers, Systems and CCT, should be integrated as well. Generally, the following factors are considered in determining whether issuers are subject to integration: (1) common control over the issuers; (2) a disregard for entity form; (3) the issuers are engaged in the same type of business; and (4) commingling of assets among the issuers. See Equity Programs Investment Corp.; 1978 SEC No-Act. Lexis 2236 (Nov. 28, 1978); see also Rathbone, King & Seeley, Inc., 1987 SEC No-Act. Lexis 1982 (Apr. 20, 1987). All of the factors are met here. Klein fully controlled both Systems and CCT, commingled the companies' accounts, and ran one business under the two company names.

collaborated in [unlawful] conduct and has profited from the violations . . . the court [may]

determine that the owner-officer too should be subject, on a joint and several basis, to the

disgorgement order.")

Courts have equitable discretion to award prejudgment interest on an amount to be

disgorged from a defendant. SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998). By awarding

prejudgment interest, the Court will deprive Defendants of the "time value" of the ill-gotten

gains derived from their wrongful conduct, and thus prevent their unjust enrichment. SEC v.

Stephenson, 732 F. Supp. 438, 439 (S.D.N.Y. 1990).

The Second Circuit has explained when prejudgment interest is appropriate:

> In deciding whether an award of prejudgment interest is warranted,
> a court should consider (i) the need to fully compensate the
> wronged party for actual damages suffered, (ii) considerations of
> fairness and the relative equities of the award, (iii) the remedial
> purpose of the statute involved, and/or (iv) such other general
> principles as are deemed relevant by the court. In an enforcement
> action brought by a regulatory agency, the remedial purpose of the
> statute takes on special importance. When the SEC itself orders
> disgorgement, which … is designed to strip a wrongdoer of its
> unlawful gains, the interest rate it imposes is generally the IRS
> underpayment rate. … That rate reflects what it would have cost to
> borrow the money from the government and therefore reasonably
> approximates one of the benefits the defendant derived from its
> fraud.

First Jersey Securities, 101 F.3d at 1476 (citations omitted). The Commission respectfully

submits that all of these factors favor awarding prejudgment interest, and asks that the Court

award prejudgment interest at the IRS underpayment rate. The Commission calculated the total

prejudgment interest due at $125,255.48. (SoF ¶39.)

    4.    The Court Should Order Defendants to Pay Civil Monetary Penalties.

"Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the

Exchange Act, 15 U.S.C. § 78u(d), provide for the imposition of civil penalties, for any violation

of the Act involving 'fraud, deceit, manipulation, or deliberate or reckless disregard of a

regulatory requirement' that 'resulted in ... or created a significant risk of substantial losses."

SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007). Here, "[d]isgorgement

alone is an insufficient remedy, since there is little deterrent in a rule that allows a violator to

keep the profits if she is not detected, and requires only a return of ill-gotten gains if she is

caught." SEC v. Inorganic Recycling Corp., No. 99 Civ. 10159 (GEL), 2002 WL 1968341, at *4

(S.D.N.Y. Aug. 23, 2002). "Civil penalties are designed to punish the individual violator and

deter future violations of the securities laws." SEC v. Haligiannis, 470 F. Supp. 2d 373, 386

(S.D.N.Y. 2007); see also SEC v. Moran, 944 F. Supp. 286, 296 (S.D.N.Y. 1996).

To determine what civil penalties should be imposed, "courts look to a number of factors,

including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's

scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial

losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5)

whether the penalty should be reduced due to the defendant's demonstrated current and future

financial condition." Opulentica, 479 F. Supp. 2d at 331.

The penalty provisions set forth three tiers of penalties that a court may assess in a

Commission enforcement action. The third tier is applicable in cases – such as this one –where

the violations (1) involve fraud, deceit, manipulation, or deliberate or reckless disregard of a

regulatory requirement, and (2) directly or indirectly result in substantial losses or create a

significant risk of substantial losses to other persons. "Third tier" penalties are not to exceed the

greater of $120,000 ($600,000 for corporations) or the gross amount of defendant's pecuniary

gain. 15 U.S.C. §§ 77t(d)(2)(C) and 78u(d)(3)(B)(iii).[9]  Defendants' conduct satisfies the

requirements for imposing the maximum allowable penalty.  Among other things, Defendants

made material misrepresentations and omissions to investors to induce them to invest in a

fraudulent scheme, which deprived investors of nearly $2 million.  Where, as here, the only

factor that might potentially militate in a defendant's favor is an inability to pay, third tier

penalties should be imposed.  See Inorganic Recycling Corp., 2002 WL 1968341, at *4

("[Defendant]'s claims of poverty cannot defeat the imposition of a disgorgement order or civil

penalty.")

## IV.    CONCLUSION

The record in this case overwhelmingly and unequivocally demonstrates that Defendants

have violated Sections 5(a), 5(c) and 17(a) of the Securities Act, Section 10(b) of the Exchange

Act and Exchange Act Rule 10b-5.  Defendants Nazon and Varughese have violated, and

Defendant Klein has aided and abetted their violations of, Section 15(a) of the Exchange Act.

Because there are no genuine issues of material fact in dispute, the Commission respectfully

requests that its motion for summary judgment be granted in full against Defendants Klein,

Nazon and Varughese.  The Commission requests that the Court enter summary judgment

against Klein, Nazon and Varughese: (a) permanently enjoining Klein, Nazon and Varughese

from future violations of the federal securities laws; (2) holding them jointly and severally liable

for their ill-gotten gains and prejudgment interest thereon; (3) barring them from participating in

---

[9] The statute actually sets the penalties at lower amounts.  However, pursuant to the Debt
Collection Improvement Act of 1996, these amounts have been adjusted for inflation.  17 CFR §
201.1001.

any offering of penny stock; and (4) imposing civil penalties against each of them. A proposed
order has been filed herewith.

Dated: New York, NY
      June 16, 2008

Respectfully submitted,

By: _____

Michael D. Birnbaum
Valerie A. Szczepanik
ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281
Ph: (212) 336-0523 (Birnbaum)
Fax: (212) 336-1319

Of Counsel:
Meaghan Cheung
Teresa Rodriguez