UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,      :
                                         :
                             Plaintiff,  :
                                         :
       -against-                         :
                                         :
CLEAN CARE TECHNOLOGIES, INC.,           :
EDWARD KLEIN, AL NAZON and               :    08 Civ. 01719 (HB)
ANIL VARUGHESE,                          :    ECF CASE
                                         :
                            Defendants,  :
                                         :
              and                        :
                                         :
CLEAN CARE SYSTEMS, LLC,                 :
                                         :
                     Relief Defendant.   :
-----------------------------------------------------------------------x

## DECLARATION OF MICHAEL D. BIRNBAUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1.      I, Michael D. Birnbaum, pursuant to 28 U.S.C. 1746, declare as follows:

2.      I am over 18 years of age and am employed as an attorney in the enforcement division in the New York Regional Office of the Securities and Exchange Commission ("Commission").  I submit this Declaration in support of the Commission's Motion for Summary Judgment in the above-captioned matter.

3.      I make this Declaration based upon personal knowledge, information and belief.  The sources of my information and the bases of my beliefs are documents produced by the Defendants to the Commission staff, Defendants' respective Answers to the Complaint filed in this action, communications with Defendants, my review of the deposition testimony of Sheldon Schwartz, Anil Varughese, Al Nazon and Edward Klein, taken on April 24, 2008, May 13, 2008, May 15, 2008 and May 20, 2008, respectively, as well as Klein's investigative testimony, taken July 20, 2007.

4.      Attached hereto as Exhibit 1 is a true and correct copy of a Certificate of Formation for Clean Care Technologies, LLC dated November 14, 2005.

5.      Attached hereto as Exhibit 2 is a true and correct copy of a New Jersey Division of Revenue Public Records Filing for New Business Entity dated March 8, 2006.

6.      Attached hereto as Exhibit 3 is a true and correct copy of a Private Offering Memorandum for Clean Care Technologies, Inc. ("CCT").

7.      Attached hereto as Exhibit 4 is a true and correct copy of a list of CCT investors provided and annotated by CCT counsel.

8.      Attached hereto as Exhibit 5 is a true and correct copy of a January 6, 2008 New Jersey Division of Revenue Public Records Filing for New Business Entity filed for Clean Care Systems, LLC ("Systems").

9.      Attached hereto as Exhibit 6 is a true and correct copy of the relevant pages of Systems'

July 16, 2007 Bank Statement Detail.

10.     Attached hereto as Exhibit 7 is a true and correct copy of the relevant pages of CCT's

Bank Statement Detail, dated August 31, 2007.

11.     Attached hereto as Exhibit 8 is a true and correct copy of a June 12, 2007 Email from

Anil Varughese to roelof@eyegiene.nl.

12.     Attached hereto as Exhibit 9 is a true and correct copy of the Verified Complaint in the

action titled Schwartz, et al. v. Klein, et al.

13.     Attached hereto as Exhibit 10 is a true and correct copy of a Settlement Agreement &

Closing Statement relating to the action titled Schwartz, et al. v. Klein, et al.

14.     Attached hereto as Exhibit 11 is a true and correct copy of the Answer to the

Commission's Complaint filed by Defendant Al Nazon in the instant action.

15.     Attached hereto as Exhibit 12 is a true and correct copy of the Answer to the

Commission's Complaint filed by Defendant Anil Varughese in the instant action.

16.     Attached hereto as Exhibit 13 is a true and correct copy of the Answer to the

Commission's Complaint filed by Defendant Edward Klein in the instant action.

17.     Attached hereto as Exhibit 14 is a true and correct copy of a May 16, 2008 email sent

from Defendant Klein to Michael Birnbaum.

18.     Attached hereto as Exhibit 15 is a true and correct copy of an April 9, 2008 Cover Letter

Enclosing Klein's Answer to the Commission's Complaint.

19.     Attached hereto as Exhibit 16 is a true and correct copy of relevant pages from the

Transcript of Klein's July 20, 2007 Investigative Testimony.

20.    Attached hereto as Exhibit 17 is a true and correct copy of a January 5, 2007 CCT Press Release.

21.    Attached hereto as Exhibit 18 is a true and correct copy of a January 2, 2007 email from Klein to Sheldon Schwartz.

22.    Attached hereto as Exhibit 19 is a true and correct copy of a July 1, 2006 CCT Press Release.

23.    Attached hereto as Exhibit 20 is a true and correct copy of a June 15, 2006 email from Klein to Sheldon Schwartz.

24.    Attached hereto as Exhibits 21, 22, 23 and 24 are true and correct copies of relevant pages from the transcripts of deposition testimony for Sheldon Schwartz (Ex. 21), Anil Varughese (Ex. 22), Al Nazon (Ex. 23) and Edward Klein (Ex. 24), taken on April 24, 2008, May 13, 2008, May 15, 2008 and May 20, 2008, respectively.

25.    Attached hereto as Exhibit 25 is a true and correct copy of the Commission's prejudgment interest calculations.

Pursuant to 28 U.S.C. §1746, I, Michael D. Birnbaum, declare under penalty of perjury that the foregoing is true and correct.

Executed on June 16, 2008
New York, New York

Michael D. Birnbaum

3

# – State of New Jersey –

# Limited Liability Company

# Certificate of Formation

**First:**        The name of the limited liability company is Clean Care Technologies, LLC.

**Second:**    The address of its registered office in the State of New Jersey is 335 West State Street, New Jersey, 07608-1001.  The name of the registered agent at such address is on file at the Division of Revenue, in the State of New Jersey.

**Third:**       The limited liability company shall be managed by one or more Managing Board Members.

          **In Witness Whereof**, the undersigned had executed this Certificate of Formation of Clean Care Technologies, LLC this 14th day of November, 2005.

By:    _Edward Klein_
Edward B. Klein
President

State of New Jersey
Division of Revenue
Delivered 11:42 AM 11/14/05
Filed 11:42 AM 11/14/05
SRV 1621710 – 3058335 FILE

---

Clean Care Technologies, LLC.

## SUMMARY OF BENEFITS:

- Fully automatic operation (sensor driven).
- Rotation takes 10 seconds.
- The seat is hygienically cleaned and dry in less than 10 seconds.
- No electricity or water supply needed.
- The fully charged battery will operate at least 1400 times.
- The seat fits on all lavatory pans.
- 1 year complete guarantee.
- Installation in an instant, no tradesmen needed.
- Easy maintenance.





Wave bacteria goodbye!



Simple Refilling of Solution.



The battery is easy to replace



Eyegiene Sensor.

OK

### TECHNICAL DATA:

- The hygiene status is indicated with coloured lights in the control panel:
  *Green:* ready for use.
  *Orange:* cleaning process taking place.
  *Blue:* replenish fluid/fluid needs topping up.
  *Red:* replace battery.
- The rechargeable battery is easily replaced by opening the right side of the unit. This can be done with a special key. The battery can be removed with its cover and the new battery inserted right away. The battery can be recharged at least 300 times.
- The blue lamp lights up when there is still 0.3 litres of fluid left.
- Refilling with fluid is very simple. Using the same special key, the left side can be opened and the bottle with its special stopper clicked into the opening.
- The 2 small wipers in the mechanism need to be replaced 2x per year on average, which is a simple operation.
- A full tank of fluid is enough for 1800 rotations.
- Dimensions: length - 55 cm, breadth – 45 cm, height - 24 cm, depth just 10 cm.
- Weight – 4.7 kg.

Mar 08'06 01:27p    Serico & Dubnik, PC    Mar  8 2006  13:35    p.2
7328751183

Nail to: 340 Box 308    **STATE OF NEW JERSEY**    Overnight to: 225 West State M
Trenton, NJ 08624    **DIVISION OF REVENUE**    3rd Floor
Trenton, NJ 08608 1001

## PUBLIC RECORDS FILING FOR NEW BUSINESS ENTITY
*(Fee Required)*

Fill out all information below INCLUDING INFORMATION FOR ITEM 11, and sign in the space provided. Please note that once filed, this form constitutes your original certificate of incorporation/formation/registration/authority, and the information contained in the filed form is considered **public**. Refer to the instructions for delivery/return options, filing fees and field-by-field requirements. Remember to remit the appropriate fee amount. Use the attachments if more space is required for any field, or if you wish to add articles for the public record.

1. Business Name    CleanCare Technologies, Inc

2. Type of Business Entity    D P.    3. Business Purpose :  Janitorial Supplies
(See Instructions for Codes, Page 21, Item 2)    (See Instructions, Page 22, Item 3)

4. Stock (Domestic Corporations only, LLCs and Non-Profit leave blank)    5. Duration (If Indefinite or Perpetual, leave blank)
1000

6. State of Formation/Incorporation (Foreign Entities Only)    7. Date of Formation/Incorporation (Foreign Entities Only)

8. Contact Information
Registered Agent Name    Edward B Klein

**FILED**
**MAR 0 8 2006**
**STATE TREASURER**

Registered Office    Main Business or Principal Business Address
(Must be a New Jersey street address)

Street  27 West Parsonage Way    Street

City  Manalapan    Zip  07726    City    State    Zip

9. Management (Domestic Corporations and Limited Partnerships Only)
   - For-Profit and Professional Corporations list initial Board of Directors, minimum of 1.
   - Domestic Non-Profits list Board of Trustees, minimum of 3.
   - Limited Partnerships list all General Partners

| Name | Street Address | City | State | Zip |
|------|----------------|------|-------|-----|
| Edward B Klein | 27 West Parsonage Way | Manalapan | NJ | 07726 |

The signatures below certify that the business entity has complied with all applicable filing requirements pursuant to the laws of the State of New Jersey.

10. Incorporators (Domestic Corporations Only, minimum of 1)

| Name | Street Address | City | State | Zip |
|------|----------------|------|-------|-----|
| Edward B Klein | 27 West Parsonage Way | Manalapan | NJ | 07726 |

Signature(s) for the Public Record (See instructions for information on Signature Requirements)

| Signature | Name | Title | Date |
|-----------|------|-------|------|
| | Edward B Klein | President | 3/8/06 |

S 1669554
J 3143740

- 23 -

0100959811

**STATE OF NEW JERSEY**
**DEPARTMENT OF TREASURY**
**FILING CERTIFICATION (CERTIFIED COPY)**

*CLEANCARE TECHNOLOGIES, INC.*

*I, the Treasurer of the State of New Jersey, do hereby certify, that the above named business did file and record in this department the below listed document(s) and that the foregoing is a true copy of the*
*Certificate of Incorporation*
*as the same is taken from and compared with the original(s) filed in this office on the date set forth on each instrument and now remaining on file and of record in my office.*

*IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal at Trenton, this 26th day of July, 2007*

*Bradley Abelow*

Bradley Abelow
State Treasurer

*DO NOT COPY OR DUPLICATE*



**IRA APPROVED**

# CLEAN  CARE  TECHNOLOGIES

## $10,000,000



### 100 UNITS

### Unit Purchase Price: $100,000

### Each Unit Consisting of 40,000 Series A Preferred Membership Interests

### Total Offering Consisting of 4,000,000 Series A Preferred Membership Interests

This Confidential Private Offering Memorandum (this "Memorandum") relates to the offer and sale (the "Offering") by Clean Care Technologies, a New Jersey limited liability (sometimes referred to as the "Company", "we", "us", or "our") of a total of 100 units (the "Units"), each Unit consisting 40,000 series A preferred limited liability membership interests (the series A preferred limited liability membership interests are referred hereinafter individually as a "Series A Preferred Membership Interest" and collectively as the "Series A Preferred Membership Interests"). The 100 Units offered consist of a total 4,000,000 Series A Preferred Membership Interests. The proceeds of this Offering will be applied by Clean Care Technologies for (i) inventory costs, (ii) advertisings costs, (iii) shipping, handling and warehousing costs, and operating expenses of the offering together with associated legal and accounting fees.

| Price Per Unit | Number of Units | Discounts and Commissions | Net Proceeds To The Company Per Unit | Total Net Gross Proceeds To The Company |
|---|---|---|---|---|
| $100,000 | 100 | $-0- | $100,000 | $10,000,000 |

---

[1] The offer and sale of the Units pursuant hereto made through the efforts of our corporate officers pursuant to federal "issuer exemption" and corresponding state equivalents.

[2] The offer and sale of the Units pursuant hereto made through broker-dealers who are registered with the National Association of Securities Dealers, Inc. is 10% from the Company. The Company may also pay incentive compensation to registered broker-dealers in the form of Common Stock or stock options in the Company.

*( This page has intentionally been left blank. )*

## GENERAL NOTICES

THE UNITS AND THE SERIES A PREFERRED MEMBERSHIP INTERESTS COMPRISING THE UNITS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGED COMMISSION (THE SEC") OR ANY SECURITIES REGULATORY AUTHORITY OR ANY STATE, NOR HAS THE SEC OR ANY SUCH AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM, AND IT IS NOT INTENDED THAT ANY OF THEM WILL. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THIS OFFERING IS BEING MADE IN RELIANCE UPON THE AVAILABILITY OF AN EXEMPTION FROM THE REGISTRATION PROVISIONS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS FOR TRANSACTIONS NOT INVOLVING A PUBLIC OFFERING BY AN ISSUER. IT IS INTENDED THAT THIS OFFERING COMPLY WITH THE PROVISIONS OF SECTION 4(2) OF THE SECURITIES ACT AND RULE 506 OF REGULATION, C.F.R.250.501 et. seq. ADOPTED BY THE SEC UNDER THE SECURITIES ACT, AND THAT THE UNITS BE OFFERED AND SOLD TO A LIMITED NUMBER OF INVESTORS WHO CONSTITUTE EITHER "ACCREDITED INVESTORS" WITHIN THE MEANING OF REGULATION D OR WHO ARE OTHERWISE KNOWLEDGABLE, EXPERIENCED AND "SOPHISTICATED" IN BUSINESS AND FINANCIAL MATTERS. PROSPECTIVE INVESTORS, ACCORDINGLY, WILL BE REQUIRED TO MAKE CERTAIN REPRESENTATIONS REGARDING THEIR RESPECTIVE QUALIFICATIONS AS EITHER ACCREDITED INVESTORS OR THEIR BUSINESS AND FINANCIAL, SOPHISTICATION, INCLUDING THEIR INCOME AND NET WORTH, THEIR UNDERSTANDING OF THE TERMS AND CONDITIONS OF THIS OFFERING, THEIR KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS, AND THEIR ABILITY TO SUSTAIN AND MAINTAIN AN ILLIQUID INVESTMENT AND TO SUSTAIN A LOSS OF ALL OR SUBSTANTIALLY ALL OF THEIR INVESTMENT IN THE UNITS. RISKS INVOLVED IN THE PURCHASE OF THE UNITS OFFERED HEREBY INCLUDE, AMONG OTHERS, THE RISK THAT (i) THERE IS NO PUBLIC OR OTHER MARKET FOR THE SECURITIES OF THE COMPANY, NOR IS SUCH A MARKET EXPECTED TO DEVELOP, AND (ii) NEITHER THE ENTITY NOR THE SERIES A PREFERRED MEMBERSHIP INTERESTS COMPROMISING THE UNITS MAY BE TRANSFERRED OR RESOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION THEREFROM. FOR THESE REASONS, AN INVESTOR MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT AND TO RETAIN ITS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. ACCORDINGLY IN DETERMINING WHETHER AN INVESTOR CAN BEAR THE ECONOMIC RISK OF THIS INVESTMENT, AN INVESTOR SHOULD CONSIDER, AMONG OTHER FACTORS, WHETHER SUCH INVESTOR CAN AFFORD TO HOLD SUCH UNITS FOR AN INDEFINITE PERIOD, AND

WHETHER AT THE TIME OF INVESTMENT SUCH INVESTOR CAN AFFORD A COMPLETE LOSS OF INVESTMENT.

NEITHER THE UNITS NOR THE SERIES A PREFERRED MEMBERSHIP INTERESTS COMPROMISING THE UNITS MAY BE RESOLD, TRANSFERRED OR OTHERWISE DISPOSED OF BY AN INVESTOR WITHOUT THE CONSENT OF OUR MANAGING MEMBER AND UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO OUR MANAGING MEMBER, REGISTRATION UNDER APPLICALBE FEDERAL AND STATE SECURITIES LAWS IS NOT REQUIRED, OR UNLESS SUCH DISPOSITION IS MADE IN COMPLIANCE WITH SUCH REGISTRATION REQUIREMENTS. SEE THOSE RISK FACTORS IN THE "RISK FACTORS" SECTION OF THIS OFFERING MEMORANDUM ENTITILED: "THERE IS NO PUBLIC TRADING MARKET FOR YOUR UNITS" AND "YOUR UNITS HAVE LIMITED TRANSFERABILITY AND LACK LIQUIDITY."

THIS MEMORANDUM DOES NOT CONSTITUE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY UNITS IN ANY JURISDICTION IN WHICH SUCH AN OFFEROR SOLICITATION WOULD BE UNLAWFUL. ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM OR THE INFORAMTION CONTAINED HERIN, IN WHOLE OR IN PART, OR THE DISCLOSURE OR ANY OF ITS CONTENTS TO UNAUTHORIZED PERSONS, WITHOUT OUR PRIOR WRITTEN CONSENT IS EXPRESSLY PROHIBITED. EACH PROSPECTIVE INVESTOR, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN THIS MEMORANDUM AND ALL RELATED OFFERING MATERIALS TO US UPON REQUEST, OR PROMPTLY UPON MAKING A DECISION NOT TO INVEST IN THE UNITS.

BY ACCEPTING DELIVERY OF THIS MEMORANDUM, THE RECIPIENT AGREES TO KEEP THE CONTENTS HEREOF, AND ANY INFORMATION OBTAINED BY SUCH PERSON IN CONNECTION HEREWITH, IN STRICTEST CONFIDENCE.

NO ADVERTISING OR OFFERING LITERATURE IN ANY FORM MAY BE EMPLOYED IN THE OFFERING OF THE UNITS, EXCEPT FOR THIS MEMORANDUM. NO PERSONS OTHER THAN OUR MANAGING DIRECTORS ARE AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, ANY SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON. STATEMENTS CONTAINED HEREINAS TO THE CONTENTS OF ANY AGREEMENT OR OTHER DOCUMENTS ARE SUMMARIES AND, THEREFORE, ARE NECESSARILY SELECTIVE AND INCOMPLETE. COPIES OF THE DOCUMENTS REFERRED TO HEREIN MAY BE OBTAINED FROM US, AND ARE AVAILABLE FOR INSPECTION AT OUR OFFICES. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALES MADE HEREUNDER, UNDER ANY CIRCUMSTANCES, SHALL CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION CONTAINED HEREIN SINCE THE DATE HEREOF. HOWEVER,

IN THE EVENT OF ANY MATERIAL CHANGE, THIS MEMORANDUM WILL BE AMENDED OR SUPPLEMENTED ACCORDINGLY.

THE CONTENTS OF THIS MEMORANDUM IS NOT TO BE CONSTRUED AS TAX, LEGAL, INVESTMENT OR OTHER ADVICE. EACH INVESTOR SHOULD CONSULT HIS OWN COUNSEL, ACCOUNTANT, OR TAX OR BUSINESS ADVISOR AS TO TAX, LEGAL, AND RELATED MATTERS CONCERNING THIS INVESTMENT.

PURCHASE OF THE UNITS CAN BE CONSUMMATED ONLY BY ACCEPTANCE BY CLEANCARE TECHNOLOGIES OF OFFERS TO PURCHASE UNITS, WHICH ARE TENDERED, TO THE US BY PROSPECTIVE INVESTORS. NO SOLICITATION OF ANY SUCH OFFER (INCLUDING ANY SOLICITATION WHICH MAY BE CONSTRUED AS AN "OFFER" UNDER FEDERAL AND/OR STATE SECURITIES LAWS) TO SUCH PROSPECTIVE INVESTORS IS AUTHORIZED WITHOUT OUR PRIOR APPROVAL. CLEAN CARE TECHNOLOGIES RESERVES THE RIGHT TO REVOKE THE OFFER MADE HEREBY AND TO REJECT ANY OFFER TO PURCHASE THE SECURITIES BY ANY PROSPECTIVE INVESTOR, IN WHOLE OR IN PART, AND ANY PROCEEDS FROM SUBSCRIPTIONS WHICH ARE NOT ACCEPTED WILL BE RETURNED WITHOUT INTEREST OR DEDUCTION. WE RESERVE THE RIGHT TO REJECT ANY SUCSCRIPTIONS FOR THESE SECURITIES, IN WHOLE OR IN PART, IN OUR SOLE DISCRETION, AND THE OFFER OF THE SECURITIES MADE HEREBY IS SPECIFICALLY MADE SUBJECT TO THE CONDITIONS SET FORTH HEREIN AND IN THE SUBSCRIPTION AGREEMENT.

THIS MEMORANDUM HAS BEEN PREPARED FOR THE EXCLUSIVE USE AND BENEFIT OF PROSPECTIVE INVESTORS. UNDER NO CIRCUMSTANCES SHALL THIS MEMORANDUM CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY UNLESS (i) THE PROSPECTIVE INVESTOR TO WHOM THIS MEMORANDUM IS GIVEN SATISFIES THE SUITABILITY STANDARDS STATED HEREIN AND (ii) THE PROSPECTIVE INVESTOR'S NAME AND MEMORANDUM IDENTIFICATION NUMBER ARE INSERTED IN THE SPACE PROVIDED ON THE COVER PAGE.

WE SHALL, PRIOR TO THE SALE OF ANY UNITS, ALLOW EACH INVESTOR OR ITS AGENT, REPRESENTATIVE, ACCOUTANT AND ATTORNEY THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM PERSONS AUTHORIZED TO ACT ON BEHALF OF CLEANCARE TECHNOLOGIES (OUR DIRECTORS) CONCERNING ANY ASPECT OF THE INVESTMENT AND TO OBTAIN ANY ADDITIONAL INFORMATION (TO THE EXTENT WE POSSESS SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE) NECESSARY TO VERIFY THE ACCURACY OF THE INFORAMTION CONTAINED IN THIS MEMORANDUM. INVESTORS OR THEIR REPRESENTATIVES HAVING QUESTIONS OR DESIRING ADDITIONAL INFORMATION SHOULD CONTACT OUR INVESTOR RELATIONS DEPARTMENT.

## NOTICE TO RESIDENTS OF ALL STATES

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE UNITS HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY FURTHERMORE, NO SUCH AUTHORITIES HAVE CONFIRMED EITHER THE ACCURACY OR ADEQUACY OF THE CONTENTS OF THIS DOCUMENT. ANY REPRESENTATION TO TE CONTRARY IS UNLAWFUL.

THIS PRIVATE OFFERING MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY ARE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS OF DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

# TABLE OF CONTENTS

SUMMARY OF THE OFFERING . . . . . . . . . . . . . . . . . . . . . . . . . . 8

RISK FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Management And Transferability Risks . . . . . . . . . . . . . . . . . 10

    General Business And Investment Risks . . . . . . . . . . . . . . . . 11

    Risks Associated With The Offering . . . . . . . . . . . . . . . . . . 12

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

COMPANY OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    Industry Overview . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

PRESS RELEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

INITIAL STUDIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    Communicable Diseases . . . . . . . . . . . . . . . . . . . . . . . . 24

    Market Strategy . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

MANAGEMENT TEAM . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

FINANCIAL STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    Chart 1 – Individual Master Dealer Gross Profit Projection . . . . . . . . 29

    Chart 2 – Company's Gross Profit Projection . . . . . . . . . . . . . . 31

Chart 3 – Projected Statement Of Expenses . . . . . . . . . . . . . . . . . 33

Chart 4 – Projected Statement Of Revenue And Expenses . . . . . . . . 35

Chart 5 – Cash Flow Statement . . . . . . . . . . . . . . . . . . . . . . . . 37

CERTIFICATE OF FORMATION . . . . . . . . . . . . . . . . . . . . . . . . 39

*Questions and requests for additional information should be directed to the following:*

**CLEAN CARE TECHNOLOGIES**
**4400 Route 9 South, Suite 1000**
**Freehold, NJ 07728**
**Tel:  (732) 303-7890**
**Fax: (732) 462-9149**
**E-mail:    Eklein@cleancaretech.com**
**Website:   http://www.cleancaretech.com**

# SUMMARY OF THE OFFERING

Securities Offered .................    100 units ("Units") each unit consisting of 40,000 series A preferred limited liability membership interests in Clean Care Technologies, a State of New Jersey Corporation (sometimes referred to as the "company" "we", "us", or "our") The total Offering is comprised of 4,000,000 Series A Preferred Membership Interests [See "Description of Securities"]

Size of Offering ...................    100 Units ($10,000,000) [See "Description of Securities"]

Nature of Offering;
Subscription Period...................    The Offering is being made by the company on a "best efforts" basis. Closings will take place from time to time as subscriptions are received and accepted by the Company and for a period commencing upon the date of this Memorandum and terminating thirty-six (36) months thereafter.

Placement............................    This Offering is being placed by the corporate officers of Clean Care Technologies on behalf of the company pursuant to the federal "issuer exemption" and corresponding state equivalents. There will not be any commissions payable or paid in connection herewith. The offer and sale of the Units made through broker-dealers who are registered with the National Association of Securities Dealers, Inc. is 10% from the Company. The Company may also pay incentive compensation to registered broker-dealers in the form of Common Stock or stock options in the Company.

Investor Suitability.................    Sales of the Units shall be made only to (1) 35 or fewer individuals and/or entities who/which qualify, either alone or their purchaser representative as sufficiently knowledgeable and experienced in business and financial matters such that they are capable of evaluating, understanding,

and assuming the relative risks and merits of the Offering, and (2) an unlimited number of "accredited investors" as defined in Rule 501(a) under the Securities Act. Each prospective investor shall be required to submit an investor questionnaire that shall be utilized by us in evaluating and determining suitability and qualification, and shall be further upon by us in lawfully qualifying this Offering for exemption from registration. [See "Investor Suitability Standards"]

Risk Factors ................... See "Risk Factors" beginning on page ten and other information included in this confidential Equity Offering for a discussion of issues you should consider before deciding to invest in the common stock.

Use of Proceeds................. The Company is currently seeking to raise $10,000,000. The net proceeds of the initial capitalization will be used for working capital, capital expenditures, marketing campaign to establish relationships with national corporate accounts by providing product and installation at no cost to the client, expansion of service and training facilities, expansion of the Company's sales, marketing and support staff, creation of brand name awareness of Eyegiene Seat, through the use of print and TV media, research and development activities.

# RISK FACTORS

**The securities offered hereby are speculative and involves risk, and should not be purchased by persons or entities who/which cannot afford the loss of their entire investment. In addition to the other information contained in this Memorandum, you should carefully consider the following risk factors before investing in the Units.**

**Marketability and Transferability Risks**

THIS OFFERING IS ONLY SUITABLE FOR LONG-TERM INVESTORS BECAUSE THERE IS NO PUBLIC TRADING MARKET FOR SECURITIES SOLD IN THIS OFFERING AND ANY INVESTMENT IN THESE SECURITIES WILL LACK LIQUIDITY.

There is no public trading market available for the Series A Preferred Membership Interests comprising the Units or the Common Membership Interests into which they are convertible, and we do not anticipate that a public trading market will ever develop for these securities. As a result of this lack of liquidity, you may find it difficult to sell your Membership Interests (whether Series A Preferred or Common), and you will likely have to wait to realize any gain on your investment, to the extent that one is realized at all, until you either (i) receive a dividend approved by the management, and/or (ii) the Series A Preferred Membership interest are bought by a larger corporate entity or is merged into another entity. For this reason, you should consider investment into these securities a long-term investment.

THIS OFFERING IS ONLY SUITABLE FOR LONG-TERM INVESTORS BECAUSE THE SERIES A PREFERRED MEMBERSHIP INTEREST SOLD IN THIS OFFERING (AND THE COMMON MEMBERSHIP INTEREST INTO WHICH THEY ARE CONVERTIBLE) WILL CONSTITUTE RESTRICTED SECURITIES.

Neither the Series A Preferred Membership Interests to be issued in this Offering nor the Common Membership Interests into which they are convertible, have been registered under the Securities Act or registered or qualified under any state securities or "Blue Sky" law. The Series A Preferred Membership Interests are being sold pursuant to exemptions contained in and under those laws. Accordingly, the Series A Preferred Membership Interests sold in this Offering will constitute "restricted securities" as defined in Rule 144 promulgated under the Securities Act. This means that they must be held indefinitely unless (i) they are registered under applicable federal and state securities laws, or (ii) an exemption from the registration requirements of those laws is available. The certificates representing the Series A preferred Membership Interests issued pursuant hereto will contain a legend reflecting their restricted status.

Although it may be possible under certain circumstances to sell in a private resale, it is unlikely to be possible for at least two years, and, even then, the suitability standards

---

applied to you upon the purchase of the securities in this Offering may also be applied to persons to whom you wish to transfer the securities. In the meantime, you should be aware that Rule 144, which permits the resale, subject to various terms and conditions, of limited amounts of restricted securities after they have been held for one year, does not now apply to the Company because we are not now required to file, and do not file, current reports under the Securities Exchange Act of 1934 and because information concerning the Company substantially equivalent to that which would be available if we were required to file such reports is not now publicly available. It is highly unlikely, moreover, that the Company will ever become a reporting entity in the future.

As a result of their restricted status, you may find it very difficult to sell your Membership Interests (whether Series A Preferred or Common), and you will likely have to wait to realize any gain on your investment, to the extent that one is realized at all, until either (i) you receive distributions in accordance with the terms of our Subscription Agreement, and/or (ii) we liquidate the Company. For this reason, you should consider an investment in these securities as a long-term investment.

THIS OFFERING IS ONLY SUITABLE FOR LONG-TERM INVESTORS BECAUSE THESE ARE A SIGNIFICANT RESTRICTION ON TRANSFERABILITY OF OUR MEMBERSHIP INTEREST, WHICH MAY PROHIBIT YOU FROM SELLING THEM.

In accordance with our Subscription Agreement, a copy of which is annexed hereto as Exhibit A, our members ("Members") may not transfer or pledge all or any part of their non-economic rights as a Member (including voting rights) without a vote of two-thirds of our Members are in favor of such a transfer of pledge. In the event that you acquire our Membership Interests, therefore, and are able to find a private buyer for them, you may still be prohibited from proceeding with any such sale.

As a result of this restriction, you may find it very difficult to sell your Membership Interests (whether Series A Preferred or Common), even in the event of an emergency, and you will likely have to wait to realize any gain on your investment, to the extent that one is realize at all, until either a (i) you receive distributions in accordance with the terms of our Subscription Agreement, and/or (ii) we liquidate the Company. You should know that your Membership Interests are probably not likely to be accepted as collateral for a loan. For these reasons, you should consider an investment in these securities as a long-term investment.

## GENERAL BUSINESS & INVESTMENT RISKS

### WE HAVE NO OPERATING HISTORY AND HIGHLY UNCERTAIN PROSPECTS FOR PROFITABILITY.

We have no investment or operating history upon which potential investors may evaluate whether we will be successful in selecting well-performing investments or otherwise

---

developing our business, and there can be no assurance that we will be successful in this regard. If we are unable to generate gains on our investments, or unable to become profitable, it would have a materially adverse effect on our business, results of operations, financial condition and prospects.

## RISKS ASSOCIATED WITH THE OFFERING.

## THIS OFFERING IS BEING PLACED ON A "BEST EFFORTS" BASIS ONLY.

THIS OFFERING IS BEING PLACED ON A "BEST EFFORTS" BASIS ONLY.

The Units are being offered by the Company on a "best efforts" basis only. This means that there is no commitment, firm or otherwise, on the part of anyone to purchase any of the Units. In accordance with the terms of this Offering, we are entitled to close the sale of any Units sold at any time following receipt by us of subscriptions therefore without any minimum number of subscriptions first being received. Once we close on any Units, we may have subsequent closings for additional Units (or partial Units) from time to time thereafter, as our Management deems advisable in its discretion. As a result of this flexibility, we may not obtain all of the funds required to fund all of our proposed uses of proceeds as identified in the Estimated Use of Proceeds section of this Memorandum, and we may, therefore, find ourselves without sufficient working capital despite having closed on this Offering.

### *Risks Related to Our Business*

We have a limited operating history, which makes our future operating results difficult to predict.

We have limited our operations to date to the sale and installation of our products within a limited number of business markets. Accordingly, we have only a limited operating history upon which an evaluation of our business and prospects can be based. Our prospects must be considered in light of the risks and difficulties frequently encountered by companies in their early stages of development, particularly companies in new and rapidly evolving markets.

Our future success and ability to generate revenues depends on our ability to attract Dealers, corporate and business customers and if we fail to build a Master Dealership Network and user base, our business could suffer.

Our future success depends upon our ability to establish nationally an extensive Dealership Network. This ability depends, in part, upon the perceived value to business customers of the quality, personal and comprehensive nature of the products and services provided by us. There can be no assurance that we will attract a sufficient number of Dealerships and business customers and users to generate substantial revenues. If we are

unable to attract, retain and expand a loyal Dealership Network, we will be unable to generate additional revenues, which could cause the business to suffer.

If we are not able to successfully develop brand awareness of Eyegiene hygienic toilet seats, we may not be able to attract a significant number of Dealerships and business customers.

Developing and maintaining widespread national awareness of Eyegiene hygienic toilet seats is an important element of our business strategy. If we do not successfully promote and maintain widespread recognition of Eyegiene hygienic toilet seats, we may fail to become profitable. Successfully promoting Eyegiene hygienic toilet seats will depend largely on the effectiveness of our sales and marketing efforts.

### *Uncertainty of Financial Projections*

The Company's limited operating history makes financial forecasting and evaluation of its business difficult. As a result, the Company's financial projections included in this offering are based in large part on assumptions derived from the Company's management's experience and limited performance rather than long-term actual performance data and are subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the Company's control and could have a material adverse effect on the Company's business, financial condition and results of operation. These projections may not be as accurate as they would be if the Company had a longer operating history. The revenue and income potential of the Company's industry and business are unproven. Because of the emerging nature of the Company's industry and the fact that its business model is unproven, CLEAN CARE TECHNOLOGIES cannot determine trends that may emerge in its market or affect the business.

# INTRODUCTION

Clean Care Technologies distributes and markets unique self-cleaning toilet seats. The company's focus is on identifying public and commercial restrooms that need this type of product. Through the use of these revolutionary products, businesses and institutions can help eliminate the spread of germs, disease, bacteria, and also reduce their utility and overall janitorial costs.

## Sanitary Conditions: The Problem With Public Restrooms

Dirty, unsanitary conditions in restrooms are on the minds of everyone. Eyegiene Toilet Seats aid facility managers in addressing the situation and solidifies our relationship with them as a true consultative seller. With Eyegiene, issues such as a lack of cleanliness in the restroom, germs and cross contamination, can be solved easier than you think, and the payoff is well worth the effort.

According to a national survey of adults, more people are afraid of getting sick from germs in a public restroom than in any other public place.

Thirty-nine percent of respondents said they believed they were most likely to pick up other people's germs in a public bathroom. Restaurants came in next at 21 percent, followed by airplanes (20%), subways and trains (11%), and movie theaters (4%).

The survey was conducted by Opinion Research Corporation International on behalf of Kimberly-Clark Professional. Since germs and unsanitary conditions go hand-in-hand, it's not surprising that "unclean conditions" were most apt to lead to a bad impression of a public restroom, according to 66 percent of respondents. "No toilet paper" was a distant second (13%), followed by odors (11%).

Clean Care Technologies has successfully addressed these social, health, and cost control issues with the introduction of it's line of Eyegiene™ "sensor activated" hygienic toilet seats and our unique and revolutionary ClearCare Toilet Seat™. With a wave of the hand in front of the sensor, the Eyegiene Seat is automatically cleaned and disinfected with a patented hygienic solution, which dries in less than ten seconds and presents a fresh, clean, untouched hygienic surface for each use. Our second model, the Clean Care Seat provides a fresh sleeve of sanitized plastic called ClearWrap, which incases the seat and protects against bacteria from coming in contact with the user. ClearWrap is a comfortable, sanitary plastic sleeve made of high-density polyethylene, tested and approved by dermatologists. With each revolution, a full length of fresh ClearWrap encases the seat and a digital display informs the maintenance personnel when a new roll of ClearWrap is needed. Replacement of a new roll takes just a few seconds and the used roll is disposable in an environmentally-friendly way.

In order to achieve national expansion, the Company is presently implementing a program of Master Dealerships here in the United States, which shall establish a network of cooperative sales and marketing personnel. Within each Territory, the Master Dealer or Dealers (depending on the size and population of the Territory) will specifically target business and corporate complexes, public and private schools, casinos, hotels, airports, government buildings and health care organizations which include, but are not limited to, physician practice groups, independent physician associations, as well as hospital groups.

The Company will be retaining as corporate counsel the Venable Law Firm of Washington D.C. and Baltimore. Venable has already been instrumental in introducing the Company to the Veteran's Administration Hospital System (400 Hospitals).

The Venable Law Firm will also be assisting the Company in its application for inclusion in the Government Spending Act commonly known as GSA, and lobbying for an amendment and/or recommendation that all handicapped assisted restrooms provide hygienic toilet seat devices in accordance with the American Disabilities Act. Among others, the Venable firm represents the Marriott Corporation, A & P Corporate, Boeing Corporation, major nursing home facilities and other clients which will be instrumental in successfully placing our equipment in highly visible and profitable locations.

The Company is well positioned to capitalize on the problems and challenges that currently exist in the public and commercial restroom industry in the United States. The Company's goal and singular focus is to become the leading provider of hygienic toilet seats to business, industry and leading health care organizations within the United States and to become recognized as a leader in bringing significant improvements to the entire public restroom industry.

The key components of the Company's strategy to achieve these goals include the following:

Achieve critical mass growth by targeting selected national markets with a concentration on the health care industry, including but not limited to, hospitals, nursing homes, physicians' offices, clinics, laboratories, etc. The Company's future relationship with the VA Hospital Network, as described above, shall assist the Company in broadening its customer base in the health care industry.

By developing strategic relationships with national and international organizations, we will be able to maximize the Company's name recognition and generate account penetration. Our relationship with former Pennsylvania State Senator Bob Stewart, will enable us to initiate programs with McDonalds and Burger King corporate locations throughout the United States.

We will implement a brand recognition program by providing equipment and installation at no cost to high visibility/high volume locations (i.e. airport terminals, casinos, hotels, convention centers, etc.). This marketing strategy would establish a direct campaign to facilitate the ongoing sale of the most profitable portion of the Company's after sale market, namely Eyegiene Sanitary Solution and CleanWrap Plastic Refills.

We will expand direct and indirect sales efforts by increasing sales and marketing staffs to expedite the implementation of the Nationwide Dealership Network. The Company plans to establish 100 Master Dealers and an additional 300 Sub-Dealers.

We will achieve greater exposure and visibility within the American public, by enlisting the support of municipal and state officials to mandate that all public and commercial restrooms provide hygienic toilet seats, specifically the Eyegiene Seat, for their customers and employees. With the assistance of the Venable Law Firm, the Company shall enlist the support of state and federal agencies to amend the American Disabilities Act, to require and /or recommend the installation of hygienic toilet seats in all handicapped toilet facilities.

We will create and develop an interactive website to address the ever expanding e-Business-to-Business marketplace.

**CLEAN CARE TECHNOLOGIES** is a privately held Company, founded by Edward B. Klein, and incorporated in the State of New Jersey. The address of the principal executive office is 4400 Route 9 South, Suite 1000, Freehold, NJ 07728. The Company's main telephone number is (732) 303-7890 and fax number is (732) 462-9149. The Company's main website is www.cleancaretech.com.

The Company's e-mail address for suggestions is **Comments@cleancaretech.com.**

**Summary of Financial Data**
The following summary of financial results and projections for CLEAN CARE TECHNOLOGIES should be read in conjunction with, and are qualified in their entirety by reference to, Individual Master Dealer Gross Profit Projection (Years 1-8), Gross Profit Projection (Years 1-8), Projected Statement of Expenses (Years 1-8), Projected Statement of Revenue and Expenses (Years 1-8) and Cash Flow Statement of Changes in Financial Position (Years 1-8). The detailed compilation of the above mentioned Projection is attached as the Company's Financial Statements.

Projected Gross Revenues, Profits and Net Income: Years 1-8 – available at the end of this document.

**Market Dynamics – The Increasing Demand for Safe / Clean Public Restrooms**

According to the Health Care Financing Administration ("HCFA"), health care expenditures in the United States now exceed $1.2 trillion, representing 14% of the

---

Clean Care Technologies, LLC.
**- 16 -**

annual gross domestic product. As the impact of technology and services in the health care industry increase, the Company is well suited to serve this large and rapidly expanding market. In fact, Forrester Research estimates that on-line health care transactions are growing at a rate of 50% annually and will reach $348 billion by 2006. According to HMO/PPO Digest, 175 million lives will be covered by over 5,000 managed care organizations by 2006. The Company is well positioned to take advantage of the growing revenues associated with the health care industry through its marketing and sales efforts as more fully described below.

**Master Dealership Network Business Model**

A key component of the Company's strategy is the creation of a Master Dealership Network Business Model. The Network shall be comprised of experienced entrepreneurs, all of whom are currently engaged in complementary ventures that provide a substantial customer base. By securing a critical pool of potential customers, the Company shall demonstrate early success at the inception of the Network.

The Company has recognized the inherent benefit of establishing working relationships with providers of services directly related to the public / commercial restroom industry (i.e. janitorial supply, medical supply, restaurant supply, plumbing supply, construction contractors, restroom cleaning services, etc.). By doing so, the Company shall establish an immediate customer base for the installation of Eyegiene Seats and the after sale market of Eyegiene Liquid Solution and CleanWrap Plastic Refills.

After the Master Dealership Network becomes fully operational, the Company will expand public awareness by implementing a multi-dimensional (print / TV) advertising campaign. The Company intends to target national and international corporate accounts, which can be properly serviced through the teamwork and shared revenue of the Network members by commencing a direct marketing campaign to provide product and installation at little or no cost to the end user.

**Attractive and Profitable Revenue Model**

Eyegiene Seat – Provides the Company with revenues from a number of distinct sources. The implementation of the Master Dealership Network will provide the Company with immediate revenue derived from fees paid by Network members for their exclusive Territories. This model also enables the Company to realize substantial opportunities for recurring revenue from the continuous reorders of Eyegiene Solution, CleanWrap Plastic Refills and associated products. Direct sales via the brand name awareness campaign will be implemented by establishing working relationships with national and international accounts with high visibility / high volume locations (i.e. airport terminals, casinos, etc.). In doing so, the Company intends to provide initial products (seats) and installation at no cost to the end-user / customer.

The funding requirements of the Company will enable it to promote its product and services by offering the Eyegiene Seat at little or no cost to the end-user. This direct approach has proven successful in the public and commercial restroom industry for years, as witnessed by the paper towel and soap dispenser after product market. In addition, these "promotional" Eyegiene Seats will enhance consumer awareness of the Company's product line at a cost factor substantially less than that of the print, cable, and television advertising campaigns, which will be coordinated with the ever-growing public demand for residential restroom hygienics in a public / commercial setting.

**Seasoned Management Team**

To capitalize on this tremendous market opportunity, we have assembled a veteran and experienced management team with relevant expertise in marketing and sales. In particular, members possess the combined strength of executive leadership drawn from a variety of successful business enterprises.

Edward B. Klein, President, previously was President and a key architect of Fax Express, Inc. and shall be directly responsible for the implementation of the Master Dealership Network. Mr. Klein also headed the marketing and distribution side of North American Hygiene, as well as CleanCover, LLC. before starting Clean Care Technologies.

The Venable Law Firm (Corporate Counsel) of Washington D.C. and Baltimore, has been instrumental in introducing the Company to the Veteran's Administration Hospital system and shall provide the Company with limitless references to their clientele, federal and state agencies.

**Project Overview**

We are working on numerous objectives to accomplish the company's strict agenda:

The Company is presently working on presenting the product to: Marriot Hotels, Boyd Casinos, New York Port of Authority, O'Hare Airport, McDonalds and Burger King Restaurant Chains, The VA Hospital Network, State and Local Government Agencies. After the establishment of the Master Dealership Network, the Company intends to commence an aggressive public awareness campaign. Preliminary discussions have already begun with print, TV and cable media experts to implement such a program. An initial promotional video will be produced by the Company and will be available in video or CD-ROM format for viewing by potential Master Dealers and end-users.

# COMPANY OVERVIEW

CLEAN CARE TECHNOLOGIES (the "Company") exclusively distributes and markets Eyegiene Seat, the innovative "hands free" hygienic toilet seat in the United States.

Our Eyegiene Toilet Seat provides a clean, sanitary, germ-free surface for each individual user. By simply waving your hand before sitting down, the Eyegiene is cleaned and sanitized with a patented hygienic solution, which dries in less than ten seconds. This visible procedure eliminates the use of costly tissue seat covers or toilet paper, which are currently being used by most people to cover the seat before they sit down. We believe that once our product becomes visible to the American public, city and state health officials will make it mandatory that all public restrooms install the Eyegiene System.

Presently the Company has contracts with two manufacturers, who will be providing the Eyegiene and CleanCare Systems to CleanCare Technologies, exclusively for sale in the United States.

## INDUSTRY OVERVIEW
### Introduction

It's an established fact that both employees and customers are wary of utilizing public toilet seats. Until now, there was little one could do to avoid the issue. The very idea is likened to sharing a toothbrush or bath towel with coworkers or strangers. It's a risk that most people prefer not to take. In most settings, maintenance departments or janitorial personnel cannot be expected to clean toilets after every use. Paper liners, hand towels, and toilet tissue used to line the seats often clog the plumbing, and since it has always been a sensitive subject, "no one" was demanding a solution. Today, when managing a business with toilet facilities, safety and hygiene can no longer be ignored. Both employees and customers know there is an alternative and management is currently turning to CleanCare Technologies to help solve their problem.

### Manufacturing

The Eyegiene Seats and Clean Care Seats are manufactured in Asia. The quality control testing for the products will also be conducted on site.

### Patent and Trademark Protection

The Eyegiene Seat has worldwide patents pending, as well as the International Plumbing Code and EPA approval and CE (Central Europe) approval. The Eyegiene Seat has also passed the ANSI Standard in Europe and United States for use in heavy commercial buildings. The Eyegiene Seat has also passed the IAPMO Code.

# COMPETITION

Our competitors vary in size, in the scope and breadth of their products and services, and in their technical, financial and human resources.  Our principal competitors include: Hygolet, Brill Hygienic Products, Inc., Everclean, and Smart Flush.

In addition, the Company may face potential competition from companies that may enter the existing or future markets that provide similar or alternative services to ours.

The Company believes that the principal competitive factors in the market for hygienic toilet seats are:

> *Ability to effect meaningful change within the public restroom industry*

> *Ability to establish product branding with the public and / or end-user*

> *Ease of use, high adoption rate by users and reliability of the delivered product*

> *The reputation and experience of the professionals delivering the product and their ability to provide service in a timely fashion*

### *Hygolet USA*

Based in Deerfield Beach, Florida, Hygolet has been involved in the manufacture and sale of hygienic toilet seats for approximately 20 years.  While Hygolet has been relatively successful overseas (Europe and South America), their impact in the North American market has been negligible.  Hygolet's marketing strategy was predicated, for the most part, on mail order, with no established dealer network.  Hygolet had made inroads in the airport terminal markets, but due to major financial difficulties, they have experienced significant setbacks and are no longer present in Miami International Airport, Chicago O'Hare and Detroit Metro.  (We do not consider Hygolet a major competitor, for they are currently using the same outdated technology as they started out with 20 years ago).

### *Brill Hygienic Products, Inc.*

Alan Brill of Delray Beach, Florida, had previously been a distributor for Hygolet USA until the mid 1990's.  Thereafter, Brill commenced operations with a product, which allegedly infringed on the patents of Hygolet.  After years of litigation, Brill was required to modify its products.  Brill now focuses its marketing strategy in his local home state of Florida, with no apparent interest in any other markets.

---

*Smart-Flush*

Manufactured by Rosch Technologies of France, the Smart-Flush is a complete automatic toilet seat and toilet bowl system (sensor / electric based). The total cost of the Smart-Flush system is in excess of $2,500 per unit, plus installation charges and targets only commercial buildings currently under construction. Rosch intends to begin a consumer awareness campaign in the United States to educate the public about the risk of bacteria, which will underscore the benefits of the Eyegiene Seat. No Smart-Flush systems have been installed in the United States as of the date of this presentation.

## PRESS RELEASE

### Kimberly-Clark Pushes 'No-Touch' Bathrooms

Roswell, GA. – Cleaning service providers don't need to be told how important their work is.    In case a client or potential client doesn't know, ask them this: "The average office building tenant spends more than three workdays a year in the restroom.  Do you know how they spend the rest of their time?"

Towel-and-tissue producer Kimberly-Clark Corp. (NYSE: KMB) is dispensing information on avoiding germs – and telling consumers to look for bathrooms that utilize "no-touch" systems as a way to avoid contact with germs.

The company's Away from Home division is making the following suggestions:

Look for enclosed toilet paper systems that let you touch only the product you need, reducing the potential for cross-contamination.  Toilet paper in an enclosed system is also protected from dirt and moisture.

If you have a choice, pick a restroom with no-touch faucets and toilet flushing devices.  That way you can use the restroom without touching a lot of handles or levers that may harbor germs.

No-touch paper towel and no-touch soap systems offer the same benefits when washing hands.

Shut the faucet with a paper towel after washing your hands and also use it to open the door handle before throwing it away.

Try not to touch bathroom surfaces after you have washed your hands since germs can be spread to others via restroom fixtures, surfaces, faucets and product dispensers.

Kimberly-Clark is also urging people to wash hands thoroughly.

The company offers germ protection information at its Skin Wellness Institute Website.

---

Public restrooms frighten users

Atlanta – Nearly 30 percent of Americans avoid public restroom out of a fear of germs, according to a poll by tissue and towel giant Georgia-Pacific Corp. (NYSE: GP).

The survey also found that 40 percent of those who do use public restrooms, such as those in gas stations, flush with their feet as opposed to their hands.

Another 20 percent use towels to shield their hands form the objects and a full 60 percent of respondents say they don't touch a thing in public bathrooms. Those respondents say they squat over toilets instead of sit and simply don't touch any objects in the bathrooms.

Private bathrooms also raise germ fears, the survey uncovered. More than four out of every five respondents say they are concerned about germs in private and public bathrooms.

They survey results should underscore the necessity for keeping bathrooms clean since a clean bathroom will give a good public perception of your business or institution.

**ENews Daily**

# INITIAL STUDIES

**Communicable Diseases**

Medical research has shown that communicable diseases such as hepatitis, herpes and HIV can be transmitted via bodily fluids; therefore, making the use of public restrooms potentially hazardous.

The following are five pathogenic bacteria families found most frequently on the toilet seats of public restrooms, the percentage of seats that were infected and the possible disease resulting from exposure.

| Bacteria | Percentage | Disease |
|---|---|---|
| Micrococcaceae | 97% | Boils, pimples, pus infections |
| Coryneform | 81% | Diptheria, Hepatitis |
| Streptococcaceae | 39% | Epidemic sore throat, Bronchial pneumonia |
| Pseudomonadaceae | 22% | Urinary tract infections, Blood poisoning |
| Enterobacteriaceae | 19% | Kidney infections, Typhoid / Paratyphoid fever, Salmonella, Shigellosis |

In addition, trichomanas protozoa, which causes an infection of the lower genital area can be carried in a drop of urine and, if deposited on a toilet seat, will survive for up to 45 minutes.

Studies on the transmission of herpes virus conducted by Dr. Trudy Larson and Dr. Yvonee Bryson at the UCLA School of Medicine, determined that a secretion from an open herpes sore on the thigh or buttocks of a toilet seat user can be spread onto a toilet seat and survive up to four hours. The next toilet user could contract the virus through a break in the skin, which comes in contact with the seat.

The following are additional pertinent facts about the presence of the herpes virus in the American population:

*20 million Americans have incurable genital herpes.*

*The herpes virus, resulting in cold sores, infects 90% of humans.*

*1 in 10 Americans have herpes.*

# MARKET STRATEGY

It is apparent to Management that the most logical method of expanding our customer base and market presence is to establish both public awareness and demand. To date, hygienic toilet seats have not been marketed properly in the United States.

The Company has commenced an aggressive marketing plan to establish a Master Dealership Network throughout the United States. By attending a number of tradeshows around the country, numerous relationships have already been established by the Company to begin implementing the Master Dealership Network Plan.

To date a number of business entities and groups have expressed interest in becoming Master Dealers in South Carolina, Pennsylvania, California, Florida, Missouri, Indiana, Nevada, Texas, Michigan, Minnesota, Massachusetts, Illinois, North Carolina and Puerto Rico.

We will implement a brand recognition campaign by providing equipment and installation at little or no cost to high visibility / high volume locations (i.e. airport terminals, casinos, major medical facilities, government agencies, etc.)

Develop strategic relationships with national and international organizations to maximize the Company's name recognition and generate account penetration.

Achieve critical mass growth by targeting selected national and international markets with a concentration on the health care industries, namely, hospitals, doctor's offices, nursing homes, clinics, laboratories, etc.

The Company's retention of the Venable Law Firm of Washington D.C. / Baltimore, will result in door opening opportunities with Marriott Hotels, New York Port of Authority, VA Hospital Chain, McDonalds and Burger King Restaurants.

Subsequent to the establishment of the Master Dealership Network, the Company intends to commence an aggressive public awareness campaign. Preliminary discussions have already begun with print, TV and cable media experts to implement such a program. An initial promotional video will be produced by the Company and will be available in video and CD-ROM format for viewing by potential Master Dealers and end-users.

# MANAGEMENT TEAM

## Edward B. Klein – President

Mr. Klein attended the University of Houston. He has been actively involved in a number of successful business ventures including Sports Comm., Inc., which was part of a national network of companies that provided media information to the working press at major sporting events, including the 1980 Winter Olympics at Lake Placid. Mr. Klein continues to provide such services at the annual Super Bowl game and various NFL venues around the country. In 1984, he formed Fax-Express, Inc., which became a leader in the distribution of fax machines and related office products, with annual sales exceeding $10 million.

## Brena Resnick – Vice President of Marketing and Management

Brena Resnick attended Suffolk College and the University of Hartford earning a B.A. in Business Management. Ms. Resnick owned and operated a full service printing company in Manhattan for 12 years. Relocating to New Jersey where for the past 10 years has had a graphic arts / printing company. Ms. Resnick has an extensive background in computer design, as well as marketing and corporate sales. Ms. Resnick's responsibility will include overseeing the daily office operations of the company and assist Mr. Klein in developing a marketing and advertising campaign for the company.

## Jeremy Klein – VP of Sales

Jeremy Klein, an Economics graduate of Ramapo College, played baseball for Team USA in Europe. Mr. Klein has actively been involved in establishing a network of Dealers and Distributors both on a national and international level for hygienic toilet seats and other janitorial products for use in commercial restrooms. He has conducted sales training seminars, won Government bids on restroom products, and has an immense knowledge of coordinating and exhibiting at all types of trade shows and events. Mr. Klein's duties within the company will be dealing with the sales aspects of the company's products and the training of key individuals.

## Victor Greene – Advisor to the Board

Victor Greene, Senior Managing Director of Investment Banking, is a Wall Street veteran, having spent over thirty years in the institutional market. He has been at leading firms such as Saloman Brothers and E. F. Hutton, and he joined Spencer Clarke in 2003. With a degree in Finance from University of Pennsylvania's Wharton School of Business, coupled with a degree from University of Pennsylvania's School of Law, Mr. Greene brings an educational background found in few financial professionals.

*( This page has intentionally been left blank. )*

# FINANCIAL STATEMENTS

**Introduction**

The following projections were not prepared with a view towards compliance with published guidelines of the American Institute of Certified Public Accountants or Generally Accepted Accounting Principals and have not been examined, reviewed or compiled by our independent certified public accountants. The projections represent our estimate as of January 2006 based on certain hypothetical assumptions, which are summarized below. We believe that we have a reasonable basis to make the following projections.

The projections are based on a number of assumptions and estimates that, while presented with numerical specificity and considered reasonable by us, are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond our control, and based upon assumptions with respect to future business decisions that are subject to change. The degree of uncertainty inherent in the projections increases significantly with each year covered by the projections. Accordingly, the projections are only an estimate, and actual results will vary form the projections and these variations may be material. Consequently, the inclusion of the projections herein should not be regarded as a re-offering by us, our advisors or any other person, that the projected results will be achieved and there cannot be any assurance that they will. You are cautioned not to place undue reliance on the projections.

The projections assume that we expand significantly during the next eight years. As a result of this activity, the assumption should not be made that any specific yearly results will be equal to one eighth of the projections. In addition, to the extent that growth is accelerated or delayed relative to the timing assumptions in the projections, this change could have a material effect on the projected results. The projections also assume the success of our business strategy. The success of our strategy is subject to uncertainties and contingencies beyond our control, and no assurances can be given that the strategy will be realized in the periods for which the projections have been prepared. The assumptions described herein are those that we believe are significant to the projections; however, not all assumptions used in the preparation of the projections have been set forth herein.

The projections do not assume the occurrence of any periods of recession that might adversely affect demand for our products and services. The projections assume, among other things, that: (i) there will be no material costs, gains or losses resulting from legal proceedings; (ii) there will be no material change in the political, fiscal or economic conditions in the United States that are material to our revenue; (iii) there will be no material change in legislation or regulations or the administration thereof that will have an unfavorable or unexpected effect on our business; (iv) there will be no change in Generally Accepted Accounting Principles that will have a material effect on our financial results; and (v) there will be no labor or industrial disputes or other disturbances that would materially affect our operations or revenue.

---

*( This page has intentionally been left blank. )*

## Clean Care Technologies, LLC.
## Individual Master Dealer
## Eight (8) Year Gross Profit Projection

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 |
|---|---|---|---|---|---|---|---|---|
| Master Dealer | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Seats Purchased | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 |
| Seats Installed | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 |
| | | | | | | | | |
| Seats Installed | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 |
| Profit Per Seat | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |
| Gross Profit Seats | 30000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 |
| | | | | | | | | |
| Seats Installed To Date | 1000 | 2000 | 3000 | 4000 | 5000 | 6000 | 7000 | 8000 |
| Each Seat Uses 10 Bottles Of CleanCare Solution | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| Total Bottles Sold | 10,000 | 20,000 | 30,000 | 40,000 | 50,000 | 60,000 | 70,000 | 80,000 |
| Average Profit Per Bottle | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |
| Gross Profit Solution | $200,000 | $400,000 | $600,000 | $800,000 | $1,000,000 | $1,200,000 | $1,400,000 | $1,600,000 |
| | | | | | | | | |
| Total Gross Profit | $230,000 | $430,000 | $630,000 | $830,000 | $1,030,000 | $1,230,000 | $1,430,000 | $1,630,000 |

*( This page has intentionally been left blank. )*

## Clean Care Technologies, LLC.
## Eight (8) Year Gross Profit Projection

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 |
|---|---|---|---|---|---|---|---|---|
| Master Dealers | 12 | 24 | 36 | 48 | 60 | 72 | 84 | 96 |
| Seats Sold Per Dealer | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Total Seats Sold | 12,000 | 24,000 | 36,000 | 48,000 | 60,000 | 72,000 | 84,000 | 96,000 |
| | | | | | | | | |
| Total Seats Sold | 12,000 | 24,000 | 36,000 | 48,000 | 60,000 | 72,000 | 84,000 | 96,000 |
| Profit Per Seat | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |
| Gross Profit (Seats) | $360,000 | $720,000 | $1,080,000 | $1,440,000 | $1,800,000 | $2,160,000 | $2,520,000 | $2,880,000 |
| | | | | | | | | |
| Promotional Seats | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Seats Sold To Date | 12,000 | 39,000 | 78,000 | 129,000 | 192,000 | 267,000 | 354,000 | 453,000 |
| Total Seats Installed | 15,000 | 42,000 | 81,000 | 132,000 | 195,000 | 270,000 | 357,000 | 456,000 |
| Bottles Of Solution | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| Total Bottles Sold | 150,000 | 420,000 | 810,000 | 1,320,000 | 1,950,000 | 2,700,000 | 3,570,000 | 4,560,000 |
| Profit Per Bottle | $15 | $15 | $15 | $15 | $15 | $15 | $15 | $15 |
| Gross Profit Bottles | $2,250,000 | $6,300,000 | $12,150,000 | $19,800,000 | $29,250,000 | $40,500,000 | $53,550,000 | $68,400,000 |
| Total Profit Seats & Liquid | $2,610,000 | $7,020,000 | $13,230,000 | $21,240,000 | $31,050,000 | $42,660,000 | $56,070,000 | $71,280,000 |
| Dealership Fees | $1,200,000 | $1,200,000 | $1,200,000 | $1,200,000 | $1,200,000 | $1,200,000 | $1,200,000 | $1,200,000 |
| Total Gross Profit | $3,810,000 | $8,220,000 | $14,430,000 | $22,440,000 | $32,250,000 | $43,860,000 | $57,270,000 | $72,480,000 |

Notes:

1. The Company plans to open twelve (12) Master Dealers per year.
2. The wholesale price of the Seat to Master Dealers is $195.00. The cost to the Company is $165.00 per Seat.
3. The wholesale price of the Liquid to the Master Dealers is $24.00 per bottle. The cost to the Company is $9.00 per bottle.
4. In addition to the revenue generated form the sale of the Seats and the Liquid to the Master Dealers, the Company intends to provide 3,000 promotional Seats per year, at no charge, to highly visible locations; ie., airports, hotels, casinos, convention centers, etc.
5. Each Seat will use an average of ten (10) bottles of Liquid per year.
6. The cost to purchase an exclusive territory will average $100,000.00.

*( This page has intentionally been left blank. )*

## Clean Care Technologies, LLC.
### Projected Statement Of Operating Expenses
### Years One Through Eight

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 |
|---|---|---|---|---|---|---|---|---|
| **Operating Expenses** | | | | | | | | |
| **Salaries:** | | | | | | | | |
| Executive Salaries | $400,000 | $550,000 | $700,000 | $900,000 | $1,200,000 | $1,200,000 | $1,200,000 | $1,200,000 |
| Administrative Staff | $150,000 | $156,750 | $163,804 | $171,175 | $178,878 | $178,878 | $178,878 | $178,878 |
| Warehouse Personnel | $80,000 | $83,500 | $87,382 | $91,293 | $95,401 | $95,401 | $95,401 | $95,401 |
| Service Technicians | $165,000 | $172,425 | $180,184 | $188,292 | $196,766 | $196,766 | $198,766 | $198,766 |
| Sales Staff / Commisions | $450,000 | $1,208,000 | $3,340,000 | $8,920,000 | $8,920,000 | $8,920,000 | $6,920,000 | $6,920,000 |
| Payroll Taxes & Insurances | $136,850 | $238,786 | $491,848 | $809,784 | $945,015 | $945,015 | $945,015 | $945,015 |
| Auto Allowance | $88,200 | $88,200 | $90,000 | $90,000 | $92,500 | $92,500 | $92,500 | $92,500 |
| Health Insurance | $54,000 | $56,700 | $59,535 | $62,512 | $65,637 | $65,637 | $65,637 | $65,637 |
| Rent | $80,000 | $60,000 | $60,000 | $60,000 | $60,000 | $60,000 | $60,000 | $60,000 |
| Print | $24,250 | $25,000 | $27,500 | $30,000 | $35,000 | $35,000 | $35,000 | $35,000 |
| Trade Shows | $250,000 | $250,000 | $350,000 | $350,000 | $375,000 | $375,000 | $375,000 | $376,000 |
| Advertising Print / Cable TV | $1,000,000 | $2,000,000 | $3,000,000 | $4,000,000 | $5,000,000 | $6,000,000 | $7,000,000 | $8,000,000 |
| Demo-material / Booth | $75,000 | $75,000 | $85,000 | $85,000 | $90,000 | $90,000 | $90,000 | $90,000 |
| Website Development | $90,000 | | | | | | | |
| Website Maintenance | $20,000 | $30,000 | $50,000 | $70,000 | $90,000 | $100,000 | $110,000 | $125,000 |
| Travel & Entertainment | $200,000 | $205,000 | $210,250 | $215,763 | $221,551 | $221,551 | $221,551 | $221,551 |
| Telephone Expense | $45,000 | $47,250 | $49,613 | $52,093 | $54,698 | $54,698 | $54,698 | $54,698 |
| **Professional Fees:** | | | | | | | | |
| Legal & Accounting | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Private Offering Fees | $50,000 | | | | | | | |
| Utilities | $15,000 | $15,750 | $16,538 | $17,364 | $18,233 | $18,233 | $18,233 | $18,233 |
| Misc. Office Expense | $15,000 | $15,750 | $16,538 | $17,364 | $18,233 | $18,233 | $18,233 | $18,233 |
| Service Van Lease / Insurance | $54,000 | $27,200 | $27,200 | $27,200 | $27,200 | $27,200 | $27,200 | $27,200 |
| Office Equipment | $60,000 | | $15,000 | | $15,000 | | $16,000 | |
| Warehouse Equipment | $60,000 | | $6,250 | | $7,000 | | | |
| Warehouse Construction | $200,000 | | | | | | | |
| Business Related Expenses | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Bank Floor Planning | $75,000 | | | | | | | |
| **Total Operating Expenses** | $3,937,410 | $5,455,410 | $9,178,622 | $14,407,840 | $15,856,112 | $16,844,112 | $17,869,112 | $18,869,112 |

( *This page has intentionally been left blank.* )

## Clean Care Technologies, LLC.
## Projected Statement Of Revenue And Expenses
## Years One Through Eight

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 |
|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | |
| Seats | $2,925,000 | $9,360,000 | $18,720,000 | $31,005,000 | $43,290,000 | $84,350,000 | $85,410,000 | $109,395,000 |
| Solutions | $3,600,000 | $11,520,000 | $23,040,000 | $38,160,000 | $53,280,000 | $79,200,000 | $105,120,000 | $134,640,000 |
| Territorial Fees (12 dealers) | $1,200,000 | $1,200,000 | $1,200,000 | $1,200,000 | $1,200,000 | $1,200,000 | $1,200,000 | $1,200,000 |
| **Total Revenues** | $7,725,000 | $22,080,000 | $42,960,000 | $70,365,000 | $97,770,000 | $144,750,000 | $191,730,000 | $245,235,000 |
| **Cost of Goods:** | | | | | | | | |
| Seats | $1,980,000 | $7,920,000 | $15,840,000 | $28,235,000 | $39,105,000 | $54,450,000 | $72,270,000 | $92,565,000 |
| Solutions | $1,080,000 | $3,760,000 | $7,830,000 | $13,230,000 | $19,980,000 | $28,080,000 | $37,530,000 | $48,330,000 |
| Promotional Seats (3,000) | $495,000 | $990,000 | $1,485,000 | $1,980,000 | $2,475,000 | $2,970,000 | $3,495,000 | $3,980,000 |
| Installation of Promo Seats | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 |
| **Total Cost Of Goods Sold** | $3,805,000 | $12,840,000 | $25,405,000 | $41,695,000 | $61,810,000 | $85,750,000 | $113,515,000 | $145,105,000 |
| **Gross Profit** | $3,920,000 | $9,140,000 | $17,555,000 | $28,670,000 | $35,960,000 | $59,000,000 | $78,215,000 | $100,130,000 |
| **Total Operating Expenses** | $3,937,410 | $5,455,410 | $9,176,622 | $14,407,840 | $15,856,112 | $16,844,112 | $17,869,112 | $18,869,112 |
| **Net Income Prior To Taxes** | -$17,410 | $3,684,590 | $8,378,378 | $14,262,160 | $20,103,888 | $42,155,888 | $60,345,888 | $81,260,888 |

---

**Notes**

**SEATS:**
| | |
|---|---|
| Wholesale Price Per Seat | 195 |
| Cost Per Seat To Company | 165 |

**COVERS:**
| | |
|---|---|
| Wholesale Price Per Bottle | 24 |
| Cost Per Bottle To Company | 9 |

Page 35

*( This page has intentionally been left blank. )*

## Clean Care Technologies, LLC.
## Cash Flow Statement Of Changes In Financial Position (Years 1-8)

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 |
|---|---|---|---|---|---|---|---|---|
| **Sources of Cash:** | | | | | | | | |
| Operations during the year: | | | | | | | | |
| Net Income prior to Taxes | -$17,410 | $3,684,590 | $8,378,378 | $14,262,160 | $20,103,888 | $42,155,888 | $60,345,888 | $81,260,888 |
| Add Items not decreasing cash | | | | | | | | |
| Depreciation | | | | | | | | |
| Increase In Accounts Payable | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Increase In Other Payables | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Increase In Accrued Liabilities | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | |
| Deduct Items not increasing cash | | | | | | | | |
| Increase In Accounts Receivable | | | | | | | | |
| Increase In Inventory | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | |
| Cash from Operations | -$17,410 | $3,684,590 | $8,378,378 | $14,262,160 | $20,103,888 | $42,155,888 | $60,345,888 | $81,260,888 |
| | | | | | | | | |
| Financing & Other | | | | | | | | |
| Sale of Stock | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Proceeds from Short Term Loans | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Proceeds from Long Term Loans | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Capitalization (Private Offering) | $10,000,000 | | | | | | | |
| Collection of Notes Receivable | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Reduction of Other Current Assets | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Reduction of Other Assets | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | |
| Cash from Operations & Financing | $9,982,590 | $3,684,590 | $8,378,378 | $14,262,160 | $20,103,888 | $42,155,888 | $60,345,888 | $81,260,888 |
| | | | | | | | | |
| **Applications of Cash:** | | | | | | | | |
| Payment of Dividends | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Purchases of Fixed Assets | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Repayment of Short Term Loans | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Repayment of Long Term Loans | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Purchase of Investments | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Increase In Notes Receivable | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Increase In Other Current Assets | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Increase In Other Assets | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | |
| Increase / (Decrease) In Cash | $9,982,590 | $3,684,590 | $8,378,378 | $14,262,160 | $20,103,888 | $42,155,888 | $60,345,888 | $81,260,888 |
| | | | | | | | | |
| **Change In Cash Balance** | | | | | | | | |
| Beginning Cash Balance | $0 | $9,982,590 | $13,667,180 | $22,045,558 | $36,307,718 | $56,411,606 | $98,567,494 | $158,913,382 |
| Increase /(Decrease) In Cash | $9,982,590 | $3,684,590 | $8,378,378 | $14,262,160 | $20,103,888 | $42,155,888 | $60,345,888 | $81,260,888 |
| Ending Cash Balance | $9,982,590 | $13,667,180 | $22,045,558 | $36,307,718 | $56,411,606 | $98,567,494 | $158,913,382 | $240,174,270 |

*( This page has intentionally been left blank. )*

# – State of New Jersey –

# Limited Liability Company

# Certificate of Formation

**First:** The name of the limited liability company is Clean Care Technologies, LLC.

**Second:** The address of its registered office in the State of New Jersey is 335 West State Street, New Jersey, 07608-1001. The name of the registered agent at such address is on file at the Division of Revenue, in the State of New Jersey.

**Third:** The limited liability company shall be managed by one or more Managing Board Members.

**In Witness Whereof,** the undersigned had executed this Certificate of Formation of Clean Care Technologies, LLC this 14th day of November, 2005.

By: *Edward Klein*
Edward B. Klein
President

```
State of New Jersey
Division of Revenue
Delivered 11:42 AM 11/14/05
Filed 11:42 AM 11/14/05
SRV 1621710 - 3058335 FILE
```

Clean Care Technologies, LLC.

- 39 -

## SUMMARY OF BENEFITS:

- Fully automatic operation (sensor driven).
- Rotation takes 10 seconds.
- The seat is hygienically cleaned and dry in less than 10 seconds.
- No electricity or water supply needed.
- The fully charged battery will operate at least 1400 times.
- The seat fits on all lavatory pans.
- 1 year complete guarantee.
- Installation in an instant, no tradesmen needed.
- Easy maintenance.





Wave bacteria goodbye!



Simple Refilling of Solution.





Eyegiena Sensor.    OK

**TECHNICAL DATA:**
- The hygiene status is indicated with coloured lights in the control panel:
  Green: ready for use.
  Orange: cleaning process taking place.
  Blue: replenish fluid/fluid needs topping up.
  Red: replace battery.
- The rechargeable battery is easily replaced by opening the right side of the unit. This can be done with a special key. The battery can be removed with its cover and the new battery inserted right away. The battery can be recharged at least 300 times.
- The blue lamp lights up when there is still 0.3 litres of fluid left.
- Refilling with fluid is very simple. Using the same special key, the left side can be opened and the bottle with its special stopper clicked into the opening.
- The 2 small wipers in the mechanism need to be replaced 2x per year on average, which is a simple operation.
- A full tank of fluid is enough for 1800 rotations.
- Dimensions: length – 55 cm, breadth – 45 cm, height – 24 cm, depth just 10 cm.
- Weight – 4.7 kg.

CLEAN CARE TECHNOLOGIES Investors:

Byron Violett – 12,000    ( plus $60,000.) $72,000. TOTAL
1727 Pine Avenue, Apt. #4
Long Beach, CA 90813-1843
(562) 591-1925

Paul Robinson – 10,000
N3031CTHFA
La Crosse, WI 54601
(608) 784-5151

Thomas Wencl – 2,500
1122 South Oak Avenue
Owatonna, MN 55060
(507) 451-3399

George Reid – 99,000    $98,500.
2073 Perrin Drive
Lawrenceville, GA 30043
(770) 339-0851

Dean Miles – 19,975
18021 Sky Park Circle, Suite J
Ervin, CA 92614
(949) 266-1411

Lynn D. Otto – 70,000    ( plus $34,952.)  $104,952. TOTAL
5806 Whitneyville Road
Middleville, MI 49333
(269) 795-3634

Martin J. Campbell – 1,000
1070 24th Avenue East
Seattle, WA 98112
(206) 324-3210

Daniel R. Droz – 5,000
529 Augusta Drive
Monroe, MI 48161
(734) 242-5023

Larry Cobb – 150,000
1243 NE 152nd Street
Shoreline, WA 98155-7137
(206) 523-2742

Carl Hunt – 50,000
11310 Glissade Drive
Clinton, MD 20735
(301) 292-1399

Terry Mcquoid – 5,000
18861 329th Avenue
Isle, MN 56342
(320) 630-3435

Michael Dardaris – 10,000
1933 Teaberry Avenue
Williamstown, NJ 08094
(856) 863-0461

Rocky J. Romanelli – 35,000
9138 Chambelle Street
St. Leonard, PQH1P2M3
Montreal, Quebec, Canada
(H1P-2M3)
(800) 267-2774 ext. 114

Richard Blackketter – 7,500
5451 South Leonard Springs Road
Bloomington, IN 47403
(812) 824-4798

James Cullen - 2,000
7071 Eckstrom Ave.
San Diego, CA 92111-3424
(858) 277-2704

John Sauter - 10,000
761 Coronado Avenue
Coronado, CA 92118
(619) 215-9373

Michael Sherer - 50,000
2603 NE 87th Street
Seattle, WA 98115
(206) 528-1264

Robert Helgren - 20,000
668 Forest Avenue
Larchmont, NY 10538
(914) 834-4434

Roy Miller - 7,500
722 Indian Point Road
Mount Desert, ME 04660
(207) 244-3044

Timothy Bibens - 10,000
31 Burnley Rise
Pittsford, NY 14586
(585) 755-7230

Richard L. Eggert / Cory L. Eggert - 6,000
3625 409th Avenue NW
Braham, MN 55006
(320) 396-3664

Richard Jablonski - 5,000
26722 Hyte Road
Ranchos Palos Verdes, CA 90275
(310) 669-6330

Kevin O'Connor - 15000
1075 East 8th Street
Holland, MI 49423
(616) 394-9681

Zachary Hodes - 10,000
637 Bryn Mawr Drive
Indianapolis, IN 46260-4735
(317) 253-9646

Thomas Fragomeni - 10,000
175 Capital Boulevard #201
Rocky Hill, CT 06067
(860) 616-5100

The following clients have equity positions in the company, however they do not have any funds invested into the company.

Bill Paul
8812 East Sunny Lane
Claremore, OK 74019
(918) 266-3500

John Fleming
1621 Tiffany Ranch Road
Arroyo Grande, CA 93420
(805) 541-2079

Lloyd Wood
969 Highway 108
Rutherfordton, NC  28139
(828) 287-4919

Jim Lee
12050 Rising Road
Wilton, CA 95693
(916) 687-8355

Jan 06 06 10:45a    Serico & Dubnik, PC

Jan  6 2006  10:52
7328751183

P.2

Mail to    PO Box 309
Trenton, NJ 08625

**STATE OF NEW JERSEY**
**DIVISION OF REVENUE**

Overnight to    225 West State St
3rd Floor
Trenton, NJ 08608-1001

## PUBLIC RECORDS FILING FOR NEW BUSINESS ENTITY
### (Fee Required)

Fill out all information below INCLUDING INFORMATION FOR ITEM 11, and sign in the space provided. Please note that once filed, this form constitutes your original certificate of incorporation/formation/registration/authority, and the information contained in the filed form is considered public. Refer to the instructions for delivery/return options, filing fees and field-by-field requirements. Remember to remit the appropriate fee amount. Use attachments if more space is required for any field, or if you wish to add articles for the public record.

1. Business Name:  Clean Care Systems, LLC

2. Type of Business Entity:  L  L  C
   (See Instructions for Codes, Page 21, Item 2)

3. Business Purpose :  Janitorial Supplies
   (See Instructions, Page 22, Item 3)

4. Stock (Domestic Corporations only, LLC's and Non-Profit leave blank)

5. Duration (If Indefinite or Perpetual, leave blank):

6. State of Formation/Incorporation (Foreign Entities Only)

7. Date of Formation/Incorporation (Foreign Entities Only)

*LLC*

8. Contact Information
   Registered Agent Name:  Edward B Klein

   FILED
   JAN - 6 2006
   STATE TREASURER

   Registered Office:
   (Must be a New Jersey street address)

   Street  27 West Parsonage Way

   City  Manalapan        Zip  07726

   Main Business or Principal Business Address

   Street

   City        State        Zip

9. Management (Domestic Corporations and Limited Partnerships Only)
   - For-Profit and Professional Corporations list initial Board of Directors, minimum of 1.
   - Domestic Non-Profits list Board of Trustees, minimum of 3.
   - Limited Partnerships list all General Partners.

| Name | Street Address | City | State | Zip |
|------|----------------|------|-------|-----|
|      |                |      |       |     |
|      |                |      |       |     |

The signature below certify that the business entity has complied with all applicable filing requirements pursuant to the laws of the State of New Jersey.

10. Incorporators (Domestic Corporations Only, minimum of 1)

| Name | Street Address | City | State | Zip |
|------|----------------|------|-------|-----|
|      |                |      |       |     |

Signature(s) for the Public Record (See Instructions for Information on Signature Requirements)

| Signature | Name | Title | Date |
|-----------|------|-------|------|
|           | Jason Dubnik | CPA | 1/6/06 |

S1643543
J3096747

- 23 -

0600257276



*STATE OF NEW JERSEY*
*DEPARTMENT OF TREASURY*
*FILING CERTIFICATION (CERTIFIED COPY)*

**CLEAN CARE SYSTEMS, LLC**

*I, the Treasurer of the State of New Jersey, do hereby certify, that the above named business did file and record in this department the below listed document(s) and that the foregoing is a true copy of the*
*Certificate of Formation*
*as the same is taken from and compared with the original(s) filed in this office on the date set forth on each instrument and now remaining on file and of record in my office.*



*IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal at Trenton, this 26th day of July, 2007*

*Bradley Abelow*

Bradley Abelow
State Treasurer

# Clean Care Systems
# Trial Balance
### As of July 16, 2007

07/16/07

|  | Jul 16, 07 | |
| --- | --- | --- |
|  | Debit | Credit |
| Bank Of America | 70,619.10 |  |
| Bank of America T & E | 5,244.85 |  |
| Accounts Receivable | 0.00 |  |
| Shelly |  | 1216475.75 |
| Retained Earnings | 471,478.60 |  |
| Sales Income |  | 132,376.00 |
| Goods Purchases (Cost of Goods) | 399,571.61 |  |
| Bank Service Charges | 926.40 |  |
| Car/Truck Expense | 4,253.62 |  |
| Car/Truck Expense:Gas | 2,318.77 |  |
| Car/Truck Expense:Repairs & Maintena... | 195.51 |  |
| Conferences and Seminars | 11,345.96 |  |
| Garbage | 77.04 |  |
| Insurance | 20,757.22 |  |
| Insurance:Auto Insurance |  | 118.00 |
| Marketing Expense | 59,217.42 |  |
| miscellaneous | 1,977.42 |  |
| Office Equipment | 2,612.03 |  |
| Office Supplies | 2,959.80 |  |
| Payroll | 79,878.42 |  |
| Postage and Shipping | 9,121.71 |  |
| Printing and Reproduction | 28,963.49 |  |
| Professional Fees:Accounting Fees | 2,350.00 |  |
| Promotional Expense | 2,800.00 |  |
| Rent | 15,909.08 |  |
| Repairs and Maintenance | 6,947.90 |  |
| Shipping | 3,503.89 |  |
| Tax | 15,071.37 |  |
| Telephone and Fax | 4,490.54 |  |
| Trade Shows | 45,232.04 |  |
| Travel & Entertainment | 11,066.90 |  |
| Travel & Entertainment:Airline Travel | 20,050.69 |  |
| Travel & Entertainment:Entertainment | 848.53 |  |
| Travel & Entertainment:Hotel | 24,304.60 |  |
| Travel & Entertainment:Meals | 3,769.17 |  |
| Travel & Entertainment:Travel | 22,403.22 |  |
| Other Income |  | 4,297.15 |
| Loan | 3,000.00 |  |
| **TOTAL** | **1,353,266.90** | **1,353,266.90** |

**EXHIBIT**

*6*

*462686*

08/31/07

# Eyegiene America
# Profit and Loss Detail
### January 2006 through August 2007

| Type | Date | Num | Name | Memo | Split | Amou... | Balance |
|---|---|---|---|---|---|---|---|
| **Other Income/Expense** | | | | | | | |
| **Other Expense** | | | | | | | |
| **Other Expenses** | | | | | | | |
| Check | 07/01/06 | 102 | Byron Violet | | The Bank | 1365.00 | 1,365.00 |
| Check | 10/15/06 | 133 | Byron Violet | | The Bank | 1365.00 | 2,730.00 |
| General Journal | 12/31/06 | AJE3 | | Reclass inve... | Investors | ***** | 0.00 |
| Total Other Expenses | | | | | | 0.00 | 0.00 |
| | | | | | | | |
| **Interest Expense** | | | | | | | |
| Check | 02/20/07 | 178 | Byron Violet | | The Bank | 1365.00 | 1,365.00 |
| Check | 04/13/07 | 211 | Byron Violet | | The Bank | 1365.65 | 2,730.65 |
| Check | 07/17/07 | 259 | Byron Violet | 2nd Quater | The Bank | 1365.00 | 4,095.65 |
| General Journal | 12/31/06 | AJE3 | | Reclass inve... | Investors | 2730.00 | 6,825.65 |
| General Journal | 06/30/07 | | | | Inventory As... | 430.00 | 7,255.65 |
| General Journal | 12/31/06 | AJE4 | | accrue expe... | -SPLIT- | 935.00 | 8,190.65 |
| Total Interest Expense | | | | | | 8190.65 | 8,190.65 |
| | | | | | | | |
| Total Other Expense | | | | | | 8190.65 | 8,190.65 |
| **Other Income** | | | | | | | |
| **Other Income** | | | | | | | |
| Deposit | 05/11/07 | 1003 | Eyegiene Arizona | arizona terro... | The Bank | ***** | 14,500.00 |
| General Journal | 12/31/06 | AJE1 | | To reclassify... | Investors | ***** | 2,500.00 |
| Deposit | 01/03/06 | | | Byron Vilolet | First Washin... | ***** | 14,500.00 |
| Total Other Income | | | | | | ***** | 14,500.00 |
| | | | | | | | |
| **Income Tax Benefit** | | | | | | | |
| General Journal | 12/31/06 | AJE9 | | record 2006 ... | Deferred Ta... | ***** | 63,808.00 |
| Total Income Tax Benefit | | | | | | ***** | 63,808.00 |
| | | | | | | | |
| Total Other Income | | | | | | ***** | 78,308.00 |
| | | | | | | | |
| Net Other Income | | | | | | ***** | 70,117.35 |
| **Ordinary Income/Expense** | | | | | | | |
| **Expense** | | | | | | | |
| **Credit Card** | | | | | | | |
| Check | 01/29/07 | | Merchant Wareh... | | The Bank | 75.50 | 75.50 |
| Deposit | 01/30/07 | | | Deposit | The Bank | 53.02 | 128.52 |
| Check | 02/07/07 | | Merchant Wareh... | | The Bank | 10.70 | 139.22 |
| Deposit | 04/18/07 | | | Deposit | The Bank | 96.37 | 235.59 |
| Deposit | 05/01/07 | | | Deposit | The Bank | 16.16 | 251.75 |
| Check | 05/03/07 | | Merchant Wareh... | | The Bank | 13.05 | 264.80 |
| Deposit | 05/29/07 | | | Deposit | The Bank | 32.67 | 297.47 |
| Deposit | 05/30/07 | | | Deposit | The Bank | 17.48 | 314.95 |
| Deposit | 06/07/07 | | | Deposit | The Bank | 8.34 | 323.29 |
| Total Credit Card | | | | | | 323.29 | 323.29 |
| | | | | | | | |
| **Printing** | | | | | | | |
| Check | 05/03/07 | 225 | Printing Prose | | The Bank | 7400.00 | 7,400.00 |
| Total Printing | | | | | | 7400.00 | 7,400.00 |
| | | | | | | | |
| **Refund** | | | | | | | |
| Deposit | 07/10/07 | | ISSA | for ISSA show | The Bank | ***** | -5,008.25 |
| Check | 07/10/07 | 256 | Clean Care Syste... | not processed | The Bank | 5008.25 | 0.00 |
| Total Refund | | | | | | 0.00 | 0.00 |

**Page 1**

**Eyegiene America**
# Profit and Loss Detail
### January 2006 through August 2007

08/31/07

| Type | Date | Num | Name | Memo | Split | Amou... | Balance |
|------|------|-----|------|------|-------|---------|---------|
| **Rent** | | | | | | | |
| Check | 05/03/07 | 226 | HQ Global | | The Bank | 252.44 | 252.44 |
| Check | 05/03/07 | 227 | 1413 Chappan LLC | | The Bank | 3300.00 | 3,552.44 |
| Total Rent | | | | | | 3552.44 | 3,552.44 |
| **Repairs** | | | | | | | |
| **Building Repairs** | | | | | | | |
| Check | 01/08/07 | 168 | CAP Technologies | | The Bank | 1500.00 | 1,500.00 |
| Check | 01/08/07 | 169 | CAP Technologies | | The Bank | 300.00 | 1,800.00 |
| Total Building Repairs | | | | | | 1800.00 | 1,800.00 |
| Total Repairs | | | | | | 1800.00 | 1,800.00 |
| **Subcontract Labor** | | | | | | | |
| Check | 01/05/07 | 165 | Edward B. Klein | | The Bank | 3000.00 | 3,000.00 |
| Check | 01/14/07 | 170 | Edward B. Klein | | The Bank | 1000.00 | 4,000.00 |
| Check | 02/07/07 | 180 | Edward B. Klein | | The Bank | 2000.00 | 6,000.00 |
| Check | 02/20/07 | 183 | Juniper Bank | EBK | The Bank | 320.27 | 6,320.27 |
| Check | 03/01/07 | 197 | Edward B. Klein | | The Bank | 500.00 | 6,820.27 |
| Check | 03/26/07 | 204 | Lindsay Klein | | The Bank | 800.00 | 7,620.27 |
| Check | 04/12/07 | 215 | Edward B. Klein | | The Bank | 2000.00 | 9,620.27 |
| Check | 04/13/07 | | Capital One | EBK | The Bank | 118.50 | 9,738.77 |
| Check | 05/03/07 | 222 | Franks Big and Tall | EBK | The Bank | 972.00 | 10,710.77 |
| Check | 05/03/07 | 224 | Jeremy Klein | | The Bank | 2087.86 | 12,798.63 |
| Check | 05/03/07 | 235 | Edward B. Klein | | The Bank | 1000.00 | 13,798.63 |
| Check | 05/03/07 | 237 | Theofel, Michael | | The Bank | 4000.00 | 17,798.63 |
| Check | 05/03/07 | 239 | Juniper Bank | EBK | The Bank | 850.10 | 18,648.73 |
| Check | 05/03/07 | | Credit One Bank | EBK | The Bank | 110.72 | 18,759.45 |
| Check | 06/18/07 | 246 | Edward B. Klein | | The Bank | 2000.00 | 20,759.45 |
| Check | 06/19/07 | 249 | Edward B. Klein | | The Bank | 1000.00 | 21,759.45 |
| Total Subcontract Labor | | | | | | ***** | 21,759.45 |
| **Taxes** | | | | | | | |
| Check | 04/12/07 | 213 | State of New Jer... | | The Bank | 548.00 | 548.00 |
| Total Taxes | | | | | | 548.00 | 548.00 |
| **Telephone** | | | | | | | |
| Check | 08/03/06 | 108 | Verizon Wireless | | The Bank | 214.94 | 214.94 |
| Check | 09/01/06 | 117 | Verizon Wireless | | The Bank | 167.81 | 382.75 |
| Check | 05/03/07 | | Verizon Wireless | | The Bank | 215.43 | 598.18 |
| Check | 05/11/07 | | Verizon Wireless | | The Bank | 311.09 | 909.27 |
| Total Telephone | | | | | | 909.27 | 909.27 |
| **Travel & Ent** | | | | | | | |
| **Travel** | | | | | | | |
| Check | 05/03/07 | 228 | Jeremy Klein | | The Bank | 203.22 | 203.22 |
| Check | 05/03/07 | 230 | Matthew Delcora | | The Bank | 250.00 | 453.22 |
| Check | 05/03/07 | 234 | Brena Resnick | | The Bank | 2371.65 | 2,824.87 |
| Check | 05/03/07 | 236 | Michael Sherer | | The Bank | 1106.34 | 3,931.21 |
| Total Travel | | | | | | 3931.21 | 3,931.21 |
| Total Travel & Ent | | | | | | 3931.21 | 3,931.21 |
| **Utilities** | | | | | | | |
| **Garbage** | | | | | | | |
| Check | 05/03/07 | 231 | MIDCO Waste | | The Bank | 76.90 | 76.90 |

Page 2

**Eyegiene America**
# Profit and Loss Detail
### January 2006 through August 2007

08/31/07

| Type | Date | Num | Name | Memo | Split | Amou... | Balance |
|------|------|-----|------|------|-------|---------|---------|
| Total Garbage | | | | | | 76.90 | 76.90 |
| | | | | | | | |
| Total Utilities | | | | | | 76.90 | 76.90 |
| **Payroll Taxes** | | | | | | | |
| General Journal | 06/30/07 | | | | Inventory As... | 4930.00 | 4,930.00 |
| Total Payroll Taxes | | | | | | 4930.00 | 4,930.00 |
| **Professional Fees** | | | | | | | |
| **Legal Fees** | | | | | | | |
| Check | 03/01/07 | 199 | Legal & Complia... | | The Bank | ***** | 10,000.00 |
| Check | 07/10/07 | 255 | Legal & Complia... | | The Bank | 1675.75 | 11,675.75 |
| Total Legal Fees | | | | | | ***** | 11,675.75 |
| **Professional Fees - Other** | | | | | | | |
| General Journal | 06/30/07 | | | | Inventory As... | ***** | -2,100.00 |
| Total Professional Fees - Other | | | | | | ***** | -2,100.00 |
| **Accounting** | | | | | | | |
| Check | 04/12/07 | 212 | Serico and Dubnik | | The Bank | 1050.00 | 1,050.00 |
| Check | 05/03/07 | 238 | Jason Dubnik | | The Bank | 300.00 | 1,350.00 |
| Check | 06/29/07 | 251 | Serico and Dubnik | | The Bank | 4000.00 | 5,350.00 |
| Check | 06/29/07 | 251 | Serico and Dubnik | | The Bank | 1000.00 | 6,350.00 |
| Check | 07/24/07 | 261 | Serico and Dubnik | 07 Audit | The Bank | 0.00 | 6,350.00 |
| Check | 07/24/07 | 263 | Serico and Dubnik | | The Bank | 450.00 | 6,800.00 |
| General Journal | 12/31/06 | AJE4 | | accrue expe... | Interest Exp... | 5050.00 | 11,850.00 |
| Check | 01/10/06 | 92 | Jason Dubnik | | First Washin... | 300.00 | 12,150.00 |
| Check | 01/10/06 | 97 | Jason Dubnik | | First Washin... | 300.00 | 12,450.00 |
| Total Accounting | | | | | | ***** | 12,450.00 |
| | | | | | | | |
| Total Professional Fees | | | | | | ***** | 22,025.75 |
| **NJ CBT** | | | | | | | |
| General Journal | 06/30/07 | | | | Inventory As... | -548.00 | -548.00 |
| General Journal | 12/31/06 | AJE4 | | accrue expe... | Interest Exp... | 548.00 | 0.00 |
| Total NJ CBT | | | | | | 0.00 | 0.00 |
| **Fees** | | | | | | | |
| General Journal | 12/31/06 | AJE8 | | to reclass mi... | Office | 550.00 | 550.00 |
| General Journal | 12/31/06 | AJE5 | | to reclassify ... | Investors | 30.00 | 580.00 |
| Check | 01/03/06 | 101 | Sterling Trust Co... | | First Washin... | 150.00 | 730.00 |
| Total Fees | | | | | | 730.00 | 730.00 |
| **Automobile Expense** | | | | | | | |
| Check | 08/01/06 | 106 | Pine Belt Chevrolet | | The Bank | 1842.71 | 1,842.71 |
| Check | 09/01/06 | 116 | Progressive Insur... | | The Bank | 613.65 | 2,456.36 |
| Check | 11/12/06 | 148 | Felice Glazer | | The Bank | 150.00 | 2,606.36 |
| Check | 02/15/07 | 184 | GMAC | | The Bank | 474.97 | 3,081.33 |
| Check | 05/03/07 | 240 | Progressive Insur... | | The Bank | 434.91 | 3,516.24 |
| Check | 04/26/06 | 151 | Progressive Insur... | | First Washin... | 1219.10 | 4,735.34 |
| Total Automobile Expense | | | | | | 4735.34 | 4,735.34 |
| **Bank Service Charges** | | | | | | | |
| Check | 10/31/06 | | | Service Char... | The Bank | 59.00 | 59.00 |
| Check | 02/09/07 | | | Service Char... | The Bank | 20.00 | 79.00 |
| Check | 03/07/07 | | | | The Bank | 35.20 | 114.20 |
| Check | 04/30/07 | | | Service Char... | The Bank | 34.95 | 149.15 |

**Eyegiene America**
# Profit and Loss Detail
### January 2006 through August 2007

08/31/07

| Type | Date | Num | Name | Memo | Split | Amou... | Balance |
|------|------|-----|------|------|-------|---------|---------|
| Check | 06/06/07 | | | Bank CD fee | The Bank | 21.65 | 170.80 |
| Deposit | 06/11/07 | | | Larry Cobb | The Bank | -15.00 | 155.80 |
| Check | 06/30/07 | | | Larry Cobb ... | The Bank | 15.00 | 170.80 |
| General Journal | 06/30/07 | | | | Inventory As... | 445.00 | 615.80 |
| Check | 01/26/06 | | | Service Char... | First Washin... | 30.00 | 645.80 |
| Check | 04/30/06 | | | Service Char... | First Washin... | 19.00 | 664.80 |
| Check | 05/01/06 | | | Service Char... | First Washin... | 15.00 | 679.80 |
| Check | 06/30/06 | | | Service Char... | First Washin... | 20.00 | 699.80 |
| Check | 12/30/06 | | | Service Char... | First Washin... | 8.61 | 708.41 |
| Check | 01/31/07 | | | Service Char... | First Washin... | 7.69 | 716.10 |
| Check | 03/31/07 | | | Service Char... | First Washin... | 7.57 | 723.67 |
| Deposit | 04/06/07 | | | Deposit | First Washin... | -7.57 | 716.10 |
| Deposit | 04/06/07 | | | Deposit | First Washin... | -7.57 | 708.53 |
| **Total Bank Service Charges** | | | | | | 708.53 | 708.53 |
| **Miscellaneous** | | | | | | | |
| Check | 11/12/06 | 149 | Jeremy Klein | | The Bank | 2000.00 | 2,000.00 |
| General Journal | 12/31/06 | AJE8 | | to reclass mi... | Office | ***** | -4,304.00 |
| Check | 01/03/06 | 102 | Jim Lee | | First Washin... | 75.00 | -4,229.00 |
| Check | 01/03/06 | 105 | Bill Paul | | First Washin... | 375.00 | -3,854.00 |
| Check | 01/03/06 | 103 | Dr. John Flemming | | First Washin... | 75.00 | -3,779.00 |
| Check | 01/10/06 | 93 | Brena Resnick | | First Washin... | 177.00 | -3,602.00 |
| Check | 01/10/06 | 95 | Brena Resnick | | First Washin... | 577.00 | -3,025.00 |
| Check | 01/10/06 | 96 | Edward B. Klein | | First Washin... | 3000.00 | -25.00 |
| Check | 06/26/06 | 155 | Thomas Wench | | First Washin... | 25.00 | 0.00 |
| **Total Miscellaneous** | | | | | | 0.00 | 0.00 |
| **Payroll** | | | | | | | |
| Check | 07/13/06 | 104 | Edward B. Klein | | The Bank | 3000.00 | 3,000.00 |
| Check | 08/03/06 | 107 | Edward B. Klein | | The Bank | 1500.00 | 4,500.00 |
| Check | 08/10/06 | 111 | Edward B. Klein | | The Bank | 1500.00 | 6,000.00 |
| Check | 08/21/06 | 112 | Edward B. Klein | | The Bank | 2000.00 | 8,000.00 |
| Check | 09/30/06 | 125 | Edward B. Klein | | The Bank | 1000.00 | 9,000.00 |
| Check | 09/30/06 | 127 | Edward B. Klein | | The Bank | 1500.00 | 10,500.00 |
| Check | 10/14/06 | 132 | Edward B. Klein | | The Bank | 1000.00 | 11,500.00 |
| Check | 10/25/06 | 139 | Edward B. Klein | | The Bank | 1000.00 | 12,500.00 |
| Check | 10/28/06 | 142 | Edward B. Klein | | The Bank | 1000.00 | 13,500.00 |
| Check | 11/02/06 | 147 | Edward B. Klein | | The Bank | 5000.00 | 18,500.00 |
| Check | 12/12/06 | 158 | Edward B. Klein | | The Bank | ***** | 28,500.00 |
| Check | 12/29/06 | 159 | Edward B. Klein | | The Bank | ***** | 38,500.00 |
| Check | 12/30/06 | 162 | Edward B. Klein | | The Bank | 3000.00 | 41,500.00 |
| Check | 01/03/07 | 163 | Edward B. Klein | | The Bank | ***** | 51,500.00 |
| Check | 01/27/07 | 174 | Edward B. Klein | | The Bank | ***** | 61,500.00 |
| Check | 03/01/07 | 191 | Edward B. Klein | | The Bank | 6000.00 | 67,500.00 |
| Check | 03/01/07 | 196 | Edward B. Klein | | The Bank | 3000.00 | 70,500.00 |
| Check | 03/26/07 | 205 | Edward B. Klein | | The Bank | 5000.00 | 75,500.00 |
| Check | 04/05/07 | 210 | Edward B. Klein | | The Bank | 4000.00 | 79,500.00 |
| Check | 04/16/07 | 216 | Edward B. Klein | | The Bank | 4000.00 | 83,500.00 |
| Check | 05/03/07 | 223 | Edward B. Klein | | The Bank | 3000.00 | 86,500.00 |
| Check | 05/03/07 | 241 | Edward B. Klein | | The Bank | 3000.00 | 89,500.00 |
| Check | 07/05/07 | 253 | Edward B. Klein | | The Bank | ***** | 109,500.00 |
| Check | 07/11/07 | 257 | Edward B. Klein | | The Bank | ***** | 119,500.00 |
| Check | 07/16/07 | 258 | Edward B. Klein | | The Bank | 2000.00 | 121,500.00 |
| Check | 08/15/07 | | Jeremy Klein | | The Bank | 2087.85 | 123,587.85 |
| Check | 08/15/07 | | Edward B. Klein | | The Bank | ***** | 133,587.85 |
| General Journal | 12/31/06 | AJE8 | | to reclass mi... | Office | 5000.00 | 138,587.85 |
| General Journal | 06/30/07 | | | | Inventory As... | 4242.00 | 142,829.85 |

**Eyegiene America**
# Profit and Loss Detail
## January 2006 through August 2007

08/31/07

| Type | Date | Num | Name | Memo | Split | Amou... | Balance |
|------|------|-----|------|------|-------|---------|---------|
| Check | 01/13/06 | 98 | Edward B. Klein | | First Washin... | 1000.00 | 143,829.85 |
| Check | 01/13/06 | 99 | Edward B. Klein | | First Washin... | 1000.00 | 144,829.85 |
| Check | 01/16/06 | 100 | Edward B. Klein | | First Washin... | 1000.00 | 145,829.85 |
| Check | 01/19/06 | 104 | Edward B. Klein | | First Washin... | 2000.00 | 147,829.85 |
| Check | 02/09/06 | 108 | Edward B. Klein | | First Washin... | 300.00 | 148,129.85 |
| Check | 03/18/06 | 109 | Edward B. Klein | | First Washin... | 1000.00 | 149,129.85 |
| Check | 04/07/06 | 111 | Edward B. Klein | | First Washin... | 500.00 | 149,629.85 |
| Check | 04/07/06 | | Edward B. Klein | | First Washin... | 2000.00 | 151,629.85 |
| Check | 06/16/06 | 157 | Edward B. Klein | | First Washin... | 1500.00 | 153,129.85 |
| Check | 06/26/06 | | Edward B. Klein | | First Washin... | 1800.00 | 154,929.85 |
| Check | 06/26/06 | | Edward B. Klein | | First Washin... | 1000.00 | 155,929.85 |
| Check | 06/26/06 | | Edward B. Klein | | First Washin... | 1500.00 | 157,429.85 |
| Check | 06/26/06 | 159 | Edward B. Klein | | First Washin... | 3000.00 | 160,429.85 |
| Check | 06/26/06 | 160 | Edward B. Klein | | First Washin... | 2000.00 | 162,429.85 |
| Check | 06/26/06 | 161 | Edward B. Klein | | First Washin... | 1000.00 | 163,429.85 |
| **Total Payroll** | | | | | | ****** | 163,429.85 |
| **Promotion** | | | | | | | |
| Check | 09/01/06 | 118 | Printing Prose | | The Bank | 1000.00 | 1,000.00 |
| Check | 10/25/06 | 140 | Printing Prose | | The Bank | 1000.00 | 2,000.00 |
| Check | 10/25/06 | 141 | Zachary Resnick | | The Bank | 300.00 | 2,300.00 |
| General Journal | 12/31/06 | AJE7 | | Record 18 s... | Inventory As... | 4347.00 | 6,647.00 |
| General Journal | 06/30/07 | | | | Inventory As... | ***** | 49,778.00 |
| Check | 01/10/07 | 94 | Brena Resnick | | First Washin... | 1600.00 | 51,378.00 |
| Check | 06/26/06 | 158 | Printing Prose | | First Washin... | 877.00 | 52,255.00 |
| **Total Promotion** | | | | | | *****: | 52,255.00 |
| **Supplies** | | | | | | | |
| **Marketing** | | | | | | | |
| Check | 07/01/06 | 103 | Focus Marketing | | The Bank | 9000.00 | 9,000.00 |
| Check | 08/01/06 | 105 | Focus Marketing | | The Bank | 4000.00 | 13,000.00 |
| Check | 08/03/06 | 109 | Focus Marketing | | The Bank | 2000.00 | 15,000.00 |
| Check | 08/10/06 | 110 | Focus Marketing | | The Bank | 1500.00 | 16,500.00 |
| Check | 08/21/06 | 113 | Focus Marketing | | The Bank | 6750.00 | 23,250.00 |
| Check | 09/01/06 | 119 | Focus Marketing | | The Bank | 6000.00 | 29,250.00 |
| Check | 09/15/06 | 120 | Focus Marketing | | The Bank | 3000.00 | 32,250.00 |
| Check | 09/30/06 | 122 | Focus Marketing | | The Bank | 750.00 | 33,000.00 |
| Check | 09/30/06 | 123 | Focus Marketing | | The Bank | ***** | 44,821.00 |
| Check | 09/30/06 | 124 | Focus Marketing | | The Bank | 1000.00 | 45,821.00 |
| Check | 10/13/06 | 128 | Focus Marketing | | The Bank | 1500.00 | 47,321.00 |
| Check | 10/13/06 | 129 | Focus Marketing | | The Bank | 1500.00 | 48,821.00 |
| Check | 10/13/06 | 130 | Focus Marketing | | The Bank | 1000.00 | 49,821.00 |
| Check | 10/13/06 | 131 | Focus Marketing | | The Bank | 300.00 | 50,121.00 |
| Check | 10/20/06 | 134 | Focus Marketing | | The Bank | 1125.00 | 51,246.00 |
| Check | 10/20/06 | 137 | Focus Marketing | | The Bank | 5000.00 | 56,246.00 |
| Check | 10/25/06 | 135 | Focus Marketing | | The Bank | 5000.00 | 61,246.00 |
| Check | 11/02/06 | 144 | Focus Marketing | | The Bank | 7500.00 | 68,746.00 |
| Check | 11/02/06 | 145 | Focus Marketing | | The Bank | 3750.00 | 72,496.00 |
| Check | 11/02/06 | 146 | Focus Marketing | | The Bank | 1500.00 | 73,996.00 |
| Check | 11/24/06 | 151 | Focus Marketing | | The Bank | 3750.00 | 77,746.00 |
| Check | 11/24/06 | 152 | Focus Marketing | | The Bank | 300.00 | 78,046.00 |
| Check | 11/24/06 | 153 | Focus Marketing | | The Bank | 1000.00 | 79,046.00 |
| Check | 12/12/06 | 154 | Focus Marketing | | The Bank | 1500.00 | 80,546.00 |
| Check | 12/12/06 | 155 | Focus Marketing | | The Bank | 3750.00 | 84,296.00 |
| Check | 12/12/06 | 156 | Focus Marketing | | The Bank | 1500.00 | 85,796.00 |
| Check | 12/12/06 | 157 | Focus Marketing | | The Bank | 3000.00 | 88,796.00 |
| Check | 01/08/07 | 166 | Focus Marketing | | The Bank | 375.00 | 89,171.00 |

# Eyegiene America
# Profit and Loss Detail
### January 2006 through August 2007

08/31/07

| Type | Date | Num | Name | Memo | Split | Amou... | Balance |
|------|------|-----|------|------|-------|---------|---------|
| Check | 01/08/07 | 167 | Focus Marketing | | The Bank | 3000.00 | 92,171.00 |
| Check | 01/14/07 | 171 | Focus Marketing | | The Bank | 900.00 | 93,071.00 |
| Check | 01/26/07 | 172 | Focus Marketing | | The Bank | 7500.00 | 100,571.00 |
| Check | 01/27/07 | 173 | Focus Marketing | | The Bank | 3000.00 | 103,571.00 |
| Check | 01/31/07 | 177 | Focus Marketing | | The Bank | 750.00 | 104,321.00 |
| Check | 02/07/07 | 181 | Focus Marketing | | The Bank | 1500.00 | 105,821.00 |
| Check | 02/07/07 | 182 | Focus Marketing | | The Bank | 1500.00 | 107,321.00 |
| Check | 02/15/07 | 185 | Focus Marketing | | The Bank | ***** | 124,442.00 |
| Check | 02/15/07 | 187 | Focus Marketing | | The Bank | 1500.00 | 125,942.00 |
| Check | 03/01/07 | 192 | Focus Marketing | | The Bank | 750.00 | 126,692.00 |
| Check | 03/01/07 | 193 | Focus Marketing | | The Bank | 1500.00 | 128,192.00 |
| Check | 03/01/07 | 195 | Focus Marketing | | The Bank | 3000.00 | 131,192.00 |
| Check | 03/07/07 | 198 | Focus Marketing | | The Bank | 1500.00 | 132,692.00 |
| Check | 03/26/07 | 203 | Focus Marketing | | The Bank | 2996.25 | 135,688.25 |
| Check | 04/05/07 | 206 | Focus Marketing | | The Bank | 3000.00 | 138,688.25 |
| Check | 04/05/07 | 207 | Focus Marketing | | The Bank | 3000.00 | 141,688.25 |
| Check | 04/05/07 | 208 | Focus Marketing | | The Bank | 2234.25 | 143,922.50 |
| Check | 04/05/07 | 209 | Focus Marketing | | The Bank | 3750.00 | 147,672.50 |
| Check | 04/25/07 | 219 | Focus Marketing | | The Bank | 3000.00 | 150,672.50 |
| Check | 04/26/07 | 218 | Focus Marketing | | The Bank | 5000.00 | 155,672.50 |
| Check | 05/03/07 | 229 | Zachary Resnick | | The Bank | 3150.00 | 158,822.50 |
| Check | 05/25/07 | | Focus Marketing | | The Bank | ***** | 173,822.50 |
| Check | 06/01/07 | 241 | Focus Marketing | | The Bank | 3000.00 | 176,822.50 |
| Check | 06/01/07 | 243 | Focus Marketing | | The Bank | 5242.80 | 182,065.30 |
| Check | 06/01/07 | 245 | Focus Marketing | | The Bank | 6200.00 | 188,265.30 |
| Check | 06/18/07 | 248 | Focus Marketing | | The Bank | 9637.50 | 197,902.80 |
| Check | 03/18/06 | | Focus Marketing | | First Washin... | ***** | 212,177.80 |
| Check | 04/07/06 | 110 | Focus Marketing | | First Washin... | 4200.00 | 216,377.80 |
| Check | 05/08/06 | 152 | Focus Marketing | | First Washin... | 3000.00 | 219,377.80 |
| Check | 05/16/06 | 153 | Focus Marketing | | First Washin... | 5250.00 | 224,627.80 |
| Check | 06/16/06 | 154 | Focus Marketing | | First Washin... | 6124.60 | 230,752.40 |
| Check | 06/16/06 | 156 | Focus Marketing | | First Washin... | 3075.00 | 233,827.40 |
| **Total Marketing** | | | | | | ****** | 233,827.40 |
| **Office** | | | | | | | |
| Check | 10/25/06 | 138 | Apple Locksmith | | The Bank | 199.23 | 199.23 |
| General Journal | 12/31/06 | AJE8 | | to reclass mi... | -SPLIT- | 754.00 | 953.23 |
| **Total Office** | | | | | | 953.23 | 953.23 |
| **Total Supplies** | | | | | | ****** | 234,780.63 |
| **Total Expense** | | | | | | ****** | 523,895.66 |
| **Income** | | | | | | | |
| **Sales** | | | | | | | |
| Invoice | 12/06/06 | 19 | Liberty Paper an... | Eyegiene Se... | Accounts Re... | 0.00 | 0.00 |
| Invoice | 01/02/07 | 1015 | Douglas Manning | 4 Eyegiene ... | Accounts Re... | 876.00 | 876.00 |
| Invoice | 01/02/07 | 1015 | Douglas Manning | 8 Batteries | Accounts Re... | 160.00 | 1,036.00 |
| Invoice | 01/02/07 | 1015 | Douglas Manning | One MAster ... | Accounts Re... | 672.00 | 1,708.00 |
| Invoice | 01/02/07 | 1015 | Douglas Manning | 4 Battery Ch... | Accounts Re... | 80.00 | 1,788.00 |
| Invoice | 01/02/07 | 1015 | Douglas Manning | Freight Char... | Accounts Re... | 68.62 | 1,856.62 |
| Invoice | 01/08/07 | 1011 | Major Supply Copr. | Eyegiene To... | Accounts Re... | 438.00 | 2,294.62 |
| Invoice | 01/08/07 | 1011 | Major Supply Copr. | One Master ... | Accounts Re... | 672.00 | 2,966.62 |
| Invoice | 01/08/07 | 1011 | Major Supply Copr. | Batteries | Accounts Re... | 80.00 | 3,046.62 |
| Invoice | 01/08/07 | 1011 | Major Supply Copr. | Charger Unit | Accounts Re... | 40.00 | 3,086.62 |
| Invoice | 01/08/07 | 1011 | Major Supply Copr. | No Charge | Accounts Re... | 38.32 | 3,124.94 |
| Invoice | 02/16/07 | 1010 | Liberty Paper an... | Eyegiene Seat | Accounts Re... | 398.00 | 3,522.94 |

From: Anil V4 [mailto:anilv4@hotmail.com]
Sent: Tuesday, June 12, 2007 6:37 PM
To: roelof@eyegiene.nl
Subject: Address

Dear Roelof,

The main address for mailing is given below:

Focus Investor Group
Attn: Dr. Varughese
284 Eighth Avenue, Level B
New York, NY 10001

Anil Varughese, M.D.

---

Don't miss your chance to WIN $10,000 and other great prizes from
Microsoft Office Live
http://clk.atdmt.com/MRT/go/aub0540003042mrt/direct/01/

**WOLFF & SAMSON** PC
The Offices at Crystal Lake
One Boland Drive
West Orange, New Jersey 07052
973-325-1500
Attorneys for Plaintiffs

| | |
|---|---|
| SHELDON SCHWARTZ, M.D. and CLEAN CARE SYSTEMS, LLC, | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: UNION COUNTY |
| Plaintiffs, | |
| vs. | DOCKET NO. UNN-C-97-07 |
| EDWARD B. KLEIN and CLEAN CARE TECHNOLOGIES, INC., | Civil Action |
| Defendants. | **VERIFIED COMPLAINT** |

Plaintiffs Sheldon Schwartz, M.D., an individual residing at 5 Abernathy Road, Lexington, Massachusetts, and Clean Care Systems, LLC, a New Jersey limited liability company with a principal place of business at 1413 Chestnut Avenue, Hillside, New Jersey, by way of Verified Complaint against defendants Edward B. Klein, an individual residing at 27 West Parsonage Way, Manalapan, New Jersey, and Clean Care Technologies, Inc., a New Jersey Corporation with a address at 4400 Route 9 South, Suite 1000, Freehold, New Jersey, allege and say:

## FACTS COMMON TO ALL COUNTS

### Introduction

1.     Defendant Edward B. Klein ("Klein"), in blatant disregard for his fiduciary duties to plaintiffs, has embarked upon an improper, fraudulent and unlawful course of conduct highlighted by his secret formation and operation of Clean Care Technologies, Inc. ("Clean Care Technologies") for the apparent purpose of diverting and appropriating the assets, profits, customers and good-will of Clean Care Systems, LLC ("Clean Care Systems").  If left unrestrained, Klein and Clean Care Technologies will cause the demise of, and irreparable

1082338.3

harm to, Clean Care Systems, to the detriment of plaintiff Sheldon Schwartz ("Dr. Schwartz"), who has contributed the entirety of the capital funding of Clean Care Systems since its formation by Klein in January, 2006. Klein persuaded Dr. Schwartz to provide that funding for Clean Care Systems by, among other things, representing that Clean Care Systems owned the valuable and *exclusive* right to distribute the Eyegiene self-cleaning toilet seat in North America. Klein, while drawing a substantial salary as President of Clean Care Systems, has trampled those exclusive rights and misused company funds in his operation of Clean Care Technologies, which is now unlawfully reaping the benefits of Dr. Schwartz' investment in Clear Care Systems. The conduct of defendants continues to this day, all to plaintiffs' substantial and continuing detriment.

## The Parties

2.      Plaintiff Dr. Schwartz is a medical doctor and owns half of the six million member shares currently outstanding in Clean Care Systems by virtue of his initial capital contribution of $240,000. Dr. Schwartz has loaned Clean Care Systems additional funds in excess of $1 million, representing all of Clean Care System's capital funding from its inception to date, and has the right to convert those loans into additional member shares.

3.      Clean Care Systems is a limited liability company organized and existing under the laws of the State of New Jersey. Clean Care Systems' members consist of Dr. Schwartz and defendant Klein. Dr. Schwartz commences this action individually and also on behalf of Clean Care Systems; any effort to cause Klein to join in the commencement of this action to protect the rights of Clean Care Systems would be futile, because those rights are being appropriated by Klein for his other company and it is Klein and others in concert with him who are responsible for the damages alleged on behalf of Clean Care Systems in this action.

1082338.3

2

4.    Defendant Klein owns half of the six million member shares currently outstanding in Clean Care Systems and serves as its President. Klein has contributed no funds to the formation or operation of Clean Care Systems, but rather obtained his member shares by virtue of his professed ability to successfully run the company and make it an enormously profitable and successful venture.

5.    Defendant Clean Care Technologies is a New Jersey corporation which, upon information and belief, was surreptitiously formed by Klein in March, 2006 in order to engage in the identical business as Clean Care Systems and which holds itself out to the public as having the exclusive distribution rights which actually were purchased, and are owned by, Clean Care Systems.

**The Hook**

6.    In or around late 2005, Dr. Schwartz was approached by Klein who offered him an opportunity to invest in a new venture that Klein was forming to market and sell a self-cleaning toilet seat for restrooms in public and commercial facilities, which was being manufactured with the use of patented technology by a foreign company named NTF Eyegiene.

7.    The Eyegiene toilet seat automatically cleans itself after each use by rotating through a cleaning device mounted to the toilet. The seat is driven by a powerful, rechargeable battery and utilizes a special, deep-cleansing liquid developed by Eyegiene. The Eyegiene toilet seat operates on sensors and completes a full rotation within ten seconds, leaving the seat cleansed and sanitized.

8.    Klein represented to Dr. Schwartz that the Eyegiene products are already in extensive use in other countries throughout the world and that there would be tremendous demand for the product in North America.

1082338.3

3

9.      Klein's stated business plan for Clean Care Systems was to begin distributing the Eyegiene toilet seats at a minimal profit to large public and private customers in an effort to develop goodwill and raise public awareness of the product in North America, with the stated expectation and promise that Clean Care Systems would ultimately reap enormous profits through increased demand for the product and from the income stream that would be generated from the sale of replacement bottles of solution to its customers.

10.     Thus, the value of Clean Care Systems rests in its exclusive distribution rights of the Eyegiene products -- secured through Dr. Schwartz' capital contributions -- and its growth is dependent upon the creation and development of strong customer relationships and goodwill in the marketplace through the distribution of those Eyegiene products.

11.     Klein induced Dr. Schwartz to provide the capital funding to Clean Care Systems by assuring him, among other things, that Clean Care Systems had and would maintain the exclusive right to distribute the Eyegiene toilet seat and sanitizer in North America; and Klein showed Dr. Schwartz documentation which granted such rights to Clean Care Systems from Eyegiene.

12.     At various times from the inception of the venture, Klein justified additional and substantial expenditures on behalf of Clean Care Systems -- from funds contributed by Dr. Schwartz -- as necessary to assure that Clean Care Systems did not lose its exclusive rights to distribute the product from the patent holder. A copy of Klein's January 18, 2006 email to Dr. Schwartz, in which he touts his negotiation of a deal with the patent holder (the "Dutchman") and confirms that Clean Care Systems will "own the patent rights" for North America, is attached hereto as **Exhibit A.**

4

13.   Klein at all times represented to Dr. Schwartz that he possessed the expertise and ability to market the Eyegiene products and establish a nationwide distribution system that would make "millions of dollars" for Clean Care Systems -- and therefore for both Klein and Dr. Schwartz.

**The Formation and Capitalization of Clean Care Systems**

14.   On or about January 6, 2006, Klein caused the formation of Clean Care Systems. A copy of the formation certificate filed with, and obtained from, the New Jersey Secretary of State is attached hereto as **Exhibit B**.

15.   Pursuant to his agreement with Klein, and based upon Klein's representations, Dr. Schwartz provided the initial capitalization of $240,000 in exchange for 30% of the 10,000,000 member shares of Clean Care Systems.

16.   Klein, for his role, received 30% of the member shares of Clean Care Systems, but made no cash capital contribution.

17.   Klein and Dr. Schwartz further agreed that Dr. Schwartz would invest additional monies in the company which would be treated as loans to the company, at an interest rate of 1% per month, which loans could be converted by Dr. Schwartz into member shares at one (1) share per dollar up to the first $2 million invested (and, thus, up to 2,000,000 shares). In the event that Dr. Schwartz purchased those 2,000,000 member shares (bringing his ownership to five million shares), the remaining 2,000,000 member shares would either be purchased by Dr. Schwartz or, at his option, sold to another investor. Any unsold member shares would ultimately be split evenly between Klein and Dr. Schwartz. Attached hereto as **Exhibit C** is a copy of Klein's January 10, 2006 email confirming the receipt and terms of Dr. Schwartz' initial capital investment, together with a copy of the document subsequently executed by Klein

and Dr. Schwartz memorializing their agreement with regard to the loans and cash contributions to Clean Care Systems.

18.     Based upon the representations of Klein, and in reliance upon Klein's repeated assurances that the new venture had exclusive distribution rights of the Eyegiene products, Dr. Schwartz has throughout 2006 and 2007 contributed additional monies to the company in excess of $1 million.

19.     Klein was designated, and continues to serve, as President of Clean Care Systems and is paid a gross annual salary and benefits of approximately $180,000.

20.     Klein, in his capacity as President, has controlled the day-to-day operations of Clean Care Systems, including the approval of all contracts and expenditures.

21.     Klein has continually sought to exclude or disregard Dr. Schwartz in the making of material decisions affecting the company and has largely ignored Dr. Schwartz' requests for information regarding the operation and expenses of Clean Care Systems.

**Klein's Diversion of the Company's Assets and Opportunities**

22.     Faced with mounting losses and the apparent lack of success of Clean Care Systems, coupled with constant pressure from Klein for additional funding, Dr. Schwartz has attempted to obtain from Klein material information about the operations and expenditures of the company to ensure that his interests, and the interests of Clean Care Systems, are being furthered and protected.

23.     In response to Dr. Schwartz' inquiries, Klein provided him with only piecemeal and often false or misleading information, included inflated and deceptive sales figures, without revealing to him that a large portion of the "sales" were actually either returns to the manufacturer or sham transfers to Klein's other company, Clean Care Technologies.

24.    Notwithstanding the efforts of Klein to conceal his misconduct and limit Dr. Schwartz' access to the books and records of Clean Care Systems, Dr. Schwartz has recently discovered that Klein has been diverting substantial monies from Clean Care Systems for his own improper use.

25.    Among the most shocking revelations is that fact that, on or about March 8, 2006 -- a mere two months after the formation of Clean Care Systems -- Klein surreptitiously formed Clean Care Technologies for the apparent and unlawful purpose of diverting the assets of Clean Care Systems.  The Certificate of Incorporation executed by Klein states that he is the President of Clean Care Technologies.  A copy of the Certificate of Incorporation filed with, and obtained from, the New Jersey Secretary of State is attached hereto as **Exhibit D**.

26.    Clean Care Technologies is falsely described on its website (at www.cleancaretech.com) as "the exclusive distributor for the Eyegiene seat for all of North America ... focused on marketing and distributing its unique seat to all public and commercial facilities."  Its website also states that "Clean Care Technologies manufactures and distributes their unique self-cleaning toilet seat into all commercial restrooms."  A copy of the "About Us" page from the Clean Care Technologies website is attached hereto as **Exhibit E**.

27.    Upon information and belief, Klein or others acting with him are actively attempting to obtain financing of up to $10 million for Clean Care Technologies by touting it as "the exclusive distributor of a unique self-cleaning toilet seat."  Attached hereto as **Exhibit F** is a copy of a website entry regarding the solicitation of investors for Clean Care Technologies.

28.    It thus appears that Klein has established and is operating at least one other company to engage in the *exclusive* distribution of the very same product that he is supposed to be selling exclusively for Clean Care Systems.

29.    Moreover, Klein has unlawfully been funding the overhead of Clean Care Technologies through the diversion of Clean Care Systems' funds by, among other things, utilizing the employees of Clean Care Systems to operate the business, as well as funding the marketing, warehousing, and other expenses of Clean Care Technologies.

30.    Contrary to Klein's repeated representations to Dr. Schwartz that all sales efforts and agreements were for the benefit of Clean Care Systems, in actuality, Clean Care Technologies was injected as an illicit and unnecessary "middleman" for the purpose of misappropriating the profits, customers and goodwill of Clean Care Systems.

31.    Between August, 2006 and July, 2007, Klein, through Clean Care Technologies "purchased" hundreds of Eyegiene toilet seats and hundreds of containers of Eyegiene liquid sanitizer from Clean Care Systems with the apparent intention of re-selling them in the marketplace to further the growth of Clean Care Technologies, to the detriment of Clean Care Systems and in violation of Clean Care Systems' exclusive distribution rights.  The products "purchased" by Clean Care Technologies remain stored in the Clean Care Systems' warehouse, so that Clean Care Systems is carrying the storage costs for the benefit of Clean Care Technologies.

32.    By inserting Clean Care Technologies as an unnecessary middleman in transactions with the end users, Klein has not only diverted potential profits, but has robbed Clean Care Systems of its exclusivity and of the opportunity to generate the customer relationships and goodwill which were to be its lifeblood, taking those profits and opportunities for Clean Care Technologies.

1082338.3

33.    Clean Care Technologies' overhead is largely -- if not entirely -- funded by Clean Care Systems, so it is unlawfully positioned to unfairly compete with Clean Care Systems and misappropriate Clean Care Systems' business opportunities.

34.    Copies of the Invoices reflecting the self-dealing purchases by Clean Care Technologies are attached hereto as **Exhibit G** and those sales represent a substantial percentage of the Clean Care Systems' inventory that was intended to be sold for the purpose of furthering the business of Clean Care Systems and not Clean Care Technologies. The prices purportedly paid by Clean Care Technologies range from $300 per toilet seat to the more recent price of $200 per toilet seat; and the sanitizer was bought for $20 per bottle until a recent purchase of 432 bottles at $18 each.

35.    Even when confronted about his misconduct, Klein insisted (in a series of July 13, 2007 emails attached hereto as **Exhibit H**) that he has "worked extremely hard over the past year developing and creating a market for the EYEGIENE Product. And because of [his] dedication and commitment to both EYEGIENE and Dr. Sheldon Schwartz, if everything falls into place, [Dr. Schwartz] and [Klein] stand to make millions of dollars over the next two decades" and that Dr. Schwartz stands to "make a ton of money." Such statements were made with the apparent and unlawful purpose of continuing to conceal his fraud and to induce continued financing from Dr. Schwartz.

36.    All of the foregoing actions of defendants have been designed to harm Clean Care Systems in its business and to injure Dr. Schwartz personally.

## FIRST COUNT

### (Unfair Competition)

37.    Plaintiffs repeat and reallege each of the foregoing allegations as if set forth at length herein.

38.     The foregoing scheme was conceived and carried out by Klein and those acting in concert with him in order to unlawfully compete against Clean Care Systems and deprive Dr. Schwartz of the fruits of his investment, all for the benefit of Klein and Clean Care Technologies.

39.     Klein, in concert with others, has engaged in the most heinous form of unfair competition and fraud in his dealings with Dr. Schwartz and Clean Care Systems, essentially using them to fund the operations of a corporation that he created for the sole and illicit purpose of usurping Clean Care Systems' business and rendering Dr. Schwartz' investment worthless.

40.     The defendants' above-described actions are transgressive of fundamental and generally-accepted standards of commercial competition, morality and law, and accordingly violate common law principles relating to unfair competition.

41.     All the aforesaid unlawful acts were undertaken by the defendants willfully and maliciously, in bad faith, and for the purpose of injuring plaintiffs.

42.     As a result of defendants' aforesaid conduct, plaintiffs have sustained and continue to sustain substantial damage, and defendants' unfairly competitive conduct, unless restrained and enjoined, will cause Clean Care Systems irreparable harm in the destruction of its business.

## SECOND COUNT

### (Conversion)

43.     Plaintiffs repeat and reallege each of the foregoing allegations as if set forth at length herein.

44.     Dr. Schwartz has invested over $1.5 million in Clean Care Systems and the business operations of Clean Care Systems have generated income and cash flow from that investment, all of which are the sole property of Clean Care Systems.

1082338.3

45.    Klein willfully diverted the income and assets of Clean Care Systems to himself and Clean Care Technologies.

46.    The foregoing improper exercise of dominion and control over Clean Care Systems' income and assets by Klein and Clean Care Technologies constitutes wrongful conversion of Clean Care Systems' property.

47.    As a result of the foregoing, plaintiffs have been damaged.

### THIRD COUNT

#### (Breach of Fiduciary Duty)

48.    Plaintiffs repeat and reallege each of the foregoing allegations as if set forth at length herein.

49.    By virtue of his role as an owner and officer of Clean Care Systems, Klein owes Dr. Schwartz and Clean Care Systems a fiduciary duty to act in the utmost good faith and in the best interests of Clean Care Systems and its members.

50.    The actions of Klein, as above-described, including but not limited to his diversion of assets for the operation of a competing business, constitute fraud, dishonesty, breach of fiduciary duty and overreaching, all in violation of his obligations to Clean Care Systems and Dr. Schwartz.

51.    As a result of the foregoing, plaintiffs have been damaged.

### FOURTH COUNT

#### (Fraud)

52.    Plaintiffs repeat and reallege each of the foregoing allegations as if set forth at length herein.

53.    Klein willfully and with malice misrepresented to Dr. Schwartz that his investment Clean Care Systems would be, and was being, utilized to enhance the ability of

1082338.3

11

Clean Care Systems to become the exclusive distributor of Eyegiene products in North America.

54.    Klein's representations regarding Clean Care Systems to Dr. Schwartz were made with the intent that Dr. Schwartz would rely upon such representations, and with knowledge that such representations were material to Dr. Schwartz, and for the purpose of inducing Dr. Schwartz to invest in Clean Care Systems.

55.    In actuality, Klein has been illicitly operating an unlawful competing business with the funding provided by Dr. Schwartz and undermining and usurping the business development of Clean Care Systems.

56.    The above-described scheme by Klein, and those acting in concert with him, was conceived and implemented with the intent to defraud Dr. Schwartz out of millions of dollars.

57.    Klein and those acting with him have intentionally misrepresented and concealed important and material facts, including the diversion of sales and assets to Clean Care Technologies, to Dr. Schwartz in an effort to further and conceal the fraudulent conduct.

58.    Dr. Schwartz has reasonably relied upon the above representations and has been damaged by reason thereof.

### FIFTH COUNT

### (Negligent Misrepresentation)

59.    Plaintiffs repeat and reallege each of the foregoing allegations as if set forth at length herein.

60.    As described above, Klein willfully and wantonly misrepresented his intention to grow the business of Clean Care Systems as the exclusive distributor of Eyegiene products in North America and willfully and wantonly misrepresented the progress of Clean Care Systems'

1082338.3

business growth, with the knowledge and belief that these matters were material to Dr. Schwartz in his decisions with respect to investing in the company and that Dr. Schwartz would rely upon said representations.

61.    Dr. Schwartz has reasonably relied upon the above representations and has been damaged by reason thereof.

## SIXTH COUNT

### (Breach of Duty of Good Faith and Fair Dealing)

62.    Plaintiffs repeat and reallege each of the foregoing allegations as if set forth at length herein.

63.    Implied in every agreement, including the agreement between Dr. Schwartz and Klein with regard to the formation and ownership of Clean Care Systems, is a covenant of good faith and fair dealing, pursuant to which, among other things, Klein is obligated not to take actions that would have the effect of destroying or injuring the right of Dr. Schwartz to receive the fruits of his investment in Clean Care Systems.

64.    By virtue of the aforementioned wrongful conduct, Klein breached his duty of good faith and fair dealing to Dr. Schwartz.

65.    Dr. Schwartz has been damaged by Klein's breach of the covenant of good faith and fair dealing.

## SEVENTH COUNT

### (Intentional Interference with Business Relations)

66.    Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

67.    The actions of Klein and Clear Care Technologies have interfered with the business of Clean Care Systems by denying Clean Care Systems its right and ability to

maintain relationships with clients, vendors, and others with whom it was intended to conduct business, with full knowledge of the intrusion upon and usurpation of the rights of Clean Care Systems.

68.    Said interference with the business relations of Clean Care Systems was engaged in knowingly, willfully, maliciously, and wantonly with actual intent to harm Clean Care Systems.

69.    Said interference and conduct have impaired the ability of Clean Care Systems to carry on its business and have disrupted the ongoing business relationships between Clean Care Systems and its clients, vendors and others.

70.    By virtue of the foregoing conduct, plaintiffs have been damaged.

## EIGHTH COUNT

### (Tortious Interference with Prospective Business Advantages)

71.    Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

72.    Klein and Clean Care Technologies, by their improper and unlawful acts, have tortiously interfered with prospective business opportunities and advantages of Clean Care Systems by denying Clean Care Systems its right and ability to develop and maintain relationships with clients, vendors, and others with whom it was formed to conduct business, with full knowledge of the intrusion upon and usurpation of Clean Care Systems' rights.

73.    These unlawful activities have been conducted by Klein and Clean Care Technologies to wrongfully interfere with Clean Care Systems' prospective business advantages and relations and are wholly transgressive of generally accepted standards of commercial morality and law.

74.    By virtue of the foregoing, plaintiffs have been damaged.

14

1082338.3

## NINTH COUNT

### (Unjust Enrichment)

75.    Plaintiffs repeat and reallege each of the foregoing allegations as if set forth at length herein.

76.    As described above, Clean Care Technologies has been unjustly enriched by its use of the property, assets and income of Clean Care Systems.

77.    As a result, Clean Care Systems has been and will continue to be injured by the conduct of Klein and Clean Care Technologies.

## TENTH COUNT

### (Conspiracy)

78.    Plaintiffs repeat and reallege each of the foregoing allegations as if set forth at length herein.

79.    All of the foregoing schemes and actions of defendants, whether conceived or implemented by one or both of them were part and parcel of an unlawful, fraudulent, immoral and tortious conspiracy in which they participated and aided and abetted one another.

80.    Upon information and belief, all the aforesaid unlawful acts were undertaken by the defendants willfully and maliciously, in bad faith, and for the purpose of injuring plaintiffs in their business.

## ELEVENTH COUNT

### (Inspection of Books and Records)

81.    Plaintiffs repeat and reallege each of the foregoing allegations as if set forth at length herein.

82.    Statutory and common law provide an owner of a business, including a member of a limited liability company, the right to review his company's books and records.

1082338.3

83.     Pursuant to N.J.S.A. 42:2B-25, Dr. Schwartz, as a member of Clean Care Systems has the right to obtain from time to time upon reasonable demand for any purpose reasonably related to his member interest, among other things: true and full information regarding the status of the business and financial condition of the company; a copy of any written operating agreement and certificate of formation and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the operating agreement and any certificate and all amendments thereto have been executed; and all other non-confidential information regarding the affairs of Clean Care Systems as is just and reasonable.

84.     Dr. Schwartz has demanded full access to Clean Care Systems' books and records, but has received only partial records and has been denied access to the entirety of those records, including copies of the company's contracts and agreements.

85.     Pursuant to his statutory and common law rights, Dr. Schwartz is entitled to an inspection of Clean Care Systems' books and records.

## TWELFTH COUNT

### (Accounting)

86.     Plaintiffs repeat and reallege each of the foregoing allegations as if set forth at length herein.

87.     As described hereinabove, Klein has diverted operating income and/or assets of Clean Care Systems for his own use in violation of his common law and statutory duties to plaintiffs.

88.     As a result of the foregoing actions, Dr. Schwartz is entitled to a full accounting from Klein of the affairs of Clean Care Systems and of the affairs of his unlawfully created Clean Care Technologies.

1082338.3

16

WHEREFORE, plaintiffs demand judgment against defendants as follows:

(a)    For an Order preliminarily and permanently enjoining and restraining defendant Clean Care Technologies and its agents and employees, and all other persons acting with them or on their behalf, from directly or indirectly:

(i) selling or distributing any Eyegiene products in North America; or

(ii) engaging in business similar to or in competition with Clean Care Systems;

(b)    For an Order preliminarily and permanently enjoining and restraining defendant Klein and his agents and all other persons acting with him or on his behalf from directly or indirectly:

(i) selling or distributing any Eyegiene products in North America; or

(ii) engaging in business similar to or in competition with Clean Care Systems;

(c)    For an Order granting Dr. Schwartz full access to all of the books and records, including but not limited to all contracts and agreements, of Clean Care Systems and enjoining defendant Klein from interfering with such access;

(d)    For an Order requiring a full accounting of all income, expenses, and profits of Clean Care Systems and Clean Care Technologies;

(e)    For the appointment of a receiver or custodial agent to manage the business of Clean Care Systems;

(f)    For the payment of compensatory and consequential damages by the defendants to the plaintiffs;

(g)    For the payment of punitive damages by the defendants;

(h)    For prejudgment and post-judgment interest;

(i)    For payment of attorneys fees and costs of suit; and

17

(j)    For such other and further relief as the Court deems just and proper.

WOLFF & SAMSON PC
Attorneys for Plaintiffs


By _____
        JOHN F. CASEY

Dated: August 1, 2007

## SETTLEMENT AGREEMENT & CLOSING STATEMENT

This Settlement Agreement (the "Agreement") is made and entered into among Sheldon Schwartz, M.D., an individual residing at 5 Abernathy Road, Lexington, Massachusetts ("Schwartz"), Clean Care Systems, LLC, a New Jersey limited liability company with a principal place of business at 1413 Chestnut Avenue, Hillside, New Jersey ("CCS"), Edward B. Klein, an individual residing at 8 Robinson Court, Freehold, New Jersey ("Klein"), and Clean Care Technologies, Inc., a New Jersey Corporation, with an address at 4400 Route 9 South, Suite 1000, Freehold, New Jersey ("CCT"), and is executed on the dates shown below.

### W I T N E S S E T H:

WHEREAS, CCS is a limited liability company organized and existing under the laws of the State of New Jersey and, since it inception in January, 2006, has been in the business of marketing and selling a certain self-cleaning toilet seat for restrooms in public and commercial facilities. Such products are being manufactured by NTF International B.V., a Netherlands Corporation (NTF) pursuant to a NTF Distribution Agreement dated January 26, 2006, and CCS holds the exclusive rights to sell Eyegiene Products in the United States; and

WHEREAS, Schwartz owns thirty percent (30%) of the ten million member shares of CCS by virtue of his initial capital contribution of $240,000, and Schwartz has loaned CCS additional funds, representing all of CCS's capital funding, and has the right to convert those loans into additional member shares in CCS; and

WHEREAS, Klein, as the only other holder of an interest in CCS, owns thirty percent (30%) of the ten million member shares of CCS; and

1093738.2

WHEREAS, on or about March 8, 2006, CCT was formed by Klein and, since that time, CCT has purchased Eyegiene Products from CCS, some of which remain in the possession of CCT (the "Inventory"); and

WHEREAS, Schwartz and CCS commenced litigation against Klein and CCT captioned *Schwartz, et al. v. Klein, et al.*, Superior Court of New Jersey, Chancery Division, Union County, Docket No. UNN-C-97-07 (the "Litigation") asserting claims for injunctive relief and significant monetary damages against Klein and CCT in which the Court has entered a September 4, 2007 Consent Order for Preliminary Injunction against Klein and CCT; and

WHEREAS, Klein and CCT dispute the allegations in the Litigation and the parties have agreed to resolve all of their disputes, including all claims that were or could have been asserted among them in the Litigation, in accordance with the terms of this Agreement; and

WHEREAS, the parties hereto desire to enter into a distributorship agreement between CCS and CCT; and

NOW, THEREFORE, in the good and valuable consideration of the mutual promises and undertakings of the parties herein, it is agreed as follows:

1.    **Payment.**  CCS hereby agrees to pay to CCT, and CCT agrees to accept, the sum of Two Hundred and Twenty-Five Thousand Dollars ($225,000) within ten (10) business days of the full execution of this Agreement (the "Payment") in exchange for the promises, releases and undertakings of CCT and Klein set forth herein.

2.    **Return of Inventory.**  Upon receipt of the Payment, CCT hereby agrees that it shall surrender and transfer to CCS all of its rights, title and interest to the Inventory which remains at warehouse under control of CCS.

109373R.2                          2

3.   **Resignation.**  Klein shall and hereby does resign from all of his positions with CCS, including without limitation, his position as employee and President of CCS, effective as of October 5, 2007 and shall deliver a letter of resignation to that effect thereof simultaneously hereto.

4.   **Surrender of Member Shares.**   In addition to the foregoing and as additional consideration hereto, Klein shall and hereby does surrender to CCS his entire member interest in CCS and acknowledges that he has no further rights, title or interest in CCS.

5.   **Distributorship Agreement.**  CCS agrees to enter into a distributorship agreement with Klein and CCT or such entity as Klein shall designate, to sell Eyegiene Products in Eastern Pennsylvania or as modified upon such terms as may be agreed upon between the parties and in a form consistent with the standard CCS distributorship agreement in use at this time.

6.   **No Employment Related Claims.**  Klein acknowledges and agrees that he has received all compensation, distributions and other consideration from CCS and Schwartz to which he is entitled, whether in his capacity as a shareholder, employee, member, officer or director of CCS or otherwise, and under all agreements to which he and Schwartz or CCS are parties.  CCS acknowledges and agrees that it has no further claims and other consideration from Klein, whether in his capacity as a shareholder, employee, member, officer or director of CCS or otherwise, and under all agreements to which he and Schwartz or CCS are parties.

7.   **Representations and Warranties of Klein.**  Klein hereby represents and warrants, to the best of his knowledge and except as specifically noted in subparagraph (f) hereof, to Schwartz and CCS as follows:

   (a)      Klein has full power and authority to enter into this Agreement, individually and on behalf of CCT, and to perform his obligations, and to cause CCT to perform its

obligations, under this Agreement. This Agreement has been duly executed and delivered by Klein and CCT and constitutes the legal, valid and binding obligation of Klein and CCT, enforceable against them in accordance with its terms.

(b)     The member interest in CCS surrendered herein by Klein is owned beneficially, solely and of record by Klein, free and clear of all liens, security interests, pledges, mortgages, encumbrances, charges, rights of first refusal or first offer, options to sell or purchase, agreements and other claims or rights of others of any nature whatsoever.

(c)     Neither Klein's or CCT's execution and delivery of this Agreement, nor the performance by Klein or CCT of any of the transactions contemplated by this Agreement, whether with or without the giving of notice or the lapse of time or both, violates or constitutes a default under any mortgage, indenture, deed of trust, lease, contract, agreement, license or other instrument to which Klein or CCT is a party, or by which Klein and/or CCT or their property is bound.

(d)     No consent, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority or third party is required in connection with the execution and delivery by Klein and CCT of this Agreement and the consummation by Klein or CCT of the transactions contemplated by this Agreement.

(e)     No broker, finder or other person acting in a similar capacity has represented or otherwise acted, directly or indirectly, for Klein or CCT in connection with this Agreement or any of the transactions contemplated by this Agreement.

(f)     The consummation by Klein and CCT of the transactions contemplated by this Agreement will not violate any order, judgment or ruling of any court or governmental body having competent jurisdiction, and there is no action, suit, proceeding or investigation

which is pending or, to Klein's knowledge, threatened that seeks to enjoin or question the validity of this Agreement or any action taken or to be taken to consummate the transactions contemplated by this Agreement. Other than it is understood and acknowledged by the parties that CCT, CCS and Klein is currently under investigation by the Securities and Exchange Commission and may be cited in an action by the Securities and Exchange Commission of which Klein shall make a proffer to settle including the request to release CCS therefrom.

(g)       Klein has returned to CCS any and all property in Klein's possession or control that belongs to CCS, including without limitation the following:  all keys; all access, telephone and credit cards; all equipment, products, samples, inventory, tools, computers and software; all present or prospective customer files or information pertaining thereto, account files, price lists, product information, training manuals and handbooks; and all other documents and materials relating to CCS' business, products and/or services, personnel, licensors, suppliers and customers.

(h)       Since September 4, 2007, Klein has not had any contact or communication with any of CCS' vendors, suppliers, licensors, prospective licensors or customers, the purpose or intent of which was to solicit business from such parties, to disparage or defame CCS or Schwartz, or to cause any of such parties to modify or terminate their business relationship with CCS.

8.      **Representations and Warranties of Schwartz**. Schwartz represents and warrants to the best of his knowledge, to Klein and CCT as follows:

(a)       Schwartz has full power and authority to enter into this Agreement, individually and on behalf of CCS, as its sole surviving member after the surrender by Klein of his

member interest in CCS hereunder, and to perform his obligations and to cause CCS to

perform its obligations, under this Agreement. This Agreement has been duly executed and

delivered by Schwartz and CCS and constitutes the legal, valid and binding obligation of

such party, enforceable against him or it in accordance with its terms.

(b)        Neither Schwartz' execution and delivery of this Agreement, nor the performance

by Schwartz or CCS of the transactions contemplated by this Agreement, whether with or

without the giving of notice or the lapse of time or both, violates or constitutes a default

under any mortgage, indenture, deed of trust, lease, contract, agreement, license or other

instrument to which Schwartz or CCS is a party, or by which Schwartz and/or CCS or their

property is bound.

(c)        No consent, approval or authorization of, or declaration, filing or registration

with, any governmental or regulatory authority or third party is required in connection with

the execution and delivery by Schwartz of this Agreement and the consummation by the

Schwartz or CCS of the transactions contemplated by this Agreement.

(d)        No broker, finder or other person acting in a similar capacity has represented or

otherwise acted, directly or indirectly, for Schwartz or CCS in connection with this

Agreement or any of the transactions contemplated by this Agreement.

(e)        The consummation by Schwartz or CCS of the transactions contemplated by this

Agreement will not violate any order, judgment or ruling of any court or governmental

body having competent jurisdiction, and there is no action, suit, proceeding or investigation

which is pending or, to Schwartz' knowledge, threatened that seeks to enjoin or question

the validity of this Agreement or any action taken or to be taken to consummate the

transactions contemplated by this Agreement.

(f)     Schwartz shall, following execution of this Agreement, take any steps that
Schwartz shall deem, in his absolute discretion, necessary or appropriate to cause the
cancellation, refund or buy-out of the contracts between (i) CCT and Eyegiene Arizona,
LLC and (ii) CCT and 360 Health, at no cost to CCT.

9.     **Survival of Representations and Warranties**.  The representations, warranties and
covenants of the parties contained in this Agreement will survive the consummation of the
transactions contemplated by this Agreement.

10.     **Indemnification by Klein and CCT**.  From and after the execution of this Agreement,
Klein and CCT shall and hereby do indemnify, defend and hold Schwartz and CCS harmless
from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs
and expenses (including without limitation, reasonable attorneys' fees and disbursements,
including those incurred to enforce this indemnification), suffered or incurred by Schwartz or
CCS, or either of them, arising out of or in connection with (i) the failure of any of the
representations or warranties made by Klein in this Agreement to be true, correct and complete
in all material respects when made; (ii) the breach or violation by Klein and/or CCT of any of the
terms and conditions of this Agreement; and/or (iii) the formation, capitalization, or operations
of CCT and/or CCS, including but not limited to any loss, costs, or expenses arising out of the
Securities and Exchange Commission investigation referenced in paragraph 7(f) above.

11.     **Indemnification by Schwartz and CCS**.  From and after the execution of this
Agreement, Schwartz and CCS shall and hereby do indemnify, defend and hold Klein and CCT
harmless from and against any and all claims, demands, causes of action, losses, damages,
liabilities, costs and expenses (including without limitation, reasonable attorneys' fees and
disbursements, including those incurred to enforce this indemnification), suffered or incurred by

Klein or CCT, or either of them, arising out of or in connection with (i) the failure of any of the representations or warranties made by Schwartz and CCS in this Agreement to be true, correct and complete in all material respects when made, or (ii) the breach or violation by Schwartz and/or CCS of any of the terms and conditions of this Agreement.

12.     **Survival of Indemnifications.** The indemnity provisions of this Agreement shall survive the consummation of the transactions contemplated by this Agreement.

13.     **Non-competition, Non-solicitation and Non-disparagement.**  Klein shall not, directly or indirectly, individually or in conjunction or in concert with any person or persons, firm, entity, limited liability company, partnership, corporation, company, association or syndicate, as a principal, equity owner, shareholder, director, employee, officer, independent contractor or agent, or in any other manner whatsoever.

(a)     For the period commencing on the date hereof and continuing for a period of two (2) years hereafter (except pursuant to a written agreement with, and for the benefit of, CCS as provided herein in Paragraph 5 hereof), directly or indirectly contact, communicate with, or solicit any customers, distributors, manufacturers, or suppliers of CCS for any purpose related to the sale of Eyegieno Products or any similar products in the United States; or

(b)     For the period commencing on the date hereof and continuing for a period of two (2) years hereafter render services to, become employed by, own or have a financial interest in (either as an individual, partner, joint venturer, owner, manager, stockholder, employee, officer, director, independent contractor or any other role) any business which is engaged in the same, similar or competitive business as to sale of self-cleaning toilet seats as CCS in the United States, except that nothing herein shall prohibit Klein or CCT from operating as a distributor for CCS pursuant to a written agreement and as provided in Paragraph 5 hereof; or

  (c)  disparage, denigrate or in any way discredit the reputation or integrity of Schwartz, CCS or any of its present or future members, officers, directors or employees, or the quality or value of the products and/or services that CCS provides; and

  (d)  Klein acknowledges that the provisions set forth in this Section are fair and reasonable, are reasonably required for the protection of CCS, that adequate consideration has been provided to Klein, and that such provisions do not prevent Klein from earning a livelihood. If any part or parts of this Section shall be held to be unenforceable or invalid, the remaining parts shall nevertheless continue to be valid and enforceable as thought the invalid portion or portions were not a part of this Agreement. If any of the provisions of this Section relating to the time periods of restriction shall be deemed to exceed the maximum periods which a court of competent jurisdiction would deem enforceable, the time periods shall, for the purposes of said Section be deemed to be the maximum time periods which a court of competent jurisdiction would deem valid and enforceable.

  **Non-disparagement by Schwartz.**  (b) Schwartz shall not directly or indirectly, individually or in conjunction or in concert with any person or persons, firm, entity, limited liability company, partnership, corporation, company, association or syndicate, as a principal, equity owner, shareholder, director, employee, officer, independent contractor or agent, or in any other manner whatsoever disparage, denigrate or in any way discredit the reputation or integrity of Klein or CCT or any of its present or future members, officers, directors or employees, or the quality or value of the products and/or services that CCT provides.

14.  <u>Use of Eyegiene Name</u> Except as expressly permitted in any distribution agreement entered into pursuant to Paragraph 5 hereof, Klein and CCT shall discontinue use of the designation "d/b/a Eyegiene" or any other name or mark comprised in whole or in part of the

term "Eyegiene," as a trademark, service mark, trade name, logo, domain name or any other indicator of source in connection with any goods or services and shall not at any time in the future adopt or provide goods or services under a trade name, corporate name, trademark, service mark, logo or other indicator of source that: (i) includes the term "Eyegiene" or (ii) is phonetically substantially similar to "Eyegiene;" or (iii) is otherwise confusingly similar to "Eyegiene," except that they may use the term to describe the line of products to the extent they, or either of them, is selling such products pursuant to a written agreement with CCS.

15.     **Injunctive Relief.**  The parties agree that any breach or threatened breach by the parties of the preceding paragraphs 13 or 14 would cause irreparable harm to the injured party, that a remedy at law or in damages would be inadequate to remedy such a breach or threatened breach, and that the provisions of the preceding paragraphs 13 and 14 may be enforced by way of a restraining order or injunction, in addition to any other remedies which may be available at law or in equity.

16.     **Dismissal of Litigation and Permanent Restraints**  Following execution of this Agreement, the parties shall cause their respective attorneys to execute and file with the Court a Consent Order of Dismissal with Injunction, in the form annexed hereto as Exhibit A, which shall dismiss the Litigation with prejudice and without costs and which shall enjoin CCT from engaging in the same, similar or competitive business as to sale of self-cleaning toilet seats as CCS in the United States, except that nothing herein or in such Consent Order shall be deemed to prohibit CCT from operating as a distributor for CCS pursuant to a written agreement.

17.     **Mutual Releases**

**Klein and CCT Release.**  In consideration for CCS and Schwartz entering into this Agreement and dismissing the Litigation, from and after the date hereof, Klein and CCT, their heirs, successors, personal representatives and assigns, hereby release and forever discharge (a) CCS and its members, officers, directors, employees, representatives, agents, attorneys, successors and assigns and (b) Schwartz, his heirs, personal representatives, agents, attorneys, successors and assigns, in each case from any and all claims or causes of action of any type whatsoever, legal or equitable, known or unknown, arising from or pertaining to any act, circumstance or event occurring at any time prior to the execution of this Agreement, including, but not limited to, any claim, cause of action, grievance, charge or suit arising out of or in connection with the formation, capitalization or operations of CCT, Klein's membership interest in or employment by CCS, separation from such employment, or any other actions of any kind prior to, during or after such employment.

This release includes, but is not limited to, the release, waiver and discharge of: (a) any claim based on breach of express or implied contract, estoppel or reliance, tort, negligence, defamation, libel, or slander, negligent or intentional misrepresentation, negligent or intentional infliction of emotional distress, interference with contractual relations, fraud or violation of public policy; (b) any claim of wrongful or constructive discharge; (c) any claim of discrimination; (d) any claim of a violation of any federal, state or local statute, regulation, rule, or ordinance, (e) any claim for wages, bonus payments or other compensation or benefits, or (f) any claims that were or could have been asserted in the Litigation.

**Schwartz and CCS Release.**  In consideration for Klein and CCT entering into this Agreement, from and after the execution of this Agreement, Schwartz and CCS, their heirs, successors, personal representatives and assigns, hereby release and forever discharge (a) CCT

and its members, officers, directors, employees, representatives, agents, attorneys, successors and assigns and (b) Klein, his heirs, personal representatives, agents, attorneys, successors and assigns, in each case from any and all claims or causes of action of any type whatsoever, legal or equitable, known or unknown, arising from or pertaining to any act, circumstance or event occurring at any time prior to their execution of this Agreement, including, but not limited to, any claim, cause of action, grievance, charge or suit arising out of or in connection with the formation, capitalization or operations of CCT, Klein's membership interest in or employment by CCS, separation from such employment, or any other actions of any kind prior to, during or after such employment.

This release includes, but is not limited to, the release, waiver and discharge of: (a) any claim based on breach of express or implied contract, estoppel or reliance, tort, negligence, defamation, libel, or slander, negligent or intentional misrepresentation, negligent or intentional infliction of emotional distress, interference with contractual relations, fraud or violation of public policy; (b) any claim of wrongful or constructive discharge; (c) any claim of discrimination; (d) any claim of a violation of any federal, state or local statute, regulation, rule, or ordinance, (e) any claim for wages, bonus payments or other compensation or benefits, and (f) any claims that were or could have been asserted in the Litigation.

**Exception to Releases.** The releases set forth in this Section do not apply to any claims arising after the date hereof, including any claims relating or arising out of this Agreement.

18.     **Acknowledgment of Consultation.**  The parties each expressly acknowledge that they have consulted with an attorney of their choice before signing this Agreement.

19.    **Severability.** If any provision or provisions of this Agreement shall be held to be illegal, invalid or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

20.    **Notices.** Any notice, demand, consent, approval, request or other communication ("Notice") required or permitted under this Agreement must be in writing and shall be sent either by the parties or by their respective attorneys (who are expressly authorized to do so on their behalf) by personal delivery or by certified mail postage prepaid, return receipt requested, or by overnight delivery service providing proof of delivery. Notices shall be effective upon receipt or refusal of delivery. Notices must be sent to the addresses first set forth above unless and until a party notifies the other party in writing of a change of address, which subsequent address may thereafter be changed from time to time in accordance herewith. Notices shall also be given by facsimile transmission (fax) to the parties' counsel at the Fax numbers set forth below:

Counsel for the Schwartz and CCS:

> Wolff & Samson, P.C.
> The Offices at Crystal Lake
> One Boland Drive
> West Orange, New Jersey 07052
> Attention: John F. Casey, Esq.
> Telephone: 973-530-2017
> Fax: 973-530-2217

Counsel for Klein and CCT:

> Larry A. Stempler, Esq.
> Stempler Law Center
> 704 Passaic Avenue
> West Caldwell, NJ 07006.
> Telephone: (973) 882-9300
> Fax: (973) 882-9788

21.    **Governing Law.** This Agreement shall be construed and interpreted in accordance with the laws of the State of New Jersey.

22.    **Modification.** This Agreement shall not be modified except in a writing signed by each of the parties.

23.    **Knowing and Voluntary Agreement.** The parties acknowledge that they have had a reasonable opportunity to consider the terms of this Agreement and that they enter into this Agreement knowingly, freely and voluntarily.

24.    **Entire Agreement.** The parties hereto agree that there are no additional promises or assurances between the parties, other than those written in this Agreement and that this Agreement constitutes the entire agreement and understanding of the parties and supersedes and replaces any and all other agreements, promises, and representations with respect to the subject matter of this Agreement and such other documents.

25.    **Counterparts.** This Agreement may be signed in one or more counterparts, all of which will be considered one and the same agreement and will become effective when each of the parties has signed and delivered a counterpart to the other.

26.    **Construction of Agreement.** The parties have fully negotiated the terms of this Agreement in consultation with counsel, and have arrived at the wording of this Agreement as a result of their mutual discussions. Accordingly, no provision of this Agreement will be construed against a particular party or in favor of another party merely because of which party (or its representative) drafted or supplied the wording for such provision.

Where the context requires: (i) use of the singular or plural incorporates the other, and (ii) pronouns and modifiers in the masculine, feminine or neuter gender will be deemed to refer to or include the other genders. Section headings appearing in this Agreement are inserted solely

as reference aids for the ease and convenience of the reader; they will not be deemed to modify,

limit or define the scope or substance of the provisions they introduce, nor will they be used in

construing the intent or effect of such provisions.

Date: ___11/20/07___

EDWARD B. KLEIN, Individually

Date: ___11/16/07___

SHELDON SCHWARTZ, Individually

CLEAN CARE SYSTEMS, LLC

Date: ___11/16/07___      By: _____
                              SHELDON SCHWARTZ,
                              as sole surviving member after surrender of
                              shares by Klein pursuant to this Agreement.

CLEAN CARE TECHNOLOGIES, INC.

Date: ___11/20/07___      By: _____
                              EDWARD B. KLEIN,
                              as President

1003738.2                           15



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND Exchang Commission
Valeoie ANN Szezeparib

*(In the space above enter the full name(s) of the plaintiff(s)/petitioner(s).)*

08 Civ. 01719 (HB) (___)

- against -

Clean Care Technologies, INC Et Al.
Edward Klien
Al Nazon
Anil Varughese

**AFFIRMATION OF SERVICE**

*(In the space above enter the full name(s) of the defendant(s)/respondent(s).)*

I, ____Al Nazon____, **declare under penalty of perjury** that I have
        *(name)*

served a copy of the attached ___Answer to Complaint / Notice of Appearance pro se___
                                        *(document you are serving)*

upon ___Valerie Ann Szezepanik___ whose address is _____
        *(name of person served)*

3. World Financial Center Rm. 4300 New York, NY 10281
                        *(where you served document)*

by ___Certified Mail_____
        *(how you served document: For example - personal delivery, mail, overnight express, etc.)*

Dated:  Staten Island, NY
        *(town/city)*    *(state)*

        April    14, 2008
        *(month)*  *(day)  (year)*

Signature
        2 Hendricks Ave App 1A
Address
        Staten Island, NY
City, State
        10301
Zip Code
        917-488-4080
Telephone Number

*Rev. 05/2007*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Securities AND Exchange Commission
Valerie Ann Szczepanik
_(In the space above enter the full name(s) of the plaintiff(s)/petitioner(s).)_

08 civ. 01719 (HB) ( )

**NOTICE OF APPEARANCE**

- against -

Clean Cape Technologies, Inc et al
Edward Klier
Al Nazen
Biju Varughese
_(In the space above enter the full name(s) of the defendant(s)/respondent(s).)_

Please take notice that I, ___Al Nazen___, a defendant in
                                    _(name)_
this action, hereby appear *pro se* and that all future correspondence and papers in connection with
this action are to be directed to me at the address indicated below.

Dated: ___Staten Island, NY___
          _(town/city)_     _(state)_
       ___April___  ___14___, 20_08_

___Al Nazen___
Signature of Defendant
___2 Hendricks Ave Apt 1A___
Address
___Staten Island, NY___
City, State & Zip Code
___10301___
Telephone Number
___917-488-4080___
Fax Number (if you have one)

*Rev. 05/2007*

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Securities and exchange commission
Valerie Ann Szczepanik

*(In the space above enter the full name(s) of the plaintiff(s)/petitioner(s).)*

08 Civ. 01719 (HB )

**ANSWER**

- against -

Clean Care Technologies Et Al
Edward O'Brien
Al Nazon
Anil Varughese

*(In the space above enter the full name(s) of the defendant(s)/respondent(s).)*

## I
### ADMISSIONS AND DENIALS

*In this section, state which factual allegations in the complaint you admit to and which factual allegations you deny.*
*You should refer to the complaint paragraph by paragraph (and sentence by sentence within each paragraph), in the*
*same order as the paragraphs and sentences appear in the complaint. Attach additional sheets of papers as necessary.*

1. Paragraphy 4 The Defendants also issued false (deny) releases

2. We admit to paragraph 14 ( Nazon is not registered as a broker

3. _____

4. _____

5. _____

6. _____

7. _____

8. _____

9. _____

10. _____

## II
### DEFENSES

*In this section, state any legal theories that, even assuming that what plaintiff has alleged in the complaint is true, do not permit the plaintiff to win the case. Attach additional sheets of paper as necessary.*

**FIRST DEFENSE:** ~~ALONE~~ SEE Letter-Alien had right To distribute the Toilet

**SECOND DEFENSE:** Steps were already Taken to get offerings registered

**THIRD DEFENSE:** Steps were being take to became directors

**WHEREFORE** defendant asks this Court to dismiss the complaint and enter judgment in favor of defendant.

*[If you have any counterclaim against the plaintiff that arises out of the same events or transactions stated in the complaint, and/or any crossclaims against the other defendants that arise out of the same events or transactions stated in this complaint, and/or any third-party claims you have against third-parties (that is, someone not already named in the lawsuit) that arise out of the same events or transactions stated in the complaint, you should attach additional sheets of paper to set forth the facts and bases for any such claims. See the Pro Se Manual for a further explanation.]*

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 14 day of April, 2008

Signature of Defendant _Al Grazon_

Address _2 Hendricks Ave Aps 1A Staten Island, NY 8301_

Telephone Number _917-488-4680_

Fax Number (if you have one) _____

Dear Honorable Judge Baer,

I would like to first start by thanking you for taking the time to read my answer. Your Honor, I have read the complaint filed by SEC and I cannot say they are completely inaccurate. I and Mr .Varughese approached Micheal Birnbaum and the SEC staff about voluntarily providing information about my possible violations and what can be done to remedy the matter .I expressed to the staff that I do not have the resources for an attorney to represent me and asked for them to work with me. Although they were not obligated to, they have been very cooperative in hearing my concerns. We (I and Varughese) went with the intent of not saving our skin but making sure the company would continue to operate. In addition, making the staff understand that Clean Care is a real and viable company. Any violation that may have been done. was not intentional. Ed Klien from the commencement of the offering had us meet the manufacturers of the Eyegiene seat, discussed what the terms would be. And we all got very excited about what enormous potential the Eyegiene seat has to offer. We went to trade shows, researched competitors, participated in toilet seat installation workshops and even got involved in unloading cargo. Mr. Klien was told from the commencement that we are not brokers or registered and in addition the finder's agreement clarified that as well. This was also repeatedly expressed to all the other investors.

To better understand the violations and possible misrepresentations, would mean to go to the origin of how these misrepresentations/violations came to be. As for the origin of the two companies, that derived from Investor A having his greed and only his interest in mind and decided to be the sole investor. Despite, knowing that other investors involved in a previous matter could possibly lose their investment. Ed Klien, never on his own intent, decided to create two separate companies. However, at the time, we were on the understanding that Klien owned both companies and there was a document produced by Klien to show distributorship rights were transferred from systems to tech. I am not looking to justify the actions, your Honor, but it was either all the other investors lose their money or we (Klien, Varughese and Myself) made the company actually work. Mr. Klien was under a lot of pressure from the manufacturers to order 500 seats per quarter or face to lose the distributorship for the entire United States. It was a constant balancing act between Investor A and the distributor's quarterly demands. Mr. Klien's business model regarding the seat, was one if applied correctly, would have proven to be very effective which was to give away the seat for free and the company would generate revenue from the consumption of the solution. I would definitely say with hindsight being 20-20, things could have been handled a lot differently and I say this for all parties involved. As for the in person meeting's, that were arranged for Mr.Klien, the purpose was two fold; first, for the investors to meet the individual running the company and  to witness a working model of the eyegiene seat and second, understanding it would take real capital to make the company grow. According to the emails that were read to me and varughese by Klien, Investor A's business model was completely opposite.

Something that definitely needs to be clarified, our violation of soliciting an unregistered offering and acting as "Finder's" for CCT was only limited to Clean Care

Tech(717,000).There was no PPM created systems nor did we engage in any communications with Investor A after the introduction was made. Investor A, as we were told by Mr.Klien, would invest three million over a period of time which of course, did not happen. However, Mr.Klien felt his "just-in-time" financing was hindering the potential growth of the company. But of course, with no formal agreement in place between Klien and Investor A. It was Kliens intent of returning monies to Investor A with a small agreed upon interest. And do away with the aggravation and have only one company in operation which would have been Tech. We would be periodically notified by Klien about discussions between him and Investor A. In most cases, Klien's debriefing of Investor A would end in frustration considering he was not easy to get along with.

Honorable Baer, these statements that I am making does not change the fact we in essence acted as brokers, solicited an unregistered offering and failed to disclose some information which some may construe as misleading. I guess we felt we were on course of getting everything in order that we wouldn't need to have information conveyed in a certain matter that would create a panic. However, Laura Anthony PA, stated the recission offering would have to disclose everything and she would've handled it accordingly. But a misrepresentation is what it is, no matter how one may try to translate it. But we do have documented proof that there were corrective measures being taken long before any inquiries made by the SEC and that is something I can firmly state as a fact.

I am not looking to act as my own attorney but simply asking you to give myself and varughese an opportunity to rebuild our lives and prove to you and the staff, we have no further intentions of committing any future violations or participating in any securities related activities. As you may already know your Honor, the posting of this complaint alone could possibly hinder any chances of employment in the corporate arena. In the age of the internet, employers look up everything and this will not look good. I cannot erase the past. But I believe I can rebuild my future. I have a three year old son and six year old daughter that I need to build a foundation for. I have a ton of debts to address, student loans, taxes, child support among other things. I spoke with Terrance Bowman, who was one of the inviduals that looked to make sure I was being treated fairly and arranged the opportunity for me to voice my concerns with Staff and Director of Staff Doria Bachenhiemer. I have submitted a complete background questionnaire and statement of financial condition. I asking you Honor to consider a Waiver of Disgorgement and Civil Penalties that may be applied and to keep in consideration of my realistic ability to repay the determined amount based on my present finances. If my gains are in fact ill-gotten as referred to by the staff, I would have no hesitancy in paying a full restitution on monies paid provided I have the ample resources to do so. But above anything else, I do want not this looming over my family name, for the sake of my son and daughter. I have not yet broken the news to my family. But rest assured, once they know and they will, there will be a feeling of shame and disappointment that will be projected towards me. I am taking the time your Honor, to explain these things, because they have caused me a lot of heartache, worry and I am looking to resolve these matters quickly. I feel in my heart despite any misrepresentations, we cared about the investors; we thanked them for their

participation, invited them to trade shows and made sure they were fully educated on the seats potential and product knowledge. Even after we understood that we would be barred as members of the board and would be prohibited from any offerings of Clean Care Tech, we expressed to the SEC, we would like to continue getting actual corporate contracts for the company to move the assets that was paid for by investor capital, which would mean revenue for the company.

Again, your Honor, I thank you in advance for reading my letter. I humbly await your decision. I plead with you again to be merciful in your decision and as God as my witness, I have no intentions whatsoever, of participating in any securities offerings, whether it be registered or unregistered. Nor, do I look to commit any further or future Violations. Above and beyond the securities industry, I am making a commitment to being ethical in my general sales and business practices.

Thank you,
Al Nazon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------X
                                :
SEC                             :
                                :
    -against-                   :
                                :
Clean Care Technologies, LLC    :
                                :
--------------------------------X

NOTICE OF APPEARANCE

08 civ. 01719 (HB)

Please take notice that the undersigned Anil Varughese
~~Plaintiff~~/Defendant

hereby appears Pro se in the above captioned matter and that all
future correspondence and papers in connection with this action are
to be directed to the undersigned.

Dated: 4/6/08
       New York, New York

Signature

82-61 256 St.
Address

Glen Oaks, NY 11006
City, State Zip Code

(917) 627-6676
Telephone Number

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_SEC_
_____

*(In the space above enter the full name(s) of the plaintiff(s)/petitioner(s).)*

- against -

_Clean Care Technologies_
_(Anil Varughese)_
_____
_____

*(In the space above enter the full name(s) of the defendant(s)/respondent(s).)*

_08_ Civ. _01719_ (_HB_) (___)

**ANSWER**

# I
## ADMISSIONS AND DENIALS

*In this section, state which factual allegations in the complaint you admit to and which factual allegations you deny. You should refer to the complaint paragraph by paragraph (and sentence by sentence within each paragraph), in the same order as the paragraphs and sentences appear in the complaint. Attach additional sheets of papers as necessary.*

1. _Attached with this document_

2. _____

3. _____

4. _____

5. _____

6. _____

7. _____

8. _____

9. _____

10. _____

*Rev. 05/2007*                                    1

## II
### DEFENSES

*In this section, state any legal theories that, even assuming that what plaintiff has alleged in the complaint is true, do not permit the plaintiff to win the case. Attach additional sheets of paper as necessary.*

FIRST DEFENSE:

_____

SECOND DEFENSE:

_____

THIRD DEFENSE:

_____

**WHEREFORE** defendant asks this Court to dismiss the complaint and enter judgment in favor of defendant.

*[If you have any counterclaim against the plaintiff that arises out of the same events or transactions stated in the complaint, and/or any crossclaims against the other defendants that arise out of the same events or transactions stated in this complaint, and/or any third-party claims you have against third-parties (that is, someone not already named in the lawsuit) that arise out of the same events or transactions stated in the complaint, you should attach additional sheets of paper to set forth the facts and bases for any such claims.* __See__ *the Pro Se Manual for a further explanation.]*

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this 8 day of April , 2008

Signature of Defendant _____

Address    82-61  256 St.

Glen Oaks, NY 11004

Telephone Number    (917) 627-4476

Fax Number (if you have one) _____

*Rev. 05/2007*                    2

To Honorable Harold Baer, Jr.
Re: 08 CV 01719

Your Judgeship,

First of all, I would like to take the opportunity to thank the Commission Staff for the professionalism and patience in explaining all the paperwork and events that were taking place. I understand and acknowledge that there may have been violations of securities laws that occurred while working with Clean Care Technologies.

I humbly request your Judgeship to take into account the fact that there has never been any prior criminal or civil record or case against me. In fact, I've voluntarily gone to the Commission before I was even called in. I have given truthful information, to the best of my knowledge, on Clean Care Technologies and any other companies that I was asked about. I do not have the resources to hire attorneys and explain my case. When I was in front of the Commission Staff, they had assured me I do not need an attorney and that the whole questioning was informal. I've complied all my life with any rules and regulations that I was aware of and am hardly the caliber of individual that would knowingly break the law. I was introduced to the private venture industry by individuals that (I'm aware now) had no morals or scruples. Had I known back then when I first walked into Commonwealth Capital Group that I would be in such a situation today, I would have walked back out and never looked back. Unfortunately, I did not know any better. As someone that does know better now, never will I be employed as a finder for any company, nor in the task of selling any securities and I ask modestly for your understanding when you do make your judgment on fines. I do not have the financial resources to pay exorbitant fines and penalties, if I did, I would gladly pay it all willingly and before it was even asked of me. I personally request your honor to allow me an opportunity to have a chance to change my vocation and to make amends for any wrongdoing that I may have unknowingly done. I am looking to move forward with my life after resolving this with the commission staff and your honor.

There are also a few points in the document that I received that I would like to clarify.

According to Summary section 2 it states that all funds collected were freely commingled to benefit defendants Mr. Nazon and myself. Not a single penny of the funds went into

Mr. Nazon or Mr. Varughese's personal accounts, nor did we have access to any bank accounts that held investor's funds at any point.

In reference to Summary section 3, Mr. Klein had retained Mr. Nazon and myself as finders for the company. Mr. Klein had sole ownership of both Clean Care Technologies and of Clean Care Systems. Clean Care System's expenses were the same as Clean Care Technologies' expenses, that is, the two companies had the same goal of buying, stocking and distributing self-cleaning toilet seats. To that end both Mr. Nazon and myself are eye-witnesses to the fact that Clean Care as a whole did tradeshows, magazine advertisements and billboards.

In reference to Summary section 4 we had expressed to the Commission Staff that the news releases were written and edited by Mr. Klein. The news release they used as a direct reference was a July 2006 news release, which was a draft version, and not the final version that was sent to individuals interested in learning more about the company.

In reference to Summary section 5, both Mr. Nazon and myself have never said or implied that they were brokers or were registered with any broker dealers. Both were finders for the company and in that capacity called for marketing and advertising the company and its product – the self-cleaning toilet seat.

In reference to Facts section 18, Mr. Klein hired us to market and advertise the company and bring awareness to its product – the self-cleaning toilet seat. There were discussions at the onset of the company to make both Mr. Nazon and myself salaried directors of the company, with disclosure to all investors. The initial company was Clean Care Technologies not Clean Care Systems.

In reference to Facts section 19, both Mr. Nazon and myself did work together in a company called Commonwealth Capital Group, headed by Mr. Alexander Stelmak. I had gone there right after college and got a job as an assistant to one of the salesman there by the name of Felix Stratton. (It later came to light, years later, that Mr. Stratton was himself in violation of securities laws prior to his joining Commonwealth Capital Group and was barred from the industry altogether.) Fresh out of college I accepted what was told to me at face value; that I could work as a finder for any company and it was perfectly legal and right. I had repeatedly asked them if any license was required for the work I was doing and they had responded 'No'. If I had known that a license was required, I would have immediately applied for it and gotten it.

In reference to Facts section 20, as was told to the Commission Staff, Robert Clark was a name that was told by Mr. Paul Schmidt for us to use. Mr. Paul Schmidt is the individual that introduced both Mr. Nazon and myself to the self-cleaning toilet seat. His information is included with this letter. He had a registered debt offering for his company ASC Hygiene with the SEC and was listed with Dun and Bradstreet. He was informed as well that we were neither brokers nor broker dealers and his plan was to pay us as salaried employees eventually, but as finders initially. His last letter to us is also included with this letter. Mr. Schmidt's email is to rclark, which is the email he set up

(and he had complete access to) and told us to use as he had investors that were already familiar with the name Robert Clark. Mr. Schmidt did mail out dividend checks to investors, as per my knowledge – at least initially. Once CWS, which was the parent company manufacturing the self-cleaning seat, pulled out of the United States market, he literally disappeared. Both Mr. Nazon and myself tried frantically to reach him but to no avail. Mr. Klein showed up at this time and allowed the existing clients with ASC Hygiene to be converted over to Clean Care Technologies and hired us as finders to market and advertise the product (the self-cleaning toilet seat).

In reference to Facts section 22, to my knowledge, Clean Care Technologies was set up before Clean Care Systems. I believe the incorporation papers should prove as such. It was filed with the Division of Revenue in the State of New Jersey, SRV – 1621710 – 3058335 File.

In reference to Facts section 24, No new individuals that were approached on Clean Care Technologies were called under the Robert Clark name. That was only in connection with the original investors in ASC Hygiene. The last email that was sent by Paul Schmidt was sent to rclark is evidence of that.

In reference to Facts section 25 dividends were paid initially to investors in ASC Hygiene by Mr. Paul Schmidt, the owner. The investor in Georgia had met with Paul Schmidt in person and was shown the self-cleaning toilet seat on location.

In reference to Facts section 27 – Late registration was already under way when the Commission Staff had started the informal inquiry. A rescission offer was also included with the new offering. This can be verified with the SEC Attorney Laura Anthony from Florida, who had undertaken the task of making the new Offering documents.

In reference to Facts section 29 – Audited financials were prepared by Clean Care Technologies' accountant but not sent to investors to comply with the Commission Staff's instruction in not having any correspondence with investors.

In reference to Facts section 31 – July 1, 2006 press release was only a draft copy. The only new releases that were sent were in April 2006 and January 2007.

In reference to Facts section 32 – Clean Care Technologies role as an exclusive Eyegiene Seat distributor were not false. It came to pass after the POM was printed. Mr. Klein had documents that showed the ownership of Clean Care Systems by Clean Care Technologies.

In reference to Facts section 37 – The copy of the original finder's agreement is provided along with this letter. The finder's fees were set at ten percent and bonus' were given later on based on performance. Any additional monies were put toward salaries for employees and for office expenses.

In reference to Facts section 39 – Mr. Nazon and myself were employed as finders for other companies, but with the understanding that it was legal to do so. This is what we were told at Commonwealth Capital Group, the company that we started work with.

In reference to Facts section 40 – Mr. Klein never asked but he was informed that Mr. Nazon and myself were not brokers nor were they registered dealers. All they could provide the company with was marketing and advertising the product.

In reference to Facts section 41 – Audited financials were prepared by the company's accountant, Jason Dubnik from New Jersey, and given to the commission staff from Mr. Klein's side. As was explained prior, the company was in the process of a late registration filing.


I thank you sincerely for your time and consideration.
Varughese

Read Message

**Read Message**                                                          Move To | Select One ▾

Previous    Next

⬛⬛⬛⬛⬛⬛                                              ⬛⬛⬛⬛ ⬛

From:  L Paul Schmidt <lps@ascholdings.com>                          [ add to contacts ]

To:  r.clark@ascholdings.com
Cc:
Date:  Monday, October 24, 2005 02:34 am
Subject:  Up date on CWS meeting

Hi Guys-

Well the meeting with CWS was very interesting.  They have lost interest in the U.S. market because their board feels the market not worth their time at this pace.  Also they are no longer warm to the ideal of building through a dealer network.

They want to either work with us in acquiring other Jan/San businesses and building a network in 10 key market areas that our own 100% by us and them or buy us out.

The other option is for us to find our own manufactures and develop our own product line.  If ASC chooses not to work with CWS and not sale to them, than they will pull out of the U.S. market.  They will support ASC for one year with supplies necessary to service the current accounts.

I have it on good authority that if we developed our own products they would not pursue us for any patent violations, cause there seems to be some problems with their patents. (This is in the strict of confidences, not to shared with anyone!)

Based on this meeting ASC will not be pursuing a relationship with Ed Kline for two reasons.  First, if we work with CWS in accqusions, there will be no room for Ed. Second, if we choose to manufacture our own products I don't trust letting Ed know this and possible becoming our competitor before are products are ready.

I have to fly to Germany for a meeting with HTS CEO and Board. I will be leaving tonite at 6:15pm and back Friday afternoon. I will be in the office later today and will fax you the 2nd quarter financials.  I will also try to get a hold of you later today, but must get some sleep now.

Think this over as I have the last couple of days and lets see what we come up with as the best course of action for our future.

Sincerely,

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION

08 CV 01719

ANSWER

Plaintiff

-against-

CLEAN CARE TECHNOLOGIES, INC.,
EDWARD KLEIN, AL NAZON and
ANIL VARUGHESE,

Defendants,

and

CLEAN CARE SYSTEMS, LLC,

Relief Defendant.

## ADMISSIONS AND DENIALS

1. Deny----The amount of $2.2 million raised is incorrect. Also, Systems is a separate company and should not be listed as a co-defendant. Systems was not part of the CCT POM.

2. Admit---Except for the fact that CCT was to be set-up as a Sub-Dealer for Systems and there was no commingled funds from CCT to Systems. Also, this was not a "scheme." CCT was a real company with a real product. Unfortunately, CCT was not set up the correct way and the raising of funds was done improperly.

3. Admit---However, I did not take part in preparing the POM. The POM was prepared by Nazon and Varughese. I only provided Nazon and Varughese with marketing and sales materials and I was unaware of the statements and misrepresentations they were making to investors. Furthermore, CCT investor monies were not diverted to pay Systems' expenses.

4. Admit---Except that the press releases were prepared and issued by Nazon and Varughese. I was unaware that they were making false statements to the investors.

5. Admit

6. I do not have sufficient information or knowledge to admit or deny the statement in the complaint.

7. Admit---However, I unknowingly aided and abetted. But I do take responsibility for what happened.

8. I do not have sufficient information or knowledge to admit or deny the statement in the complaint.

9. Admit

10. Admit

11. I do not have sufficient information or knowledge to admit or deny the statement in the complaint.

12. Admit

13. Admit

14. Admit

15. Admit

16. Admit---However, the date is November 2007, not December 2007.

17. Admit

18. Admit

19. Admit---Except that when I hired Nazon and Varughese, I did not know they were not licensed to do that type of work. Nor did I know exactly how they went about raising money. They told me they had clients who liked to invest in new companies.

20. Admit---But the amount that Dr. Schwartz promised to invest into Systems was 3 to 5 million dollars.

21. Denied---The amounts are wrong. As of July 2007, Dr. Schwartz invested less than $800,000.00 into Systems, which was a separate company from CCT. After July 2007, Dr. Schwartz sued me and I was no longer involved with Systems.

22. Admit---But again, the amount of $1.5 million is not correct. What's more, Dr. Schwartz never invested any money into CCT. His investment was limited to Systems and in November 2007, Dr. Schwartz and I resolved our differences via a settlement agreement of which the SEC approved and has a copy thereof.

23. Admit---Except for the fact that Nazon and Varughese put together the CCT POM. I only provided them with marketing and sales materials. Nazon and Varughese were the ones who spoke to the investors about buying shares in the company. I never discussed any of that with the investors. I spoke to them only about the seat, the distribution network and the marketing strategy, which was where my expertise lies.

24. Admit

25. I do not have sufficient knowledge or information to admit or deny the statement in the complaint.

26. Admit---Except that Investor A (Dr. Schwartz) invested about $800,000.00 into Systems, and not $1.5 million. Furthermore, Dr. Schwartz and I never had a written agreement between us and Systems was and currently is a separate company and should not be part of this lawsuit. Dr. Schwartz never invested any money into CCT and should not be listed as an investor in CCT. As you are aware, Dr. Schwartz and I resolved our differences via a settlement agreement dated November 2007, of which the SEC approved.

27. I do not have sufficient knowledge or information to admit or deny the statement in the complaint.

28. I do not have sufficient knowledge or information to admit or deny the statement in the complaint.

29. I do not have sufficient knowledge or information to admit or deny the statement in the complaint.

30. Agreed—Except that I was not aware of what Nazon and Varughese were telling the investors. My time was spent on the road selling toilet seats.

31. Admit---Except that once again I was not aware of what Nazon and Varughese were telling the investors. I was traveling coast to coast attending trade shows and meeting with Dealers.

32. Admit---However CCT was supposed to be set-up as a Sub-Dealer of Systems.

33. Deny---There was no commingling of funds from CCT to Systems.

34. Admit---Except I was not aware that Nazon and Varughese had put those statements into CCT's POM.

35. Admit---Except I was not aware that Nazon and Varughese had put those statements into CCT's POM.

36. Admit

37. Admit

38. Admit

39. Admit

40. Admit—Except that the materials I provided were strictly marketing and sales materials. I did not provide any materials or information regarding the sale of securities to investors. I was however careless in not knowing that Nazon and Varughese were not licensed to do this type of work. Regretfully, I never thought to ask them if they were registered brokers before I hired them. If I knew that they were not licensed, I never would have hired them.

41. I do not have sufficient knowledge or information to admit or deny the statement in the complaint.

42. I do not have sufficient knowledge or information to admit or deny the statement in the complaint.

43. I do not have sufficient knowledge or information to admit or deny the statement in the complaint.

44. I do not have sufficient knowledge of information to admit or deny the statement in the complaint

45. I do not have sufficient knowledge or information to admit or deny the statement in the complaint.

46. I do not have sufficient knowledge or information to admit or deny the statement in the complaint.

47. I do not have sufficient knowledge or information to admit or deny the statement in the complaint.

48. I do not have sufficient knowledge or information to admit or deny the statement in the complaint.

49. Admit

50. Admit

51. Admit

52. Admit

53. I do not have sufficient knowledge or information to admit or deny the statement in the complaint.

54. Admit

55. Admit—However, I did not know that Nazon and Varughese were not licensed to do that type of work.

56. Admit—Again, the materials that I provided to Nazon and Varughese were for the sales and marketing of the seats and not for the purpose of selling shares in the company. Whenever I had the opportunity to speak to an investor, it was regarding the distribution and marketing of the seats. I never discussed the investment end. I do not possess the education or background to have those types of conversations.

57. Admit—I unknowingly and indirectly aided and abetted Nazon and Varughese and I am truly sorry for that. And I will never get involved in this type of situation again.

58. I do not have sufficient knowledge or information to admit or deny the statement in the complaint.

59. I do not have sufficient knowledge or information to admit or deny the statement in the complaint

60. I do not have sufficient knowledge or information to admit or deny the statement in the complaint.

61. I do not have sufficient knowledge or information to admit or deny the statement in the complaint.

**From:** ebk2727@aol.com [mailto:ebk2727@aol.com]
**Sent:** Friday, May 16, 2008 6:41 PM
**To:** Birnbaum, Michael D.
**Subject:** Deposition

Dear Michael,

Confirming my scheduled deposition for Tuesday, May 20th. I'll see you at 10:30am on the 20th.

Needless to say I was astonished to hear Al Nazon's testimony. It is now apparent that both Nazon and Varughese have been unlawfully selling securities for many years prior to Clean Care. It seems that when they finish one deal, they immediately look for another one. Their track record seems to prove that out. I should have sought the advice of an SEC attorney, before I hired them to raise money for my Company.

While I was traveling coast to coast, border to border promoting the Eyegiene Seat, Nazon and Varughese were making false statements to potential investors, sending out press releases that were not true, while at the same time they were putting together a POM, which did not fall within SEC guidlines. I ask myself over and over again, "How could I have let this happen?"

Nazon and Varughese played both me and Dr. Schwartz for fools. They played one against the other in order to benefit their financial needs. And the end result is that I have now lost everything I have worked for, along with one of my closet and dearest friends, who now won't even talk to me because of this.

From a financial standpoint, I have lost everything. I'm 64 years old and from an emotional standpoint, I don't know whether or not I can overcome what has happened. But once again, I want you to understand that I take responsibility for what has happened. I unknowingly aided and abetted two individuals, who prey on people like myself. It seems that they also seek out investors, who seem to be less educated when it comes to the purchase of securities. For any sophisticated investor would have noticed right from the start, that the POM was put together improperly, which should have raised a red flag. Unfortunetly, I do not have the education, knowledge, or experience when it comes to matters like this. And for that I am deeply regretful.

I'll see you Tuesday Morning.

Sincerely,

ED KLEIN

---

Plan your next roadtrip with MapQuest.com: America's #1 Mapping Site.

April 9, 2008

Mr. Michael D. Birnbaum
General Attorney
United States Securities and Exchange Commission
3 World Financial Center, Room 16-409
New York, NY 10281-1022

Dear Michael,

Enclosed you will find my Admissions and Denials regarding the litigation between the SEC and Clean Care Technologies, Inc. If you have any questions, please call me at 908-616-3730.

As per our previous conversations, I would like to resolve this matter without going to Court. Therefore, please contact me as soon as possible to arrange a settlement meeting.

On a personal note, this situation has destroyed my life. If I knew that Anil Varughese and Al Nazon were not licensed to do that type of work, I never would have hired them to raise money for the company. For some ungodly reason, I never bothered to ask that question, which was naïve on my part. Without a doubt, I should have consulted with an attorney before I hired them.

Clean Care Technologies was a real company with a real product and had it been set up properly, CCT would have made lots of money for it's investors. Because of what happened, the woman I was seeing for almost five years will no longer speak to me. Many of my friends have turned their back on me and at the age of 64, I now find myself in a non-recoverable situation. I worked extremely hard to make CCT a success, but I got involved with something that I knew nothing about, something that was way over my head. I relied on other people to do the right thing and now I'm the one paying the price. However, I take full responsibility for what happened. I should have done a better job to monitor what was going on.

Please let me know when we can get together and resolve the matter at hand.

Sincerely,

Edward B. Klein

UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:        )

                         )  File No. NY-7741

COMMONWEALTH CAPITAL  )


WITNESS:   Edward Klein

PAGES:     1 through 189

PLACE:     Securities and Exchange Commission

           3 World Financial Center

           New York, New York  10281

DATE:      Friday, July 20, 2007

           The above-entitled matter came on for hearing,

pursuant to notice, at 11:25 a.m.

1 APPEARANCES:

2 On behalf of the Securities and Exchange Commission:

3      MICHAEL D. PALEY, ESQ.

4      MICHAEL BIRNBAUM, ESQ.

5      TERRANCE BOHEM, ESQ.

6      MEGAN CHEUNG, ESQ.

7      Division of Enforcement

8      Securities and Exchange Commission

9      3 World Financial Center

10     New York, New York 10281-1022

11 On behalf of the Witness:

12     LAURA ANTHONY, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 42

1    A    He never mentioned it to me.
2    Q    As you sit here today, do you know of any deals
3 that ASC ever had with any institutions or businesses?
4    A    No.
5    Q    I mean not just so the record is clear, do you
6 know of any arrangement that Mr. Schmit or ASC had with any
7 business or person to use the CWS seat?
8    A    I don't know of any, he never mentioned it.
9 Again my conversations in meetings with him were to talk
10 about the toilet seat itself and how to create and build a
11 market for that type of product here in the United States.
12        MS. ANTHONY:  I think you were asked if you
13 learned of anything additional besides from him. Right?
14    Q    From him or anyone else.
15    A    No, not at that point.
16    Q    Did there come a point when you learned something
17 more about his business?
18    A    Yes.
19    Q    What did you learn and when did you learn it?
20    A    Months had passed and once again I promised
21 myself I'm never going near toilet seats. I'll go get my
22 real estate license or I'll sell insurance or I'll go to
23 work for a friend. The last thing I ever imagined is going
24 back into the toilet seat business but that frustrated me too
25 because Exhibit No. 3 is unacceptable and I always felt and

Page 43

1 my friends would say to me "Ed, whatever happened to that
2 self-cleaning toilet seat" and I'd say "Look, it never really
3 came to pass" and we all agreed, my group of friends that
4 wow, what a product. Like I said before, it's another fax
5 machine. If it was done right and the seat worked, wow. So
6 months passed but I had written this whole thing off but I
7 always had that burning in back of me.
8        So occasionally I would go on the internet, et
9 cetera, et cetera, and I was selling my clothing bins and
10 placing my clothing bins in shopping centers and malls and
11 things like that and it was done. I wasn't going there and
12 one day my phone rings. This is months after the Las Vegas
13 deal. The phone rings, "Mr. Klein?" I said "Yes," this is
14 Anil Varghese." I said "Who?" He said "Anil Varghese, I met
15 you with Paul Schmit in New York, we had lunch together." I
16 said "Oh yes, Emil, how are you?" He said "Mr. Klein, do you
17 know how we can locate Paul Schmit?" I said "What?" He said
18 "We need to talk to Paul and we can't find him. We're
19 calling him and he's not returning any calls, do you know
20 where he is" and I said "Emil, I don't know where he is and I
21 haven't spoken to him in months and the last time I had
22 anything to do with him he made me stay outside the Circus
23 Circus Hotel in Las Vegas until 3:30, 4:00 in the morning and
24 I don't care if I ever talk to the guy ever again but he
25 sounded concerned on the phone, Emil did.

Page 44

1        I said "What's going on?" He said "We really
2 need to talk to him" and then we changed the subject. He
3 asked me what I was doing and I told him I was placing
4 clothing bins and he asked me if I would ever go back into
5 the toilet seat business and I said no, I've had it with
6 this. We just talked in general but I could hear in his
7 voice that he was concerned about something.
8        So he said to me, he said "Would it be possible
9 for us to have lunch together?" I said who is "us" and he
10 said me, you and Al Nazon. I was coming into New York in a
11 couple weeks anyway. I said sure, I'll get together with you
12 but where and when and whatever. So we set up an appointment
13 to have lunch and it was about two, maybe two and a half
14 weeks after that phone call. When I hung up, I wondered why
15 are these guys calling me. I mean I met them for an hour,
16 exchanged business cards and that was it. So two, two and a
17 half weeks later I met them for lunch at the same Hilton
18 Hotel on 42nd Street.
19    Q    Okay. What happened?
20    A    Well I said "What's going on, guys?" and then
21 said "Well we've been trying to contact Paul Schmit and he's
22 not returning any calls and we have no idea where he is and
23 we need to locate him. I said "Is there a problem" and they
24 said "Well hopefully not but there may be." I said "What's
25 the problem" and then they explained that they had gotten

Page 45

1 some investors to invest money into Paul's company and it's
2 not good when investors invest in a company and then the
3 president or owner of the company can't be found and doesn't
4 return a phone call. That's not good.
5        I said "What are you going to do?" They said "We
6 don't know, we were hoping you knew where he was," I said "I
7 haven't spoken to him in months and that was it.
8    Q    Did they tell you how much they had raised from
9 investors?
10    A    Yes.
11    Q    How much?
12    A    I think they said around $700,000 and when I
13 heard that number I was astonished that, number one, these
14 two young guys because they were kids and they still are,
15 could raise that kind of money and number two, okay, guys,
16 what are you going to do now. You put your good name and
17 your good will up front to your investors or your clients
18 whoever they are and they didn't tell me who they are and now
19 this guy, Schmit, can't be found. Guys, what are you going
20 to do here, this is very, very serious. They didn't have any
21 answers right then and there.
22    Q    Did they ultimately come up with some answers to
23 the questions?
24    A    No, not to me. They didn't come up with any
25 answers.

Page 46

1   Q   Did they tell you anything about how they found
2 those investors?
3   A   No, not at that time.
4   Q   Did you learn at some point how they found those
5 investors?
6   A   I only learned what they told me which was that
7 they were "former clients" of theirs and use that term,
8 former clients, who they got to invest in ASC, Paul Schmit's
9 company.
10   Q   Do you know how it was that they were former
11 clients?
12   A   No.
13   Q   Do you have an understanding of what they had
14 done before they began raising money for ASC?
15   A   No.
16     MS. ANTHONY:  Not at that time.
17   A   Not at that time.
18   Q   What happened next?
19   A   So again we exchanged business cards and then we
20 changed the subject and they said to me well what are you
21 doing now and I said I'm putting out clothing bins in
22 shopping centers, malls and areas Emil and Al said look, if
23 you ever go back into this industry yourself, if you ever
24 need  he called it financing, give us a call.
25     I said well how much can you get for me and I

Page 47

1 just  how much can get for me and they said what do you need
2 and I just threw a number on them, I said ten million and
3 they said we can get that for you. I'm thinking to myself
4 "what, you're two young kids," I said "are you serious" and
5 he said yes. I said okay and that was it, good-bye, good
6 luck with Paul Schmidt and we left.
7   Q   What happened next?
8   A   Well I continued to put out my clothing bins and
9 a couple months later I get a call from a company called
10 Eyegiene who had sought me out and they were coming to New
11 York City to look for a USA dealer.
12     MS. ANTHONY:  How could they have found you?
13     THE WITNESS:  Because although the other
14 ventures in the toilet seat businesses with Hybolet and
15 SaniSeat and Clean Cover had failed, I do what I do and I'm
16 great at it. I market, I sell, I build dealership networks
17 dating back to my fax days because you had asked me about the
18 toilet seat but you didn't ask me about fax and I wish you
19 would. At one point my company was the largest fax dealer in
20 the United States, so I know how to build a dealership
21 network but specifically they knew or they had gotten my name
22 from jan/san dealers around the country who they had gone to
23 to open up this Eyegiene dealer and apparently one or more
24 than one of the jan/san dealers said hey, if you're looking
25 for the right guy to build you a dealer network in the United

Page 48

1 States, call Ed Klein because I asked that, I said where did
2 you get my name from, he said you came highly recommended and
3 we'd like to fly to New York to meet you, you're the guy that
4 we need.
5   Q   What was the name of that person you talked to?
6   A   His name is Roelof.
7   Q   Can you spell that.
8   A   R-O-E-L-O-F, Remjin, R-E-M-J-I-N.
9   Q   What was his position at Eyegiene?
10   A   He's an owner of Eyegiene, the parent company is
11 called NTF.
12   Q   Had you ever heard of NTF or Eyegiene before
13 that?
14   A   Never.
15   Q   What happened after that call?
16   A   I had been beaten up pretty good in this darn
17 toilet seat business and now I'm asking questions even before
18 I drive through the Lincoln Tunnel to go to another meeting
19 blindfolded. I said what kind of product do you have and he
20 said are you familiar with the CWS and said I said yes. He
21 said we have something very, very similar. He said we're a
22 lot cheaper, we have newer technology, if you'd like to go on
23 website you can see it but we'd like to fly into New York in
24 a couple weeks and meet with you.
25     I went on their website and I saw a self-cleaning

Page 49

1 toilet seat that looked very similar to CWS and Roelof had
2 told me it's cheaper, it's newer technology and they're
3 looking for the right guy to build a dealer network here in
4 the United States and they wanted to talk to me first before
5 they spoke to anyone else.
6     I hung up the phone, Michael, and I just went
7 like oh, I can't believe this, again but I knew and my
8 friends knew that if we found  if I found the right product
9 and it worked, we would knock them dead here in the United
10 States because Exhibit No. 2 here was totally unacceptable.
11   Q   Exhibit No. 3.
12   A   Exhibit No. 3 is totally unacceptable, it's not
13 good. So I met with them, I met with Roelof.
14     MR. BIRNBAUM:  Ballpark when was this?
15     THE WITNESS:  End of 2005 maybe, maybe middle of
16 2005. I could check my records and find that for you.
17   A   So I went into New York and before I did I called
18 Emil and Al because I thought for a couple days okay, this
19 guy says he's got a seat, this guy says he works, swears up
20 and down that it works, if what he's saying is true then I'm
21 going to need some money. So I called Emil and Al and I told
22 them about this phone call and I asked them would they meet
23 me to see this seat and this guy and they did, we did.
24   Q   What happened after that?
25   A   Well we met with them, we met with him and he

Page 50

1  showed us the seat on a bed and it spun around and
2      MS. ANTHONY:  On a bed?
3      THE WITNESS:  Yes, he put it on the bed. He put
4  the seat on the bed. We met in his hotel room and he put it
5  on the bed and it spun around. That's where he did the big
6  demo and I asked him questions pertaining to the seat and
7  what was he looking for from me and he said that the USA
8  market is enormous and that other companies with similar
9  products have brought their seats here to the United States
10  and have failed for various reasons, most of the reasons is
11  because their products didn't work and if something doesn't
12  work, that's the end right there ala Kennedy Airport.
13      So I left the meeting with Al and Emil and I told
14  Roelof that I would get back to him and we went out to lunch
15  and he courted me, he basically courted me. He told that I'm
16  the guy and I have a great reputation and I've been
17  recommended by a lot of jan/san dealers and if I'll take the
18  position and I'll do this, then he won't open any other
19  dealers in the United States, I could have the exclusive
20  license to the product from coast to coast, border to border.
21      Q    Did you ultimately sign such an agreement?
22      A    Yes, but before I did I had to make sure that Al
23  and Emil could get me the "ten million dollars" that they
24  said they could get me. So then after lunch and Roelof left,
25  I sat with Al and Emil for about an hour and I said okay,

Page 51

1  guys, put up or shut up, can you get me this money and they
2  said they could because I explained to them the concept of
3  the product, that it's a give away. In order to create a
4  market for a product that doesn't exist here in the United
5  States, we have to get them out in the street and I told them
6  that if there was any doubt that they couldn't get me this
7  money, they need to tell me now because I'm not going to put
8  my neck in a noose again and they said they could get me the
9  money, there's no doubt about it.
10      Q    Did they explain to you how they intended to get
11  the money?
12      A    Again they used the term "clients." They said
13  they had clients, private people who had money and were
14  looking to invest. Some were looking for new types of
15  opportunities like a self-cleaning, self-sanitizing toilet
16  seat, some of their investors they said would not go with
17  this because they're more conservative but they said they
18  know a lot of guys who would look at this product and go wow
19  and love to be part of this thing. So they said it was
20  private money, it wasn't institutional money.
21      Q    Is there anything else they told you about how
22  they expected to raise money?
23      A    That was it.
24      Q    Did they discuss with you whether they would sell
25  shares in the company or ask people for financing?

Page 52

1      A    Not at that meeting, it was just guys can you get
2  me the money because if you can't, then I'm not going to do
3  this because I'm going to be putting my neck in a noose and I
4  don't want to do it. They assured me that they could.
5      Q    At some point did you gain a better understanding
6  of how they intended to raise the money?
7      A    Well the thing is, Michael, had I gained that
8  better understanding I wouldn't be sitting here with you
9  people now, so I wish I would have gotten a better
10  understanding but I really didn't.
11      Q    Putting aside whether you have a perfect
12  understanding of how they were raising money, was there
13  anything additional that you learned about what they were
14  doing to raise the money?
15      A    Other than contact their clients and say that
16  they're now involved with a new company with a new product
17  and it would be a good investment, I don't know any specifics
18  other than that.
19      MS. ANTHONY:  I think you need to ask the
20  question differently to get what you're looking for.
21      MR. PALEY:  Okay. I'm happy to take a
22  suggestion.
23      MS. ANTHONY:  I think what he's saying is
24  eventually did you learn they were going to be selling an
25  equity interest or ownership in your company as the mechanics

Page 53

1  of what was going on with the raising of the money.
2      THE WITNESS:  Yes, eventually I did but up until
3  that point I didn't. They just said they were going to
4  contact some of their clients and start to get me some money.
5  Eventually I did find out.
6      Q    When did you learn that?
7      A    They had called me and they wanted to set up
8  another meeting and they told me they had spoken to some of
9  their clients and they had some people interested already but
10  there was something that I needed to agree to for them to do
11  this and I said what is it and it referred back to the Paul
12  Schmit situation. They said they have some clients who have
13  invested money with Paul Schmit and Paul Schmit now still
14  can't be found and they did not want their clients to get
15  hurt and I would have to agree that if they raised this money
16  for me that I would agree to give the investors who had given
17  Paul Schmit money, I would agree to bring them into my new
18  company and give them shares of stock in my new company so
19  those people didn't get hurt and didn't lose and I thought
20  that was fair. I thought that was nice of them to do for
21  those people and so I agreed to do it, I said okay.
22      Q    Did you think that was a good arrangement for you
23  since the investors had not put any money into your company?
24      A    I thought it was a good arrangement for me and I
25  thought it was a good arrangement for the investors. I said

# *Clean Care Technologies*
*"wave bacteria goodbye!"*



## For Immediate Release

**NEW JERSEY, January 5, 2007** - We would first like to offer all of our best wishes in the coming new year, may it bring health and happiness to you and you family.

In our initial year of operations, Clean Care Technologies has achieved a high level of visibility in the commercial hygiene arena via numerous trade shows and prominent industry publications. CCT plans to further expand product to the public restroom industry by continuing a rigorous 14-city trade schedule across the United States in 2007.

Key trade shows in Tampa, Dallas, Atlantic City and Chicago throughout 2006 have proved to be the cornerstone for marketing and expanding the awareness and necessity of the Eyegiene Seat in the public restroom arena. As a direct result we are proud to announce CCT has signed on numerous dealers including the Las Vegas Towel and Linen Company, which services sixty percent of all hotels in the Las Vegas area. In addition, other dealers include: Liberty Paper and Janitorial, Walsh Chemical and M & J Industrial Supply. These dealers span from the east to west coast and service many household names and institutions. Last but not least, Technical Concepts, a global leader in designing and manufacturing automated restroom products wishes to private label the Eyegiene Seat. Private/White label deals have proven to be lucrative for all parties involved as the third party's end goal of expanding their brand results in more orders of hardware and solution for Clean Care Technologies.

We are currently installing the Eyegiene seat in an initial test phase in many high traffic, commercial and municipal facilities. Management is currently formulating plans to increase the inventory supply to 2500 seats per quarter. The increase in inventory will ensure that all orders from dealers and end users can be fulfilled in a timely fashion. A staff of trained service technicians will be implemented to handle all service and training calls.

Clean Care Technologies anticipates 2007 to be a banner year for the company. We would like to extend our thanks and continued support to all of our shareholders. We look forward to sharing more good news in the near future.

## Sheldon Schwartz

**From:**     "Sheldon Schwartz" <selmj@rcn.com>
**To:**       <EBK2727@aol.com>
**Sent:**     Wednesday, January 03, 2007 12:13 AM
**Subject:**  Re: 300 Seats Sold

Done!

Let's talk about any sale greater than 50, in the future, before it takes place.  OK?

Where is M & J located?  Did this include any solution?

Rest assured, I am very happy!

Shelly


—— Original Message ——
**From:** EBK2727@aol.com
**To:** selmj@rcn.com
**Sent:** Tuesday, January 02, 2007 10:20 PM
**Subject:** Re: 300 Seats Sold

Please send the check to:

Clean Care Systems
4400 Route 9 South
Suite 1000
Freehold, New Jersey  07728

The grand total was for $74,700.00

Sold to:  M & J Industrial Services



PLAINTIFF'S EXHIBIT
20
5/20/08 UP

7/17/2007

# *Clean Care Technologies*

"*wave bacteria goodbye!*"



PLAINTIFF'S
EXHIBIT
16
5-13-08   28

## **For Immediate Release**

**NEW JERSEY, July 1, 2006** – To date the company has managed to make sales to several major corporate entities. Wegman's in , a food and grocery chain store comprising of 70 stores ; AmeriChem, a janitorial supply company in Harrisburg, Pennsylvania that services Wyndham Hotel Chain, and Penn State University among other clients has bought 16 seats to test in Wyndham Hotel in Pennsylvania and will be approaching the Corporate Headquarters to service the entire chain fully, also a subsidiary of AmeriChem has bought 64 seats and 256 bottles as an initial order for Penn State university; Ace Janitorial and Surgical Supply company located in New York has also bought 70 seats and 280 bottles of solution as their initial order.

In the upcoming weeks, the company will be approaching major corporations in the hygiene market, including Sloan, Technical Concepts, and Bemis. The premise of the meeting is to further discuss a "Private Label" deal.

The company now is in motion to acquire its second order for 2006 for an additional 1000 seats. As stated in the previous newsletter, the company is actively and aggressively pursuing the sale of dealerships throughout the nation through tradeshows, franchise shows and even word of mouth. The company is also in negotiations for the O'Hare Airport Contract to service their restrooms as well. As more information becomes available all clients will be notified immediately.

We wish to thank all clients for their continued support in expanding this unique product and service throughout the United State, Canada and South America. Look forward to providing more good news in the forthcoming quarter.

**For any additional Information please contact Clean Care Technologies:**

## **CLEAN CARE TECHNOLOGIES**
**Attn: Investor Relations Department**
**4400 Route 9 South, Suite 1000**
**Freehold, NJ 07728**

**By phone at (732) 303-7890, by email at info@cleancaretech.com or via fax at (732) 462-9149.**

## Sheldon Schwartz

**From:**    "Sheldon Schwartz" <selmj@rcn.com>
**To:**    <EBK2727@aol.com>
**Sent:**    Thursday, June 15, 2006 4:48 PM
**Subject:**    Re: Eyegiene Update

You never called!

Liability insurance for what?  Wait before you commit, please.

I will be in Detroit all week; my daughter is having a baby.  I will call you.

Shelly



—— Original Message ——
**From:** EBK2727@aol.com
**To:** selmj@rcn.com
**Sent:** Thursday, June 15, 2006 8:35 AM
**Subject:** Eyegiene Update

1.  Just got back from the Dallas Trade Show on Monday.  The response to our product was OUTSTANDING!  I now have at least 4 solid possibilities regarding Dealers for that area.

2.  Yesterday I was in Harrisburg, PA, presenting our product to the Wyndham Hotel.  They ordered 16 seats.  If things go well, they will make a recommendation to Corporate, which could lead to a national contract.

3.  While I was in Harrisburg, I met with a Janitorial Supply Dealer, who does business with Penn State University.  They have 10 salesmen and the owner gave me an opening order for 64 seats and 256 bottles of cleaning solution.

4.  Today I'll be out in Brooklyn meeting with a Medical Supply Company.  I expect to come back with an order.

5.  Next week I leave for Chicago and Milwaukee.  I have meetings set up with Sloan, Technical Concepts and Bemis.  They are all interested in a "private label deal."

6.  The Container has arrived in New York Port and is awaiting inspection by the Customs Authorities.  It could take another 10 days before it is released.

7.  I rented a small warehouse in Hillside NJ, near Newark Airport....3750sq feet.  $2700.00 per month, plus utilities.

8.  I will need for you to send me a check for the next quarter's expenses.  Because of the trade shows and security deposit on the warehouse ( 2 months...$5400.00 ), I will need at least $90,000.00 to cover everything.  Also, Eyegiene is now requiring us to provide Liability Insurance and I am shopping around getting quotes.

Let's talk later this week.  Lots more to go over.

Best Regards,   ED

7/17/2007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------
SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,

  -against-

CLEAN CARE TECHNOLOGIES, INC.,
EDWARD KLEIN, AL NAZOR and
ANIL VARUGHESE,

       Defendants.

  -and-

CLEAN CARE SYSTEMS, LLC,

       Relief Defendants.
---------------------------------------


      DEPOSITION OF SHELDON E. SCHWARTZ,

the witness herein, taken by Plaintiff, at the

offices of the Securities and Exchange

Commission, 3 World Financial Center, New

York, New York on Thursday, April 24, 2008 at

10:00 a.m., before ROBERT BLOOM, a Shorthand

Reporter and notary public, within and for the

State of New York.

```
 1 A P P E A R A N C E S :

 2

 3 SECURITIES AND EXCHANGE COMMISSION

 4          Attorneys for Plaintiff

 5 3 World Financial Center

 6 New York, New York 10281

 7          BY:  MICHAEL BIRNBAUM, ESQ.

 8               VALERIE SZCZEPANIK, ESQ.

 9

10

11 EDWARD KLEIN, Defendant

12          Appearing pro se

13

14

15                    *  *  *

16

17

18

19

20

21

22

23

24

25
```

Page 22

1 you take any other coursework, either formal
2        S. Schwartz
3 or otherwise with any focus on accounting?
4    A. No.
5    Q. Other than -- withdrawn.
6       Have you taken any courses, formal or
7 otherwise, with any instruction concerning
8 personal investment?
9    A. No courses.
10   Q. Any formal education?
11   A. I read extensively. I have not gone
12 back to school since medical school formally.
13   Q. When, if you can recall -- withdrawn.
14      Have you ever invested in the stock
15 market?
16   A. Yes.
17   Q. What was your first experience if you
18 recall investing in the stock market?
19   A. I bought shares of McDonald Douglas
20 when I was a college sophomore. And Chrysler
21 Corporation.
22   Q. And since then how would you describe
23 your experience in investing in the stock
24 market?
25   A. Standard. I invest my 401(k) and

Page 23

1 other investments personally. I have a
2        S. Schwartz
3 mutual fund with TIAA Creff, and my investing
4 as a whole has been more successful than the
5 average return in the market, in the stock
6 market.
7   Q. Have you before your involvement in
8 Clean Care Systems been involved in running
9 any company that offered shares of stock or
10 securities in that company?
11   A. No.
12     My company at one time, my
13 properties, were at one time considered under
14 pre-Reagan tax law to be a sub chapter S
15 corporation. But they had no shares.
16   Q. What was your role in that?
17   A. I was the president, owner.
18   Q. Was there anybody else involved in
19 the accounting?
20   A. I think my wife was designated -- you
21 had to have more than one person -- was a
22 treasurer or secretary.
23   Q. Anybody outside of the family?
24   A. Nobody.
25   Q. Do you still keep that corporation,

Page 24

1 that company, in some form?
2        S. Schwartz
3   A. No, that reverted back to the
4 properties which I own now which are all on a
5 Schedule E of my taxes.
6   Q. For all of those properties, do you
7 have anybody outside of your family that has
8 invested with you?
9   A. No, I own it 100 percent.
10   Q. Did you have any experience before
11 Clean Care Systems with janitorial products,
12 generally?
13   A. Yes. A very short experience.
14   Q. What was that experience?
15   A. I had been contacted by a gentleman
16 by the name of Paul Schmidt, not by him
17 directly, by an individual by the name of
18 Robert Clark who I've since been told the name
19 was an alias, and who discussed an investment
20 in a company that had a self cleaning toilet
21 seat that was Swiss-made. And I had made an
22 investment in that.
23   Q. This Robert Clark, do you know, did
24 Robert Clark call you on the phone?
25   A. It was a cold call.

Page 25

1   Q. And how did Robert Clark describe
2        S. Schwartz
3 that product to you?
4   A. A self-cleaning toilet seat, very
5 similar to the one that we have in our
6 company. He sent me some information about
7 the seat, about the person running the
8 company. And the proposal was that I lend
9 some money. He had a 12 percent return on
10 the investment. And after a period of time
11 the bond was convertible to stock.
12   Q. And --
13   A. There was a prospectus associated
14 with it.
15   Q. And did Mr. Clark send that you
16 prospectus?
17   A. Yes.
18   Q. Did you receive that prospectus
19 before you invested?
20   A. Yes.
21   Q. And how much did you invest?
22   A. In total, the first time, $100,000.
23 In total, it was $300,000.
24   Q. Can you break that down for me, you
25 said $100,000 the first time?

Page 26

1    A. I think several months later another
2          S. Schwartz
3  hundred. And maybe 8, 10 months later the
4  third $100,000.
5    Q. Did you deal with anybody from --
6  withdrawn.
7        What was the name of this company?
8    A. The company was ACS.
9    Q. Did you deal -- did that stand for
10 anything, as far as you know?
11   A. No. But I think they are a Swiss
12 company that makes that product, among others.
13   Q. Did you deal with anybody from ACS at
14 any time other than Robert Clark?
15   A. Not verbally.
16      I got some representations from ACS
17 from Paul Schmidt. But the person who was,
18 quote, the investor relations person, was this
19 Robert Clark.
20   Q. Do you have any understanding of what
21 Paul Schmidt's role was?
22   A. He was the president, director. His
23 job was to market the product.
24   Q. Do you have any understanding of what
25 the $300,000 you put into the company related

Page 27

1  in terms of a proportion or percentage of the
2          S. Schwartz
3  company in its entirety?
4    A. No.
5    Q. Did you have any understanding --
6  withdrawn.
7        What did you receive in return for
8  your $300,000?
9    A. Some certificates, a description that
10 interest would be forthcoming at specific
11 dates.
12      It didn't last very long because I
13 got one small interest payment, and then
14 basically Mr. Schmidt who is a Swiss national,
15 who I understand is living in Las Vegas, and
16 Robert Clark, both disappeared.
17   Q. Did you ever hear from Robert Clark
18 again?
19   A. Yes.
20   Q. When was that?
21   A. I don't recall the exact time. But
22 he called me sometime probably late 2005.
23   Q. And how long had it been since you
24 had spoken to him since then?
25   A. I don't recall.

Page 28

1        I attempted to call his phone number
2          S. Schwartz
3  and the phone number that had been given to me
4  for Paul Schmidt multiple times and had gotten
5  no response.
6        But he called and left a message, I
7  think one day. And the next day I was home
8  when he called.
9    Q. Did you -- other than exchanging
10 those messages, did you speak to him at any
11 time in 2005, would you say, before this time
12 that you heard from him again -- withdrawn.
13      About when in 2005 did you hear from
14 him again after your ACS experience?
15   A. He called me -- we had more than one
16 conversation, if I recall correctly. And he
17 said that he didn't know how to get in contact
18 with Mr. Schmidt. That everything was a
19 terrible surprise to him.
20      That there was somebody else who had
21 a similar product that he felt responsible for
22 the people who had invested with Paul Schmidt,
23 and that the plan was that they were going to
24 give those of us that had lost monies -- and I
25 didn't know if there were any other people or

Page 29

1  to what degree -- some ownership of a new
2          S. Schwartz
3  entity, because, quote-unquote, he felt sorry
4  or guilty for what had transpired.
5    Q. What had transpired?
6    A. I had no money, I received no
7  interest. Paul Schmidt wasn't anywhere to be
8  found.
9    Q. Have you ever received anything back
10 for your $300,000 investment in ACS?
11   A. No, nothing.
12   Q. Let's turn then to that conversation
13 with Mr. Clark regarding something he can give
14 you because he felt bad or sorry or however he
15 may have characterized it.
16      What did you understand Mr. Clark to
17 be offering you?
18   A. Well, at first he was offering stock
19 ownership, some stock, a small percentage. I
20 can't recall correctly because there were
21 multiple discussions.
22      In the beginning it was an offer just
23 to make good.
24      In the second part it was a request
25 for maybe some more funds in addition to the

Page 30

1   ownership that would be given because this
2                S. Schwartz
3   other company was going to have a future and a
4   promise.
5        And it ultimately led to him
6   describing this new entity, and I don't know
7   if he mentioned Mr. Klein by name, but the
8   fact that they had this product that they
9   wanted to market, and he wanted to be able to
10  put me in touch with the principal who was
11  potentially looking for a partner or other
12  investors.
13       Q.  At that time, did Mr. Clark give you
14  a name on this new entity?
15       A.  I don't recall.
16       Q.  Did he tell you that an entity
17  already existed or that an entity was being
18  put together?
19       A.  I don't think he was very specific.
20       Q.  Was it your understanding that what
21  Mr. Clark was offering was some
22  combination of free shares in the new entity
23  and an opportunity to purchase more shares?
24       A.  Yes.
25       Q.  Did you ever get free shares in any

Page 31

1   new entity?
2                S. Schwartz
3        A.  No, because I told them that I wasn't
4   interested in free shares.  And that I
5   couldn't begin to understand why anybody who
6   had no responsibility would offer free shares.
7   And that I also mentioned if somebody wanted
8   to contact me specifically, that I would be
9   more than willing to talk to them.
10       In fact, I said to him it made no
11  economic sense to give people free shares in
12  something which we may have been defrauded,
13  but it just didn't make any sense.  And I
14  didn't understand.
15       And I also made it relatively clear
16  to him that I didn't particularly want to
17  continue dealing with him because I didn't
18  accept the fact that he all of a sudden didn't
19  know how to get a hold of Mr. Schmidt and that
20  he was an innocent.
21       Q.  Did Mr. Clark put you in touch with
22  anybody else?
23       A.  Somewhere probably toward the end of
24  2005, I heard from Ed Klein who contacted me
25  and said that he this distributorship, and

Page 32

1   this product.
2                S. Schwartz
3        I described the product which
4   candidly I thought made sense.  I thought it
5   made sense when it was being represented by
6   Mr. Schmidt.  And he said that he was looking
7   for investors, somebody who would help him get
8   the entity off the ground.
9        Q.  How did Mr. Klein contact you?
10       A.  Called me.
11       Q.  And for about how long would you say
12  you spoke the first time?
13       A.  Might have been half hour, 45
14  minutes.
15       Q.  And did you discuss how much of an
16  investment you were willing to make or were
17  considering?
18       A.  We started to have multiple
19  conversations.
20       Q.  On that first call, tell me as much
21  as you can about the conversation.
22       A.  I don't recall any specifics.
23       Q.  At some point, did you come to meet
24  Mr. Klein face-to-face?
25       A.  Yes.

Page 33

1        Q.  How many times would you say you
2                S. Schwartz
3   spoke to Mr. Klein on the phone before you met
4   with him face-to-face?
5        A.  Probably three to five times.
6        Q.  Did Mr. Klein or anybody else send
7   you any written materials at any time before
8   you met face-to-face?
9        A.  Yes.
10       Q.  And can you describe those written
11  materials?
12       A.  They were brochures defining the
13  product.
14       There was a description.  There was
15  a website.
16       He obviously defined it as a Dutch
17  company.  He defined it as a distributorship.
18       He misrepresented the specifics of
19  the distributorship in the beginning.  But I
20  did invite him -- he said that he was -- we
21  started to talk a little about amount of money
22  needed in the beginning, ownership, ground
23  rules, and he came to my home probably in late
24  November/December of 2005.
25       Q.  When you say Mr. Klein misrepresented

Page 34

1  certain things about the distributorship, what
2        S. Schwartz
3  specifically are you referring to?
4     A.  He represented the distributorship as
5  being for North America.  I later found out
6  that it was only for the United States.
7     Q.  When did you find that out?
8     A.  Probably closer to -- at least after
9  the first four, five months.
10    Q.  How did you find that out?
11    A.  I had started -- well, I had started
12 to get a little bit suspicious because of the
13 size of the budgets.  This is in -- well,
14 okay.  I'm sorry, I'm in the wrong year.  I
15 was talking about 2007.
16       2006, I was -- something was referred
17 to and not connected, and when I talked to, I
18 think, Brena or somebody else, and I mentioned
19 something about Canada, somebody corrected me,
20 it wasn't Ed at that time, and said no, no.
21 It was only for the United States.  And I had
22 some E-mails, I kept all my E-mails as I want
23 to do.  And it was clearly stated what the
24 distributorship was.
25    Q.  So just if I can walk through and

Page 35

1  make sure I understand it bit by bit:  At
2        S. Schwartz
3  some point during your conversations in and
4  around December of 2006, Mr. Klein related --
5     A.  2005.
6     Q.  2005?
7     A.  Yes.
8     Q.  Mr. Klein represented to you that the
9  company he was creating would have a
10 distributorship for all of North America, is
11 that correct?
12    A.  Yes, for North America, not for
13 Mexico.
14    Q.  Canada and United States?
15    A.  Canada and United States.
16    Q.  At some point after that you learned
17 that the entity Mr. Klein was creating did not
18 have distribution rights for Canada, is that
19 correct?
20    A.  It was unclear.
21    Q.  Is it clear to you?
22    A.  Yes.
23    Q.  What is the answer?
24    A.  We only have distributorship rights
25 in the United States.

Page 36

1     Q.  How do you know that now?
2        S. Schwartz
3     A.  Because I've spoken to the people in
4  Holland, and I've been shown a copy of the
5  contract.
6     Q.  And when you say Mr. Klein
7  communicated to you that the rights were for
8  North America or Canada and the United States,
9  was that communication by E-mail?
10    A.  E-mail and also verbally.
11    Q.  And did the extent of the -- did the
12 scope of the distributorship, that is, whether
13 it was limited to the United States or whether
14 it was more than the United States, play any
15 role in you deciding whether to invest in the
16 company?
17    A.  Not really.
18    Q.  At some time, did you agree with Mr.
19 Klein that you would invest in this new
20 entity?
21    A.  Yes.
22    Q.  When was that?
23    A.  Early in 2006.
24    Q.  And by that time, did this new entity
25 have a name?

Page 37

1     A.  Yes, Clean Care Systems, LLC.
2        S. Schwartz
3     Q.  Were you aware at that time of any
4  other Clean Care entity?
5     A.  No.
6     Q.  Were you aware of any other entity
7  that Mr. Klein was involved in that was
8  engaged in the business of selling or
9  distributing toilets?
10    A.  No.
11    Q.  Was it your understanding when you
12 first decided to invest in Clean Care Systems
13 that the entity already existed as a corporate
14 entity?
15    A.  I was told that it was created in the
16 beginning of 2006, and we had negotiated
17 mutual ownerships.  And a decision -- that if
18 I had invested $240,000, there's really not
19 stock in an LLC, it's in a sense ownership.
20       And we had decided that I would own
21 30 percent, he would own 30 percent.  And the
22 remaining, theoretical 40 percent -- you can
23 say we both owned half.  But if you looked at
24 it a different way, that the remaining 40
25 percent would be available by mutual agreement

1  for me to make -- this was discussed -- future
2          S. Schwartz
3  investments which would be translatable into
4  stock.
5      That evolved.  I can't say that was
6  our agreement on day 1.  On day 1, it was
7  just 30/30.  But that's what evolved over
8  several months.
9      Q.  So on day 1, what was your
10 understanding regarding the 40 percent of the
11 company that you didn't own and Mr. Klein
12 didn't own?
13     A.  The agreement of me purchasing the 30
14 percent was that I would be the only investor.
15 Mr. Klein would run the company, and that
16 nobody else would invest in CCS unless it was
17 acceptable to both of us.
18     Q.  Did you have any understanding as to
19 how profits would be apportioned?
20     A.  The understanding at the time was we
21 both owned half the company.  Mr. Klein was
22 going to get a salary.  And that profits
23 would be apportioned on the percentage of
24 ownership that each individual had.
25     Q.  And by percentage of ownership do you

1  mean 30/30 or 50/50?
2          S. Schwartz
3      A.  In the beginning 30/30 was 50/50.
4      Theoretically in an LLC 30/30 is
5  50/50.  Unless somebody were to distribute
6  something else and change those numbers, it
7  would mean that he and I were equal.
8      Q.  Did you and Mr. Klein ever agree to
9  sell any portion of that extra 40 percent?
10     A.  We signed an agreement to that effect
11 later.
12     Q.  How much later?
13     A.  I can't recall.  I think it was
14 about -- it might have been the call of 2006.
15 I sent you a document that he and I signed and
16 he agreed that for every million dollars that
17 I invested we had made our ownership in a
18 sense 10 million shares, 30 percent being 3
19 million.  30 percent being 3 million, or
20 however you want.
21     And that for every million dollars,
22 it didn't have to be a million, but any
23 percentage of a million that at a later date
24 that could be translated into percentage of
25 ownership which meant that if I theoretically

1  had invested -- we only talked about the very
2          S. Schwartz
3  beginning.
4      But theoretically, if somebody had
5  made investments or I invested larger sums of
6  money, I would have owned, theoretically, 70
7  percent, he would have owned 30.  Or we could
8  have decided that we only needed 2 or $3
9  million to get started, I might have ended up
10 owning 45 or 55.  And he might have owned 45.
11     Because I told him that any stock
12 which I didn't buy by loaning money to the
13 company would be distributable by both him and
14 me 50/50, even though I might own a majority.
15 It wouldn't be divided by the percentage that
16 I already owned.
17     So theoretically to make it simple,
18 if I had bought 10 percent and now owned 40
19 and he owned 30, and that was enough money to
20 get the company going, there would be 30 left,
21 at which point that would be divided 15/15.
22 He would own 45, I would own 55.
23     Q.  What you have described so far, I
24 understand to being a theoretical?
25     I want to get into the actual?

1      As I understand it, when you first
2          S. Schwartz
3  started in early 2006, your initial investment
4  bought you 30 percent of the company.
5      A.  Yes.
6      Q.  You understood Mr. Klein to own 30
7  percent of the company?
8      A.  Yes.
9      Q.  And 40 percent was put aside --
10     A.  Called a treasury.
11     Q.  Treasury?
12     A.  Yes.
13     Q.  At that time, it was your
14 understanding that until that 40 percent was
15 sold or otherwise disposed of, you and Mr.
16 Klein were 50/50 owners in the company?
17     A.  Yes.
18     Q.  And any profits that came to the
19 company would be shared in 50/50?
20     A.  Yes, and by the tax law any losses,
21 because it was an LLC at that time, would be
22 divided equally among us as it was in 2006.
23     Q.  Now, before you got to this time in
24 the fall of 2006 when you entered into a
25 contract as to what to do -- to potentially do

Page 46

1  owned 50 percent, obviously not micromanage
2          S. Schwartz
3  moment to moment decisions, but major
4  decisions, I would be fully informed. We
5  would discuss them and come to conclusions and
6  we would act together. And that he would get
7  compensated in the form of salary and
8  benefits.
9      Q. Did you ever discuss when you first
10 invested in Clean Care Systems, did you ever
11 discuss how decisions would be made if you and
12 Mr. Klein disagreed?
13     A. We touched on it. We agreed we
14 would have to agree.
15     Q. And beyond that, was anything
16 discussed?
17     A. No. But that both of us essentially
18 had a veto to any major decision being made.
19 We both owned equal amounts of the company.
20 We were, quote-unquote, partners.
21     Q. At some point after your initial
22 $240,000 investment, did you invest more money
23 in Systems?
24     A. Yes, I did.
25     Q. And when was that?

Page 47

1      A. I signed an agreement with Mr. Klein,
2          S. Schwartz
3  and $240,000 lasted for a reasonable part of
4  2006. And then I started to send monies to
5  meet the monthly budget to the company.
6      And I also purchased -- sent checks
7  which allowed the company to buy product from
8  the parent company. And I would mail or wire
9  that money to Clean Care Systems, LLC at that
10 time. And then they would supposedly
11 purchase the product from Europe.
12     Q. Were all of your payments to Clean
13 Care Systems done either by wire or by check?
14     A. Yes. I think almost every one was
15 by check.
16     Q. Did you have any understanding as to
17 whether anybody was getting any commission on
18 your investment, anybody was being paid a
19 commission on the investment you made in
20 Systems?
21     A. Of course not.
22     Q. Was it your understanding that for
23 every dollar you put into Systems, 100 percent
24 would go into the operating of Systems?
25     A. Yes.

Page 48

1      Q. Did you have any understanding as to
2          S. Schwartz
3  what, if any, role Mr. Clark had with Systems?
4      A. Until September of 2007, I knew
5  nothing about anybody's involvement other than
6  Mr. Klein, his son, Brena, Brena's son,
7  Hector, Hector Junior.
8      Q. All told, from your first $240,000
9  investment through today, how much have you
10 invested in Systems?
11     A. I don't have an accurate accounting.
12     I gave you some data which I at a
13 break could give you specifics of what was
14 sent to Systems. And then I have been, since
15 September of 2007, supporting Systems
16 unilaterally.
17     I would guess that the total amount
18 is greater than $1 million and less than $1.75
19 million.
20     Q. That total includes what you have put
21 in since September of '07?
22     A. Yes, but I haven't had to put very
23 much -- I probably only put in about 400,000
24 since September.
25     Q. Would you say that by September you

Page 49

1  put in at least $1 million?
2          S. Schwartz
3      A. Close to it.
4      Q. And did you always wire money to the
5  same account?
6      A. I usually sent it by check.
7      Q. Who was that check made out to?
8      A. The check was made out to Clean Care
9  Systems, LLC.
10     Q. Is it your understanding that check
11 was always deposited into the same bank
12 account?
13     A. Yes.
14     Q. Do you know where that bank account
15 was, at what bank?
16     A. I think it was Bank of America and I
17 think it was in New Jersey.
18     I think there might have been an
19 occasion or two where I didn't send the money
20 to Clean Care Systems. I think there was at
21 least one occasion where there was a need for
22 the money to go directly to Europe and I wired
23 the money to Europe. And I got an
24 acknowledgment from Europe that the money had
25 been sent. And obviously I had a copy of the

Page 90

1  was being taken from Systems to pay these
2              S. Schwartz
3  individuals to whom you refer?
4    A.  Brena Resnick.
5    Q.  When approximately did she tell you
6  this?
7    A.  After I started to get suspicious,
8  she started to get uncomfortable and basically
9  she opened up to me and said to me that she
10  couldn't answer my questions because of a
11  whole series of things that she said.  And it
12  became apparent to me that I was being
13  scammed.
14        And I said to her well, if you know
15  something you better tell me now because if
16  you don't tell me now, then you're going to be
17  party to what's happening from this point on.
18  And she started to speak to me.  She started
19  to tell me almost in a deluge of information
20  that Mr. Klein had spent money on himself, his
21  girlfriend, on personal things, taking his
22  girlfriend on trips, used the credit card for
23  personal interest of his own, paid these
24  people, and that I was being scammed.
25        And that there was another entity

Page 91

1  called Clean Care Technologies that was being
2              S. Schwartz
3  used to totally defraud me.
4    Q.  My question is when you had that
5  conversation with Ms. Resnick?
6    A.  Early July 2007.
7    Q.  Had you heard of the company called
8  Clean Care Technologies before that?
9    A.  Right around that time, I'm not sure
10  if it was immediately after or right before I
11  asked to see the books, to try to understand
12  the partnership part that I got and how the
13  company was really working.
14    Q.  You asked Mr. Klein?
15    A.  Yes.
16        Mr. Klein in the beginning didn't
17  want to send me the books.  And there's
18  numerous E-mails where, well --
19        Finally, Mr. Klein said I'm going to
20  send you the books.  I'm not sure if Brena
21  told me before or after, it became apparent to
22  me we didn't sell seats to anybody other than
23  an entity called Clean Care Technologies.
24        When I saw that, when she alluded to
25  something, but when I saw it I understood

Page 92

1  totally what was happening.  And that was
2              S. Schwartz
3  that there was a parallel company being run
4  where toilets were being sold, and all or most
5  of the profits of Clean Care Systems were
6  being -- ending up in the coffers of Clean
7  Care Technologies and I was paying for
8  everybody's bills, I was paying for the rent,
9  everybody's salaries, travel and everything
10  else.
11        And Clean Care Technologies was then
12  taking them because the book showed -- you had
13  to assume, I can look quickly, it became
14  apparent to me that Clean Care Technologies
15  was reselling this and making a profit, where
16  I was making $5 on a toilet seat or a dollar
17  on a toilet seat or $2, the profit that Mr.
18  Klein said we were selling them $48 a bottle,
19  obviously the $48 was being sold by Clean Care
20  Technologies and I was getting $2 a bottle.
21    Q.  Let's get back to when you say you
22  wanted to look at the books but didn't at
23  first receive them.
24        Tell me in as much detail as you can
25  of any communications between you and Mr.

Page 93

1  Klein where you requested access to the books.
2              S. Schwartz
3    A.  I requested access to the books.
4        We had many discussions, arguments.
5  I basically said I want to see the books.
6  And he said basically, what's wrong, you don't
7  trust me.  And I said I don't know.  I want
8  to see the books.
9        And then he said I don't have the
10  books, I have to get the books organized.
11  The accountant has the books.
12        And I kept saying I want to see the
13  books, I want to see the books, I have to see
14  the books, I'm entitled to see the books, I
15  own 50 percent of the company, even if I owned
16  5 percent of the company I'm entitled to see
17  the books.  Finally he said fine, the books
18  will be sent to you.
19    Q.  How long had elapsed between the
20  first time you asked to see the books and when
21  you received the books?
22    A.  Maybe six weeks, maybe eight weeks.
23  Maybe a bit longer.
24    Q.  When you reviewed the books, did you
25  find any payments from any of the companies

Page 94

1  that you had previously understood to have
2          S. Schwartz
3  purchased toilets from Clean Care Systems?
4      A.  No.
5      Q.  You discussed earlier money that you
6  now believe Systems covered for Clean Care
7  Technologies.
8          Did you have any understanding as to
9  whether Clean Care Technologies ever gave
10  money to Clean Care Systems?
11     A.  To the best of my knowledge, no.
12  Other than the purchasing of inventory which
13  is outlined.
14     Q.  Clean Care Technologies would
15  purchase inventory from Systems?
16     A.  Yes, and then they would sell it.
17  And that was listed under purchases from Clean
18  Care Technologies to Clean Care Systems.
19         But no monies were transferred if it
20  wasn't tied to inventory.
21     Q.  I want to look at some of that, the
22  second page, for example, April 1, 2006 you
23  will see two different entries from Clean
24  Care, what seems to be Technologies, it says
25  TE?

Page 95

1      A.  Where?
2          S. Schwartz
3      Q.  If you look on the left, it says
4  deposit, on page 2?
5      A.  Yes.  I see it, April 1, 2006.
6      Q.  Do you have any understanding what it
7  means that Clean Care Technologies put money
8  into Clean Care Systems account?
9      A.  To my knowledge, it was to purchase
10  product.
11     Q.  And under the column "split," in both
12  cases it says Shelly.
13         Do you have any understanding as to
14  what that means?
15     A.  Oh, I don't know why it's listed as
16  Clean Care Technologies.
17         It may not be Clean Care
18  Technologies.  It might have been a check
19  that I made out to Clean Care Systems and
20  somebody even typed it in as Clean Care
21  Technologies.
22     Q.  Just in case it will help clarify, if
23  you go back to the first page, three lines up
24  from the bottom, there is a deposit?
25     A.  Yes.

Page 96

1      Q.  In that case on 2-1-06, the deposit
2          S. Schwartz
3  says under the name Shelly Schwartz?
4      A.  Yes.
5      Q.  Under the memo it says deposit, after
6  the letter C, it's not legible.
7          Is that your understanding, reading
8  this balance sheets that that reflects a
9  deposit from you into Clean Care Systems?
10     A.  Yes, the 60,000 and the 25,000 were
11  probably checks which I also sent.
12     Q.  Why?
13     A.  I sent several checks --
14     Q.  Let me get the question on the
15  record:  Why would checks from you in one
16  case say from Shelly Schwartz and in the other
17  case from Clean Care Technologies?
18     A.  I have no knowledge of how it was
19  entered.  But what I'm telling you is I sent
20  a check on January 10 for $60,000.  And I'm
21  pretty sure on April 1st I sent a check for
22  $60,000.
23         And I had promised Mr. Klein that I
24  would send them $240,000 over a certain number
25  of months, and then I sent a check on 6-26 for

Page 97

1  $90,000.  I can't recall exactly what they
2          S. Schwartz
3  were from.  But those checks, I believe, were
4  checks that I sent.
5      Q.  Let's turn to page 18, where there is
6  a summary, or what seems to be a summary?
7      A.  Yes.
8      Q.  Under long-term liabilities, you'll
9  see it says Shelly and a list of deposits?
10     A.  Yes.
11     Q.  And all but two of those deposits,
12  the name is listed as Shelly Schwartz.  And
13  two, which are the same in amount and date,
14  4-1-2006 say Clean Care TE?
15     A.  I'm almost absolutely positive that
16  was my check into the company.
17     Q.  You have no idea why it would be that
18  it's listed differently?
19     A.  No.  I have no idea at all.
20     Q.  What about on the top of that page
21  where you see under payment as opposed to
22  deposit, where it says payment type, there you
23  see two different entries on 2-15-07 from
24  Clean Care.
25         Can we agree that Clean Care TE is

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------
SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

          -against-                    08-CV-1719


CLEAN CARE TECHNOLOGIES, INC., EDWARD

KLEIN, AL NAZON and ANIL VARUGHESE,

                    Defendants.

----------------------------------------

          DEPOSITION OF AL NAZON, taken by
Plaintiff, pursuant to Subpoena, at the

Securities and Exchange Commission, Three World
Financial Center, New York, New York, taken on
Thursday, May 15, 2008, at 10:22 a.m., before

Lisa Rosenfeld, a Shorthand Reporter and Notary

Public within and for the State of New York.

```
 1 A P P E A R A N C E S :

 2

 3      SECURITIES AND EXCHANGE COMMISSION

 4        Three World Financial Center

 5        New York, New York 10281

 6      By:   MICHAEL BIRNBAUM, ESQ.

 7            VALERIE A. SZCZEPANIK, ESQ.

 8

 9

10

11 Also Present:

12

13      EDWARD KLEIN

14
        AL NAZON, Pro Se
15

16

17

18

19

20

21

22

23

24

25
```

Page 10

Nazon

1
2     A.   Jill Fanera.
3     Q.   Jill Fanera?
4     A.   Yes.
5     Q.   For any of the accounts you've
6   mentioned so far, did anybody other than you have
7   access to those accounts?
8     A.   CCT and ASC invest was accessible by
9   Anil Varughese.
10    Q.   Would you both use those accounts?
11    A.   Yes.
12    Q.   Any other accounts other than those
13  that you've mentioned that you've used in the
14  last five years?
15    A.   Oh, Nazon at clear vision.
16    Q.   What did you use that for?
17    A.   Music.
18    Q.   Only music?
19    A.   Yes.
20    Q.   Anything else?
21    A.   No, not that I can recall at this
22  point.
23    Q.   Did you ever use an e-mail that began
24  with R. Clark, perhaps at ASC?
25    A.   That I can't recall, that I can't

Page 11

Nazon

1
2   recall.
3     Q.   Let's go back to the time you
4   worked --
5     A.   You know, I may have but I can't
6   recall, I can't confirm that.
7     Q.   We'll look at that a bit later.
8   Let's go back to the time you were working at
9   ASC, was ASC the first experience you had in
10  marketing or selling securities?
11    A.   No.
12    Q.   What was the first experience?
13    A.   My first experience was with Advanced
14  Technologies Group.
15    Q.   Was that also known as Commonwealth?
16    A.   Also known as Commonwealth and other
17  names.
18    Q.   What other names?
19    A.   Well, they had a holding company, so
20  the different offerings, so it was FX 3000,
21  Luxury Lounge, and Luxury Lounge.
22    Q.   And when did you start working there?
23    A.   I started in October '98.
24    Q.   And what did you start doing in
25  October '98?

Page 12

Nazon

1
2     A.   I was hired as a cold caller.
3     Q.   And were you provided with leads to
4   cold call?
5     A.   Yes.
6     Q.   Who provided you with those leads?
7     A.   Alex Stelmak.  Well, Alex Stelmak and
8   Felix Straton.
9     Q.   Did anybody else other than Stelmak
10  and Straton provide you with leads at
11  Commonwealth Capital?
12    A.   They would be passed around the
13  office by different employees.  They were the
14  originators of the source of the leads.
15    Q.   So you might have somebody on your
16  level that might have extra leads that they might
17  pass to you?
18    A.   Yes.
19    Q.   But the only source of new leads were
20  Stelmak and Straton?
21    A.   Yes.
22    Q.   Did they give you a script that you
23  should use when you made the cold calls?
24    A.   They had us write down the script.
25    Q.   Did you save that script?

Page 13

Nazon

1
2     A.   For the most part, we were instructed
3   to stick to it in the beginning and then vary to
4   it a little bit.
5     Q.   Did there ever come a time while you
6   were working at Commonwealth that you came to
7   believe the representations you were making to
8   potential investors were false or misleading?
9     A.   At some point, well, not when I first
10  started there, but the second time.
11    Q.   When was the second time?  When was
12  the second time you began working there?
13    A.   The second time I began working there
14  was 2002.
15    Q.   For approximately how long?
16    A.   For about a year.
17    Q.   And sometime during that year you
18  came to believe that the representations you were
19  making to potential investors were false or
20  misleading?
21    A.   I can say that I know that the
22  representations that I made, yes, may have been
23  leading, but I can't confirm that they were
24  false, but there were just certain patterns that
25  I was seeing that didn't make sense.

Nazon

1
2  Q.  Were these representations ones that
3  you were instructed to make from Mr. Stelmak or
4  Mr. Straton?
5      A.  Yes, in a sort of ways, yes.
6      Q.  Both of them or one or the other?
7      A.  It would be both, not simultaneously.
8      Q.  Putting aside whether or not sitting
9  here you can prove that the representations were
10  false, is it fair to say that at some point when
11  you made those representations you believed them
12  to be false or misleading?
13     A.  A part of me may have felt that it
14  was misleading.  I mean but most of the things
15  that we were saying to investors were -- we
16  provided some sort of article or news release so
17  I'd be under the impression, especially
18  considering that they had their filings in place,
19  that things were in order, but when I saw a
20  pattern of they say they're going public, then
21  they say okay, the market's bad, then they say,
22  you know what, we're not going to go public,
23  we're going to merge with this company, and then
24  it would be a cycle of okay, the company we're
25  merging with the deals fell apart, so we're going

Nazon

1
2  to go back to going public.  It would be this
3  circle.
4      Q.  So is it fair to say that at first
5  you believed what you were conveying to investors
6  was true but at some point during your second
7  term of employment at Commonwealth you realized
8  that at least some of what you were conveying was
9  false or misleading?
10     A.  Yes.
11     Q.  When did you stop working there?
12     A.  October -- no, not October '03, like
13  around spring '03.
14     Q.  What was the next job you went to?
15     A.  Infomercial Funding.
16     Q.  How did you find out about that job?
17     A.  By Anil Varughese.
18     Q.  Who is Anil Varughese?
19     A.  Someone that I worked with at
20  Advanced Technologies.
21     Q.  Is that where you first met him?
22     A.  Yes.
23     Q.  Did he have the same job as you
24  there?
25     A.  He was actually a director -- I'm

Nazon

1
2  sorry, let me clarify.  Did he have the same job
3  as me at Advanced Technologies or Infomercial
4  Funding?
5      Q.  Let's start with Advanced
6  Technologies.
7      A.  Advanced Technologies he came in as a
8  cold caller and then he graduated to a closer.
9      Q.  When he got to Informercial what was
10  his job?
11     A.  He was a director in the company.
12     Q.  And when you went to Informercial
13  what did you begin as?
14     A.  Initially I began as a cold call for
15  Anil because I didn't know the deal that well.
16     Q.  How did you get your leads?
17     A.  I had some leads of my own and Elliot
18  Jacobson, who is the president of Informercial,
19  had some leads, and Anil had some leads.
20     Q.  Were the leads that you took from your
21  own leads that you took from your days at
22  Advanced Technologies?
23     A.  Yes.
24     Q.  Did you ever have a job other than
25  cold caller at Informercial?

Nazon

1
2      A.  Yes.
3      Q.  What was that job?
4      A.  It was closing.
5      Q.  About how long after you showed up at
6  Informercial did you become a closer?
7      A.  About four, five months.
8      Q.  What is a closer?
9      A.  A closer is someone that will, A, get
10  their own leads, B, follow up with the leads for
11  the purpose of persuading the investor to invest
12  into that company.  Well, with respect to this
13  business.
14     Q.  So a cold caller might contact a
15  potential investor but only somebody above that
16  cold caller could close the deal?
17     A.  Yes.
18     Q.  By close the deal, you mean come to
19  an agreement with an investor about how much they
20  would invest in the company?
21     A.  Yes.
22     Q.  When did you leave Informercial?
23     A.  December '05.
24     Q.  And why did you leave?
25     A.  There was a fallout between Anil and

Nazon

1
2  Elliot Jacobson.
3      Q.  How did that affect you?
4      A.  Being that I worked with Anil, we
5  knew each other for a long time and I guess at
6  the time the treatment or the behavior of Mr.
7  Jacobson towards Mr. Varughese may have seemed I
8  guess somewhat on the abusive side, a little bit
9  verbally.  I guess I had a certain loyalty to him
10  at that time.
11      Q.  To Mr. Varughese?
12      A.  Yes.
13      Q.  Do you have any reason to believe,
14  sitting here today, that any of the
15  representations you made on behalf of
16  Informercial were false or misleading?
17      A.  No.  I'm just revising that time era.
18  No.
19      Q.  Where did you go after Informercial?
20      A.  Well, actually just shortly before we
21  left Informercial, we were embarking on a deal
22  with Veritas of China.
23      Q.  That overlapped with your time at
24  Informercial?
25      A.  Yes, towards the latter part, during

Nazon

1
2  the arguments and the fallout we figured, you
3  know what, this might not end too well.  So let's
4  see what else we can find.
5      Q.  When you say we, you mean you and Mr.
6  Varughese?
7      A.  Yes.  But actually I didn't make the
8  contact with -- I didn't have the contact with
9  Veritas, Anil did.
10      Q.  With whom at Veritas did Anil speak?
11      A.  Dr. Edwin Ruh, Jr., Ed Ruh, Jr. or
12  something like that.
13      Q.  How do you spell Ruh?
14      A.  R-u-h.
15      Q.  Is that the first you heard of Mr.
16  Ruh?
17      A.  Yes.
18      Q.  At some point did you meet Mr. Ruh?
19      A.  Yes.
20      Q.  When was that?
21      A.  It probably was -- yeah, most likely
22  was '04.
23      Q.  While you were still at Informercial?
24      A.  Yes.
25      Q.  Did you start working for Veritas

Nazon

1
2  while you were at Informercial?
3      A.  Yes.  This was towards again the
4  latter part of our relationship.
5      Q.  Were you a cold caller for Veritas?
6      A.  Yes.
7      Q.  And were you using the same leads as
8  you had used at Informercial?
9      A.  Some.  I can't recall, it was a long
10  time ago so I can't recall what leads were used.
11      Q.  There was a definite overlap?
12      A.  Yes, there was definite overlap.
13      Q.  Did Mr. Ruh or anybody else at
14  Veritas give you new leads?
15      A.  No.  Actually I believe he did
16  provide some leads, I apologize.
17      Q.  When you spoke to investors, at times
18  did you offer them the chance to purchase both
19  Informercial and Veritas?
20      A.  I never got involved in regards to
21  Veritas, I never got involved deep in those
22  conversations.
23      Q.  What did you do for Veritas?
24      A.  I provided leads because the deal at
25  the time for me was too complex to understand.  I

Nazon

1
2  understood -- I guess I took maybe merit of the
3  deal on the basis of Dr. Ruh's academic
4  credentials, his connection to this and that, and
5  I think he had some sort of deal going with
6  Intellsat.  So, you know, I went largely by what
7  Mr. Varughese would say.
8      Q.  So you never made the cold calls for
9  Veritas?
10      A.  Yes, I did.
11      Q.  When you made those cold calls did
12  you describe the product?
13      A.  Yes.
14      Q.  What was the product?
15      A.  They were looking to raise money to
16  build I guess an educational infrastructure
17  online distance learning from China to the U.S.,
18  and that Veritas was a think tank, was an
19  economic think tank at Harvard University.
20      Q.  Sitting here today, do you believe
21  the representations you made on behalf of Veritas
22  to be true?
23      A.  At this point I don't have sufficient
24  knowledge to make that determination.  But at the
25  time I did believe that it was true.

Page 22

```
1              Nazon
2      Q.  Do you have any reason now to believe
3  it wasn't?
4      A.  No.
5      Q.  When you told -- gave investors the
6  opportunity to invest in Veritas, how did you
7  explain the investors would make money off the
8  project?
9      A.  Number one, they would make money
10  off -- they were actually paid, if I'm not
11  mistaken, a quarterly dividend.  I think it was
12  8 percent of their investment or I forgot how the
13  calculations were made, but they got a check
14  every quarter.
15      Q.  And that check came from Veritas?
16      A.  Yes.
17      Q.  How did Veritas make money?
18      A.  They didn't.
19      Q.  So Veritas would write that check for
20  money brought in from other investors?
21      A.  Again I don't have the sufficient
22  knowledge to answer or confirm that.
23      Q.  Have you ever heard the phrase
24  "pyramid scheme"?
25      A.  Yes.
```

Page 23

```
1              Nazon
2      Q.  What do you understand that to mean?
3      A.  When you take money from one group of
4  investors to pay another group of investors.
5      Q.  Do you believe that Veritas was a
6  pyramid scheme?
7      A.  Again, I don't have the sufficient
8  knowledge to know that.
9      Q.  Do you --
10      A.  From my understanding, from my
11  understanding there was a reserve fund set aside
12  by Dr. Ruh to cover these payments, when that
13  question was addressed not in the form of pyramid
14  scheme but it was addressed in the form of okay,
15  well, investors are investing but where is the
16  money coming from to make sure that they're
17  getting their payments.
18      Q.  When you say the question was asked
19  or addressed, you mean some investors would ask
20  about that?
21      A.  No, I would address it to Anil to
22  relay it to Dr. Ruh.
23      Q.  Did you know where that fund came
24  from?
25      A.  That I didn't know.
```

Page 24

```
1              Nazon
2      Q.  Did you have any understanding as to
3  what the business model was for Veritas?
4      A.  I had a -- I guess I had a macro
5  understanding of it.  Even after meeting with
6  Dr. Ruh I still didn't have a full grasp of it.
7  And my personal opinion to Anil when we were
8  remarking on it was that it was too big of a
9  deal, you know, for the retail investor, and at
10  the same time simultaneously Dr. Ruh was I guess
11  looking to go elsewhere for bigger investor
12  capital because he stated that the retail money
13  was too small for him to meet his objectives.
14      Q.  Did you have any understanding as to
15  how Veritas planned to make money?
16      A.  A various amount of licensing deals,
17  things that were described in the memorandum from
18  my understanding.  Things, if I'm not mistaken,
19  were Shanghai University or Xu Zhang University
20  in China, and different licensing deals that they
21  were supposed to line up through communication
22  deals, com deals, satellite deals.  It seemed
23  like there was a multiple income stream of
24  different things that Dr. Ruh said he was going
25  to do.
```

Page 25

```
1              Nazon
2      Q.  When did you leave Veritas?
3      A.  I ended my relationship with Veritas
4  in December 2004.
5      Q.  What were the circumstances
6  surrounding your departure from Veritas?
7      A.  I came to the understanding that the
8  deal was too complex and too big for me to
9  understand.
10      Q.  Had you been making money at Veritas?
11      A.  Yes.
12      Q.  Commissions on what you bring in?
13      A.  Yes, on leads that were provided.  I
14  never closed any one but I got commissions.
15      Q.  If one of the leads you provided
16  ended up investing money you get commissions?
17      A.  Yes.
18      Q.  What was the size of that commission?
19      A.  Approximately 15 percent.
20      Q.  Do you know if investors were ever
21  told of the commissions that you would get?
22      A.  I don't believe they were, I don't
23  believe they were.
24      Q.  Did you ever tell anybody at Veritas
25  that you were a registered broker/dealer?
```

1              Nazon
2      A.  Never.
3      Q.  Were you ever asked?
4      A.  No.
5      Q.  Do you know what became of Veritas?
6      A.  I followed up on it for a few years
7  through Anil.  I would ask what's going on and he
8  stated that, you know, and I think he was still
9  keeping in contact with some investors and they
10  were stating they were still getting their checks
11  and they were getting news releases about this
12  agreement being signed or that agreement, but I
13  never myself had any receivership of these
14  documents to know exactly what was going on
15  per se.
16      Q.  Do you know if the company still
17  exists?
18      A.  Last time I believe it does because I
19  researched -- I was just researching it online
20  and I saw the website and I think it was updated.
21  The admin was updated for 2006 to 2007.
22      Q.  Do you remember anybody else who
23  worked there with you?
24      A.  At Veritas, just myself and Anil.
25      Q.  Where did you go after leaving there?

1              Nazon
2      A.  Empire Development.
3      Q.  What was that?
4      A.  Empire Development was a private real
5  estate fund.  Their objective was to raise money
6  to buy homes for foreclosures.
7      Q.  And you and I have discussed that
8  deal in connection with litigation against
9  Empire, is that correct?
10      A.  That is correct.
11      Q.  Rather than go into too many details
12  then regarding Empire, I'll just ask you a couple
13  of general questions and we can move on.
14      A.  Understood.
15      Q.  Did you have any other jobs while you
16  were at Empire?
17      A.  Yes.
18      Q.  What was that job or jobs?
19      A.  Well, I produce music, you know, of
20  course.  But other than that, I was moonlighting
21  with ASC Investments.
22      Q.  Anything else?
23      A.  Nothing I can recall at this point.
24      Q.  What did you do for Empire?
25      A.  I came in as a cold caller for a few

1              Nazon
2  weeks and I was a closer and I raised capital as
3  an unregistered officer for the company.  Well,
4  an unregistered broker.
5      Q.  Who else -- withdrawn.  Did Mr.
6  Varughese work at Empire?
7      A.  No, he did not.
8      Q.  When did ASC begin, your involvement
9  with ASC begin?
10      A.  My involvement with ASC began spring
11  of '05.
12      Q.  And you were still at Empire at the
13  time?
14      A.  Yes.
15      Q.  How did you hear of ASC?
16      A.  I researched it online while my
17  relationship was -- while we were looking around
18  for deals.  I saw a demonstration of a -- a video
19  demonstration of the toilet, of a self-cleaning
20  toilet seat and I immediately contacted the
21  person that owned that company.
22      Q.  When you say you researched it
23  online, what do you mean?
24      A.  I did a search, a general -- I did a
25  general research like a Google.

1              Nazon
2      Q.  Google search for toilets?
3      A.  A Google search for -- at the time I
4  was looking for investments that were actually
5  returning income, that was giving quarterly
6  returns.
7      Q.  To investors?
8      A.  Yes.
9      Q.  And do you remember what search terms
10  ended up yielding ASC?
11      A.  I think it was a private placement in
12  high yield -- either private placement -- income
13  in private placement.
14      Q.  Did your Google search reveal a name
15  you should call if you wanted to get involved in
16  ASC?
17      A.  No, it reeled me first to the site
18  and then from going to the site I went to the
19  contact info and then I contacted the info.  But
20  right on the site the first time I saw it, it
21  explained what dollar amount if an investor
22  invests, what they're going to receive and it had
23  testimonials and everything.
24      Q.  Do you know who maintained that
25  website?

1                 Nazon
2      A.  Paul Schmidt.
3      Q.  Did he create it, to your knowledge?
4      A.  Yes.
5      Q.  And when you contacted ASC, was it
6  Paul Schmidt that you contacted?
7      A.  Yes, via e-mail originally.
8      Q.  And did you become a cold caller for
9  ASC?
10     A.  Yes.
11     Q.  Did you eventually become a closer?
12     A.  Yes.  You could say in essence my job
13  was simultaneous from that point.  I had the
14  experience to kind of just pick up the ball from
15  there.
16     Q.  Cold caller and closer at the same
17  time?
18     A.  Yes.
19     Q.  Had you worked with Anil Varughese?
20     A.  Not initially.  Anil came on board
21  after I introduced him to the deal.
22     Q.  About how long were you working for
23  ASC before you brought Anil along?
24     A.  Probably two months.
25     Q.  Was anybody else working as a cold

1                 Nazon
2  caller or closer or otherwise raising money for
3  ASC, other than you and Mr. Varughese at any time
4  you were there?
5      A.  No.
6      Q.  How did you get paid at ASC?
7      A.  We got paid commissions.
8      Q.  Based on what you brought in?
9      A.  Yes.
10     Q.  A certain percentage?
11     A.  Yes.
12     Q.  What was that percentage?
13     A.  It was 10 if it was under 100,000 and
14  if I'm not mistaken -- no, actually I'm sorry, I
15  think it was 15, somewhere about 15 percent, and
16  then if it was over 100,000 it was 20 percent,
17  but 5 percent was paid at the end of the quarter.
18     Q.  Was it paid directly to you?
19     A.  Yes.
20     Q.  From an ASC account?
21     A.  Yes.  It wouldn't be paid directly to
22  my account.  I think it would be paid to Anil's
23  account and then Anil would pay me.
24     Q.  Were you ever paid directly from ASC?
25     A.  At one point, yes.

1                 Nazon
2      Q.  Were you ever paid in any other way
3  other than directly to an Al Nazon account or
4  through Mr. Varughese?
5      A.  No, not that I can recall.
6      Q.  Did you ever recall using a company
7  named Focus 4?
8      A.  Oh, I'm sorry.  I never received
9  checks as Al Nazon, I received checks to Focus 4
10  Marketing.
11     Q.  When did you create Focus 4
12  Marketing?
13     A.  2004.
14     Q.  And for which of these deals that
15  you've mentioned was Focus 4 Marketing involved?
16     A.  Infomercial Funding, Veritas, Empire,
17  ASC and present.
18     Q.  Present meaning Clean Care?
19     A.  Yes.
20     Q.  Anything else?
21     A.  No.
22     Q.  At all times were you paid through
23  Focus 4?
24     A.  For the most part, yes.
25     Q.  When you weren't paid through Focus 4

1                 Nazon
2  Marketing how were you paid?
3      A.  I was -- I may have received -- like
4  for example when I first started at Empire, my
5  first week they gave me like an advanced check
6  like $900.
7      Q.  To your name?
8      A.  Yes, to my name.  And I believe there
9  were times at Informercial I would receive, if
10  Anil wasn't available to write me a check, I
11  would receive a check as Al Nazon.  Actually yes,
12  for most of 2003 I received all the way until I
13  started the Focus 4 Marketing I received.
14     Q.  Did you ever have any other companies
15  through which you got paid by any companies
16  you've mentioned today?
17     A.  Not that I can recall.
18     Q.  Were you aware of a company called
19  Focus 44 Marketing that Mr. Varughese was
20  involved?
21     A.  Okay, I'm sorry, checks would be
22  given to Focus 4 Marketing, that was Anil's
23  company.  And I likened the name just for
24  simplification purposes if someone was dealing
25  with us they're not writing names to 15 million

Nazon
1
2 different companies. So mine was Focus 44
3 Marketing.
4     Q.  Would you ever have people write a
5 check out to Focus 44?
6     A.  Yes.
7     Q.  Would you be able to cash checks in
8 the Focus 44 account that were written to
9 Focus 4?
10     A.  I'm sorry, can you repeat that
11 question.
12     Q.  When you received checks for Focus 4
13 Marketing.
14     A.  From Focus 4. Focus 4 is Anil's.
15     Q.  Understood. Let me back up then.
16 The company you created in 2004 was Focus 44
17 Marketing, correct?
18     A.  Understood, yes.
19     Q.  And you created that after you
20 learned of Mr. Varughese's company Focus 4
21 Marketing, correct?
22     A.  Yes.
23     Q.  And at some point you began getting
24 paid instead of directly to Al Nazon, through
25 your company Focus 44 Marketing, is that correct?

Nazon
1
2     A.  Yes.
3     Q.  And the companies would write a check
4 directly to Focus 44 Marketing, is that correct?
5     A.  Focus 44, yes.
6     Q.  Would they sometimes write it to
7 Focus 4 Marketing and you would then move it over
8 to Focus 44 Marketing?
9     A.  In most case that's the way it would
10 usually happen. Mainly because yeah, I mean I
11 was horrible at bookkeeping and I basically left
12 most of the finance issues to Anil when it came
13 to collecting checks.
14     Q.  How did you know what Anil needed to
15 pay you?
16     A.  If a dollar amount came in, we would
17 figure out what needs to get split or what's owed
18 to me.
19     Q.  How did you figure that out?
20     A.  He would sit and calculate it.
21     Q.  Would it be a matter of seeing which
22 investors and investments you were responsible
23 for as opposed to which ones he was responsible
24 for?
25     A.  Yes.

Nazon
1
2     Q.  And would you make the full
3 commission on the investments that you brought
4 in?
5     A.  You know, if I'm not mistaken, I
6 think most of the investments in Informercial
7 there was kind of like a shared relationship
8 because a lot of times he would give me advances.
9 So the understanding was okay, well, he would
10 give me advances and so the understanding would
11 be when you have an account and it comes in we'll
12 just share it this way, it will make up for the
13 recoupment of me providing you money and so
14 forth.
15     Q.  So Focus 4 Marketing Mr. Varughese's
16 would receive a check from Informercial and that
17 check would be for money raised by both you and
18 Mr. Varughese, correct?
19     A.  Yes.
20     Q.  And Mr. Varughese would then decide
21 how much of that money you were entitled to,
22 correct?
23     A.  Yes.
24     Q.  And one of the things he factored in
25 was whether or not you already owed him money

Nazon
1
2 from the advances he gave you?
3     A.  Yes.
4     Q.  Would you be involved in figuring out
5 exactly how much Mr. Varughese should pay you?
6     A.  Yeah, we'd go back and forth and you
7 know.
8     Q.  Were there any other individuals
9 raising money from investors through one of the
10 Focus entities?
11     A.  Yes.
12     Q.  Could you list them?
13     A.  Sure.
14     Q.  Start from Informercial through the
15 present and for each of the people if there was
16 more than one, let me know where they worked.
17     A.  Where they worked?
18     Q.  Or on what offerings they worked.
19     A.  Albert Favish.
20     Q.  Is that his real name?
21     A.  I believe it is.
22     Q.  That's the name he gave investors?
23     A.  I believe so, yes.
24     Q.  What deals did he work on?
25     A.  Through Focus, Informercial and

Page 42

Nazon

1                     Nazon
2  closers would come in. Was there any closer
3  other than you?
4      A.  Yes.
5      Q.  Who were they?
6      A.  Myself and Albert Favish, and of
7  course Michael Ayngorn, and Felix Straton.
8      Q.  And if an investor was contacted by a
9  lead and then closed by somebody, the closer
10  would get the money, correct?
11      A.  Yes.
12      Q.  So here's what I'm having trouble
13  figuring out. Let's take a 1,000 dollar
14  investment, what percentage would the closers get
15  on that investment?
16      A.  For which company?
17      Q.  Empire.
18      A.  Approximately 20 percent, but that
19  was subject to change because what Michael and
20  Felix would say and do are two different things.
21      Q.  But in terms of how you would handle
22  things, if Empire paid the 20 percent on that
23  thousand dollars, let's call it $200, they would
24  pay it to Focus 44?
25      A.  Yes.

Page 43

Nazon

1                     Nazon
2      Q.  And then you would pass along that
3  $200 to whoever the closer was, either you or Mr.
4  Favish or somebody else, correct?
5      A.  Yes.
6      Q.  Now Focus 44 would also pay the
7  person who -- like Mr. Rivera, who got the lead,
8  correct?
9      A.  Yes.
10      Q.  Would that money come out of the
11  closer's percentage?
12      A.  Yes.
13      Q.  Now I understand. And was it the
14  same kind of deal whenever Focus 44 was involved
15  that Focus 44 would pass along the commissions to
16  the closer minus whatever money was being paid to
17  a lead?
18      A.  Yes, that's correct. Because I'm
19  remembering how everyone did. Mr. Rivera was
20  there for maybe a few months but he never
21  developed enough business to be paid.
22      Q.  Any other closers at any of the other
23  entities you've mentioned?
24      A.  There were people that were
25  independently employed by Mr. Jacobson that I

Page 44

Nazon

1                     Nazon
2  didn't know. I didn't know them by name that
3  would come in and out.
4      Q.  Nobody that worked for Focus 44 or
5  Focus 4, correct?
6      A.  No.
7      Q.  Yes, that's correct?
8      A.  I mean that's correct, yes.
9      Q.  Did Focus 44 maintain a bank account?
10      A.  Yes, that's correct.
11      Q.  How many bank accounts?
12      A.  One.
13      Q.  Where was that account?
14      A.  Commerce Bank, the original, the
15  branch of origination, if I'm not mistaken, was
16  43rd and Third, something like that.
17      Q.  Do you know the account number?
18      A.  Yes.
19      Q.  What is it?
20      A.  7917254398, Focus 44.
21      Q.  7917254398?
22      A.  Uh-huh.
23      Q.  Were you the only one with authority
24  with that account?
25      A.  No.

Page 45

Nazon

1                     Nazon
2      Q.  Who else had authority?
3      A.  My mother.
4      Q.  Anybody else?
5      A.  No.
6      Q.  Did your mother ever make any
7  deposits or withdrawals from that account?
8      A.  I made deposits and if she needed
9  something I would tell her, I think she made like
10  one or two checks.
11      Q.  For personal reasons?
12      A.  Yes.
13      Q.  She wasn't involved in the business
14  in any way?
15      A.  No, not whatsoever, not at all.
16      Q.  So you left Empire, you started with
17  ASC, other than the jobs you've mentioned today,
18  Advanced Technologies under its different names,
19  Informercial, Veritas of China, Empire, ASC and
20  we'll get to Clean Care, are there any other jobs
21  you've had where you either sold or marketed or
22  assisted somebody in selling or marketing any
23  securities?
24      A.  Well, there was one last job that I
25  had recently, it was securities, but I worked

Page 46

1              Nazon
2  somewhere called Program Trading Solutions.
3       Q.   When did that job start?
4       A.   I started in October, recently,
5  October '07.
6       Q.   Are you done with that job?
7       A.   Yes, I'm done with that job.
8       Q.   When did you finish?
9       A.   I think late November.
10      Q.   So you worked there for about two
11 months?
12      A.   Uh-huh.
13      Q.   Why do you say that was another job
14 relating to securities, if that's what you mean?
15      A.   The reason being is -- the reason why
16 I thought it was another job relating to
17 securities is because the presentation sounded
18 very much like an investment pitch because it was
19 software for like the S&P futures, something like
20 that.
21      Q.   You were selling software?
22      A.   Yes.
23      Q.   Cold calling people to sell software?
24      A.   Yes, I was -- it was an autodialer
25 actually.

Page 47

1              Nazon
2       Q.   So a computer program would dial a
3  bunch of numbers and if somebody picked up you
4  would know to pick up the phone?
5       A.   Uh-huh.
6       Q.   Who was in charge of Program Trading
7  Solutions?
8       A.   Someone by the name of Eugene
9  Biegelman. I don't know exactly how to spell
10 that.
11      Q.   What would this software do?
12      A.   It was supposed to be able to --
13 well, yeah, it was supposed to be able to -- it
14 was an automated trading system that was supposed
15 to be able to kind of trade the S&P futures in a
16 predictive kind of way.
17      Q.   How much did this software cost?
18      A.   If I'm not mistaken it was either
19 5,995 or $6,995.
20      Q.   Did you sell any?
21      A.   I got leads but I never closed any of
22 the accounts.
23      Q.   Do you know if any of the leads you
24 got were ever closed by anybody else?
25      A.   Yes, they were sent to an L.A.

Page 48

1              Nazon
2  office.
3       Q.   But do you know that any of the leads
4  to which you were connected ended up purchasing
5  the actual product?
6       A.   Yes.
7       Q.   How many?
8       A.   About four, four accounts, three or
9  four accounts.
10      Q.   Purchased this product?
11      A.   Three or four purchasers.
12      Q.   Purchased the software for about five
13 or $6,000 each?
14      A.   Yes.
15      Q.   Other than paying for the software,
16 were the purchasers asked to do anything else?
17 Did they need to invest any money or did they
18 need to provide any information or was it set up
19 to be buying the way somebody might buy a
20 computer program?
21      A.   I'm sorry, can you repeat the
22 question.
23      Q.   Sure. Were you just selling software
24 or were you offering something else to these
25 potential customers?

Page 49

1              Nazon
2       A.   No, we were just selling the software
3  but we would explain to them that -- well,
4  actually the closer would explain to them that
5  once they get off the phone they're going to get
6  a compliance call from a futures brokerage and
7  they had to open up an account with Future
8  Brokerage Group in order for the actual software
9  itself to do its magic. But it wasn't software.
10 I believe if I'm not mistaken it wasn't software
11 that was delivered to them or they had to
12 download and work it and install it. I think it
13 was just something like a master system.
14      Q.   If you called me I could pay five or
15 $6,000 to let you use the system with my money?
16      A.   Yes.
17      Q.   And I would have to give you a
18 certain amount of money on top of the five or
19 $6,000 to invest?
20      A.   To a brokerage firm?
21      Q.   To a brokerage firm.
22      A.   Yes.
23      Q.   Was this a registered broker/dealer?
24      A.   I believed it to be from my
25 understanding, I think it was a CFTC or

Page 54

Nazon

1             Nazon
2     A.  Less than ten.  The bulk of it
3 300,000 was from Shelly Schwartz.  50 was from
4 Lloyd Wood.
5     Q.  Was that somebody you contacted?
6     A.  Yes.
7     Q.  Was that a lead you had brought over
8 from a previous job?
9     A.  Infomercial Funding.
10    Q.  Had he invested in Informercial?
11    A.  Yes.
12    Q.  How much did he invest in
13 Informercial if you remember?
14    A.  That, I don't know, that was someone
15 that Anil Varughese was speaking to.
16    Q.  At ASC did you get all of the
17 commissions for all the money you purchased --
18 you brought in?
19    A.  Yes, actually they were split with me
20 and Anil.
21    Q.  Did you have any specific way you
22 split them?
23    A.  50/50 minus any I guess advances or
24 expenses that were incurred by him.
25    Q.  And were those thrown in the Focus

Page 55

1             Nazon
2 accounts before being distributed to you?
3     A.  Yes.
4     Q.  And at some point through ASC you met
5 Ed Klein?
6     A.  Yes.
7     Q.  And did Mr. Schmidt introduce you to
8 Ed Klein?
9     A.  Yes.
10    Q.  And was that after you had already
11 raised most of the $350,000 for Mr. Schmidt?
12    A.  A majority of it was raised, I don't
13 think we were at 350 yet but it was around there,
14 yes.
15    Q.  And did you decide at some point to
16 go into business with Mr. Klein?
17    A.  Much later down the road.
18    Q.  About how long elapsed between the
19 time you first met Mr. Klein and the time you
20 decided to go into business with Mr. Klein?
21    A.  I met Mr. Klein in about August, he
22 had given me a business card and I was introduced
23 by Paul Schmidt as someone that he wanted to
24 bring in as president of business development.
25    Q.  August of?

Page 56

1             Nazon
2     A.  '05.
3     Q.  And did Mr. Schmidt bring Mr. Klein
4 in as head of business development?
5     A.  No, I believe not.  I believe he
6 stated it was in the talks, it was in the works
7 and then something somehow some way something
8 fell apart, and at the time Mr. Klein had a
9 product of his own, the Clean Cover seat that he
10 wanted to present to Mr. Schmidt.
11    Q.  I want to show you a document that
12 was marked as Plaintiff's Exhibit 12.  Take as
13 long as you need to review it and my question is
14 going to be whether you recognize the document.
15    A.  Yes, I remember this e-mail and
16 actually I will say now that I do remember using
17 in some respects the R. Clark at ASC Holding.
18    Q.  What's the date of this e-mail?
19    A.  October 24th, 2005.
20    Q.  So this came in sometime after you
21 had already met Mr. Klein, correct?
22    A.  Yes.
23    Q.  The R. Clark address, that's an
24 address you used?
25    A.  In regards to ASC Holdings, yes.

Page 57

1             Nazon
2     Q.  So it says "Hi guys."  You were one
3 of those guys?
4     A.  Uh-huh.
5     Q.  Was Mr. Varughese the other one of
6 those guys?
7     A.  Yes.
8     Q.  Do you remember receiving this
9 e-mail?
10    A.  Now I do, yes.  I do remember
11 receiving it.
12    Q.  And do you see where the e-mail
13 refers to Mr. Klein?
14    A.  Yes, one of the -- second to last
15 paragraph.
16    Q.  Would you read it?
17    A.  "Based on this meeting, ASC will not
18 be pursuing a relationship with Ed Klein for two
19 reasons.  First, if we work with CWS in
20 acquisitions there will be no room for Ed.
21 Second, if we choose to manufacture our own
22 products, I don't trust Ed, letting Ed know this
23 and possibly meeting our competitor before our
24 products are ready."
25    Q.  Do you remember being told that Mr.

Page 58

Nazon

```
 1                 Nazon
 2  Schmidt didn't trust Mr. Klein?
 3      A.  In -- after that e-mail that was
 4  clarified, yes.
 5      Q.  Did you understand why Mr. Schmidt
 6  didn't trust Mr. Klein?
 7      A.  At the time it was the understanding
 8  that I guess it was competitive like a
 9  competitive proprietary thing in terms of not
10  letting him know the details of what's going on
11  with CWS or are things all well or are things
12  aren't well, and if he sniffs that out that he'd
13  move in as a competitor.  That was the
14  understanding.
15      Q.  What was CWS?
16      A.  CWS was the manufacturer for the seat
17  that ASC distributed.
18      Q.  And when you say distributed, do you
19  know that ASC actually distributed the CWS seat
20  or was it something that they planned to do?
21      A.  From my understanding he stated that
22  he had an agreement with CWS.
23      Q.  He being Mr. Schmidt?
24      A.  Mr. Schmidt.
25      Q.  An agreement to distribute the seats?
```

Page 59

Nazon

```
 1                 Nazon
 2      A.  Yes.
 3      Q.  But do you know if any of the seats
 4  were ever distributed?
 5      A.  None other than what was stated in
 6  the memorandum.  Pitt Gyms, I recall.  Ramstein
 7  Air Force Base.  A couple of other small
 8  businesses.  And Emory University.
 9      Q.  Did you ever see the seat?
10      A.  I'm trying to recall.  I think I
11  recall maybe seeing it in D.C., I'm not sure, I
12  can't recall.
13      Q.  At some point did your relationship
14  with ASC end?
15      A.  Yes.
16      Q.  What happened?
17      A.  Mr. Schmidt disappeared.
18      Q.  When was that?  If it helps, tell me
19  in relation to this October e-mail.
20      A.  It was definitely after this October
21  e-mail, that's for sure.  The last e-mail that I
22  received from him was in regards to CWS stating
23  that it's not going to work out for them in the
24  U.S.  He was supposed to see -- well, yeah, at
25  that point I started contacting Ed Klein and
```

Page 60

Nazon

```
 1                 Nazon
 2  expressing to him that I'm concerned about Mr.
 3  Schmidt, his communications have been restricted
 4  strictly to just very little phone calls, just
 5  e-mails and text messages.
 6      Q.  Were you getting calls from concerned
 7  investors in ASC?
 8      A.  No, not at that present time.
 9      Q.  At some point did you start getting
10  calls from investors in ASC?
11      A.  We always kept communication with
12  them.
13      Q.  And --
14      A.  Proactive.
15      Q.  And did you ever let on that you
16  couldn't find or get in contact with Mr. Schmidt?
17      A.  With Mr. Schwartz, that's it.
18      Q.  And it's fair to say that without Mr.
19  Schmidt, ASC didn't exist, correct?
20      A.  Yes.
21      Q.  When did you first discuss with Dr.
22  Schwartz the disappearance of Mr. Schmidt?
23      A.  If I'm not mistaken, somewhere
24  between late November/early December.
25      Q.  And by that time had you decided to
```

Page 61

Nazon

```
 1                 Nazon
 2  work with Mr. Klein?
 3      A.  We were discussing it, yeah.  I mean
 4  at that point we -- at that point we were very
 5  concerned with what was going to take place and
 6  we saw that as a very good alternative to
 7  resolving the matter.
 8      Q.  We being you and Mr. Varughese?
 9      A.  Yes.
10      Q.  And when would you say you decided
11  that you were definitely going to work with Mr.
12  Klein?
13      A.  I'd say around December,
14  November-December.
15      Q.  Of '05?
16      A.  Yes.
17      Q.  And did you sit down with Mr. Klein
18  and come to some agreement about how the company
19  would work or be structured?
20      A.  Yes, we contacted Mr. Klein and
21  mentioned to him what happened and he said, okay,
22  guys, let's meet, and he basically was very frank
23  with us and let us know that Mr. Schmidt -- we
24  had been had by Mr. Schmidt and he disappeared.
25  He just, you know, that was the conclusion that
```

Page 62

1              Nazon
2  we came to at that point.
3      Q.  And who proposed working together?
4      A.  I -- yeah, we -- well, Mr. Klein
5  mentioned that he has a company of his that he's
6  doing in regards to the Clean Cover seat and he
7  mentioned that he located two new manufacturers
8  that he would wanted us to see and visit, and
9  then from there we would make a decision on what
10 makes sense to move forward, and after fully
11 disclosing to us and the manufacturers and how
12 things would be structured we then disclosed to
13 him that we had previous investors and if he can
14 honor the shares into the new company being
15 formed.
16          MR. BIRNBAUM:  We've been going at
17      this for a little more than an hour.
18      Let's take a break off the record.
19          (Recess taken)
20 BY MR. BIRNBAUM:
21     Q.  Mr. Nazon, I asked you earlier about
22 an e-mail document review '08 that I understood
23 to be registered to an Al Smith, but I misspoke,
24 that document review '08 e-mail appears to be
25 registered to an Al Fields.  Does Al Fields ring

Page 63

1              Nazon
2  a bell for you at all?
3      A.  No.  I think as I was setting it up I
4  was setting it up very quickly.
5      Q.  Have you ever used the name Al
6  Fields?
7      A.  No.
8      Q.  Do you know an Al Fields?
9      A.  No, I don't know an Al Fields.
10     Q.  Let's get back to Clean Care then.
11 When you first met with Mr. Klein to discuss
12 setting up the entity that would be known as
13 Clean Care Technologies, was Mr. Varughese
14 present?
15     A.  Yes.
16     Q.  Was anybody else present?
17     A.  In our initial meeting, I can't
18 recall, but I believe the first or second time we
19 met with Mr. Klein he had a friend of his Victor
20 Green.
21     Q.  When you first discussed setting up
22 an entity, tell me what you can remember of that
23 conversation.
24     A.  I remember that Mr. Klein stated that
25 after he meets with the manufacturers and he

Page 64

1              Nazon
2  knows where they stand, he's going to go ahead
3  and set up the court entity Clean Care.
4      Q.  Did he call it Clean Care
5  Technologies?
6      A.  I believe so, yes, Clean Care
7  Technologies.
8      Q.  Did he tell you that you would have a
9  role in that entity?
10     A.  We both did.
11     Q.  You and Mr. Varughese?
12     A.  Yes.
13     Q.  What would that role be?
14     A.  We would go out, raise money, buy the
15 toilet seats, get them marketed, you know, get a
16 lot of contacts.
17     Q.  Did you discuss with Mr. Klein at
18 that time the possibility of a second Clean Care
19 entity called Systems or something else?
20     A.  That I can't recall.  I can't recall
21 that.
22     Q.  Do you recall when you first learned
23 of Clean Care Systems?
24     A.  If I'm not mistaken, around January
25 '06, January/February '06.

Page 65

1              Nazon
2      Q.  And what did you understand at that
3  time Clean Care Systems was?
4      A.  It was an account that Mr. Klein
5  controlled and was I guess set up primarily to
6  handle whatever monies was coming for Dr.
7  Schwartz.
8      Q.  Who was Dr. Schwartz?
9      A.  He's an investor -- well, he was an
10 investor in ASC.  And then shortly after a
11 meeting that took place with Ed Klein and Dr.
12 Schwartz, he decided to take another alternative
13 as far as moving forward, he wanted to move
14 forward -- well, at least he stated to me that he
15 wanted to move forward strictly with Ed Klein.
16 And when I refer to me, he was referring to me as
17 Robert Clark at that time.
18     Q.  Why did he refer to you as Robert
19 Clark?
20     A.  Because that was the name that I used
21 for ASC.
22     Q.  Did he get some kind of deal, was he
23 offered some kind of deal concerning his ASC
24 shares?
25     A.  He was.  He was offered, he was given

Nazon

1
2  a memorandum, and he was offered that the shares
3  that he had in ASC would be converted over into
4  Clean Care Technologies.
5      Q.  Was the memorandum you're referring
6  to an offering memorandum for Clean Care
7  Technologies?
8      A.  That is correct.
9      Q.  And did you tell him that his ASC
10  shares would be converted in some way to Clean
11  Care shares?
12      A.  Yes, that is correct.
13      Q.  Did you explain to him how that
14  conversion would work?
15      A.  Yes.
16      Q.  What did you explain to him?
17      A.  I can't remember all the details but
18  I remember that his investment would -- because
19  ASC received -- he was receiving income checks
20  from ASC.  So the shares would not only represent
21  his original investment but the prorated number
22  of future income checks that he was supposed to
23  receive would be received in shares as well.
24      Q.  And he would receive in exchange for
25  relinquishing any claims to ASC shares some

Nazon

1
2  portion of the Clean Care Technologies business,
3  correct?
4      A.  Yes.
5      Q.  Did he accept that deal?
6      A.  Initially over the phone, yes, he --
7  the structure of it.  He didn't reject it, but
8  what transpired after his meeting with Ed Klein,
9  basically he didn't want that deal.
10      Q.  You said he mentioned the deal over
11  the phone, was that a phone conversation that you
12  were on?
13      A.  Yes.
14      Q.  Anybody else?
15      A.  I believe I had a secondary phone
16  call with Ed Klein.  I briefly introduced him
17  over the phone strictly for the purpose of
18  setting up the meeting.
19      Q.  Were other people at ASC offered a
20  similar conversion deal?
21      A.  Yes.
22      Q.  Did anybody take it?
23      A.  Everyone else had no disagreements
24  with it.
25      Q.  So they were given Clean Care shares?

Nazon

1
2      A.  Yes.
3      Q.  Did they have to pay any money into
4  Clean Care in exchange for those shares?
5      A.  No.
6      Q.  Did the memorandum you sent to
7  potential investors in Clean Care disclose in any
8  way that some portion of Clean Care Technologies
9  had been given away for in exchange for nothing
10  other than rights to ASC?
11      A.  I'm sorry?
12      Q.  Did Clean Care -- let me rephrase.
13  Did you ever disclose to any potential investors
14  in Clean Care the existence of the old ASC
15  shareholders as new Clean Care shareholders?
16      A.  Did I expose?
17      Q.  Explain.
18      A.  Did I explain to any new investors
19  that there were old ASC investors in Clean Care
20  Tech?
21      Q.  That were getting their Clean Care
22  shares for free.
23      A.  I don't believe that was the case.
24      Q.  And these people who were getting
25  their ASC shares converted, the ASC shares were

Nazon

1
2  worthless, correct, by that point?
3      A.  Oh, yes.
4      Q.  Do you know what percentage of Clean
5  Care Technologies was given in total to the old
6  ASC shareholders?
7      A.  That I don't know.
8      Q.  Is it that you don't recall or do you
9  remember whether anybody ever figured that out?
10      A.  If I'm not mistaken, I believe there
11  was a loose verbal understanding but not anything
12  put in paper in regards to the ownership, but I
13  don't know -- I can't recall what the exact
14  structure was.
15          Being that I was -- when I was a
16  person of habit just going through the motions
17  every day with the information, it was fresh in
18  my head, but right now...
19      Q.  These shares the ASC investors got
20  with Clean Care were the same shares that the new
21  investors would pay $2.50 for, is that correct?
22      A.  Yes.
23      Q.  Did you sell shares of Clean Care
24  Technologies to investors?
25      A.  Yes, I did.

Nazon

1
2      Q.  Did you do that through cold calls?
3      A.  Yes.
4      Q.  Did you essentially serve as the cold
5   caller and what you described earlier as the
6   closer?
7      A.  Yes.
8      Q.  Did Mr. Varughese do the same?
9      A.  Yes.
10     Q.  Did anybody else sell shares of Clean
11  Care in either working as a lead cold caller or a
12  closer?
13     A.  Dave Maldonado.
14     Q.  Anybody else?
15     A.  We hired a few -- we had put it out
16  on Craig's List at one point and they worked for
17  a few, a couple of weeks at one time but nothing
18  ever transpired with the leads that they got.
19     Q.  Did you receive a commission on all
20  investments in Clean Care Technologies?
21     A.  Yes.
22     Q.  What was that commission?
23     A.  It was 15 percent.
24     Q.  Was it always 15 percent or was it
25  15 percent at one time and some percentage at

Nazon

1
2   another time?
3      A.  No, it was always 15 percent, but in
4   addition to that we were paid if there was any
5   investments that if there were any investments
6   that were paid -- if there were any investments
7   that were made by Dr. Schwartz we were paid
8   10 percent from the Clean Care Technologies
9   account.
10     Q.  Dr. Schwartz would invest his money
11  in Systems, correct?
12     A.  Correct.
13     Q.  And you got 10 percent of whatever he
14  put into Systems?
15     A.  Yes.  Well, I didn't solely.
16     Q.  You and Mr. Varughese?
17     A.  Yes.
18     Q.  Would it be 10 percent each?
19     A.  Yes.
20     Q.  Do you know if that money was drawn
21  from a Systems account or Technologies account?
22     A.  I believe it was drawn from a
23  Technologies account.
24     Q.  Do you know whether Systems paid
25  Technologies to cover that?

Nazon

1
2      A.  I'm sorry, repeat that.
3      Q.  Do you know whether when Technologies
4   paid you directly or indirectly for monies
5   invested by Dr. Schwartz, whether Systems moved
6   money into a Technologies account to give to you
7   or whether the money coming from Technologies
8   account was from some other source?
9      A.  The money was just drawn directly
10  from Technologies, but I don't know the exact
11  infrastructure of how monies were moved back and
12  forth.  I just know that we were paid from
13  Technologies.  That's my understanding.
14     Q.  Do you know whether separate accounts
15  were maintained for Systems and Technologies?
16     A.  I believe there were separate
17  accounts, to the best I could recall there were
18  separate accounts maintained.
19     Q.  Do you know whether all expenses were
20  paid out of one or the other accounts?
21     A.  That -- I didn't have access to the
22  records or the books in that fashion.
23     Q.  Do you know whether the accounts were
24  commingled?
25     A.  I don't believe so.

Nazon

1
2      Q.  Do you know or do you have any
3   information that leads you not to believe so or
4   is it that you just don't know?
5      A.  I don't know but my belief is no.
6      Q.  What do you base that belief on?
7      A.  I base it on Ed Klein's overall
8   handling of business.  He was very on top of
9   records and books and from my understanding we
10  just asked how things were going and he seems to
11  have had everything in order.  And he figured out
12  what needed to be paid and I think he actually
13  actually provide directives that there were
14  certain specific expenses that were specified to
15  be handled by Dr. Schwartz from the money that he
16  would give.
17     Q.  Do you know what those expenses were?
18     A.  I believe it was rent, seat,
19  salaries.
20     Q.  When you say seat does that mean that
21  Systems would pay for the seats?
22     A.  Yes, I believe so.
23     Q.  Who would they purchase the seats
24  from?
25     A.  The name of the company is NTF, I

Page 74

Nazon

1          Nazon
2  believe.
3      Q.  Is that a European company?
4      A.  Yes, I believe out of Netherlands, or
5  Eyegiene.
6      Q.  Did Clean Care Technologies to your
7  knowledge ever buy directly from NTF?
8      A.  That I can't recall, but I believe --
9  again that I don't know.  I didn't have a daily
10  access look to the books.
11      Q.  Did Clean Care Technologies purchase
12  seats from Systems?
13      A.  From my understanding, yes.
14      Q.  Did Clean Care Technologies pay
15  Systems cost or something above cost of the
16  seats?
17      A.  That I can't confirm but I believe it
18  was cost, if I'm not mistaken.  But again, I
19  don't have sufficient data to really provide or
20  confirm the answer.
21      Q.  What did you understand Dr. Schwartz
22  to have received in return for his investment in
23  Clean Care Systems?
24      A.  From my understanding it was a little
25  complex to understand.  On the one end I believe

Page 75

1          Nazon
2  it was like I guess some sort of debenture, he
3  labeled it different things along the way from my
4  understanding.  It was an equity ownership if I'm
5  not mistaken on the LLC, but between him and Mr.
6  Klein, but I think at some point or another it
7  was a form of a loan that he can convert into an
8  ownership.  It wasn't clear.
9      Q.  Well, I want to get as specific as
10  you can.  Let's start on the expense side, it was
11  your understanding that the money from Dr.
12  Schwartz was used to pay salaries, correct, among
13  other things?
14      A.  Yes, salaries for whoever was noted
15  for salaries on Clean Care Systems.
16      Q.  Like Mr. Klein, for example?
17      A.  Mr. Klein.
18      Q.  Mr. Klein's son Jerry Klein at one
19  point?
20      A.  Yes, and I believe Brena was the
21  administrator bookkeeper, and Hector, who was a
22  maintenance tech repair person.
23      Q.  Was there another maintenance tech
24  repair person, perhaps Hector junior?
25      A.  Yes, that was later on, Hector

Page 76

1          Nazon
2  junior.
3      Q.  Your understanding was all of their
4  salaries or compensation came from the money put
5  in by Dr. Schwartz into Systems, correct?
6      A.  Correct.
7      Q.  And Dr. Schwartz, whatever he put in,
8  20 percent was taken out so that you could
9  receive 10 percent of his investment and Mr.
10  Varughese could receive 10 percent of his
11  investment, correct?
12      A.  No, 10 percent in general was taken
13  out, not 20 percent.
14      Q.  So 10 percent of Dr. Schwartz's money
15  went towards commissions?
16      A.  Yes.
17      Q.  That you and Mr. Varughese split?
18      A.  Yes.
19      Q.  Some of the monies was for salaries
20  of people working for Clean Care Systems?
21      A.  The 10 percent.
22      Q.  Moving past that 10 percent.
23  90 percent of the money went into the operation
24  of Systems, correct?
25      A.  Correct.

Page 77

1          Nazon
2      Q.  That operation was a few things, one
3  of which was salaries, right?
4      A.  Salaries.
5      Q.  And those people's salaries in
6  Hector's case for maintaining the seats, correct?
7      A.  Going out and doing service calls.
8      Q.  In Brena Resnick's case for general
9  administrative services?
10      A.  Yes.
11      Q.  And in Jerry Klein's and Ed Klein's
12  case for certain marketing responsibilities,
13  correct?
14      A.  Uh-huh.
15      Q.  Was it your understanding that
16  Systems had a right to market the NTF toilet
17  seat?
18      A.  Yes, that is my understanding.
19      Q.  And did you tell investors in Clean
20  Care Technologies that Clean Care Technologies
21  had the right to distribute the NTF toilet seat?
22      A.  Yes.
23      Q.  Did the memorandum in fact say that
24  Clean Care Technologies had the exclusive right
25  to distribute the seat?

Page 78

Nazon

2     A. I believe it may have referred to
3 that, yes.
4     Q. And were you part of the team that
5 drafted that memorandum?
6     A. Yes.
7     Q. And at the time that you distributed
8 the Clean Care Technologies offering memorandum,
9 did you know it to be the case that Systems had
10 the distribution rights for the NTF seat?
11     A. If I'm not mistaken I believe at the
12 time after the contracts were finalized I
13 understood not at the point of the company when
14 the company -- when the corporation was
15 originated, but after everything was finalized
16 and I think we were all under way with the
17 offering.
18     Q. So is it fair to say that you were
19 sending out an offering memorandum that told
20 investors that Clean Care Technologies had the
21 exclusive distribution rights to the NTF seat and
22 at least sometimes you knew that to be false?
23     A. Based on the question that you're
24 asking, yes, technically. But the reason why we
25 never perceived that to be false because we

Page 79

Nazon

2 understood that the person that owned Clean Care
3 Systems and Tech was one and the same. But today
4 I understand that we made a false representation.
5     Q. At the time did you believe Dr.
6 Schwartz had any ownership in Clean Care
7 Technologies?
8     A. No, not at that time because he moved
9 forward with Mr. Klein.
10     Q. And at that time did you think you
11 were selling individual investors shares of
12 Systems?
13     A. No.
14     Q. So you understood there to be two
15 distinct entities, correct?
16     A. That is correct.
17     Q. And Systems was the one that you
18 understood to have the distribution rights for
19 the NTF seats, correct?
20     A. Yes.
21     Q. When I say the NTF seat that's the
22 Eyegiene seat?
23     A. Yes.
24     Q. Did you ever disclose to CCT
25 investors the existence of Systems?

Page 80

Nazon

2     A. No, I did not.
3     Q. Do you know if anybody else ever did?
4     A. I don't believe so.
5     Q. I want to put in front of you a
6 document that was previously marked, it's
7 actually a cover letter and a collection of
8 documents that was previously marked as
9 Plaintiff's Exhibit 18, and refer you to page 28.
10 Take as much time as you need if you want to look
11 at the document generally. Is that part of the
12 offering memorandum you sent out?
13     A. Yes, that is correct.
14     Q. Were you part of --
15     A. Drafted.
16     Q. Did you take any part in drafting
17 that page?
18     A. Yes.
19     Q. And were these projections that you
20 were telling investors you expected the Clean
21 Care Technologies company to achieve? What are
22 these projections?
23     A. These were projections based on, if
24 I'm not mistaken, the number of dealers, and each
25 year that went by it would be a cumulative number

Page 81

Nazon

2 of dealers that would be projected.
3     Q. And did you have when you drafted
4 this a belief that it was reasonably possible
5 that these projections could be achieved?
6     A. Yeah, as far as the number of dealers
7 and the way Mr. Klein explained what the industry
8 is about and what the potentials were and based
9 on the research that I did on other companies
10 that actually -- what's the name of that
11 magazine, I think it's Entrepreneurs, there were
12 other companies in eight, nine months' time that
13 did a lot of business.
14     Q. In year one, how many seats were
15 projected to be sold in year one?
16     A. 12,000 seats.
17     Q. At what price?
18     A. At $30 per seat gross profit,
19 $360,000.
20     Q. I think $30 was the profit, is that
21 right?
22     A. Yes.
23     Q. Is that just on the seats or is that
24 on the seats and the fluid?
25     A. I don't think it's based on the

Page 82

Nazon

2 fluid.

3    Q.   So what was the seats to be sold on

4 the projection?

5    A.   I don't remember the exact cost, but

6 the cost to the company is 195, the cost to the

7 master dealers is about $242.

8    Q.   What were master dealers?

9    A.   They were people that were supposed

10 to be opened up in different territories that

11 would be sub-distributors.

12    Q.   So on these projections was it your

13 understanding that they assumed that the

14 companies could get the seats for 195 and sell

15 the seats for 242, in that first year?

16    A.   Yes.

17    Q.   Was it your understanding that the

18 company's business model was to in the first year

19 sell the seats for a profit?  Or did the

20 company's business model depend some way on

21 selling the seats at a discount or even for free

22 to help business down the road?

23    A.   That is correct.  With the exclusion

24 of the master dealers, if the company was going

25 to go directly to say let's just say to the World

Page 83

Nazon

2 Financial Center and the building houses 500

3 toilet seats, based on the traffic in here, it

4 would make business sense for the company to take

5 the loss initially of giving away these seats for

6 free so that the money would be made up in

7 solution consumption.

8    Q.   When you did the projection for these

9 first years were you considering both the seats

10 the company would place individually and the ones

11 they put through master dealer?

12    A.   Just to clarify, when it came to

13 financial projections that's not my strong point

14 per se.  I didn't construct this part of it.  The

15 part -- well, I'll get into that later.  This

16 part of it were numbers that were going back and

17 forth between Anil and Mr. Klein, but I did look

18 at this and gave it a glimpse and said okay, it

19 looks like it can be done, and from what I

20 understand that they were just merely just

21 projections.

22    Q.   When you say merely projections do

23 you mean they weren't necessarily what you

24 expected to happen?

25    A.   Yeah, what I understood was outlooks

Page 84

Nazon

2 were that these are things that you're achieving

3 for, but you're not -- from my understanding

4 you're not subject to.  So if we get eight master

5 dealers instead of 12 or whatever the case was.

6 That was the goal for years one through eight.

7    And an investor could give us

8 feedback and say, hey, you know what, that's not

9 realistic or that is realistic.

10    Q.   I just want to get an understanding

11 of what you mean by that.  Did you understand

12 projections to be something that you thought the

13 company was reasonably likely to do?  Did you

14 understand the projections to be something the

15 company would strive and hope to achieve or

16 something different?

17    A.   I always understood projections

18 that -- always understood a little bit of both

19 based on what the company's potential is and what

20 it says it think it can be capable of.

21    Q.   So if an investor that received this

22 information had called you upon receiving the

23 information and asked you about these

24 projections, if they asked you do you expect the

25 company to achieve these projections for year one

Page 85

Nazon

2 this year, what would you have said?

3    A.   Actually there were times that this

4 was presented out and I would tell investors that

5 our goal objectives -- I don't remember the exact

6 verbiage but I do recall telling investors that

7 because it's the initial phase of the seats we

8 didn't want to put out too many seats and not

9 know how to troubleshoot and not have enough

10 service techs and things of that nature.

11    Q.   So sometime during year one you

12 realized that these projections wouldn't be

13 realistic, correct?

14    A.   Yes.

15    Q.   And did you at any time during your

16 tenure at Clean Care Technologies change the

17 projections that were sent out with the offering

18 memorandum?

19    A.   No, from my understanding I was under

20 the understanding that once you put something

21 like this together you can't go and change it

22 back and forth without letting anybody know.

23    Q.   So at least some investors who

24 received the offering memorandum in the later

25 stages of the offering received projections that

Page 86

1              Nazon
2   by that time you didn't believe the company would
3   achieve, correct?
4       A.   Well, later on in the company my
5   confidence went from okay, this is a great idea,
6   to we're actually getting things done.  My
7   confidence was very high.  Not necessarily on the
8   projections but on the company's overall
9   potential.  But I didn't think that year one
10  we're going to hit $5 million.
11      Q.   Did you ever disclose to investors
12  that you thought in year one you wouldn't reach
13  any part of your projections?
14      A.   That I don't recall.  I don't recall
15  disclosing our missed steps per se.
16      Q.   At any time during your job, your
17  work with Clean Care Technologies, were you a
18  registered broker/dealer?
19      A.   No.
20      Q.   At any time did you make any effort
21  to register any securities transactions involving
22  Clean Care Technologies securities?
23      A.   Yes.
24      Q.   What efforts did you take?
25      A.   Well, myself being that I wasn't the

Page 87

1              Nazon
2   president of the company, I wasn't in a position
3   to authorize any registrations, but I did make a
4   suggestion to Edward Klein that we should look
5   into registering the offering with consideration
6   that we don't want to raise a whole lot of money
7   and then the offering's not registered and, you
8   know, have a whole bunch of -- have 200, 300
9   investors and there's nobody involved or have a
10  whole lot of money invested and there's no
11  registration.
12          So we had contacted Laura Anthony who
13  is a securities attorney.
14      Q.   You contacted her with Mr. Klein?
15      A.   I contacted her originally and
16  then -- I then had Mr. Klein contact her.
17      Q.   When did you first suggest to Mr.
18  Klein that you take some steps as a company to
19  register the offering?
20      A.   Maybe three, four months into the
21  offering, but the -- at the time we were under I
22  guess manufacture quota objectives and the
23  distributor wanted a certain minimum amount of
24  seats distributed every quarter.
25      Q.   So you didn't have the time to get

Page 88

1              Nazon
2   the registration done?
3       A.   Or it was either a combination of
4   time or money.  It was really more so time.
5       Q.   So is it fair to say at some point
6   you knew the offering needed to be registered but
7   the company had trouble finding the time and/or
8   money to get that registration accomplished?
9       A.   That's correct.
10      Q.   Did you play any role in drafting
11  press releases for the company?
12      A.   Yes.
13      Q.   How did you draft those press
14  releases?
15      A.   We would put together a general
16  template -- not template but general draft and
17  run it by Mr. Klein, and we'd go back and forth
18  as far as what may be acceptable and what's not
19  acceptable.
20      Q.   So before the final draft went out,
21  everybody had seen it by then?  By everybody, I
22  mean you, Mr. Varughese and Mr. Klein?
23      A.   I believe so, yes.
24      Q.   And you're certain you would have
25  seen it?

Page 89

1              Nazon
2       A.   Yes, I believe so.
3       Q.   Let me show you an example of one of
4   these press releases, Plaintiff's Exhibit 16, a
5   July 1, 2006 press release.  Do you recognize
6   this?
7       A.   Yes, I recognize this, but I'm not
8   sure -- actually I recognize this but it was
9   actually one of the press releases that was
10  drafted and it didn't go out.
11      Q.   Was a later draft sent out to
12  investors?
13      A.   It's hard for me to tell what was the
14  later or what was the previous.
15      Q.   So you're not sure whether this is
16  final or not?
17      A.   I believe this may have been sent
18  out.
19      Q.   Looking at the second sentence of the
20  press release, do you see where the press release
21  identifies contracts with Wegman's and other
22  companies?
23      A.   Yes, that's correct.
24      Q.   As of July 1, 2006, did the company
25  have any finalized contracts with Wegman's?

Nazon

2    A.   To my knowledge at the time, I don't
3  believe so.
4    Q.   Did the company have any finalized
5  contracts as of that date with any of the other
6  companies mentioned in this press release?
7    A.   That I don't know.  I couldn't
8  confirm at the time.  We were told different
9  business developments by as far as Ed Klein what
10  took place and we put together the news release.
11    Q.   So any mention of contracts you would
12  have made would be based on representations from
13  Ed Klein?
14    A.   Yes, but depending on based on what
15  he told us, I don't know, constructing the news
16  release, whether those developments may have been
17  translated in different respects.
18    Q.   What do you mean by that?
19    A.   In terms of whether there was just,
20  you know, a clear understanding as far as what
21  would take place.  Because this news release I
22  didn't sit and draft it, but I read over it and
23  from what I understand from the names that were
24  mentioned, it sounded pretty good, and you know,
25  I didn't question these because 16 seats, 64

Nazon

2  seats, they're a small company, but for a company
3  that wanted to brag a lot, so there was no
4  question of whether this was something that was
5  happening or not.
6    Q.   So you didn't make up those numbers,
7  did you?
8    A.   No.
9    Q.   Were those numbers given to you by
10  somebody?
11    A.   Yes, by Ed Klein.
12    Q.   And you didn't know whether they were
13  true or not, correct?
14    A.   No, well, we didn't question it.  We
15  assumed it to be true.
16    Q.   Did you know whether the seats, based
17  on your understanding at the time, had been sold
18  for a profit or at cost or something else?
19    A.   That I'm not sure.  I don't know the
20  exact parameters of what may have taken place in
21  those initial transactions or the presented
22  initial transactions.
23    Q.   Sitting here today, you don't know
24  whether those transactions ever even took place,
25  correct?

Nazon

2    A.   I believe that they took place at the
3  time and I'm -- with the exception to Wegman's
4  and maybe one or two things, from my
5  understanding the -- some of these people that
6  Mr. Klein was dealing with that deals fall apart
7  or something, something didn't work out at the
8  end with the distributors or the agreements and
9  the transactions, some of the transactions I
10  think fell apart.
11    Q.   Was it your understanding as of
12  January -- I'm sorry, July 1, 2006, that the
13  press release before you is Exhibit 16 was
14  conveying to investors the message that certain
15  deals were completed?
16    A.   Based on what I'm reading right now,
17  yes.
18    Q.   And sitting here today, are you
19  saying that you don't know whether those deals
20  actually were completed?
21    A.   Well, no, sitting here today, I know
22  that I believe a majority of these deals did not
23  go into completion.
24    Q.   I want you to look at Exhibit 17, a
25  January 5th, 2007 press release.  I refer you to

Nazon

2  the sentence in the third paragraph concerning
3  Las Vegas Towel & Linen.
4    A.   Yes.
5    Q.   Do you recognize this document
6  generally?
7    A.   Yes.
8    Q.   And is this a press release that you
9  sent out to investors?
10    A.   Yes.
11    Q.   And the sentence regarding Las Vegas
12  Towel & Linen, would you read that, please?
13    A.   "As a direct result we are proud to
14  announce CCT has signed on numerous dealers
15  including the Las Vegas Towel & Linen Company
16  which services 60 percent of all hotels in the
17  Las Vegas area."
18    Q.   Had CCT really signed on that company
19  as of January 5, '07?
20    A.   I'm not sure.
21    Q.   Did you know at the time?
22    A.   I know at the time that this was
23  definitely something in the works.
24    Q.   And does the document say that it was
25  in the works?

Page 94

Nazon

2    A.  No, it does not.
3    Q.  So it was your understanding at the
4  time that it was in the works but you sent out a
5  press release saying it was completed, is that
6  correct?
7    A.  Yes.
8        MR. BIRNBAUM:  I want to go off the
9    record, it's 12:30.
10        (Recess taken)
11  BY MR. BIRNBAUM:
12    Q.  We discussed commissions you received
13  earlier as part of your work for Clean Care, the
14  Clean Care entities.  Let's first focus on
15  commissions from Dr. Schwartz.
16    A.  Yes.
17    Q.  Did you personally ever notify Dr.
18  Schwartz that you were receiving commission on
19  money he put into Systems?
20    A.  No, I did not.
21    Q.  Do you know if anybody else disclosed
22  that to him?
23    A.  I believe -- no.
24    Q.  Regarding money collected for Clean
25  Care Technologies, did you personally disclose to

Page 95

Nazon

2  any investors that you were paid a commission on
3  money collected for Clean Care Technologies?
4    A.  I believe I did not disclose.
5    Q.  Do you know if anybody else disclosed
6  that commissions of 10 percent and up were
7  collected on investments in Clean Care
8  Technologies?
9    A.  I believe the commissions were
10  disclosed in respect to what was stated in the
11  memorandum, but that was inaccurate.
12    Q.  What was stated in the memorandum was
13  inaccurate?
14    A.  Yes.
15    Q.  And was that something that was
16  slipped in at the end of the process so that
17  only -- so that you never got to see it or were
18  the comments about the commissions that you found
19  to be inaccurate in a draft that you had already
20  reviewed before it was sent out?
21    A.  In hindsight it was a poorly put
22  together memorandum.  The 10 percent part was not
23  put intentfully on one end and then to collect
24  15 percent on the other as per in our finder's
25  agreement, it was just at the time we -- when we

Page 96

Nazon

2  put together the memorandum and when we agreed on
3  what we were going to get paid in the interim in
4  that time, the memorandum was just hashed
5  together, there was no consideration put into
6  changing the payment structure.
7    Q.  So when the memorandum went out you
8  knew that it didn't say you were making
9  15 percent, correct?
10    A.  That's correct.
11    Q.  And at some point you did collect the
12  2 percent, correct?
13    A.  That's correct.
14    Q.  When the memorandum was drafted it
15  was drafted with a 10 percent language in an
16  early enough draft that it would have been
17  reviewed by Mr. Klein?
18    A.  Yes, but our original conversation
19  with Mr. Klein was supposed to be 10 percent, and
20  then there was another conversation, well, you
21  know what, we're putting a lot of time and effort
22  into this and we should get more and that's when
23  the finder's agreement was drafted for
24  15 percent.
25    Q.  I want you to look in Exhibit 18,

Page 97

Nazon

2  about halfway through there is what I understand
3  to be the first page of the offering memorandum,
4  is that correct?
5    A.  Yes, that's correct.
6    Q.  Would you read footnote 2, please?
7    A.  Footnote 2, "The offer and sale of
8  the units pursuant hereto made through
9  broker/dealers who are registered with the
10  National Association of Securities Dealers is
11  10 percent from the company.  The company may
12  also pay incentive compensation to registered
13  broker/dealers in the form of common stock or
14  stock options in the company."
15    Q.  Did you ever discuss with Mr. Klein
16  using registered broker/dealers to sell Clean
17  Care Technologies?
18    A.  Towards the very, very end when we
19  were on the way of registering or when we were in
20  the process of looking to get the deal
21  registered.
22    Q.  Is it fair to say that you never
23  discussed that with Mr. Klein before 2007?
24    A.  I believe so, yes.
25    Q.  Are you familiar with the term

1                Nazon
2   "accredited investor"?
3        A.   Yes.
4        Q.   What do you understand that to mean?
5        A.   They have to meet certain standards
6   where they either have a million dollar net worth
7   or they're making, if I'm not mistaken, about
8   250,000 a year or they have a certain market
9   value in the market.
10       Q.   Did you ever come to any
11  understanding with Mr. Klein as to whether you
12  would target accredited investors for investment
13  in Clean Care Technologies?
14       A.   Our objective was to see mainly or
15  speak to mainly accredited investors, but we
16  understand in some cases the investors may have
17  not been accredited.
18       Q.   How do you understand that?
19       A.   Based on I guess the general
20  financial data we collect.
21       Q.   What happened when you found an
22  investor wasn't accredited?
23       A.   We would still bring them on board.
24       Q.   Would you treat them any differently
25  than an accredited investor?

1                Nazon
2        A.   No.
3        Q.   Did you in preparing for the
4   deposition today review the attachment that
5   requested the production of certain documents?
6        A.   Yes.
7        Q.   And did you make an effort to
8   identify any documents you had in your custody or
9   control that were responsive to that request?
10       A.   Yes.
11       Q.   What efforts did you take to identify
12  any responsive documents?
13       A.   I went through my bag, I -- you know,
14  I tried to access like some of the stuff, the CCT
15  and the Clean Care Tech as far as the
16  communications, but some of these documents were
17  dismantled and I didn't know -- well, the CCT one
18  I don't know what happened but it seemed like
19  there's some sort of -- getting a lot of spam, so
20  it was very hard to really purge through it.
21            But I was under the understanding
22  from a couple of conversations with Meaghan, I
23  was under the understanding that that's what they
24  were going to do was purge through those e-mails.
25       Q.   That that is what who was going to

1                Nazon
2   do?
3        A.   The SEC.
4        Q.   Go through your e-mail account?
5        A.   Yes, and find whatever it is they
6   need to find, you know, when you produce
7   documents and you ask me what's this and what's
8   this, we discovered.
9        Q.   Did you ever produce any passwords to
10  the SEC so we can go through your e-mail or
11  documents?
12       A.   That I don't recall.  I remember
13  giving the e-mails, I'm not sure.
14       Q.   Is it that at some point you gave the
15  SEC, either through Meaghan Cheung or me or
16  somebody else, a bunch of e-mails and you were
17  expecting us to figure out what was responsive or
18  do you mean that there are e-mails that exist
19  somewhere out there that haven't been produced
20  that you expected us to go find?
21       A.   No, there was no e-mail out there
22  that haven't been produced, I'm talking about the
23  ones that were already produced.
24       Q.   Months ago?
25       A.   Yes.

1                Nazon
2        Q.   So it's your understanding that the
3   one document you produced earlier this week, the
4   finder's agreement, along with documents produced
5   as part of an investigation months ago
6   constitutes the universe of documents responsive
7   to the requests made in the subpoena to you
8   returned this week?
9        A.   Actually I sent an e-mail to you --
10  actually there's two documents, I produced the
11  finder's agreement and I also produced it was
12  like a financial data that showed all the checks
13  that I received for 2006 and 2007 for Focus 4 and
14  the other documents I didn't have control or
15  proper management system of the communications.
16            The e-mail, like a majority of the
17  e-mails that took place in ASC, that account, I
18  can't seem to access it.  Or I myself may have
19  forgotten the passwords for ASC because it's been
20  that long.
21       Q.   Did you try to access your ASC
22  account?
23       A.   Yes.
24       Q.   Did you try to access any Clean Care
25  account?

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x
SECURITIES AND EXCHANGE COMMISSION,


                    Plaintiff,
                                    08 CV 01719


          -against-


CLEAN CARE TECHNOLOGIES, INC.,
EDWARD KLEIN, AL NAZON and
ANIL VARUGHESE,


                    Defendants.

          and

CLEAN CARE SYSTEMS, LLC,


                    Relief Defendants.
- - - - - - - - - - - - - - - - - - -x



     DEPOSITION of EDWARD BARRY KLEIN, held at

the Offices of United States Securities and

Exchange Commission, 3 World Financial Center,

New York, New York, on Tuesday, May 20, 2008, at

10:30 A.M., before Marion Frola, a Shorthand

Reporter and Notary Public of the State of New

York.

 1 A P P E A R A N C E S:

 2

 3 UNITED STATES SECURITIES and EXCHANGE COMMISSION

 4 Enforcement/NYRO

 5 3 World Financial Center, Room 16-409

 6 New York, New York 10281-1022

 7 BY:  MICHAEL D. BIRNBAUM, ESQ.

 8         -and-
        VALERIE A. SZCZEPANIK
 9

10

11 EDWARD BARRY KLEIN, Pro Se

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Klein

1          Klein
2  paying these individuals?
3     A.  Yes.
4     Q.  Who was responsible for paying these
5  individuals?
6     A.  Brena Resnick.
7     Q.  Was she working at your instruction?
8     A.  Yes.
9     Q.  Did you instruct her to pay all of
10  the individuals you mentioned out of a particular
11  account?
12     A.  No, there were situations where we
13  paid all our bills primarily or most of our
14  bills.
15     Q.  When you say our bills, what do you
16  mean?
17     A.  I always considered the company as a
18  personal thing, like my baby. So I'll try and
19  address it as the company or Clean Care
20  Systems or Clean Care Technologies rather than
21  our.
22     Q.  But when you say the company, are you
23  referring to Systems or Technologies?
24     A.  I was referring to both, but I'll
25  define them, Michael, if it makes it easier.

1          Klein
2     Q.  When you said earlier that certain
3  individuals were paid from Clean Care Systems,
4  from Clean Care Systems' bank account, did you
5  mean specifically Systems or did you mean
6  something different?
7     A.  I meant the majority of the people
8  that were paid, the full-time people, myself,
9  Hector Garcia and Hector Garcia, Junior, Brena
10  Resnick, and sometimes Allison Resnick, Brena's
11  daughter, and Zachary Resnick would come in on a
12  part-time basis to help us out. Most of the
13  time, those people were paid from Clean Care
14  Systems.
15     However, because Dr. Schwartz was lax
16  in sending in the money when he promised, there
17  were times I recall that Clean Care Systems did
18  not have money to pay the part-timers who came in
19  and put in a day or two or three days work, so I
20  paid them from Clean Care Technologies.
21     Q.  Let's start with the full-timers, and
22  by full-timers can we agree we're referring now
23  to Ms. Resnick, the Hector Garcia's, you, and
24  your son?
25     A.  Yes.

1          Klein
2     Q.  Were they always paid from Clean Care
3  Systems accounts?
4     A.  I will start with myself. I was paid
5  by Clean Care Systems, but I also was paid by
6  Clean Care Technologies.
7     Brena Resnick, as far as I remember,
8  was paid by Clean Care Systems. Jeremy Klein,
9  again, as far as I recall, was paid by Clean Care
10  Systems, and the two Hector Garcia's were paid by
11  Clean Care Systems. However, there may have been
12  a few instances where some of those people were
13  paid by Clean Care Technologies.
14     Q.  If some of those people were paid by
15  Clean Care Technologies, was that driven by the
16  specific services they were rendering or was it
17  driven by how much money was in any particular
18  account or something different?
19     A.  The latter. Brena would come to me
20  and say: We have to pay so and so, but we don't
21  have money in the account because Dr. Schwartz
22  never sent money for the past two months into
23  Clean Care Systems. What should I do? And I
24  said: Pay them from Clean Care Technologies this
25  time. But that I believe, Michael, other than

1          Klein
2  myself, was few and far between.
3     Q.  On those occasions where people were
4  paid from Clean Care Technologies' accounts, is
5  it fair to say that they were still paid for
6  services rendered to Clean Care Systems?
7     A.  Well, that's where the confusion
8  lies. The part-timers who came in -- I'll start
9  with those first -- unloading a delivery, let's
10  say a trailer with 500 seats, we didn't account
11  or I didn't account for which of the seats on
12  those trailers, in essence, were going to be
13  allocated for Clean Care Technologies and Clean
14  Care Systems. So if the part timers unloaded a
15  box, we couldn't tell at that time which was
16  going to one company or which was going to the
17  other.
18     But again, myself and Brena Resnick
19  and Jeremy and Hector Senior, were employed
20  full-time by Clean Care Systems, which was the
21  company that Dr. Schwartz and myself owned. And
22  the others, when they came in, were paid by Clean
23  Care Systems if there was money in that account.
24  When there was not, I instructed Brena to pay
25  from Clean Care Technologies to pay these people

Page 18

Klein

1 for their work.
2    Q.  Putting aside the part-timers for
3 now, did the nature of any of the full-timers'
4 service ever dictate that payment should be made
5 from a Clean Care Technologies account rather
6 than a Clean Care Systems account?
7    A.  In a previous question, I believe you
8 asked me were there times when these people were
9 specifically working for Clean Care Technologies.
10    There were instances.  We were doing
11 trade shows, we were meeting with potential
12 purchasers of the product, seats were being sold
13 and they were being delivered and they were being
14 installed, and those were the customers primarily
15 of Clean Care Technologies.
16    So when we did a trade show in
17 Chicago, for example, or Florida, for example, we
18 were down there and, again, my understanding was
19 when we were on the floor at the trade show in
20 the convention center we were representing Clean
21 Care Technologies, not Clean Care Systems.
22    Q.  When you say your understanding, was
23 that dictated to you by somebody else or do you
24 mean that you had decided?

Page 19

Klein

1    A.  I had decided, I was the dictator.
2    Q.  So when you were on the floor
3 representing Clean Care Technologies, did you
4 draw salary or other compensation from Clean Care
5 Technologies?
6    A.  Yes.
7    Q.  And how did you convey to Ms. Resnick
8 from what account you should be paid?
9    A.  For those types of situations and
10 that type of situation, I was being paid from Clean
11 Care Technologies.
12    Q.  On those occasions that there were
13 insufficient funds in the Systems accounts to pay
14 any individuals and you opted instead to pay
15 those individuals from the Clean Care
16 Technologies accounts, how did Clean Care
17 Technologies record those payments in their
18 books?
19    A.  Brena Resnick and the accountant
20 Jason Dubnick were handling all of the
21 recordkeeping, the payroll, billing, the
22 bookkeeping, the accounting.  I had nothing to do
23 with that.  Unfortunately, my responsibility on
24 that end was just to sign the checks.

Page 20

Klein

1    Q.  So if somebody performed a service
2 for which they would ordinarily be paid by
3 Systems and there were insufficient funds in
4 Systems accounts, you would instruct Ms. Resnick
5 to pay that individual out of the Technologies
6 account?
7    A.  Yes, but again, I recall those
8 situations were few and far between.
9    Q.  On those few and far between
10 instances, would you instruct Ms. Resnick as to
11 how she should record those payments on Clean
12 Care Technologies' books?
13    A.  No, I would not record specifically.
14 I believe she was using Quick Books as her
15 internal computer system to keep records of which
16 checks were drawn as payroll to me and/or anybody
17 else who was getting paid from that account and
18 which checks were to be put under the category of
19 expenses.
20    Q.  Did you provide her with any
21 instruction as to how to account for payments
22 made from the Technologies accounts for services
23 rendered to Clean Care Systems?
24    A.  Michael, I don't know, I don't

Page 21

Klein

1 recall.  I believe every month or every quarter
2 she would talk to the accountant and she would go
3 over every check that was written, trade show,
4 booth, travel for Ed, and he would instruct her.
5 I believe I was not there and I was not involved
6 with those conversations whether to put that
7 thousand dollar check under expenses or that
8 $3,000 check under payroll or the $200 check
9 under some other category.
10    Q.  Did you ever give Ms. Resnick or
11 anybody else any instruction as to whether any
12 payments made from Technologies for services
13 rendered to Systems needed to be repaid from one
14 account to the other?
15    A.  The way we did it or the way I did
16 it, is that Clean Care Systems ended up paying
17 some of the expenses for Clean Care Technologies.
18    Example, the rent, the phones, the
19 electric, we were all under one roof.  If you can
20 picture us being all under my roof in one
21 3700-square foot area.  And the way it should
22 have been done obviously now is that Clean Care
23 Technologies should have signed a lease with
24 Clean Care Systems, who had the lease from the

Page 22

```
 1          Klein
 2   landlord, so Clean Care Technologies would have
 3   been a subtenant of the area and it would have
 4   been a lot cleaner, but it was just chaos.
 5       Q.  Is it the case that Clean Care
 6   Technologies and Clean Care Systems both occupied
 7   the same space?
 8       A.  Yes.
 9       Q.  Is it the case that both companies
10   benefited from that space?
11       A.  Yes.
12       Q.  Is it the case that Systems paid for
13   that space?
14       A.  Yes.
15       Q.  And is it the case that Technologies
16   did not pay for that space?
17       A.  Yes.
18       Q.  Getting back for a moment to the
19   payments Technologies made to individuals for
20   services rendered, did you ever
21   instruct Ms. Resnick or anybody else to move
22   money from Systems accounts to Technologies or in
23   any other way compensate Technologies for any
24   money they were out for paying individuals for
25   services rendered to Systems?
```

Page 23

```
 1          Klein
 2       A.  Other than the times regarding the
 3   trade shows and the travel and the part-timers
 4   and the areas that I've mentioned, I don't
 5   believe and don't recall that money went from
 6   Technologies to Systems.  If anything, Michael,
 7   the money went from Systems to pay Technologies'
 8   expenses.
 9       Q.  Let's break that up a bit.  Do I
10   understand you correctly that you cannot remember
11   any instance where Systems paid Technologies back
12   for Technologies laying out money to individuals
13   who had rendered services to Systems?
14       A.  Only that Systems was paying
15   Technologies' bills, i.e., the rent and the share
16   of the phone and the electric and the gas and
17   things like that, but I don't believe that any
18   hard dollars, in the way of transferring funds
19   from Technologies to Systems, ever happened.
20       Q.  Did any contracts or other agreements
21   exist that specified which company would pay for
22   which expenses such as rent?
23       A.  No.
24       Q.  Did any guidelines exist for either
25   Ms. Resnick or the accountant or anybody else
```

Page 24

```
 1          Klein
 2   that instructed them as to which account,
 3   Technologies or Systems, should be used to pay
 4   certain expenses?
 5       A.  No.
 6       Q.  Is it fair to say that sometimes what
 7   guided who paid a particular expense was which
 8   company had enough money in its account?
 9       A.  Again, we tried to pay all -- I tried
10   to pay all the expenses from Systems, and the
11   only times we paid from Technologies was when Dr.
12   Schwartz didn't send the money and we were -- and
13   I instructed Brena to write the check from the
14   Technologies account.
15       Q.  So getting back to my question, is it
16   fair to say that there were times where what
17   governed how expenses would be covered, that is
18   whether they would be covered from a Technologies
19   account or a Systems account, was whether there
20   were sufficient funds in one or the other
21   account?
22       A.  Yes.
23       Q.  You mentioned Dr. Schwartz.  Is he
24   the other investor, other than you, in Clean Care
25   Systems?
```

Page 25

```
 1          Klein
 2       A.  Yes.
 3       Q.  Is there any other investor in Clean
 4   Care Systems?
 5       A.  No.
 6       Q.  Did you invest any money in Clean
 7   Care Systems?
 8       A.  No.
 9       Q.  Is it fair to say that the only money
10   that anybody invested in Clean Care Systems was
11   invested by Dr. Schwartz then?
12       A.  Yes.
13       Q.  Approximately, how much did Dr.
14   Schwartz invest in Clean Care Systems?
15       A.  Up until the time he and I reached a
16   settlement --
17       Q.  That's a settlement of litigation?
18       A.  Settlement of litigation, which I
19   believe began in August of '07 and we finalized
20   it in November '07, I believe Dr. Schwartz had
21   invested approximately $800,000 into Clean Care
22   Systems.
23       Q.  That doesn't include anything he put
24   in after approximately August of 2007, correct?
25       A.  I don't know.  That is correct, I do
```

Page 26

Klein

1  not know what he's put in since that time. I
2  have not been privy or part of that company since
3  actually July 2007 when the litigation started,
4  so I've been out of the loop and out of the
5  picture.
6  Q. Did Dr. Schwartz ever invest any
7  money in Clean Care Technologies?
8  A. No.
9  Q. Approximately, how much money was
10  invested in Clean Care Technologies?
11  A. Approximately $700,000.
12  Q. And was any of that your money?
13  A. No.
14  Q. Was any of that the money of any of
15  the individuals you identified earlier as people
16  who worked for Clean Care Technologies or
17  Systems?
18  A. Is your question, did the employees
19  invest?
20  Q. If there were employees, yes.
21  A. No.
22  Q. How did you find investors for Clean
23  Care Technologies?
24  A. I did not find them. Those investors

Page 27

Klein

1  were found by Anil Varughese and Al Nazon.
2  Q. Did Al Nazon have a stake in Clean
3  Care Technologies?
4  A. No.
5  Q. Did Anil Varughese have any stake in
6  Clean Care Technologies?
7  A. No, they wanted a stake, but no stake
8  was given to them.
9  Q. Did you contact Mr. Nazon or
10  Mr. Varughese and ask them to find investors for
11  Clean Care Technologies?
12  A. No.
13  Q. How did it come to pass that
14  Messrs. Nazon and Varughese brought investors to
15  Clean Care Technologies?
16  A. I had met Varughese and Nazon through
17  a gentleman named Paul Schmidt, and Paul
18  introduced me to those two gentlemen as his
19  investor relations group or investor relations
20  company, and that meeting was held in New York, I
21  believe on 42nd Street at the Hilton hotel.
22  Q. And that was early 2005?
23  A. I believe it was.
24  Q. After you met with Messrs. Nazon and

Page 28

Klein

1  Mr. Varughese, did you come to some arrangement
2  that would have them identifying investors for
3  Clean Care Technologies?
4  A. No, it was a brief meeting, Mr.
5  Schmidt had called me because there was some
6  interest on his part of hiring me as the
7  marketing director for his toilet seat company.
8  I had not heard from him for months
9  prior to meeting him at a trade show. He had
10  walked into my booth and he told me that he had a
11  toilet seat that cleaned itself that was
12  manufactured or produced out of Germany. And I
13  went from my booth to his booth and I looked at
14  his seat, and we exchanged business cards, and I
15  had not heard from him for a few months until he
16  called me and said that he was coming to New York
17  on a business meeting and why don't we get
18  together for lunch.
19  He gave me the address, we made the
20  date, and when I got there, there were two other
21  gentlemen there. I was not aware that he was
22  going to have guests, but he introduced them as
23  Anil Varughese and Al Nazon, and he said this is
24  his investor relations company or investor

Page 29

Klein

1  relations group.
2  So we sat there, we talked for about
3  40 minutes, talking about Paul's company. Paul
4  had indicated that I might come on board, and we
5  had lunch, we exchanged business cards, and we
6  all went our own separate ways.
7  And it was months after that, months
8  after that, that I received a call from Anil
9  Varughese asking me had I spoken to Paul Schmidt
10  recently. And I told him, no. He said, well, we
11  have not spoken to him either. Do you have any
12  idea how we can get in touch with him? So I
13  said, well, do you have his phone number, and
14  they said, yes, they have many phone numbers for
15  Paul Schmidt, but some are disconnected, some no
16  longer exist, some they're just getting a
17  recording, and I could hear that he was troubled.
18  So I said, is there a problem and
19  Anil said, yes, there's a problem, that they had
20  raised money for Paul Schmidt's company and it's
21  been several months, and it seems that Paul
22  Schmidt is not to be found and could I help them.
23  And my response was, I don't think I could help
24  you, I do not know where he is. And Anil said,

Klein

1 would you be willing to sit down and meet with
2 us, maybe we can come up with some ideas as to
3 how to locate Paul Schmidt, and I was going to be
4 in New York the following week anyway. So I
5 said, why don't we get together for lunch, I'll
6 sit down, I'll talk to you. And the following
7 week I believe we had our meeting.
8     But the initial meeting, Michael, was
9 to talk about Paul Schmidt and the fact that Paul
10 Schmidt has now disappeared with investors' money
11 and cannot be found anywhere.
12     Q.  Mr. Klein, I opened up the deposition
13 today by explaining that I didn't intend to
14 interrupt your answer. It was implicit in that
15 comment that your answers would be somewhat
16 responsive to my questions, and I urge you so
17 that we can get through this today, please listen
18 to my question and answer my question, and at the
19 end, if there are other things that relate to
20 something we discussed and you want to clarify,
21 we would certainly take the time.
22     A.  Yes.
23     Q.  At some point after your first
24 meeting with Messrs. Varughese and Nazon, did you

Klein

1 come to an arrangement with them under which they
2 would identify investors for Clean Care
3 Technologies?
4     A.  Yes.
5     Q.  Approximately, when did you first
6 discuss with them the possibility of their
7 bringing investors or finding investors for Clean
8 Care Technologies?
9     A.  At that second meeting.
10     Q.  That was several months after the
11 first meeting, correct?
12     A.  Several months after the meeting with
13 Paul Schmidt.
14     Q.  Is it fair to say that was
15 approximately fall of 2005?
16     A.  Yes, that's fair to say.
17     Q.  Was it at that second meeting that
18 you came to some agreement or arrangement
19 concerning any role Mr. Nazon or Mr. Varughese
20 would play in bringing investors to Clean Care
21 Technologies?
22     A.  We discussed it, Michael, but we
23 didn't come to any arrangement.
24     They had suggested, being that I had

Klein

1 a seat of my own, they had asked me what my plans
2 were to market my seat and I said, probably none
3 because I don't have the money to do it and it
4 requires a lot of money. And at that point Anil
5 said, well, why can't we raise money for your
6 company as we've been doing for Paul Schmidt.
7     Q.  Was this at a person to person
8 meeting that Mr. Varughese said that to you?
9     A.  Yes.
10     Q.  And Mr. Nazon was there as well?
11     A.  Yes.
12     Q.  How did you respond when
13 Mr. Varughese made that suggestion?
14     A.  I said, can you really do it or are
15 you bullshitters like everybody else out there
16 is.
17     Q.  What did they tell you, if anything?
18     A.  They said, no, we can do it. We have
19 clients that we have put into other deals who
20 would be willing to look at this toilet seat
21 concept as a viable way to make money.
22     Q.  Did you discuss setting up the
23 company in such a way that there would be
24 securities available for investors to purchase?

Klein

1     A.  I left that up to them, and they said
2 that they would handle everything.
3     Q.  Did you understand at any point that
4 the way Technologies would be set up would be in
5 such a way that the investors would have the
6 option of buying shares or securities in Clean
7 Care Technologies?
8     A.  Yes.
9     Q.  Did you understand that before
10 investors actually invested any money in Clean
11 Care Technologies?
12     A.  Yes.
13     Q.  Did you hire anybody, other than
14 Mr. Varughese and Mr. Nazon, to sell securities
15 in Clean Care Technologies?
16     A.  No.
17     Q.  Did you come to any written agreement
18 with Mr. Nazon and Mr. Varughese as to what their
19 role would be in selling Clean Care Technologies
20 securities?
21     A.  I don't believe we entered into a
22 written agreement. I believe everything was
23 verbal. They had shown me or presented to me a
24 few drafts of agreements and contracts that they

Page 34

Klein

1          Klein
2  wanted me to sign, but I really don't recall
3  signing them.
4       Q.  Did you discuss with them at any time
5  whether they were registered or otherwise
6  licensed to sell securities?
7       A.  No, I did not.
8       Q.  Did they make any representations to
9  you to that effect?
10      A.  No, they did not.
11          However, they looked the part, they
12  sounded to me like they knew what they were
13  talking about.  They told me they had an
14  investor -- they had investors all over the
15  country, and I knew that they had raised money
16  for Paul Schmidt.
17      Q.  Is there anything that they said to
18  you specifically that gave you the impression
19  that they were registered or otherwise licensed
20  to sell securities?
21      A.  Other than that they seemed to know
22  what they were talking about, they never said
23  that they were, nor did they ever say they
24  weren't.  I assumed.
25      Q.  And you never asked, correct?

Page 35

Klein

1          Klein
2       A.  I never asked, Michael.
3       Q.  Did you ever discuss with them
4  whether the securities transactions, through
5  which investors would purchase Clean Care
6  Technologies securities, would be registered
7  transactions?
8       A.  Is your question did I ask them?
9       Q.  Did you ever discuss with them in any
10  way whether the transactions would be registered?
11      A.  The answer is, no, I did not because
12  I did not know anything about it, I did not know
13  anything about registering.
14      Q.  Did you ever seek any counsel -- and
15  I don't want to ask you about any specific
16  conversations you may have had with any
17  attorney -- but did you seek any legal counsel in
18  connection with the offering of Clean Care
19  Technologies securities?
20      A.  Not at the beginning.  However,
21  months later I met with Laura Anthony in Florida
22  regarding these issues.
23      Q.  When you say months later, do you
24  mean months after the Clean Care Technologies
25  offering had already commenced?

Page 36

Klein

1          Klein
2       A.  Yes.
3       Q.  And was there some specific
4  occurrence that led you to seek counsel?
5       A.  Yes.
6       Q.  What was that occurrence?
7       A.  Anil and Al came to New Jersey and
8  said that they were speaking to investors,
9  potential investors, in certain states.
10          I remember they mentioned Minnesota.
11  I don't know why they mentioned Minnesota, but
12  that remains in my thought process.  They said
13  that they were now talking to investors in
14  certain states, and certain states required the
15  registration of the company, and it would cost
16  approximately $15,000 and that we needed to find
17  an SEC attorney to register the company for the
18  State of Minnesota and those other states that
19  require such.
20      Q.  Was it your understanding that
21  Mr. Varughese or Mr. Nazon would send any written
22  materials to potential investors?
23      A.  Yes.
24      Q.  Was it your understanding that they
25  would send those materials to investors in

Page 37

Klein

1          Klein
2  several different states?
3       A.  Yes.
4       Q.  And they would do this through the
5  mail?
6       A.  My understanding is they were doing
7  it through the mail, yes.
8       Q.  Did you ever review any documents
9  that Mr. Varughese or Mr. Nazon sent to
10  investors?
11      A.  I only saw drafts and bits of pieces
12  and paragraphs and sentences at a time.  I never
13  saw what I called the book.
14      Q.  And by the book, do you mean a
15  completed offering memorandum for Clean Care
16  Technologies that was sent to investors?
17      A.  Yes.
18      Q.  Did you ever ask to see the final
19  Clean Care Technologies book, as you called it,
20  or offering memorandum before it was sent out?
21      A.  No, I did not.
22      Q.  Was there anybody at Clean Care
23  Technologies responsible for reviewing the
24  substance of the offering memorandum before it
25  was sent out to investors?

Page 38

Klein

1
2     A.  No.
3        Q.  Did you take any efforts whatsoever
4  to come to your own opinion as to whether or not
5  the materials sent to investors were truthful?
6     A.  The parts that I read were accurate,
7  but I did not go beyond the parts which I
8  contributed to which were talking about the seat,
9  how the seat operated, the competition, the
10  potential market, and the personal information
11  about myself and that stuff.  I never provided
12  them with or read anything beyond those
13  particular subjects assuming, again, like a fool,
14  that it was properly done.
15     Q.  Did you at any time see a draft that
16  included information describing the seat that
17  Clean Care Technologies would sell?
18     A.  Yes.
19     Q.  Did you ever see a draft that
20  described more than one kind of seat that Clean
21  Care Technologies would offer?
22     A.  Yes.
23     Q.  Is it the case that Clean Care
24  Technologies ever offered more than one kind of
25  seat?

Page 39

Klein

1
2     A.  No.
3        Q.  Did you communicate to Mr. Varughese
4  or Mr. Nazon any reference to a second seat that
5  Clean Care Technologies purportedly would offer
6  was false or in any way misleading?
7     A.  Can you repeat the question?  I'm
8  sorry.
9     Q.  I'll just back up.  At some point you
10  came to learn that a draft offering memorandum
11  for Clean Care Technologies referred to more than
12  one kind of toilet seat, correct?
13     A.  Yes.
14     Q.  And at that time it was your
15  understanding that Clean Care Technologies
16  intended to offer only one kind of toilet seat,
17  correct?
18     A.  Yes.
19     Q.  Did you ever communicate to
20  Mr. Varughese or Mr. Nazon that reference to a
21  second toilet seat in the draft offering
22  memorandum was inappropriate or false or in any
23  way misleading?
24     A.  Yes, I told them both that we were
25  only going to carry the Eyegiene seat and to take

Page 40

Klein

1
2  the other seat out of the offering memorandum.
3     Q.  Did you ever communicate that to them
4  in writing?
5     A.  No.
6     Q.  Did you ever send them a marked up
7  draft crossing out or otherwise editing the draft
8  they had sent you?
9     A.  I don't believe so.  We would meet,
10  they would come down to New Jersey and we would
11  meet and talk.  When I read the original draft or
12  the first draft that I had seen, really the only
13  draft, and I saw that it had two seats I told
14  them, no, this is wrong.
15     Q.  Did you ever ask to see a corrected
16  copy of the offering memorandum?
17     A.  No, I did not.
18     Q.  When you saw the one draft you
19  referred to, do you recall if that draft had any
20  reference to whether Clean Care Technologies
21  intended to employ registered broker dealers to
22  sell its securities?
23     A.  Well, let me clarify one thing,
24  Michael.  The draft that I saw, I never saw a
25  draft of the whole offering statement.  All they

Page 41

Klein

1
2  gave me were pages, two or three pages, again, of
3  the sections that I contributed the information
4  for.  So they never gave me a draft of whatever,
5  how many pages that thing is, maybe 50 pages.
6        They would meet me in New Jersey, and
7  they would say:  Read this, tell us if it's
8  accurate.  And they would hand me a page or a
9  page and a half or three pages, and it would be
10  pertaining to those particular sections that I've
11  mentioned that -- what we're talking about -- the
12  two seats.  I said, this is incorrect, we're only
13  going to carry one seat, eliminate this, take it
14  off, and we're only going to carry one seat guys.
15     Q.  So is it your testimony that of the
16  entire Clean Care Technologies offering
17  memorandum you only saw a draft version of
18  approximately three pages at any time?
19     A.  Three pages, six pages.  I don't want
20  to -- what I'm saying is I never was given the
21  securities sections.  I know it talks about
22  shares and warrants and discounts, and I was
23  never given that.  So I was given bits and pieces
24  at a time.
25     Q.  I want to show you what's been marked

Page 42

Klein

1           Klein
2  previously as Plaintiff's Exhibit 13. Do you
3  recognize that as at least one version of the
4  Clean Care Technologies offering memorandum?
5      A.  Yes, I do.
6      Q.  Look at the front page where it says
7  $10 million on top. Is it your understanding
8  that that $10 million indicates that Clean Care
9  Technologies had $10 million worth of securities
10 for sale?
11     A.  If you're -- my -- I was told that
12 they were going to raise $10 million. So if this
13 is what this indicates the answer is, yes.
14     Q.  Did you ever see that front page
15 before it was sent out to investors?
16     A.  Not before, after.
17     Q.  Did you at some point see the
18 offering memorandum as it was sent out to
19 investors?
20     A.  I saw it after they sent the first
21 few out.
22     Q.  So at some time after Mr. Varughese
23 and Mr. Nazon sent the first few offering
24 memoranda out, you did see a version that you
25 understood to be final, correct?

Page 43

1           Klein
2      A.  Yes.
3      Q.  And this was some time before all of
4  the investors' money was collected, correct?
5      A.  Yes.
6      Q.  When you did see a final version, did
7  you review it?
8      A.  No.
9      Q.  Did you at any time know that
10 included in the offering memorandum were
11 projections for how Clean Care Technologies might
12 make money over the next certain amount of years?
13     A.  Yes.
14     Q.  Did you ever review those projections
15 before they were sent out?
16     A.  I provided the information as to how
17 many seats I thought the company could put out in
18 the street, how many bottles of solution each
19 seat would use over the course of the year, the
20 prices that the company was paying for the seat
21 and the solution, and I let them work out the
22 matrix or the final numbers.
23     Q.  Did you indicate how much you
24 expected Clean Care Technologies to sell the
25 seats for?

Page 44

1           Klein
2      A.  Yes.
3      Q.  And approximately how much was that?
4      A.  I believe 240 to $260, somewhere in
5  that area.
6      Q.  Did you tell Mr. Varughese or
7  Mr. Nazon how much you expected the company to be
8  able to sell the solution for?
9      A.  Yes.
10     Q.  And by solution, I don't know that we
11 already have it on the record, you mean the
12 solution that was used with the seat to help
13 clean the seat, correct?
14     A.  Yes.
15     Q.  Did you ever review the projections
16 that were included in the offering memorandum to
17 see if they were consistent with what you had
18 told Mr. Varughese and Mr. Nazon?
19     A.  I reviewed the first year. They had
20 come down and given me that on just a separate
21 sheet, because they wanted to know if their
22 numbers were accurate as far as each seat using
23 1.5 bottles of solution per month, times 12
24 months, is 18 bottles per year. So they just
25 basically said is this what you're talking about,

Page 45

1           Klein
2  Ed? And I said, yes, each seat will go through
3  18 bottles per year. If we put a million seats
4  out, they're going to go through 18 million
5  bottles.
6      Q.  When you reviewed those projections
7  for the first year, were you confident that they
8  were consistent with what you had told Mr.
9  Varughese or Mr. Nazon?
10     A.  Yes.
11     Q.  Do you remember to whom -- I'm sorry,
12 did I interrupt?
13     A.  What I was going to say, Michael,
14 when we met and sat down informally at a table
15 like this or sometimes we would meet at a diner
16 for lunch, I would review the numbers to make
17 sure they matched what I gave them. But I never
18 looked at the numbers here in the offering
19 statement to make sure they coincided with those
20 earlier meetings.
21     Q.  Was it your expectation that Clean
22 Care would place seats in the market by offering
23 a substantial discount on the actual seats so
24 that Clean Care could make money on the solution
25 in the long run?

Page 46

Klein

1
2    A.  Yes.
3    Q.  Was part of that business plan to
4  give some seats away for free?
5    A.  Yes.
6    Q.  Did you inform Mr. Nazon or
7  Mr. Varughese of that plan as part of any of
8  these conversations to which you're referring?
9    A.  Yes.
10   Q.  Did you explain to Mr. Nazon or
11  Mr. Varughese that their projections for how much
12  money the company would make in its first year
13  should take into account that some number of
14  seats would be sold at discount or even for free?
15   A.  The problem is I never saw their
16  final projections.
17   Q.  I'm not asking about their final
18  projections.  I'm only asking if you ever
19  conveyed to them, in any of the meetings you had
20  with them, that any projections they did put
21  together should account for a business plan that
22  included the sale of some number of seats at a
23  discount and the sale of some other seats
24  essentially for free?
25   A.  Yes.

Page 47

Klein

1
2    Q.  And was it your understanding then
3  that any projections that Mr. Varughese or Mr.
4  Nazon put in the offering memorandum would not
5  include, as money Clean Care expected to make, a
6  full price brought in for the toilet seats?
7    A.  Yes.
8    Q.  Earlier you said that you told
9  Mr. Nazon or Mr. Varughese that you expected the
10  seats in their first year to be sold for
11  approximately 240, $260, correct?
12   A.  Yes.
13   Q.  Did you explain to them what
14  proportion of the seats would be sold at $240 to
15  $260, as opposed to what proportion of the seats
16  would be sold at some discount or given away for
17  free?
18   A.  Yes.
19   Q.  How did you explain that to them?
20   A.  Well, we had two markets.  We had a
21  dealer market and we had a direct end user
22  market, and the dealers, who were then middle
23  men, janitorial supply, restaurant supply type
24  companies, would pay a lesser price for the seat
25  and the solution and then resell it to their

Page 48

Klein

1
2  customers at a retail price.
3        Then the other market that we had was
4  bypassing the dealers, and either selling the
5  seat and solution direct to the end user and/or
6  giving the seat away at no charge to the end user
7  to gain visibility and exposure in the
8  marketplace.
9    Q.  So what you discussed with Mr.
10  Varughese and Mr. Nazon, your projected first
11  year of sale, did you ever give them any
12  indication as to what proportion of seats sold in
13  the first year would be sold at full price, what
14  proportion would be sold at discount, what
15  proportion would be given away for free so forth?
16   A.  Yes, I had worked out dealer pricing
17  and I had worked out end user pricing and I had
18  also told them my plan was to give away at no
19  charge between 5,000 and 10,000 seats to major
20  type venues such as airports, casinos, hotels and
21  convention centers.
22   Q.  Is it fair to say that projections
23  could not reasonably rely on an assumption that
24  Clean Care would bring in $200 per seat in its
25  first year not including any solution sales?

Page 49

Klein

1
2    A.  I'm sorry, could you repeat that?
3    Q.  Is it fair to say that projections of
4  what Clean Care would receive in exchange for
5  these seats put in the market in its first year
6  could not reasonably rely on assumptions that had
7  Clean Care bringing in $200 per seat?
8    A.  No, I think that was accurate, I
9  think the numbers I gave them were accurate.  I
10  believe the company could have gotten $200 per
11  seat to those dealers and end users, not taking
12  into account the people or companies or venues
13  that we gave seats away.
14   Q.  So if projections included an
15  assumption of $200 or more per seat, that would
16  only be a fair assumption if you were only
17  referring to those seats for which the company
18  was charging full price?
19   A.  Yes, and that 200, Michael, was an
20  average.  We may have, based on a volume
21  purchase, if a guy bought 50 seats, we maybe
22  would sell him the seats for 165, if a doctor
23  wanted just one, maybe we would sell it to him
24  for 285.
25   Q.  And those averages did not

Page 50

Klein

1    incorporate some number that you gave away for
2    free, you considered that an entirely separate
3    category of seats, correct?
4        A.  Yes.
5        Q.  How much did Clean Care Technologies
6    pay for the seat when it first went into
7    business?
8        A.  I'm going to say anywhere from 195,
9    maybe to 210, 220.
10       Q.  From whom did Clean Care Technologies
11   purchase the seats?
12       A.  From Clean Care Systems.
13       Q.  Was there a markup that Clean Care
14   Systems charged Clean Care Technologies as
15   compared to what Clean Care Systems purchased
16   them for?
17       A.  Yes.
18       Q.  What was that markup?
19       A.  It was minimal, maybe 10 percent.
20       Q.  About $20?
21       A.  About $20 sounds right.
22       Q.  And Clean Care Systems purchased them
23   from whom?
24       A.  Clean Care Systems purchased them

Page 51

Klein

1    from a company called NTF.
2        Q.  Did Clean Care Systems have the
3    exclusive distribution rights to the seats NTF
4    provided?
5        A.  Yes.
6        Q.  Did you ever discuss with
7    Mr. Varughese or Mr. Nazon the fact that Clean
8    Care Systems had the exclusive distribution
9    rights?
10       A.  Yes.
11       Q.  Did Clean Care Technologies have any
12   rights concerning the seats?
13       A.  Not at the very beginning.
14       Q.  And at the very beginning, does that
15   time period include when the offering memorandum
16   was first sent to investors?
17       A.  Before the offering memorandum was
18   even put together.
19       Q.  By the time the offering memorandum
20   was sent to investors, did Clean Care
21   Technologies have any rights to the NTF seats?
22       A.  Yes.
23       Q.  What were those rights?
24       A.  As a dealer for Clean Care Systems,

Page 52

Klein

1    that is the way it was supposed to be.
2        Q.  Was that based on a written
3    agreement?
4        A.  No.
5        Q.  Did they have any rights, did Clean
6    Care Technologies have any rights, other than as
7    a dealer for Clean Care Systems?
8        A.  As far as -- I'm sorry, I don't
9    understand the question.
10       Q.  Concerning the NTF seats, if I
11   understood you correctly, Clean Care Systems had
12   the exclusive distribution rights, at least in
13   the United States, to distribute and market the
14   seats, correct?
15       A.  Yes, correct.
16       Q.  And at some point, Clean Care
17   Technologies obtained the right to become a
18   dealer for those seats, correct?
19       A.  Yes, a national dealer.
20       Q.  And they obtained that right from
21   Systems?
22       A.  Yes.
23       Q.  Did Systems license that out to Clean
24   Care Technologies in some way?

Page 53

Klein

1        A.  I don't know what you mean by the
2    word license, but I had approved and granted
3    Clean Care Technologies as a dealer for Clean
4    Care Systems.
5        Q.  Did Clean Care Technologies need to
6    pay any money or other compensation in exchange
7    for the rights to be a dealer in these seats?
8        A.  No.
9        Q.  Did Clean Care Systems receive any
10   benefit by granting a right to Clean Care
11   Technologies to deal in these seats?
12       A.  Yes.
13       Q.  What was that benefit?
14       A.  They made money off the sale of the
15   seats and the solution to Clean Care
16   Technologies.
17       Q.  Is that the only benefit?
18       A.  Yes.
19       Q.  Were Clean Care Technologies'
20   investors ever told that the only rights Clean
21   Care Technologies had in the seats was as a
22   dealer for Clean Care Systems?
23       A.  Well, I find out now, Michael, that,
24   no, they were not told.

Klein

1     Klein
2    Q.   Were they, in fact, told that Clean
3 Care Technologies was to be the exclusive
4 distributor of the NTF seats?
5    A.   Again, as I find out now, I guess
6 they were told in the offering memorandum.
7 However, that's not the way Anil and Al were
8 instructed by me to do it.  This offering
9 memorandum was to say that Clean Care
10 Technologies was a national dealer for Clean Care
11 Systems.
12    Q.   And was it your understanding at that
13 time that anybody who invested in Clean Care
14 Technologies would receive a share in a company
15 that had the rights to serve as a dealer of the
16 NTF seats and cleaning solution?
17    My question, just to clarify it, I
18 want to understand what you understood Clean Care
19 Technologies' investors to be receiving for any
20 investment they put into the company?
21    A.   My understanding was they were going
22 to receive shares in Clean Care Technologies,
23 which was a national dealer for Clean Care
24 Systems, which owned the exclusive rights to the
25 seat from a company called NTF.

1     Klein
2    Q.   When you say that Clean Care
3 Technologies would be a national dealer, does
4 that mean they had some kind of exclusive right
5 to be a dealer in the United States?
6    A.   Yes.
7    Q.   Did Clean Care Systems offer any
8 other dealership rights to any other entities in
9 the United States?
10    A.   No.
11    Q.   At some point, did clean Clean Care
12 Systems offer the rights to certain regions of
13 the country to any dealers?
14    A.   Clean Care Technologies did.
15    Q.   So Clean Care Technologies created
16 what essentially were sub-dealerships?
17    A.   Yes.
18    Q.   And those sub-dealerships would
19 receive seats from Clean Care Technologies?
20    A.   Yes.
21    Q.   Which had received them from Clean
22 Care Systems?
23    A.   Yes.
24    Q.   Which had received them from Europe?
25    A.   Yes.

1     Klein
2    Q.   Did you ever talk to any Clean Care
3 Technologies investors?
4    A.   Yes.
5    Q.   Approximately, how many?
6    A.   Six, maybe seven.
7    Q.   Did you reach out to them or did they
8 reach out to you or did meetings happen some way?
9    A.   The meetings happened some other way.
10    Q.   How?
11    A.   Well, those years 2006, 2007, I was
12 traveling extensively across the United States,
13 coast to coast, border to border, California,
14 Chicago, Dallas, Florida, Omaha, Nebraska.  I was
15 never home.
16    During my trips, sometimes Anil would
17 call me and say:  If you're going to be in Los
18 Angeles, we have a potential investor, his name
19 is Dean Miles, and he's down here at the Long
20 Beach area.  If you're going to be in LA, do you
21 mind driving down and showing him the seat.  But
22 don't talk to him about the investment, just
23 demonstrate the seat, show him how it works, show
24 him the solution.  Do you mind doing that?  And I
25 said, no, of course.

1     Klein
2    Q.   Mr. Varughese told you not to talk
3 about the investment?
4    A.   Absolutely not.
5    Q.   And you took instruction from Mr.
6 Varughese?
7    A.   In those situations, yes, because for
8 me to talk about the investment end, Michael,
9 would be for me to talk Pig Latin.
10    Q.   Were there times when investors asked
11 you about the investment?
12    A.   Yes.
13    Q.   What specific questions did they ask?
14    A.   They wanted to know how soon they
15 could start to make some money off of this
16 product, how much money they were going to make,
17 how much each share was.
18    Q.   Did you respond to those questions?
19    A.   Yes.
20    Q.   How?
21    A.   I said:  You need to talk Anil
22 Varughese or Al Nazon.
23    Q.   Is that because you did not
24 understand how the investments worked?
25    A.   Exactly, I did not and still do not.

Page 58

```
          Klein
 1
 2    Q.  Did you understand that for every
 3  dollar an investor would put into the company, a
 4  commission would be paid to Mr. Varughese and Mr.
 5  Nazon?
 6    A.  Yes.
 7    Q.  Was it a fixed percentage?
 8    A.  Yes.
 9    Q.  Was it always the same percentage?
10    A.  No.
11    Q.  Could you explain what percentage?
12    A.  At the very beginning, they said that
13  they wanted 10 percent of the money that they
14  raised, and I was agreeable to that.
15        But soon thereafter, they came to me
16  and they said that they were setting up an office
17  and hiring telephone people, and they are going
18  to have to pay them a guaranteed draw, and they
19  are going to have to pay rent and get some office
20  furniture, and 10 percent is not fair.  And they
21  told me that they wanted 15 percent.
22    Q.  Did you agree to that?
23    A.  Yes.
24    Q.  Did you ever tell Mr. Nazon or
25  Mr. Varughese to disclose to investors that they
```

Page 59

```
          Klein
 1
 2  would receive ten or 15 percent of all the money
 3  invested?
 4    A.  No.  Michael, I did not know that
 5  they were supposed to.
 6    Q.  That they were supposed to disclose?
 7    A.  Yes, I did not know that.  I mean,
 8  I'm sitting here for the past couple months and
 9  this thing is blowing me away.
10    Q.  At what point did Clean Care
11  Technologies first sell any seats for $200 or
12  more?
13    A.  I believe the first sale was to a
14  dealer, a janitorial supply dealer.
15    Q.  Was that sale at a discount or some
16  other rate?
17    A.  It was at a discount because it was a
18  dealer.
19    Q.  What dealer was that?
20    A.  I believe it was Liberty Paper and
21  Janitorial Company.
22    Q.  And when was that?
23    A.  Early 2006.
24    Q.  How many seats did Clean Care
25  Technologies sell to that company?
```

Page 60

```
          Klein
 1
 2    A.  I don't recall, perhaps it was 25,
 3  plus solution.
 4    Q.  Are you certain it wasn't less than
 5  ten or more than 50, it was somewhere between
 6  those numbers?
 7    A.  Yes.
 8    Q.  Approximately, how much did you sell
 9  those seats for?
10    A.  I don't recall, I would have to check
11  the invoices.
12        However, in many instances with these
13  janitorial dealers, you had to throw in free
14  stuff.  In other words, for every ten seats they
15  bought, you throw in a case of solution or
16  something like that, for a bakers dozen, for
17  every 12 seats they bought.  This industry, the
18  janitorial industry, historically has worked like
19  that.  They buy from Kimberly Clark, Georgia
20  Pacific, they get a lot of free stuff, and that's
21  what they wanted here.
22    Q.  Do you remember if you gave any free
23  stuff to Liberty?
24    A.  I may have given them some free
25  seats, yes, just to get them going with this
```

Page 61

```
          Klein
 1
 2  thing.
 3    Q.  About what proportion do you think
 4  you gave them free?
 5    A.  I think maybe I gave them ten or
 6  maybe 15 free seats.  In other words, if they
 7  bought 25, I would give them ten free, something
 8  like that.
 9    Q.  If they bought 25 at full price?
10    A.  Yes.
11    Q.  Other than Liberty, do you remember
12  any other sales CCT made in 2006?
13    A.  Sure.  I know I opened up a couple
14  dealers across the country.  It was minimal.  My
15  job that first year and into the second year was
16  to seek out dealers and open them up.
17    Q.  Putting aside any seats you gave away
18  for free, would you say you sold more than 100
19  seats in 2006 for full price?
20    A.  Again, if you show me the invoices I
21  could recognize that.  I would say maybe 100,
22  110.
23    Q.  And that includes all of the seats
24  that you sold for approximately $200 or more?
25    A.  I would have to look at the invoices,
```

Page 62

Klein

1         Klein
2  Michael, I don't recall, I'm sorry.
3     Q.  I want to show you an exhibit that
4  was previously marked as Plaintiff's Exhibit 17.
5  Do you recognize that document?
6     A.  I recognize this document because
7  I've been at the other deposition so I've seen it
8  pass back and forth, and I've seen a draft of
9  this document, pieces and parts of.  So I guess
10  the answer is, yes.
11     Q.  Before this litigation started --
12  withdrawn.  Before you met with the SEC, did you
13  ever see the final draft of this document?
14     A.  I never saw the final draft.  I saw a
15  draft of.
16     Q.  Is it your belief that you saw a
17  draft of this document before it was sent to
18  investors?
19     A.  I've seen parts of the document.  I
20  will tell you unequivocally, Michael, if I knew
21  they were sending this particular document out to
22  investors, I never would have allowed it because
23  it's false.
24     Q.  What's false about it?
25     A.  What's false about it is the

Page 63

Klein

1         Klein
2  statement here about Las Vegas Towel and Linen is
3  a false statement.  I was negotiating with them,
4  I had thrown out to Las Vegas, we were working on
5  putting a deal together, and they needed some
6  time to think about it.  They wanted some free
7  seats and when Anil had asked me how my Las Vegas
8  trip went, I told him I was working on a deal
9  with Las Vegas Towel and Linen but nothing was
10  signed and nothing was definite.
11     Q.  Do you see any reference to M & J
12  Industrial Services?
13     A.  Yes.
14     Q.  Would you read that sentence, please?
15     A.  Liberty Paper and M & J, Walsh
16  Chemical and M & J Supply, yes, those are false
17  also.  I had been talking to those companies, I
18  had been working out a deal, but nothing was
19  definite and Anil and Al knew that.
20     Q.  Did you ever sell any seats to Penn
21  State University?
22     A.  No.
23     Q.  Did you ever sell any seats to any
24  janitorial supply dealers who you believe did
25  business with Penn State University?

Page 64

Klein

1         Klein
2     A.  No, I had talked to a janitorial
3  dealer in Pennsylvania, and he said that if I
4  gave him some free seats he would take them and
5  present them to Penn State University, and that
6  is exactly what I told Anil and Al.
7     Q.  But you never got an order from
8  anybody?
9     A.  Absolutely not, and I'm appalled that
10  they put that in one of their news releases.
11     Q.  I want to show you a document that I
12  want to mark Plaintiff's Exhibit 19.
13       (Emails were marked as Plaintiff's
14  Exhibit 19 for identification.)
15       (Emails were marked as Plaintiff's
16  Exhibit 20 for identification.)
17     Q.  And I'll also show you Plaintiff's
18  20.  Looking at Exhibit 19 for a moment, is
19  EBK2727@aol.com an address that you're familiar
20  with?
21     A.  Yes.
22     Q.  Do you know whose email address that
23  is?
24     A.  Me, yes.
25     Q.  Do you know who selmj@rcn.com is?

Page 65

Klein

1         Klein
2     A.  Dr. Schwartz.
3     Q.  Do you recognize the emails on
4  Exhibit 19?
5     A.  I'm sorry?
6     Q.  Do you recognize the emails in
7  Exhibit 19?
8     A.  Yes.
9     Q.  If you go down to the number marked
10  three do you see where it reads:  "While I was in
11  Harrisburg, I met with a janitorial supply dealer
12  who does business with Penn State University.
13  They have ten salesmen and the owner gave me an
14  opening order for 64 seats and 256 bottles of
15  cleaning solution"?
16     A.  Yes.
17     Q.  Did I read that correctly?
18     A.  Yes, you did.
19     Q.  Was that statement true when you made
20  it?
21     A.  When I made it, it was true.  And
22  then he called and cancelled the order because he
23  decided he wanted the seats for free and I would
24  not give it to him.
25     So the Penn State deal never went

Page 66

Klein

1  through and Anil and Al were aware of that.
2  Q.  Did you ever send a subsequent email
3  to Dr. Schwartz to tell him that this order never
4  went through?
5
6  A.  I didn't send him an email, but I
7  recall I told him.
8  Q.  Looking at Exhibit Number 20, do you
9  see the bottom email, January 2, 2007, where it
10 reads: "Sold to: M & J Industrial Services"?
11 A.  I'm sorry, where are you?
12 Q.  (Indicating.)  Did I read that
13 correctly?
14 A.  No, this is an email from me to Dr.
15 Schwartz?
16 Q.  Well, let's start with that.  Is that
17 your address, from EBK2727?
18 A.  Yes, that's me.
19 Q.  And that's to Dr. Schwartz, as best
20 you can tell?
21 A.  Yes.
22 Q.  On January 2, 2007, correct?
23 A.  Yes.
24 Q.  And the email says: "Please send
25 check to," and it gives the Clean Care Systems'

Page 67

Klein

1
2  address?
3  A.  Yes.
4  Q.  And does it say: "Sold to: M & J
5  Industrial Services"?
6  A.  Yes, it does, it says that, Michael.
7  Q.  Is this the same M & J Industrial
8  Services as was mentioned in the press release we
9  looked at a moment ago?
10 A.  Yes, it is.
11 Q.  Did you, in fact, sell any toilet
12 seats to M & J Industrial Services?
13 A.  No.  However, this -- the $74,700,
14 Shelly and I, Dr. Schwartz, had spoken.  We
15 always spoke on the phone, Michael, rather than
16 send emails, but we did send emails back and
17 forth.  This was a time when Roelef Remjin was
18 demanding that we take delivery of our next order
19 and he required money up front.
20     So I told Shelly that we needed
21 approximately $74,700 to send to Roelef Remjin
22 for the next order.
23     Shelly said, well, we just got an
24 order three months ago.  Why do we need more
25 seats?  And I told him because that was in the

Page 68

Klein

1
2  contract with Roelef Remjin, we had to order on a
3  fixed schedule even though we still may have had
4  inventory.
5     And he said to me:  What are we going
6  to do with more seats?  And I told Dr. Schwartz
7  that I was working on deals, and I not only
8  mentioned M & J Industrial, but I probably
9  mentioned Penn State University and Las Vegas
10 Towel and Linen that I was working on.  And I
11 said:  Shelly, if those deals come through we're
12 going to need those seats anyway.
13 Q.  Why did you write, "Sold to M & J
14 Industrial Services" if you meant that you hoped
15 one day to sell to M & J Industrial Services?
16 A.  Michael, I don't know why.  Maybe
17 Shelly had asked me just to reference what the
18 $74,700 was for.
19     What I should have done obviously or
20 could have, I could have said potential sales to
21 M & J Industrial, Penn State University, Las
22 Vegas Towel and Linen, etcetera, etcetera.
23 Q.  But sitting here today, you can say
24 it is false that as of January 2, 2007 any Clean
25 Care entity had sold any seats to M & J

Page 69

Klein

1
2  Industrial Services?
3  A.  Yes, that is false.
4  Q.  Do you have any idea how --
5  withdrawn.  Do you know who drafted the
6  January 5, 2007 press released that we looked at
7  in Exhibit 17?
8  A.  Who drafted this?
9  Q.  Correct.
10 A.  Anil or Al.
11 Q.  Do you have any idea how they got the
12 idea that Clean Care Systems or Technologies
13 would have sold any seats to M & J Industrial
14 Services?
15 A.  I told them I was working on these
16 deals, Walsh Chemical, M & J, Las Vegas Towel and
17 Linen.
18 Q.  Is it possible that you also used the
19 words with them, "Sold to"?
20 A.  No, no, I don't recall doing that.  I
21 would not have done that, Michael, I would not
22 let this letter go out to investors saying that
23 those were done deals when they weren't.  I was
24 working on them, I was negotiating, I was doing
25 whatever I had to.

Page 70

Klein

1            Klein
2    Q.  Getting back to the Penn State
3  janitorial supply dealer --
4    A.  Right.
5    Q.  On the June 5th email in Exhibit 19.
6    A.  Okay.
7    Q.  Is it your testimony that as of
8  June 15th you believed you had a final deal with
9  the Jan-San dealer that worked with Penn State?
10    A.  Yes.
11    Q.  At what point, if ever, did you come
12  to realize that you did not have a deal with
13  them?
14    A.  It took a little bit because I was
15  going to give him free seats.  I really was going
16  to do that.  Besides Penn State, he had other
17  contacts, but then I figured, you know, I really
18  can't be giving away free seats to all these
19  dealers so I held my ground, and then he never
20  became a dealer and that was the end of Penn
21  State.
22    Q.  Would you say that by the end of June
23  it was clear to you that you did have not a deal
24  with this Jan-San dealer?
25    A.  It might have taken longer than June.

Page 71

Klein

1            Klein
2  We were bantering back and forth.
3    Q.  I want to put before you a document
4  that was previously marked as Plaintiff's
5  Exhibit 16, and this is a press release marked
6  July 1, 2006.  Do you see the reference there to
7  Penn State?
8    A.  I'm sorry, where are you looking?
9    Q.  In Exhibit 16, in the first full
10  paragraph do you see the reference to Penn State?
11    A.  Yes, I see Penn State.
12    Q.  And that's a July 1, 2006, press
13  release; is that correct?
14    A.  Yes.
15    Q.  Could you read the statement about
16  Penn State in that press release?
17    A.  I'll go a little bit before.  "To
18  date, the company has managed to make sales to
19  several major corporate entities.  Wegmen's" --
20  which is not true, Michael -- "a food and grocery
21  chain store comprising seven stores, Americhem, a
22  janitorial supply company in Harrisburg that
23  services Wyndham Hotel chain and Penn State
24  University, among other clients, has bought 16
25  seats to test in Wyndham Hotel."

Page 72

Klein

1            Klein
2    Q.  Is it possible that as of July 1st
3  you believed that Penn State or somebody on Penn
4  State's behalf had placed an order for 16 seats?
5    A.  No.  Michael, let me say this.  This
6  paragraph --
7    Q.  The first paragraph?
8    A.  Yes, is so upside down it makes no
9  sense to me because Americhem, Penn State
10  University, Wyndham Hotel, none of it is accurate
11  and I am not responsible for this, I did not do
12  this.
13    Q.  Is it possible that you discussed any
14  potential deals concerning Penn State University
15  with Mr. Varughese or Mr. Nazon?
16    A.  Only the fact that I was talking to a
17  dealer in Pennsylvania who did business with Penn
18  State University who was going to buy 64 seats
19  and distribute them to his customers.  And then
20  he wanted free seats, and I refused to do it, it
21  took a while, and then I told him, no, that we
22  can't do business.
23        But I had never told Anil and Al that
24  this paragraph, paragraph number one of
25  Document 16, was true.

Page 73

Klein

1            Klein
2    Q.  Might you have told them that
3  somebody had placed an order to place at Penn
4  State?
5    A.  No, the order never came through.
6    Q.  So you would not have told them that
7  anybody placed an order, correct?
8    A.  Place -- they may place an order,
9  they might place an order, I'm waiting for an
10  order.
11    Q.  But you certainly would not have told
12  them that they had placed an order?
13    A.  I don't believe I did that.
14    Q.  Could you have told them, as you told
15  Mr. Schwartz in your email that:  "They have ten
16  salesmen and the owner gave me an opening order
17  for 64 seats and 256 bottles of cleaning
18  solution"?
19    A.  Yes, I may have said that.
20    Q.  Where would you get those numbers?
21    A.  Those were the numbers that the
22  dealer owner and I had discussed when we were
23  visiting.  That was going to be his opening
24  order.
25    Q.  Did you ever put anything on paper?

19  (Pages 70 to 73)

Page 74

Klein

1        Klein
2    A.  No.
3    Q.  Were those 64 seats and 256 bottles
4    of cleaning solution to be paid for at full
5    price, at some discount, given away for free or
6    something else?
7    A.  At the dealer price.  We had a dealer
8    price list which was less than the retail price
9    list.
10   Q.  But you never came to an agreement,
11   correct?
12   A.  We came to a verbal agreement, a
13   handshake, but he never placed the order so he
14   never became a dealer.
15   Q.  Getting back to the July 1, 2006
16   press release, do you see the reference to
17   Wyndham Hotels?
18   A.  Yes.
19   Q.  And you say that's false, correct?
20   A.  Yes, it's the same dealer.
21   Q.  The same dealer as the Penn State
22   dealer?
23   A.  Yes, he was doing business with Penn
24   State University, Wyndham Hotel chain, he was
25   doing business with a whole bunch of companies

Page 75

1        Klein
2    down there.
3    Q.  And at some point did you believe
4    that Wyndham Hotels placed an order for 16 seats?
5    A.  They didn't place it with me.  What
6    had happened was, during my day down there, we
7    had visited Wyndham Hotel.
8    Q.  Looking back at Exhibit 19, on what
9    is marked number two, do you see where it says:
10   "Yesterday I was in Harrisburg, PA, presenting
11   our product to the Wyndham Hotel.  They ordered
12   16 seats"?
13   A.  Yes.
14   Q.  Are you now telling me, sitting here
15   today, that it is false that they actually
16   ordered 16 seats?
17   A.  No, I'm not telling you that.  May I
18   explain?
19   Q.  Please.
20   A.  I went down to Pennsylvania to meet
21   with the dealer.  We spent the day or half of the
22   day going around to a few of his customers,
23   showing and demonstrating the seat.  One was the
24   Wyndham Hotel.  We walked in, we demonstrated the
25   seat to the general manager of the hotel and a

Page 76

1        Klein
2    couple of his assistants who were women.  They
3    loved it, and the dealer said:  How many do you
4    want?  And the guy from the Wyndham Hotel said:
5    When you get the seats, I'll take 16.
6        So Wyndham verbally placed the order
7    with the dealer, but the dealer never placed the
8    order with me because he never became a dealer
9    because, Michael, he became a Chaza.  I don't
10   know how to spell that.
11       He called me up and he said that he
12   wanted seats for free, and that that's the only
13   way he would do business with me, and I was
14   seriously considering doing it because, sure, I
15   wanted Wyndham Hotel and I wanted Penn State
16   University.  It would have given the company
17   tremendous credibility, but then I figured I
18   can't be giving all these dealers free seats.
19       So the order here, let me read number
20   three, please, and then I'll try and answer the
21   question again.
22       "While I was in Harrisburg, I met
23   with a janitorial dealer who does business with
24   Penn State University."  True.
25       "They have ten salesmen and the owner

Page 77

1        Klein
2    gave me an opening order of 64 seats and 256
3    bottles of cleaning solution."  That's a true
4    statement, but it was all verbal.
5        As far as number two is concerned,
6    "Yesterday I was in Harrisburg, Pennsylvania,
7    presenting our product at the Wyndham Hotel,"
8    that is true, I went with the dealer.
9        They, meaning the Wyndham Hotel,
10   ordered 16 seats.  I was there.  He told the
11   dealer when you get them, I'll take 16.  If
12   things go well they will make a recommendation to
13   corporate, which could lead to a national
14   contract.  That is what the guy from Wyndham told
15   me and the dealer down there, but the dealer
16   wanted free seats and I told him, no, and that
17   was the end of that.
18   Q.  Did you believe at the time you were
19   sending Exhibit 19 to Mr. Schwartz that he would
20   understand what you were writing to mean
21   something other than certain purchasers had
22   actually ordered seats from Clean Care?
23   A.  I don't know what Shelly, Dr.
24   Schwartz, thought or interpreted in my emails.
25       However, generally when I would send

Page 82

Klein

1   Klein
2   Exhibit 21. We have identified the EBK and SELMJ
3   emails, but I don't know that we've seen this
4   other one here. Brenar, is that Brena Resnick?
5      A.  Yes.
6      Q.  And is that an email account that Ms.
7   Resnick used in connection with her work at Clean
8   Care?
9      A.  I don't know. I've always known this
10  to be her personal email. I believe she had
11  something other than this, but I can't answer
12  that accurately.
13     Q.  Did she have an email at Clean Care,
14  something operated by the company?
15     A.  I think once we set up a website,
16  maybe it was info at Clean Care.com, but I don't
17  know if it was Brena.
18     Q.  When you say we set up a website, did
19  you set up a website?
20     A.  I did not set it up. The company
21  had -- I believe Brena sought out a company or an
22  individual who sets up websites.
23     Q.  Did you play any role in determining
24  what content would be put on the website?
25     A.  Other than pictures and photographs,

Page 83

Klein

1   Klein
2   again, and the content regarding the seat, the
3   solution, the marketing, yes, I had some input as
4   to the content.
5      Q.  Regarding the potential orders we
6   discussed before concerning Penn State and
7   Wyndham, is it possible that the companies that
8   wanted free seats from Clean Care believed that
9   you had planned to give them free seats, but you
10  later realized that the company could not afford
11  to do so?
12     A.  No.
13     Q.  Did you ever have any disagreements
14  with Dr. Schwartz as to whether or not the Clean
15  Care entities should provide free seats to any
16  vendors?
17     A.  Is your question, did I have
18  discussions with Dr. Schwartz about it?
19     Q.  My question is whether you had
20  disagreements with him about it?
21     A.  Yes.
22     Q.  Could you describe those
23  disagreements?
24     A.  At the very beginning Shelly
25  believed, because of the uniqueness of the

Page 84

Klein

1   Klein
2   product and that we were the only ones in the
3   United States that have it, that if people wanted
4   it they would pay for it.
5         As a matter of fact, Shelly felt we
6   could get five or $600 for this seat. But after
7   that, I convinced him that that may eventually
8   come to pass, but we need to get the product out
9   there and we need gain to visibility and exposure
10  in the marketplace, so it's going to be necessary
11  to put the seats out for free to those high
12  volume locations, like the airports and casinos,
13  and then when people called us for the product,
14  instead of us knocking on their door, then we can
15  restructure the pricing.
16     Q.  At what point did you convince Dr.
17  Schwartz, if you did convince him, that Clean
18  Care Systems' business model relied upon an
19  initial give away of seats?
20     A.  Dr. Schwartz was always open to the
21  idea, but he wanted a guarantee from the end
22  user, like the airports, that they would purchase
23  a certain amount of solution in a written
24  contract which would be guaranteed.
25        But the airport and casino type

Page 85

Klein

1   Klein
2   customer would say, Ed, this is a brand new
3   product, we have no idea how many bottles of
4   solution we are going to use, so we can't commit
5   to that type of contract. Why don't you put the
6   seats in for free, let's run them for six months
7   or a year and buy the solution as need be, and
8   then after a certain period of time we'll get a
9   better idea of how many bottles we're using, and
10  we can sit down and talk about a firm commitment.
11     Q.  So did you find it feasible to use
12  the business model that Dr. Schwartz hoped to
13  use?
14     A.  I'm sorry, could you repeat that
15  question, Michael?
16     Q.  Sure. You said earlier that in the
17  beginning Dr. Schwartz believed you could sell
18  the seats for full price and even at a premium,
19  correct?
20     A.  Yes, he did believe it.
21     Q.  And by at the beginning, did you mean
22  when you first discussed Dr. Schwartz' potential
23  investment with him?
24     A.  Yes, when I was up at his house in
25  Massachusetts and he was talking about putting up

Page 86

Klein

1    the three to $5 million to become my partner.
2    Q.  Did you explain to him that you
3    needed that three to five million because, at
4    least initially, Clean Care Systems would have to
5    take a loss on the seats themselves?
6    A.  Yes.
7    Q.  And did you explain to him that that
8    required a certain investment per year?
9    A.  Yes.
10   Q.  Was that investment more than
11   $1 million?
12   A.  Yes.
13   Q.  Did Dr. Schwartz commit to putting
14   that in?
15   A.  Yes.
16   Q.  And was it clear to you that if you
17   did not get the more than $1 million per year
18   from Schwartz, that the business model you had
19   created for Clean Care Systems was unlikely to
20   succeed?
21   A.  Dr. Schwartz had committed three to
22   five million.
23        Then he said, because I balked at the
24   number, he said if we need more than that, then

Page 87

Klein

1    we could always think about going out and
2    bringing in outside people.  But right now I
3    don't want any other investors, and you can count
4    on me for three to $5 million.  So I did not
5    think, Michael, that we would need more than
6    that.
7    Q.  My question is, whether you believed
8    you needed at least three to $5 million if your
9    business model was to succeed?
10   A.  At least, yes.
11   Q.  Did there come some time when it
12   became clear to you that Dr. Schwartz did not
13   intend to put in three to $5 million?
14   A.  When.
15   Q.  When was that?
16   A.  Almost at the very beginning.
17   Q.  Is that early 2006?
18   A.  Yes.
19   Q.  And when you realized that Dr.
20   Schwartz did not intend to put in at least three
21   to $5 million, did you develop a different
22   business plan?
23   A.  Yes.
24   Q.  Was it a business plan that could

Page 88

Klein

1    succeed with a more limited investment from Dr.
2    Schwartz?
3    A.  I'm sorry?
4    Q.  Was your new business plan one that
5    could succeed with a more limited investment from
6    Dr. Schwartz?
7    A.  With a more limited investment from
8    Dr. Schwartz?
9    Q.  More limited, less, fewer dollars?
10   A.  No.
11   Q.  So your new business plan still
12   required at least three to $5 million to work?
13   A.  Yes.
14   Q.  When you realized that Dr. Schwartz
15   did not intend to put in three to $5 million, did
16   you inform him that the company was unlikely to
17   succeed without a minimum of a three to
18   $5 million investment?
19   A.  Yes.
20   Q.  Did you inform any Clean Care
21   Technologies investors that Clean Care Systems
22   was likely or unlikely to succeed without
23   additional investment in Clean Care Systems?
24   A.  To the best of my knowledge now

Page 89

Klein

1    today, I understand that the investors in Clean
2    Care Technologies did not know about Clean Care
3    Systems.  So the answer to that question is, no,
4    the investors were never notified.
5    Q.  You never made any effort to notify
6    the investors in Clean Care Technologies of the
7    existence of Clean Care Systems, correct?
8    A.  Correct.
9    Q.  Did you ever make any effort to make
10   Dr. Schwartz aware of the existence of Clean Care
11   Technologies?
12   A.  No, not at that time.
13   Q.  At what time did you, if at all?
14   A.  When Dr. Schwartz stopped giving
15   money on a timely basis and/or was holding back
16   money, I had numerous conversations with him.
17   And I told him that if he's not going to honor
18   his commitment and/or can't do it for whatever
19   reason, then the company would fail unless we
20   went out and got outside investors.
21   Q.  Did you tell Dr. Schwartz that you
22   had already gone out and gotten outside
23   investors?
24   A.  No, I did not tell him about Clean

Page 90

```
 1            Klein
 2 Care Technologies.
 3     Q.  Did you tell Dr. Schwartz that some
 4 of the money that he was putting into Clean Care
 5 Systems was being used to cover expenses incurred
 6 by Clean Care Technologies?
 7     A.  No.
 8     Q.  Did you tell Dr. Schwartz that some
 9 percentage of the money he was investing in Clean
10 Care Systems was being granted to Mr. Nazon and
11 Mr. Varughese as compensation or commission?
12     A.  No.
13     Q.  Is it a fact that some percentage of
14 Dr. Schwartz' investments were being paid to
15 Mr. Varughese or Mr. Nazon?
16     A.  Yes.
17     Q.  Was it either or both?
18     A.  It was to that company Focus Market.
19     Q.  What percentage of Dr. Schwartz'
20 investment was put into Focus Market?
21     A.  10 percent.
22     Q.  Was it always 10 percent?
23     A.  Yes.
24     Q.  Did it become 15 percent when Messrs.
25 Varughese and Nazon changed their deal with you
```

Page 91

```
 1            Klein
 2 to get 15 percent of all investments?
 3     A.  No, it remained 10 percent.
 4     Q.  Did you ever compute how much of the
 5 remaining 90 percent of Dr. Schwartz' investment
 6 went to cover costs related to Clean Care
 7 Technologies?
 8     A.  No, I never computed that.
 9     Q.  Did you ever tell Mr. Nazon or Mr.
10 Varughese that Systems was unlikely to succeed or
11 continue to exist if you could not raise
12 additional funds for Systems?
13     A.  Yes.
14     Q.  When did you first tell them that?
15     A.  When Dr. Schwartz started to hold
16 back money and not send it in on a timely basis.
17     Q.  When was that?
18     A.  Probably the spring or the summer of
19 2006.
20     Q.  When was the first time Dr. Schwartz
21 gave you money?
22     A.  Probably two weeks -- again, I'm
23 guessing -- two or three weeks after I met with
24 him at his house in Massachusetts he sent me a
25 check.
```

Page 92

```
 1            Klein
 2     Q.  Which was when?
 3     A.  I don't know, but it's in there.
 4 It's soon after the initial meeting with Dr.
 5 Schwartz at his house.
 6     Q.  Winter 2005, 2006?
 7     A.  I would say so, yes.
 8     Q.  So within three or four or maybe
 9 five months of Dr. Schwartz' initial investment,
10 you began to have problems collecting money that
11 Dr. Schwartz had promised to Systems; is that
12 correct?
13     A.  Yes, maybe sooner than that.
14     Q.  But not later?
15     A.  It could be.  Again, my time frame
16 with this is -- I don't remember.
17     Q.  But by summer of 2006, by the time,
18 for example, that you were discussing with him
19 the Penn State and Wyndham potential investments,
20 there was already a problem with Dr. Schwartz?
21     A.  Yes.
22     Q.  I want you to turn to Page 2 of
23 Exhibit 21, and it's what looks like an email
24 from you; is that correct?
25     A.  Yes.
```

Page 93

```
 1            Klein
 2     Q.  To Dr. Schwartz, copying Brena
 3 Resnick; is that correct?
 4     A.  Yes.
 5     Q.  Dated July 13th?
 6     A.  Yes.
 7     Q.  Take as much time as you need to read
 8 the document. I want to call your attention to
 9 number five which reads:  I beg you to allow me
10 to bring in other investors, but you refused.
11 You also refused to put anything in writing
12 regarding your financial commitment to the
13 company.  You wanted to "wait".  Do you recall
14 writing those words to Dr. Schwartz?
15     A.  Yes.
16     Q.  Did you, in fact, beg him to allow
17 you to bring in other investors?
18     A.  Yes.
19     Q.  And those were investors into Clean
20 Care Systems or Technologies or just generally?
21     A.  Generally.
22     Q.  And at all times did Dr. Schwartz
23 refuse?
24     A.  Yes.
25     Q.  And is it your testimony that you
```

Klein

1
2     A.  Yes.
3     Q.  And at that point did you enter into
4  any agreements involving Clean Care Technologies?
5     A.  Nothing written.
6     Q.  And you had full decision making
7  authority at Clean Care Technologies, correct?
8     A.  Yes.
9     Q.  So when you say they paid us in
10  advance, you mean that you decided that Clean
11  Care Technologies would pay Systems in advance,
12  correct?
13     A.  What paragraph are you referring to?
14     Q.  Number one.
15     A.  Give me a minute to read the whole
16  paragraph.
17     Q.  Sure.
18        (Reading aloud.)
19     Q.  So you've had a chance to read
20  paragraph one?
21     A.  Yes, I did.
22     Q.  When you referred to, WE made our
23  money up front, there you meant you and --
24     A.  Shelly and Clean Care Systems.
25     Q.  When you say the dealer would take

Klein

1
2  the loss, you mean you and the Clean Care
3  Technologies investors?
4     A.  Yes.  On the other hand, if Newark
5  airport did keep the seats and everything went as
6  planned, then it would be Clean Care Technologies
7  making the windfall out at Newark airport, not
8  Clean Care Systems.
9     Q.  So you wanted to set up a system
10  where you and Dr. Schwartz would make the
11  windfall if things went well, instead you changed
12  the risk that you and the Technologies investors
13  would stand to gain?
14     A.  I wasn't sure what I wanted to do to
15  begin with.  I was just excited and happy that we
16  had the opportunity to go in and make the
17  presentation to Newark airport.
18        When Newark airport finally agreed to
19  put the seats in on a trial, I spoke to Shelly
20  about it.  He was happy.  When he found out the
21  deal required free seats and the risk that they
22  would give us the seats back after the trial
23  period, he didn't want to do the deal and he
24  said, why don't you go find a dealer, and that's
25  what I did.

Klein

1
2        I was thinking actually, Michael, to
3  farm it out to a janitorial dealer, but I looked
4  at the lucrativeness of Newark airport and I gave
5  it to Clean Care Technologies.
6     Q.  And Clean Care Technologies purchased
7  their seats from Systems?
8     A.  Yes.
9     Q.  They did so at $200 a seat?
10     A.  Yes, in this instance.
11     Q.  And in coming to that agreement to
12  purchase a certain amount of seats and solution
13  for a certain price, you were the one making the
14  decision for Clean Care Technologies, right?
15     A.  Yes.
16     Q.  And you were the one making the
17  decision for Clean Care Systems, correct?
18     A.  Well, not a hundred percent because
19  Shelly said, I don't want that deal, go find a
20  dealer.  So he made a decision not to have that
21  deal.
22        So the answer is, yes.  After Shelly
23  told me, no, it's too risky, which it really
24  wasn't, I said, okay.
25     Q.  So you negotiated a deal between

Klein

1
2  Systems and Technologies where you were
3  representing both sides?
4     A.  Yes.
5     Q.  Did Systems make a profit off the
6  seats it sold to Technologies?
7     A.  Yes, maybe $20.
8     Q.  And if Newark continued to buy
9  solution, would they buy that solution from
10  Technologies or from Systems?
11     A.  From Technologies.
12     Q.  Where would Technologies get that
13  solution?
14     A.  Buying it from Systems.
15     Q.  They would buy it from Systems for
16  some price above what Systems purchased it for,
17  correct?
18     A.  Correct.
19     Q.  So this Newark deal allowed Dr.
20  Schwartz to have no risk, but profit potential on
21  both the seats and the solution, correct?
22     A.  Yes, a minimal profit.  Technologies
23  was going to make most of the money.
24     Q.  Up front, Technologies provided
25  400 bottles of solution, correct?

Page 102

Klein

1        Klein
2    A.   Technologies purchased 400 bottles of
3  solution from Systems.
4    Q.   In a place like Newark airport, how
5  much fluid did you expect each seat to go through
6  in a year?
7    A.   Well, on average, when we spoke about
8  averages, in an average location like an office
9  or a restaurant, something like that, Roelef
10  Remjin had given me a figure of 1.5, one and a
11  half bottles per month, times 12 months is 18
12  bottles per year.
13        However, he qualified that.  He said
14  at an airport, a casino, a hotel, a convention
15  center, a building like this perhaps the 18
16  bottles per year is not indicative.  It could be
17  a hundred bottles a year or 200 bottles a year.
18        I had no idea exactly how much
19  solution Newark airport would go through because
20  Newark airport really couldn't give me the figure
21  of how much traffic they had at that particular
22  terminal and how much of that traffic actually
23  goes in and uses the bathroom.  But I am a Newark
24  airport traveler, and I know it is a very, very,
25  very busy airport.  So there was no way it was

Page 103

Klein

1        Klein
2  just going to do 18 bottles.  We were projecting
3  anywhere from 50, 60 bottles, maybe a hundred
4  bottles per year.
5    Q.   Per toilet?
6    A.   Per toilet, yes.
7    Q.   And you were putting a hundred
8  toilets in Newark, correct?
9    A.   They had said that they would try a
10  hundred.  I do not know what they tried because,
11  again, it was soon after that or about that time
12  that Dr. Schwartz sued me and kind of eliminated
13  me from the company.
14    Q.   But when you went out to find Clean
15  Care Technologies as a dealer, to find them --
16    A.   Appoint them.
17    Q.   -- appoint them, you had the
18  expectation that whether through Technologies
19  directly or indirectly, Newark was prepared to
20  take 100 seats for free?
21    A.   Yes.
22    Q.   And that those seats could each go
23  through up to 100 bottles per year?
24    A.   Yes.
25    Q.   And my quick math would say that that

Page 104

Klein

1        Klein
2  would mean about 10,000 bottles of fluid per
3  year?
4    A.   If the numbers pan out, yes, that
5  would be the case.
6    Q.   And what was the markup Systems was
7  charging Clean Care for the fluid?
8    A.   I believe Clean Care Systems was
9  paying NTF $12 a bottle.
10    Q.   And here in the email you talk about
11  a purchase by Clean Care Technologies of $18 per
12  bottle?
13    A.   Right, so Systems made $6 per bottle
14  from Clean Care Technologies.  Then Clean Care
15  Technologies would turn around and sell it to
16  Newark airport for $45 a bottle.
17    Q.   So on the assumptions you just laid
18  out, Clean Care Systems could make $60,000, $6
19  times 10,000 bottles of fluid per year, just for
20  Newark airport, correct?
21    A.   Systems?
22    Q.   Systems, $6, the 12 to $18 markup --
23    A.   Yes.
24    Q.   On 10,000 bottles of fluid, Systems
25  had the potential to make $60,000 risk free for

Page 105

Klein

1        Klein
2  the fluid sold to Newark airport, correct?
3    A.   Yes, and that is what Shelly
4  preferred.  However, the bigger money was going
5  to be made by Technologies, the spread between
6  $18 and $45.
7    Q.   Did you ever consider letting
8  Technologies buy the fluid for $12 directly from
9  Europe or NTF?
10    A.   No, I never considered that because
11  the way I understood the offering statement to be
12  set up, again, is that Clean Care Technologies
13  was a dealer for Clean Care Systems.
14    Q.   I understand what you understood the
15  dealership agreement to be perhaps.  My question
16  is different.  Whatever Clean Care Technologies
17  was, I presumed that you understood that the
18  investors in Clean Care Technologies would have
19  preferred to make more money per bottle than less
20  money per bottle, correct?
21    A.   Yes.
22    Q.   And if they purchased the bottles at
23  $12 a bottle, whatever they sold the bottles for,
24  they would make more money per bottle than if
25  they purchased the bottles at $18 per bottle,

Klein

1           Klein
2   correct?
3       A.  Yes, in this case they would make an
4   additional $6 per bottle.
5       Q.  And you decided that Clean Care
6   Technologies would buy the bottles for 18 rather
7   than 12, correct?
8       A.  Yes.
9       Q.  And you decided that in order to cut
10  Dr. Schwartz in on some of the profit, correct?
11      A.  Yes.
12      Q.  And you stood to gain from Clean Care
13  Systems profits as well, correct, you owned a
14  percentage in Clean Care Systems?
15      A.  Yes, and it was Clean Care Systems
16  that had the contract with NTF, not Clean Care
17  Technologies.
18      Q.  So without a functioning Clean Care
19  Systems, Clean Care Technologies had no rights to
20  purchase the toilets or fluid whatsoever,
21  correct?
22      A.  From NTF.
23      Q.  From anywhere?
24      A.  Yes, Clean Care Technologies was a
25  dealer for Clean Care Systems.

1           Klein
2       Q.  So let me just make sure I understood
3   correctly, the only way Clean Care Technologies
4   could get their hands on any seats or fluid was
5   to do so through Systems?
6       A.  Yes.
7       Q.  And if Systems failed, there was no
8   agreement or out of the contract that allowed
9   Technologies to buy directly from Clean Care
10  Europe or NTF or anything like that; is that
11  correct?
12      A.  No, that's not correct.
13      Q.  There was some out in the contract?
14      A.  Well, in the contract there was not
15  an out.
16          But Roelef Remjin was aware early on
17  that I was having trouble with what he called My
18  Doctor.  Roelef knew that I had a doctor who was
19  funding Clean Care Systems.  And when I told
20  Roelef that I could not take delivery and make
21  payments on the seats as per the agreement with
22  NTF, that I needed more time, it had to be spread
23  out a little bit longer, Roelef said why, and I
24  said because the doctor in Massachusetts is not
25  honoring his agreement and I have a problem.

1           Klein
2           And it became worse and worse, and
3   then Roelef had said, well, if the doctor or if
4   you don't do business with the doctor anymore or
5   he can't continue to fund this, perhaps we would
6   work out another arrangement.
7       Q.  So you thought there was the
8   potential for Clean Care Technologies to purchase
9   straight from NTF?
10      A.  By the potential you mean?
11      Q.  You've told me that you decided on
12  behalf of Clean Care Technologies that you would
13  purchase the fluid and the seats from Systems,
14  correct?
15      A.  Yes, because Systems had the
16  agreement at the time with NTF.
17      Q.  Now, you're also telling me, if I
18  understand you correctly, that if Systems failed
19  you weren't concerned because Technologies could
20  just purchase straight from Roelef Remjin's
21  company?
22      A.  Yes, that is what Roelef had told me,
23  don't worry.
24      Q.  Did you think Clean Care Technologies
25  would be better off buying directly from NTF than

1           Klein
2   through Systems?
3       A.  I didn't think at all whether they
4   would be better off.  They would be paying $6 a
5   bottle less.
6       Q.  You've run businesses in the past,
7   correct?
8       A.  Yes, I have.
9       Q.  When you have a choice to buy your
10  inventory for cheaper or for more money, you
11  would always try to buy it cheaper, correct?
12      A.  Yes, that's correct.
13      Q.  So if you were trying to maximum
14  profits for Clean Care Technologies, you would
15  never buy it for 18 if you had the option to buy
16  for 12, correct?
17      A.  Yes, that is correct, except for the
18  fact that one of the things that Shelly used to
19  tell me is that the $12 per bottle that Systems
20  was buying from Roelef Remjin or NTF was not
21  really 12 a bottle because, Ed, we have to pay
22  import fees, we have to pay freight fees, we have
23  to pay import taxes, tariffs.  So he said, you're
24  just looking at looking at $12 a bottle, but when
25  you really add it up, you should add like another

Page 114

Klein

1 Schwartz the amount of profit Systems would make
2 by selling to Technologies?
3 A. No, Dr. Schwartz did not know about
4 Technologies per se, but we did discuss always
5 how much profit Systems would make if we sold to
6 janitorial supply dealers and restaurant supply
7 dealers of that sort.
8 Q. So the same question, without
9 identifying Technologies specifically, did you
10 discuss with Dr. Schwartz how much Systems stood
11 to gain per bottle of sales, of fluid sales, for
12 the potential Newark deal?
13 A. I probably said if I found a dealer
14 to take the deal we could probably make maybe $10
15 a bottle.
16 Q. And then you did find a dealer,
17 correct?
18 A. Yes.
19 Q. And that was Technologies?
20 A. Technologies.
21 Q. Is it your understanding that you did
22 end up making $10 a bottle?
23 A. No, based on the numbers we could
24 have, I would have to look, Michael. At the time

Page 115

Klein

1 we bought this particular batch of solution, and
2 please understand we're dealing in euros and as,
3 we know now what's happening with the euros,
4 Roelef was charging us in euros and we had to
5 convert the money, and when we first started or
6 entered into our contract with NTF the euro was
7 at 1.12, it's now 1.65.
8 Q. So when you said $10, do you mean $10
9 in some way tied to euros or did you mean $10
10 American dollars?
11 A. I believe at the time, July 13, 2007,
12 we were probably paying closer to $8 than 12, but
13 then the euro went way up. So I don't know where
14 those bottles, which inventory that was taken
15 from.
16 Q. How many bottles did Clean Care
17 Technologies ultimately place in Newark, how many
18 toilets?
19 A. I don't know. The deal, again, it
20 all consummated about the same time that Dr.
21 Schwartz changed the locks on the building. I
22 was not involved, I was not with the company when
23 those seats were installed.
24 Q. When you were with the company, did

Page 116

Klein

1 either entity install one seat in Newark?
2 A. Yes.
3 Q. How many seats?
4 A. I think three.
5 Q. I want to get back to talking about
6 your first dealings with Mr. Varughese and Mr.
7 Nazon. When, in or around the end of 2005, you
8 came to some arrangement with them regarding how
9 they would raise money for Clean Care
10 Technologies, did you know anything about their
11 prior employment history other than their
12 relationship to Paul Schmidt and his company?
13 A. No.
14 Q. Did you do any investigation into
15 whether they had ever been found to have violated
16 any laws relating to the securities industry?
17 A. No.
18 Q. Did you any do any background check
19 on them?
20 A. No.
21 Q. Did you call any references?
22 A. No.
23 Q. Did you ask them for any proof of
24 money they had raised for other companies?

Page 117

Klein

1 A. No.
2 Q. Other than the fact that they had
3 worked for Mr. Schmidt, did you know anything
4 about them at all?
5 A. No.
6 Q. And the company that they worked for
7 with Mr. Schmidt was AFC, correct?
8 A. Yes.
9 Q. When you hired or came to terms with
10 Mr. Nazon and Mr. Varughese, was it your
11 understanding that AFC had ceased to exist?
12 A. I had no understanding because I was
13 not involved in their relationship or dealings
14 with Paul Schmidt, so I didn't think where Paul
15 Schmidt or his company was at the time.
16 Q. Did you know that they could no
17 longer locate Paul Schmidt?
18 A. Yes.
19 Q. Did you know that they had investors
20 that they had brought to Paul Schmidt that they
21 now wanted to give shares of Clean Care
22 Technologies to?
23 A. Yes.
24 Q. Did you agree with them that those

Page 118

```
1            Klein
2  investors could get some portion of Clean Care
3  Technologies?
4       A.  The answer is, yes, that was their
5  deal to me.  If I would allow the Paul Schmidt
6  investors to have free shares in Clean Care
7  Technologies, if I would permit that, then they
8  would raise money.  If I would not allow that,
9  then they would not raise money.
10      Q.  Do you have any understanding as to
11 who would pay for those shares?
12      A.  No.
13      Q.  When you first met with
14 Mr. Varughese, did he introduce himself to you as
15 Anil Varughese?
16      A.  Yes.
17      Q.  And Mr. Nazon introduced himself to
18 you as Al Nazon?
19      A.  Yes.
20      Q.  Were you aware that they had, when
21 working with Mr. Schmidt, used assumed names?
22      A.  Not at that time.
23      Q.  When did you became aware of this?
24      A.  When I was on one of my business
25 trips and they had asked me would I mind meeting
```

Page 119

```
1            Klein
2  with one of the investors to show him the seat,
3  and I said that I would, they said that that
4  particular investor knows him as Robert Clark.
5       Q.  Did you ever learn that either
6  Mr. Varughese or Mr. Nazon used the name Robert
7  Clark in connection with their work in finding
8  investigators for Clean Care Technologies?
9       A.  I don't recall that, no.  Oh, I'm
10 sorry, with Clean Care Technologies?
11      Q.  Yes.
12      A.  Yes.
13      Q.  When did you learn that they were
14 using that name -- I'm sorry.  When you say you
15 learned that Mr. Varughese and Mr. Nazon had used
16 the name Robert Clark, that was at one of your
17 conventions or trips?
18      A.  I don't recall when it was, but when
19 I found out I asked why they did that, and they
20 said in their industry it's common that salesmen
21 use different names.  I think Anil said he used
22 it because of the ethnic Varughese, he said
23 Robert Clark is more American.
24      Q.  I want to refer you back to
25 Exhibit 18, and you see a letter on the top To
```

Page 120

```
1            Klein
2  Whom it May Concern?
3       A.  Yes.
4       Q.  Is that your name on the signature
5  block down below?
6       A.  Yes.
7       Q.  Is that your signature?
8       A.  Yes.
9       Q.  Do you recall signing this letter?
10      A.  It's my signature, yes.
11      Q.  Is this the kind of letter that you
12 would send out to investors?
13      A.  I signed it, Michael, I don't believe
14 it was sent from our office.  I believe it was
15 sent from the marketing -- Market Four office.
16      Q.  Focus Four?
17      A.  Yes.
18      Q.  So Mr. Varughese and Mr. Nazon would
19 put this in front of you and ask you to sign it?
20      A.  Yes.
21      Q.  Do you remember which one?
22      A.  Anil, Mr. Varughese.
23      Q.  From time to time, would both of them
24 ask you to sign documents?
25      A.  They would both come down and visit
```

Page 121

```
1            Klein
2  me periodically, but it was usually Mr. Varughese
3  who said you need to sign this or you need to
4  sign that.
5       Q.  Did you understand that you were
6  signing a letter that was going to be sent out to
7  an investor or potential investors?
8       A.  Sometimes I did, and sometimes I
9  didn't really know what I was signing.
10      Q.  When you didn't understand what you
11 were signing, did you ask?
12      A.  Sometimes I did, and regretfully
13 sometimes I didn't.  Can I take a minute and read
14 this?
15      Q.  Sure, take as long as you need.
16      A.  Okay, I read it.
17      Q.  Shifting gears, we had sent you a
18 subpoena, pursuant to which you're testifying
19 here today, and also asked for certain documents.
20 Did you have time to review the list of documents
21 that the subpoena called for?
22      A.  Yes.
23      Q.  Did you search for documents
24 responsive to those requests?
25      A.  Yes.
```

Valerie A. Szczepanik
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
3 World Financial Center – RM 400
New York, NY 10281-1022
Ph: (212) 336-0175
Fx: (212) 336-1317
szczepanikv@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**      :

                           **Plaintiff,**      :

                                         :

   **-against-**      :

                                         :

**CLEAN CARE TECHNOLOGIES, INC.,**      :
**EDWARD KLEIN, AL NAZON and**      :      **08 Civ. 1719 (HB)**
**ANIL VARUGHESE,**      :      **ECF CASE**

                                    :

                   **Defendants,**   :

                                        :

            **and**      :

                                         :

**CLEAN CARE SYSTEMS, LLC,**      :

                                         :

                   **Relief Defendant.**   :
-------------------------------------------------------------------x

## STATEMENT OF DAMAGES

I, Teresa A. Rodriguez, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

      1.      I am employed as an attorney in the New York Regional Office of plaintiff

Securities and Exchange Commission (the "Commission").

      2.      I respectfully submit this Statement of Damages in support of Plaintiff's

Motion for Default Judgment as to Defendant Clean Care Technologies, Inc. ("CCT"),

filed concurrently herewith.

3.    I am familiar with the facts and proceedings in this action and the allegations in the Commission's Complaint (the "Complaint"). I make this declaration based upon information and belief. The sources of my information and the bases of my beliefs are documents and records obtained by me or other members of the Commission staff (the "staff"). The documents that I reviewed include the following: documents obtained by the staff during the course of its investigation preceding the institution of this case and during discovery in this case; the docket maintained by the Court in this matter; and prior pleadings.

4.    As set forth in greater detail in the Complaint and in the Plaintiff's Motion for Default Judgment, the Commission seeks disgorgement of all funds Defendants raised as a result of their fraudulent offering of Clean Care Systems ("Systems") and CCT securities to the public. The offering of securities involving these two entities should be treated as one offering because both companies were under the Defendants' common control and money raised through the sale of securities in the two companies were commingled to benefit the Defendants. (See Compl. ¶¶ 1, 2, 33.)

5.    As alleged in the Complaint, Systems' sole investor was Dr. Sheldon Schwartz. Defendants have provided the staff with Systems' General Ledger, Balance Sheet Detail and Trial Balance as of July 16, 2007. I have reviewed these records and they reflect that Dr. Schwartz invested a total of $1,216,475.75. Attached as Exhibit 1 to this Declaration, is a copy of specific pages of Systems' General Ledger, Balance Sheet Detail and Trial Balance that reflect Dr. Schwartz' total investment as of July 16, 2007.

6.    As alleged in the Complaint, Defendants raised approximaetly $717,000 from at least 26 investors through the sale of CCT securities. Defendants provided the

2

staff with a list of CCT investors ("CCT's investor list"), which purports to indicate the amount that each investor contributed to CCT. CCT's then-counsel amended CCT's investor list by handwritten notation and re-submitted the list to the staff. The amended CCT investor list is attached to this Declaration as Exhibit 2, and reflects that Defendants raised $716,927 through investors in CCT.

7.      As reflected in Systems' and CCT's own business records, maintained by and submitted by Defendants, Defendants raised $1,933,403.75 through their offer and sale of Systems and CCT securities. (See Ex. 1 and 2.)

8.      The Commission also seeks prejudgment interest on Defendants' ill-gotten gains. Attached as Exhibit 3, is the staff's calculation of prejudgment interest at the IRS underpayment rate. For Dr. Schwartz's investment of $1,216,475.75, the staff calculated interest from August 2007, the month following Dr. Schwartz's last investment as reflected on Systems' records, through May 2008. For the CCT investor's investments of $716,927, the staff calculated interest from May 2007, the month following the investors' last investment as reflected on CCT's records, through May 2008. The total prejudgment interest sought is $125,255.48.

3

9.    The Commission seeks disgorgement of $1,933,403.75, representing ill-gotten gains, and  $125,255.48, representing prejudgment interest thereon, for a total of $2,058,659.23 .

I state under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
     June 10, 2008

_____
Teresa A. Rodriguez

4

# EXHIBIT 1

**Clean Care Systems**
# General Ledger
### As of July 16, 2007

07/16/07

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|------|------|-----|------|------|-------|--------|---------|
| Check | 4/2/2007 | | Embassy Suites | | Hotel | -1,454.81 | 6,513.19 |
| Check | 4/2/2007 | | Continental | | Airline Tra... | -339.40 | 6,173.79 |
| Check | 4/2/2007 | | Continental | | Airline Tra... | -339.40 | 5,834.39 |
| Check | 4/2/2007 | | Continental | | Airline Tra... | -119.40 | 5,714.99 |
| Check | 4/2/2007 | | Continental | | Airline Tra... | -119.40 | 5,595.59 |
| Check | 4/2/2007 | | Continental | | Airline Tra... | -79.40 | 5,516.19 |
| Check | 4/2/2007 | | Continental | | Airline Tra... | -79.40 | 5,436.79 |
| Check | 4/2/2007 | | Continental | | Airline Tra... | -79.40 | 5,357.39 |
| Check | 4/2/2007 | | Continental | | Airline Tra... | -79.40 | 5,277.99 |
| Check | 4/2/2007 | | Embassy Suites | | Hotel | -1,120.32 | 4,157.67 |
| Check | 4/5/2007 | | Bank of America | | Bank Servi... | -105.00 | 4,052.67 |
| Check | 4/5/2007 | | Freeman Tran... | | Postage a | -1,586.53 | 2,466.14 |
| Check | 4/8/2007 | | Gulf | | Gas | -47.01 | 2,419.13 |
| Check | 4/8/2007 | | Emporium | | Gas | -30.25 | 2,388.88 |
| Check | 4/8/2007 | | Compusystems | | Trade Sho... | -430.00 | 1,958.88 |
| Check | 4/8/2007 | | Raceway | | Gas | -48.68 | 1,910.20 |
| Check | 4/8/2007 | | USPS | | Postage a... | -9.64 | 1,900.56 |
| Check | 4/8/2007 | | Continental | | Airline Tra... | -440.00 | 1,460.56 |
| Check | 4/8/2007 | | QW Express | | Postage a... | -734.17 | 726.39 |
| Deposit | 4/10/2007 | | Lowes | | Repairs an... | 4.24 | 730.63 |
| Check | 5/5/2007 | | Mohegan Sun | | Hotel | -211.68 | 518.95 |
| Check | 5/5/2007 | | Budget Rent-A... | | Travel | -228.83 | 290.12 |
| Check | 5/5/2007 | | Hilton Hotels | | Travel & E... | -45.27 | 244.85 |
| Transfer | 7/16/2007 | | | Funds Tra... | Bank Of A... | 5,000.00 | 5,244.85 |

**Total Bank of America T & E**                                                     1,495.06      5,244.85

**Accounts Receivable**                                                                           0.00

| Payment | 1/25/2007 | 176 | Clean Care Te... | | Bank Of A... | -81,000.00 | -81,000.00 |
| Invoice | 1/27/2007 | 23 | Clean Care Te... | | -SPLIT- | 81,000.00 | 0.00 |
| Payment | 2/5/2007 | | Clean Care Te... | | Bank of A... | -6,000.00 | -6,000.00 |
| Invoice | 2/7/2007 | 24 | Clean Care Te... | | -SPLIT- | 13,000.00 | 7,000.00 |
| Payment | 2/7/2007 | | Clean Care Te... | | Bank Of A... | -13,000.00 | -6,000.00 |
| Invoice | 2/15/2007 | 25 | Clean Care Te... | | -SPLIT- | 3,000.00 | -3,000.00 |
| Invoice | 2/15/2007 | 26 | Clean Care Te... | | -SPLIT- | 3,000.00 | 0.00 |
| Invoice | 7/5/2007 | 27 | Clean Care Te... | | -SPLIT- | 29,376.00 | 29,376.00 |
| Payment | 7/5/2007 | | Clean Care Te... | | Bank Of A... | -29,376.00 | 0.00 |

**Total Accounts Receivable**                                                          0.00         0.00

**Undeposited Funds**                                                                             0.00

**Total Undeposited Funds**                                                                       0.00

**Payroll Liabilities**                                                                           0.00

**Total Payroll Liabilities**                                                                     0.00

**Shelly**                                                                                  -561,265.75

| Deposit | 1/5/2007 | | Shelly Schwartz | Deposit ... | Bank Of A... | -30,000.00 | -591,265.75 |
| Deposit | 2/2/2007 | | Shelly Schwartz | Deposit C... | Bank Of A... | -171,210.00 | -762,475.75 |
| Deposit | 2/27/2007 | | Shelly Schwartz | Deposit C... | Bank Of A... | -60,000.00 | -822,475.75 |
| Deposit | 4/2/2007 | | Shelly Schwartz | | Bank Of A... | -50,000.00 | -872,475.75 |
| Deposit | 5/10/2007 | | Shelly Schwartz | | Bank Of A... | -70,000.00 | -942,475.75 |
| Deposit | 5/16/2007 | | Shelly Schwartz | from Sove... | Bank Of A... | -50,000.00 | -992,475.75 |
| Deposit | 5/18/2007 | | Shelly Schwartz | | Bank Of A... | -100,000.00 | -1,092,475.75 |
| Deposit | 6/8/2007 | | Shelly Schwartz | Deposit | Bank Of A... | -62,000.00 | -1,154,475.75 |
| Deposit | 7/12/2007 | | Shelly Schwartz | Deposit | Bank Of A... | -62,000.00 | -1,216,475.75 |

**Total Shelly**                                                                 -655,210.00   -1,216,475.75

**Opening Bal Equity**                                                                            0.00

**Total Opening Bal Equity**                                                                      0.00

**Retained Earnings**                                                                        471,478.60

**Total Retained Earnings**                                                                  471,478.60

# Clean Care Systems
# Balance Sheet Detail
### As of July 16, 2007

07/16/07

| Type | Date | Name | Memo | Split | Amount | Balance |
|------|------|------|------|-------|--------|---------|
| **Other Current Assets** | | | | | | |
| **Undeposited Funds** | | | | | | 0.00 |
| | | | | | | 0.00 |
| Total Undeposited Funds | | | | | | 0.00 |
| Total Other Current Assets | | | | | | 0.00 |
| Total Current Assets | | | | | -13,923.20 | 75,863.95 |
| **Fixed Assets** | | | | | | 0.00 |
| Total Fixed Assets | | | | | | 0.00 |
| **Other Assets** | | | | | | 0.00 |
| Total Other Assets | | | | | | 0.00 |
| **TOTAL ASSETS** | | | | | **-13,923.20** | **75,863.95** |
| **LIABILITIES & EQUITY** | | | | | | 89,787.15 |
| **Liabilities** | | | | | | 561,265.75 |
| **Current Liabilities** | | | | | | 0.00 |
| **Accounts Payable** | | | | | | 0.00 |
| Total Accounts Payable | | | | | | 0.00 |
| **Credit Cards** | | | | | | 0.00 |
| Total Credit Cards | | | | | | 0.00 |
| **Other Current Liabilities** | | | | | | 0.00 |
| **Payroll Liabilities** | | | | | | 0.00 |
| Total Payroll Liabilities | | | | | | 0.00 |
| Total Other Current Liabilities | | | | | | 0.00 |
| Total Current Liabilities | | | | | | 0.00 |
| **Long Term Liabilities** | | | | | | 561,265.75 |
| **Shelly** | | | | | | 561,265.75 |
| Deposit | 1/5/2007 | Shelly Schwartz | Deposit C... | Bank Of A... | 30,000.00 | 591,265.75 |
| Deposit | 2/2/2007 | Shelly Schwartz | Deposit Ch... | Bank Of A... | 171,210.00 | 762,475.75 |
| Deposit | 2/27/2007 | Shelly Schwartz | Deposit Ch... | Bank Of A... | 60,000.00 | 822,475.75 |
| Deposit | 4/2/2007 | Shelly Schwartz | | Bank Of A... | 50,000.00 | 872,475.75 |
| Deposit | 5/10/2007 | Shelly Schwartz | | Bank Of A... | 70,000.00 | 942,475.75 |
| Deposit | 5/16/2007 | Shelly Schwartz | from Sover... | Bank Of A... | 50,000.00 | 992,475.75 |
| Deposit | 5/18/2007 | Shelly Schwartz | | Bank Of A... | 100,000.00 | 1,092,475.75 |
| Deposit | 6/8/2007 | Shelly Schwartz | Deposit | Bank Of A... | 62,000.00 | 1,154,475.75 |
| Deposit | 7/12/2007 | Shelly Schwartz | Deposit | Bank Of A... | 62,000.00 | 1,216,475.75 |
| Total Shelly | | | | | 655,210.00 | 1,216,475.75 |
| Total Long Term Liabilities | | | | | 655,210.00 | 1,216,475.75 |
| Total Liabilities | | | | | 655,210.00 | 1,216,475.75 |
| **Equity** | | | | | | -471,478.60 |
| **Opening Bal Equity** | | | | | | 0.00 |
| Total Opening Bal Equity | | | | | | 0.00 |
| **Retained Earnings** | | | | | | -471,478.60 |
| Total Retained Earnings | | | | | | -471,478.60 |

# Clean Care Systems
# Trial Balance
### As of July 16, 2007

07/16/07

|  | Jul 16, 07 | |
| --- | --- | --- |
|  | **Debit** | **Credit** |
| Bank Of America | 70,619.10 | |
| Bank of America T & E | 5,244.85 | |
| Accounts Receivable | 0.00 | |
| Shelly | | 1216475.75 |
| Retained Earnings | 471,478.60 | |
| Sales Income | | 132,376.00 |
| Goods Purchases (Cost of Goods) | 399,571.61 | |
| Bank Service Charges | 926.40 | |
| Car/Truck Expense | 4,253.62 | |
| Car/Truck Expense:Gas | 2,318.77 | |
| Car/Truck Expense:Repairs & Maintena... | 195.51 | |
| Conferences and Seminars | 11,345.96 | |
| Garbage | 77.04 | |
| Insurance | 20,757.22 | |
| Insurance:Auto Insurance | | 118.00 |
| Marketing Expense | 59,217.42 | |
| miscellaneous | 1,977.42 | |
| Office Equipment | 2,612.03 | |
| Office Supplies | 2,959.80 | |
| Payroll | 79,878.42 | |
| Postage and Shipping | 9,121.71 | |
| Printing and Reproduction | 28,963.49 | |
| Professional Fees:Accounting Fees | 2,350.00 | |
| Promotional Expense | 2,800.00 | |
| Rent | 15,909.08 | |
| Repairs and Maintenance | 6,947.90 | |
| Shipping | 3,503.89 | |
| Tax | 15,071.37 | |
| Telephone and Fax | 4,490.54 | |
| Trade Shows | 45,232.04 | |
| Travel & Entertainment | 11,066.90 | |
| Travel & Entertainment:Airline Travel | 20,050.69 | |
| Travel & Entertainment:Entertainment | 848.53 | |
| Travel & Entertainment:Hotel | 24,304.60 | |
| Travel & Entertainment:Meals | 3,769.17 | |
| Travel & Entertainment:Travel | 22,403.22 | |
| Other Income | | 4,297.15 |
| Loan | 3,000.00 | |
| **TOTAL** | **1,353,266.90** | **1,353,266.90** |

# EXHIBIT 2

CLEAR CARE TECHNOLOGIES Investors

Byron Violett – 12,000    ( plus $60,000.)  $72,000.  TOTAL
1727 Pine Avenue, Apt. #4
Long Beach, CA 90813-1843
(562) 591-1925

Paul Robinson – 10,000
N3031CTHFA
La Crosse, WI 54601
(608) 784-5151

Thomas Wencl – 2,500
1122 South Oak Avenue
Owatonna, MN 55060
(507) 451-3399

George Reid – ~~99,000~~  $98,500.
2073 Perrin Drive
Lawrenceville, GA 30043
(770) 339-0851

Dean Miles – 19,975
18021 Sky Park Circle, Suite J
Ervin, CA 92614
(949) 266-1411

Lynn D. Otto – 70,000   ( plus $34,952.)  $104,952.  TOTAL
5806 Whitneyville Road
Middleville, MI 49333
(269) 795-3634

Martin J. Campbell – 1,000
1070 24th Avenue East
Seattle, WA 98112
(206) 324-3210

Daniel R. Droz – 5,000
529 Augusta Drive
Monroe, MI 48161
(734) 242-5023

Larry Cobb – 150,000
1243 NE 152nd Street
Shoreline, WA 98155-7137
(206) 523-2742

Carl Hunt – 50,000
11310 Glissade Drive
Clinton, MD 20735
(301) 292-1399

Terry Mcquoid – 5,000
18861 329th Avenue
Isle, MN 56342
(320) 630-3435

Michael Dardaris – 10,000
1933 Teaberry Avenue
Williamstown, NJ 08094
(856) 863-0461

Rocky J. Romanelli – 35,000
9138 Chambelle Street
St. Leonard, PQH1P2M3
Montreal, Quebec, Canada
(H1P-2M3)
(800) 267-2774 ext. 114

Richard Blackketter – 7,500
5451 South Leonard Springs Road
Bloomington, IN 47403
(812) 824-4798

James Cullen - 2,000
7071 Eckstrom Ave.
San Diego, CA 92111-3424
(858) 277-2704

John Sauter - 10,000
761 Coronado Avenue
Coronado, CA 92118
(619) 215-9373

Michael Sherer - 50,000
2603 NE 87th Street
Seattle, WA 98115
(206) 528-1264

Robert Helgren - 20,000
668 Forest Avenue
Larchmont, NY 10538
(914) 834-4434

Roy Miller - 7,500
722 Indian Point Road
Mount Desert, ME 04660
(207) 244-3044

Timothy Bibens - 10,000
31 Burnley Rise
Pittsford, NY 14586
(585) 755-7230

Richard L. Eggert / Cory L. Eggert - 6,000
3625 409th Avenue NW
Braham, MN 55006
(320) 396-3664

Richard Jablonski - 5,000
26722 Hyte Road
Ranchos Palos Verdes, CA 90275
(310) 669-6330

Kevin O'Connor - 15000
1075 East 8th Street
Holland, MI 49423
(616) 394-9681

Zachary Hodes - 10,000
637 Bryn Mawr Drive
Indianapolis, IN 46260-4735
(317) 253-9646

Thomas Fragomeni - 10,000
175 Capital Boulevard #201
Rocky Hill, CT 06067
(860) 616-5100

The following clients have equity positions in the company, however they do not have any funds invested into the company.

Bill Paul
8812 East Sunny Lane
Claremore, OK 74019
(918) 266-3500

John Fleming
1621 Tiffany Ranch Road
Arroyo Grande, CA 93420
(805) 541-2079

Lloyd Wood
969 Highway 108
Rutherfordton, NC 28139
(828) 287-4919

Jim Lee
12050 Rising Road
Wilton, CA 95693
(916) 687-8355

# EXHIBIT 3



# U.S. Securities and Exchange Commission

## Division of Enforcement

## Prejudgment Interest Report

### Systems' Investment: SEC v. Clean Care Tech., Inc. et al, 08 Civ. 1719 (HB)

| Quarter Range | Annual Rate | Period Rate | Quarter Interest | Principal+Interest |
|---|---|---|---|---|
| Violation Amount | | | | $1,216,475.75 |
| 08/01/2007-09/30/2007 | 8% | 1.33% | $16,219.68 | $1,232,695.43 |
| 10/01/2007-12/31/2007 | 8% | 2% | $24,653.91 | $1,257,349.34 |
| 01/01/2008-03/31/2008 | 7% | 1.75% | $22,003.61 | $1,279,352.95 |
| 04/01/2008-04/30/2008 | 6% | 0.5% | $6,396.76 | $1,285,749.71 |

| Prejudgment Violation Range | | | Quarter Interest Total | Prejudgment Total |
|---|---|---|---|---|
| 08/01/2007-04/30/2008 | | | $69,273.96 | $1,285,749.71 |



# U.S. Securities and Exchange Commission

# Division of Enforcement

# Prejudgment Interest Report

## Investments in CCT: SEC v. Clean Care Tech., Inc. et al, 08 Civ. 1719 (HB)

| Quarter Range | Annual Rate | Period Rate | Quarter Interest | Principal+Interest |
|---|---|---|---|---|
| Violation Amount | | | | $716,927.00 |
| 05/01/2007-06/30/2007 | 8% | 1.33% | $9,559.03 | $726,486.03 |
| 07/01/2007-09/30/2007 | 8% | 2% | $14,529.72 | $741,015.75 |
| 10/01/2007-12/31/2007 | 8% | 2% | $14,820.32 | $755,836.07 |
| 01/01/2008-03/31/2008 | 7% | 1.75% | $13,227.13 | $769,063.20 |
| 04/01/2008-04/30/2008 | 6% | 0.5% | $3,845.32 | $772,908.52 |

| Prejudgment Violation Range | | | Quarter Interest Total | Prejudgment Total |
|---|---|---|---|---|
| 05/01/2007-04/30/2008 | | | $55,981.52 | $772,908.52 |

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,


       -against-               08-CV-1719


CLEAN CARE TECHNOLOGIES, INC., EDWARD
KLEIN, AL NAZON and ANIL VARUGHESE,

                Defendants.

----------------------------------------



     DEPOSITION OF ANIL VARUGHESE, taken by

Plaintiff, pursuant to Subpoena, at the

Securities and Exchange Commission, Three World

Financial Center, New York, New York, on Tuesday,

May 13, 2008, at 10:45 a.m., before Lisa

Rosenfeld, a Shorthand Reporter and Notary

Public within and for the State of New York.

1 A P P E A R A N C E S :

2

3    SECURITIES AND EXCHANGE COMMISSION

4      Three World Financial Center

5      New York, New York 10281

6    By:   MICHAEL BIRNBAUM, ESQ.

7         VALERIE A. SZCZEPANIK, ESQ.

8

9

10

11 Also Present:

12

13    EDWARD KLEIN

14
     ANIL VARUGHESE, Pro Se
15

16                    oOo

17

18

19

20

21

22

23

24

25

Page 110

                    Varughese
1
2   to Mr. Maldonado?
3       A.  That I don't recall.
4       Q.  Did you instruct him to use the name
5   David Allen when working for Focus 4?
6       A.  No.
7       Q.  Did you know that he was using the
8   name David Allen?
9       A.  Yes.
10      Q.  Did you ever discuss with him whether
11  he should use his real last name or not?
12      A.  Well, he said that's his middle
13  initial so he went by Allen.
14      Q.  Looking at this e-mail, about five
15  paragraphs down starting with the words "Based on
16  this meeting ASC will not be pursuing a
17  relationship with Ed Klein for two reasons," do
18  you see that?
19      A.  Yes.
20      Q.  Do you recall getting this e-mail?
21      A.  Yes.
22      Q.  Do you recall whether this was before
23  or after you had met with Ed Klein?
24      A.  This is after.
25      Q.  About how long after?

Page 111

                    Varughese
1
2       A.  That I can't say for certain.
3       Q.  Would you say days, weeks, months?
4       A.  Maybe a month or so.
5       Q.  A month or so?
6       A.  A month or two months.
7       Q.  And it says "The first reason is
8   first if we work with CWS in acquisitions there
9   will be no room for Ed." Do you remember that
10  there would be no room for Ed?
11      A.  He had actually had a phone
12  conference after that, he had said that he didn't
13  trust Ed Klein, that was the main reason, he said
14  he didn't believe Ed can have the contacts, and
15  if he had the contacts and he introduced them to
16  different parties then Ed might try to steal the
17  contacts for himself.
18      Q.  Is that what you understood him to
19  mean, I don't trust letting Ed know?
20      A.  Yes.
21      Q.  Did he give you -- did Mr. Schmidt
22  give you any reason not to trust Ed Klein?
23      A.  No.
24      Q.  Did you consider Mr. Schmidt's
25  opinion of Ed Klein when you chose to go into

Page 112

                    Varughese
1
2   business with Ed Klein?
3       A.  Partially.
4       Q.  Did you ever discuss Mr. Schmidt's
5   opinion of Ed Klein with Al Nazon?
6       A.  Well, we were on a conference call
7   together so he was already directly informed by
8   Schmidt that Ed Klein would not be a person to do
9   business with, that he would try to take the
10  contacts for himself.
11      Q.  This was a conference call among you,
12  Al Nazon and Mr. Schmidt?
13      A.  Yes.
14      Q.  Anybody else?
15      A.  No.
16      Q.  Was that before or after you received
17  this e-mail?
18      A.  That was after.
19      Q.  Was it consistent with this e-mail?
20      A.  Yes, uh-huh.
21      Q.  Was the conference call the last time
22  you ever spoke to Mr. Schmidt?
23      A.  As a matter of fact I think it was
24  before, because -- before the e-mail, because he
25  had -- right before the e-mail he had said he was

Page 113

                    Varughese
1
2   going to go down to meet with CWS to find out
3   what's really going on with their manufacturing,
4   and then right after that we had actually advised
5   him to contact Mr. Klein because he seemed like
6   he had certain contacts from just our initial
7   meeting.
8       Q.  You had advised Mr. Schmidt to
9   contact Mr. Klein?
10      A.  Yes.
11      Q.  And Mr. Schmidt is the one who
12  initially introduced you to Mr. Klein, right?
13      A.  Yes.
14      Q.  Did you ever come to learn of any
15  agreement Mr. Klein entered into to work with or
16  for ASC?
17      A.  No.
18      Q.  When you first started working for
19  Clean Care, what was your reason for working with
20  Ed Klein?
21      A.  First he seemed to have the contacts,
22  second he seemed exactly, you know, to know
23  exactly what he was talking about.  Plus he had
24  already dealt with a similar product, Clean
25  Cover, so he already knew what steps to take,

Page 114

Varughese

1 what routes to go.
2     Q.   Was that Clean Cover venture a
3 success, to your knowledge?
4     A.   It was initially, and then I believe
5 from Mr. Klein's saying of it, he said that the
6 partner he was involved with didn't want to
7 pursue it aggressively.  He had a problem with
8 the management style of the partner that was
9 involved in Clean Cover.
10     Q.   Had you ever heard of Clean Cover
11 before talking to Mr. Klein?
12     A.   Through Mr. Schmidt, yes.
13     Q.   Was that a competitor to the product
14 ASC was putting out?
15     A.   Yes.
16     Q.   And was -- go ahead.
17     A.   But this was actually the evolution
18 for the Clean Cover because it was based on
19 plastic, and this process was actually based on
20 solution, the Eyegiene seat.
21     Q.   The Eyegiene seat?
22     A.   Well, CWS at that time that's what we
23 were dealing with.
24     Q.   I want you to take a look back then

Page 115

Varughese

1 at what is marked as Exhibit 11.  And if you
2 turn, these pages aren't numbered, but about ten
3 pages into the page with "Payment Instructions"
4 across the top.
5     A.   Yes.
6     Q.   Do you remember ever seeing this page
7 before?
8     A.   Yes.
9     Q.   Is this part of the package you would
10 send to potential investors?
11     A.   Yes.
12     Q.   Did you understand at the time what
13 Sterling Trust Company was?
14     A.   Yes.
15     Q.   What was Sterling Trust Company?
16     A.   It was an IRA company that dealt with
17 retirement accounts.
18     Q.   Why would people want to put their
19 money in Clean Care through Sterling Trust
20 Company?
21     A.   Because Sterling Trust actually would
22 handle retirement accounts that individuals would
23 have either through Schwab or wherever else and
24 they would do direct transfers of those funds and

Page 116

Varughese

1 would hold shares in their name at Sterling
2 Trust.
3     Q.   I see that there are wires for First
4 Washington State Bank.  Would that be a Clean
5 Care Technologies account?
6     A.   Yes, I believe so.
7     Q.   Did you have any access to that
8 account?
9     A.   No.
10     Q.   If somebody wired money to First
11 Washington State Bank after getting a call from
12 you, how would you know about that?
13     A.   Through Mr. Klein.
14     Q.   And if somebody invested through
15 Sterling Trust, how would you know about that?
16     A.   Again through Mr. Klein.
17     Q.   Would Mr. Klein show you documents
18 reflecting investments through the bank or the
19 trust company?
20     A.   Documents from the investors, as far
21 as the subscription documents.
22     Q.   Saying how much the investors would
23 buy?
24     A.   Correct.

Page 117

Varughese

1     Q.   And you would get some percentage of
2 that investment?
3     A.   Yes.
4     Q.   What was the percentage of the
5 investment you would get?
6     A.   Initially 10 percent and then 15.
7     Q.   Was it written anywhere that you
8 would get 10 percent?
9     A.   Yes, we had it based on our finder's
10 agreement.
11     Q.   At what point did it become
12 15 percent?
13     A.   I believe sometime in early 2006 or
14 middle part of 2006.
15     Q.   I want to -- let's to make things
16 easier break this up.
17         MR. BIRNBAUM:  If we can go off the
18 record.
19         (Discussion off the record)
20         (Plaintiff's Exhibit 13, Product
21 offering memorandum, was so marked for
22 identification.)
23     Q.   Looking at the front of what has now
24 been marked Exhibit 13 where it says Clean Care

Page 118

Varughese

1          Varughese
2  Technologies and a $10 million figure right below
3  that, do you see this document?
4      A.  Yes.
5      Q.  Do you recognize this document?
6      A.  Yes.
7      Q.  What is it?
8      A.  This is the product offering
9  memorandum.
10     Q.  And we had looked at this, this is
11 part of another document earlier.  This is what
12 you, Mr. Nazon and Mr. Klein put together to send
13 to investors?
14     A.  Yes.
15     Q.  And did you review this document
16 before sending it to investors?
17     A.  Yes.
18     Q.  Looking at the first page, do you see
19 where it says there will be 100 units?
20     A.  Yes.
21     Q.  What was a unit?
22     A.  What do you mean?  As far as?
23     Q.  Is that -- how did you mean the term
24 100 units as it's written here?
25     A.  I mean it was just divided into, you

Page 119

1          Varughese
2  know, for the shares.  100 units at I believe
3  like it says there 4 million shares.
4      Q.  So each unit would be 40,000 shares?
5      A.  Yes.
6      Q.  Was this offering of 4 million
7  shares?
8      A.  Yes.
9      Q.  For $10 million?
10     A.  Yes.
11     Q.  Were you trying to sell them by the
12 unit?
13     A.  Yes.
14     Q.  So would you offer to investors the
15 opportunity to buy a unit of Clean Care
16 Technologies?
17     A.  Yes.
18     Q.  And that unit would be a specific
19 amount 40,000 Series A preferred membership
20 interest, correct?
21     A.  Yes.
22     Q.  Would you only sell in terms of
23 units?
24     A.  No, it could be fractional units as
25 well.

Page 120

1          Varughese
2      Q.  Did anybody buy a full unit?
3      A.  Yes.
4      Q.  How many people bought full units?
5      A.  I don't remember offhand, but I'd say
6  one or two people bought full units.
7      Q.  Who were those?
8      A.  The records were given to Mr. Klein,
9  but I'd have to think about it, I don't remember
10 the name offhand.
11     Q.  Was it somebody that you contacted?
12     A.  No.
13     Q.  Somebody Mr. Nazon contacted?
14     A.  No, Mr. Allen.
15     Q.  Would Mr. Allen -- withdrawn.  Let's
16 look at footnote 2 here.  Where it says "The
17 offer and sale."
18     A.  Yes.
19     Q.  I just want to read this into the
20 record.  "The offer and sale of units pursuant
21 hereto made through broker/dealers who are
22 registered with the National Association of
23 Securities Dealers, Inc. is 10 percent from the
24 company.  The company may also pay incentive
25 compensation to registered broker/dealers in the

Page 121

1          Varughese
2  form of common stock or stock options in the
3  company."  Have you ever been a registered
4  broker/dealer?
5      A.  No.
6      Q.  To the best of your knowledge has Mr.
7  Nazon ever been a registered broker/dealer?
8      A.  No.
9      Q.  Has Mr. Allen ever been a registered
10 broker/dealer?
11     A.  No.  And we haven't mentioned
12 ourself -- as a matter of fact whenever an
13 individual would ask if we are registered, we
14 would tell them we're not.
15     Q.  What did you mean in this memorandum
16 when you wrote footnote number 2, along with Mr.
17 Nazon and Mr. Klein?
18     A.  Number 2 meaning if any other
19 broker/dealers, if any other entities were to
20 come on board to raise money for the company to
21 finish out the 10 million, obviously it would be
22 possible for Mr. Nazon and myself and Mr. Allen
23 to finish up the full offering.  But if any other
24 registered broker/dealer was to come on board and

Page 122

Varughese
1    raise capital they would get that amount.
2
3        Q.   Did you ever employ any other
4    broker/dealer on behalf of Clean Care to sell
5    shares?
6        A.   No.  Well, we were -- well, the
7    second stage of the offering, the late stage
8    registration firm with Laura Anthony, we were
9    looking to have a few new broker/dealers.
10       Q.   My question is whether you ever did
11   use any registered broker/dealers to sell any
12   shares of Clean Care Technologies?
13       A.   No.
14       Q.   In footnote 2 where it says "The
15   offer and sale of the units pursuant hereto made
16   through broker/dealers who are registered with
17   the National Association of Securities Dealers,"
18   is that statement false?
19       A.   I don't understand, what do you mean?
20       Q.   Sitting here today, you're telling me
21   that Clean Care Technologies never used any
22   broker/dealers, correct?
23       A.   Correct.
24       Q.   There's a footnote here referring to
25   the broker/dealers who sold Clean Care

Page 123

Varughese
1
2    Technologies, correct?
3        A.   Yes.
4        Q.   Is it your testimony that --
5    withdrawn.  What did you intend to convey to
6    investors through footnote number 2?
7        A.   Basically that any outside
8    broker/dealer that was brought on board to finish
9    out the offering, they would get paid 10 percent
10   and whatever incentive in shares or whatever from
11   the company.
12       Q.   Did you ever disclose to investors
13   that individuals who were not registered
14   broker/dealers would sell Clean Care Technologies
15   shares?
16       A.   No.
17       Q.   Did you ever disclose to investors
18   that individuals that were not registered
19   broker/dealers would be paid commissions for
20   sales of the Clean Care Technologies securities?
21       A.   No.  There was a reason for that
22   because when we first met with Ed as well, we had
23   discussed coming on board as members in the
24   company, as workers in the company, employed
25   within the company.  So any commissions, anything

Page 124

Varughese
1
2    else that would have been paid would have been in
3    lieu of salaries being paid.
4        Q.   I want to go back for a moment and
5    leave this -- don't put it too far aside if you
6    would.  Back to Exhibit 11.  The page after the
7    one we were looking at which says "For immediate
8    release, New Jersey April 5th."
9            Was this part of the package sent to
10   investors and potential investors in Clean Care
11   Technologies?
12       A.   Yes.
13       Q.   Did you participate in drafting this?
14       A.   In the sense of doing any corrections
15   on it, we had actually met with Mr. Klein,
16   myself, and Mr. Nazon.
17       Q.   You reviewed this document before it
18   went out?
19       A.   Just for grammatical errors because
20   all the news was directly from Mr. Klein.
21       Q.   Did you read the document before it
22   went out?
23       A.   Yes, I read it.
24       Q.   Did you believe everything in this
25   document to be true when it went out?

Page 125

Varughese
1
2        A.   Yes.
3        Q.   When it says "Effectively immediately
4    Clean Care Technologies plans to institute a
5    dividend program to all equity shareholders in
6    the company," did you believe as of April 5th,
7    2006 that Clean Care Technologies did in fact
8    have plans to immediately institute a dividend
9    program?
10       A.   Yes, absolutely.
11       Q.   What steps had been taken through
12   April 5th, 2006 toward instituting a dividend
13   program?
14       A.   There was already in the works the
15   plan for doing inventory, inventory sales where
16   they, where the investors that would actually
17   come on board they'd have their funds allocated
18   partially for share investments, partially for
19   actual equipment itself.  For instance thereby
20   let's say 100,000 dollar worth or units worth,
21   they'll get 50,000 shares and the rest would be
22   allocated towards $50,000 in solution.  So when
23   solution goes out, the profit that's made from it
24   they'll get a piece of that for life.
25       Q.   What do you mean by piece of that?

Page 130

Varughese
1          Varughese
2  enough money to send investors dividend checks as
3  you call them?
4      A.  They had enough money to start
5  sending out checks but not to finish out their
6  full obligation.
7      Q.  Did there come a time where Clean
8  Care did not have enough money to buy as many
9  seats as it wanted to purchase?
10     A.  Yes, that occurred on a regular basis
11 actually because the manufacturer, they wanted
12 Mr. Klein to purchase additional seats because
13 they wanted to issue them throughout North
14 America quickly.
15     Q.  Was it your understanding in or
16 around April of 2006 that Clean Care did not have
17 enough money to buy as many seats as the
18 manufacturer insisted that Clean Care purchase?
19     A.  Yes.  And that was true from the
20 beginning as well.
21     Q.  Were you involved in the business
22 decision to create a dividend program at this
23 time?
24     A.  Well, the dividend program was
25 something that we had from the beginning.

Page 131

1          Varughese
2      Q.  Had you promised in the beginning
3  investors a dividend program?
4      A.  Yes.
5      Q.  Did you do that in writing?
6      A.  No, this was the first -- the news
7  release was the first instance where we added --
8  instituted that there's a program that the
9  company was going to do.
10     Q.  Before you did that you communicated
11 the dividend program over the phone?
12     A.  Yes.
13     Q.  How did you explain it?
14     A.  That all individuals would receive a
15 portion of whatever sales would come from
16 solutions, and the more seats that were out
17 there, the more seats are spinning, the more
18 profits would actually mean.
19     Q.  Did you tell any investors at what
20 point the company would be able to start sending
21 payments to investors?
22     A.  There was no definite time period of
23 when it would actually happen but the main point
24 was to convey to them first saturating the market
25 with those seats because the more seats that are

Page 132

1          Varughese
2  out there in every building, the more people are
3  aware of it.  The profit margin would be great.
4      Q.  Did the market ever become saturated
5  with the seats?
6      A.  No.
7      Q.  Did you ever reach a point where the
8  market was close to being saturated with seats?
9      A.  Absolutely.
10     Q.  How many seats at Clean Care's peak
11 did Clean Care have out in the market?
12     A.  I don't know the exact market.
13     Q.  Would it be more or less than 500?
14     A.  I'd say probably less than that.
15     Q.  Whatever number less than 500 it was,
16 in your opinion it was close enough to saturating
17 the market with Clean Care seats?
18     A.  Absolutely.
19     Q.  The company was prepared to pay
20 individual investors a dividend?
21     A.  As soon as it hit the 500 mark, is
22 that what you're asking?
23     Q.  I'm asking at what point you
24 understood Clean Care to have reached the stage
25 in its business plan that Clean Care would send

Page 133

1          Varughese
2  investors dividend payments, if ever?
3      A.  They were planning from the second
4  year of operations to send them out.
5      Q.  And when did Clean Care begin?
6      A.  2006, beginning 2006.  The initial
7  part of it, just to jump back to the time line,
8  initially Dr. Schwartz had agreed to Mr. Klein to
9  send I believe just under $3 million to fund the
10 entire company any seats that will be needed.
11     Q.  And who is Dr. Schwartz?
12     A.  Dr. Sheldon Schwartz was one of the
13 individuals that was involved in ASC.
14     Q.  Was it somebody that you brought into
15 ASC?
16     A.  No.
17     Q.  Was that somebody that Al Nazon
18 brought into ASC?
19     A.  Yes.
20     Q.  Was Sheldon Schwartz given shares in
21 Clean Care in exchange for his ASC shares?
22     A.  Unfortunately that was what happened
23 with the division of the company because at the
24 time he was agreeable on -- before he had
25 actually met with Mr. Klein he was agreeable with

Page 134

Varughese

1  having shares in Clean Care Technologies. After
2  he met with Mr. Klein he changed his mind, he
3  said forget the other investors, let me be the
4  only investor within Clean Care as a whole and
5  the company should be run his way and he would
6  become partners with Mr. Klein.
7      Q. When you say the division of the
8  company, how did you understand -- how did you
9  understand the company was divided?
10     A. It was divided in the sense that
11 Clean Care Systems was created for -- well,
12 actually initially just for Mr. Klein because
13 there was no contract between --
14     Q. Do you mean Mr. Schwartz or Mr.
15 Klein?
16     A. Mr. Klein. There was no contract
17 between Dr. Schwartz and Mr. Klein, at least on
18 paper, that said that they'd have to be partners
19 in the company and they'd have to split
20 everything with the company.
21         Dr. Schwartz had said all investors
22 that were involved in the company that was not
23 his responsibility, he was not going to -- take
24 care of them or have the company take care

Page 135

Varughese

1  of them. So forget about the investors, he was
2  the one who would save the company and he would
3  grow the company with Mr. Klein as his partner.
4          So Systems was created right after
5  Technologies to basically have him come aboard as
6  a silent partner in the company and say okay,
7  whenever funding is required for seats, for
8  Solution, come to me, I'll give you financing on
9  a just in time base.
10     Q. Were you involved in any of the
11 conversations with Dr. Schwartz?
12     A. No.
13     Q. Were you kept up to date about the
14 creation of Systems?
15     A. Yes.
16     Q. What did you understand Systems'
17 ownership structure to be?
18     A. Strictly Mr. Klein, Dr. Schwartz was
19 not on paper at all.
20     Q. And did you understand -- have any
21 understanding as to whether Systems owned any
22 distribution rights to the toilet seat you
23 described?
24     A. Yes.

Page 136

Varughese

1      Q. What was your understanding?
2      A. My understanding was Mr. Klein was
3  the individual that owned the rights directly to
4  the seat and he owned both entities, Clean Care
5  Technologies and Clean Care Systems, which were
6  completely separate from each other.
7          Dr. Schwartz whenever funds was
8  required for manufacturing or the seats to
9  actually be purchased on a higher level, he would
10 actually send in funds.
11     Q. Did you understand that Clean Care
12 Technologies had any deal with Mr. Klein or
13 agreement that permitted Clean Care Technologies
14 to distribute and market the toilet seats?
15     A. Sure. It was again like I said, the
16 company itself was owned by Mr. Klein, both
17 companies 100 percent, and any individuals that
18 were to benefit from it, you know, their profits
19 would come from Mr. Klein giving them their
20 portion of whatever their ownership is.
21     Q. I want you to turn to page 19 of what
22 is marked Exhibit 13.
23     A. Yes.
24     Q. Before you go through this, let's

Page 137

Varughese

1  just clarify something about Clean Care Systems.
2  What was your understanding, if you had any, as
3  to how Clean Care Systems would profit from its
4  relationship with Mr. Klein?
5      A. Well, he owned the company so
6  whatever the company made as profits he would
7  benefit from.
8      Q. How would Systems profit?
9      A. How would Systems profit? How would
10 they make their money?
11     Q. Yes.
12     A. From the seats being sold, from
13 Solution being sold.
14     Q. By Systems?
15     A. Yes, uh-huh.
16     Q. And how would Clean Care Technologies
17 profit?
18     A. The same, similar way.
19     Q. So both -- your understanding at the
20 time that Systems was created was that Clean Care
21 Systems and Technologies would both distribute --
22     A. Correct.
23     Q. -- the toilet seats and the fluid and
24 would both profit from it?

Page 138

Varughese

1
2    A.  Correct.
3    Q.  Taking a look at page 19, do you see
4  up top where it says "Clean Care Technologies,
5  the company exclusively distributes and markets
6  Eyegiene seats, the innovative hands-free
7  hygienic toilet seat in the United States"?
8    A.  Yes.
9    Q.  Is this part of the documentation
10  that you sent to potential investors in Clean
11  Care Technologies?
12    A.  Yes.
13    Q.  Was there any text in any of the
14  documents you sent to potential investors in
15  Clean Care Technologies that explained Clean Care
16  System's potential to profit off the distribution
17  of Clean Care's -- Eyegiene seats?
18    A.  Well, Systems did not even exist when
19  this document was done.  That's one.  Second, as
20  far as the ownership rights, I think I submitted
21  yesterday the paper that shows the transfer of
22  ownership for Systems to Technologies.  That was
23  to be included -- it wasn't --
24    Q.  Okay, if I can just stay on that for
25  a second.  So is it your understanding --

Page 139

Varughese

1
2    MR. BIRNBAUM:  Let's mark this what
3  Mr. Varughese just referred to is a
4  February 1, 2006 letter which we'll mark
5  Exhibit 14.
6    (Plaintiff's Exhibit 14, Letter dated
7  February 1, 2006, was so marked for
8  identification.)
9    Q.  Do you recognize this document, Mr.
10  Varughese?
11    A.  Yes.
12    Q.  What is Exhibit 14?
13    A.  This is the transfer of rights from
14  Systems to Technologies.
15    Q.  Was it your understanding that before
16  the rights were transferred, they belonged to
17  Systems?
18    A.  Yes.
19    Q.  And afterwards to Technologies?
20    A.  Yes.
21    Q.  Looking at Exhibit 13, the document
22  we were just looking at, when did you first start
23  sending that document to investors?
24    A.  Early 2006.
25    Q.  January?

Page 140

Varughese

1
2    A.  Yes, I believe so.
3    Q.  So when you first drafted the
4  documents you sent to potential Clean Care
5  Technologies investors, Clean Care Technologies
6  did not have the exclusive rights to
7  distribute seats, is that correct?
8    A.  Well, technically Mr. Klein did not
9  have a signed document with the manufacturer
10  until later on.  That was after a discussion with
11  Dr. Schwartz and, you know, the creation of Clean
12  Care Systems, that's when they signed for Clean
13  Care Systems.  Until then it was assumed that
14  Clean Care Technologies, that was the one that
15  would go on the manufacturer.
16    Q.  I'm not asking you what was assumed,
17  I'm asking you for facts here.  When you first
18  became involved in Clean Care Technologies, did
19  you have an understanding that Clean Care
20  Technologies had any distribution agreement
21  concerning the Eyegiene seat?
22    A.  Yes, through Mr. Klein as the center,
23  well, I guess the principal for both companies.
24    Q.  You say both companies, you mean
25  Systems and Technologies?

Page 141

Varughese

1
2    A.  Yes.
3    Q.  When you first became involved in
4  Technologies, did Systems exist?
5    A.  No.
6    Q.  So when you first became involved
7  with Technologies --
8    A.  Oh, okay.
9    Q.  Let me finish the question, please.
10  When you first became involved with Clean Care
11  Technologies, did you have any understanding as
12  to whether there was any agreement involving
13  Clean Care Technologies concerning the Eyegiene
14  toilet seat?
15    A.  I was aware that no contract had been
16  signed yet.
17    Q.  At some point did you understand that
18  a contract involving Clean Care Technologies and
19  the Eyegiene seat was agreed upon?
20    A.  Yes.
21    Q.  When was that?
22    A.  Right after a meeting with the
23  manufacturer, they had said they wanted to pursue
24  a relationship with Mr. Klein as the spokesperson
25  for the entire United States.

1                Varughese
2      Q.   Did you personally meet with the
3  manufacturer?
4      A.   Yes.
5      Q.   Who is the manufacturer?
6      A.   It's NTF, a company based out of I
7  believe Netherlands.  And it was a roll-off of
8  Laurence Smeets, a roll-off that I had met
9  initially.
10     Q.   Is that roll-off Remjin?
11     A.   Yes.
12     Q.   And you met with both of those
13 individuals personally?
14     A.   Myself, Mr. Nazon and Mr. Klein met
15 with them directly.
16     Q.   Did they tell you that they had the
17 ability to license the distribution rights for
18 the Eyegiene seat?
19     A.   Yes.
20     Q.   And did they tell you that they would
21 license those rights to Mr. Klein?
22     A.   Yes.
23     Q.   And did you ever see an agreement
24 between Mr. Klein and NTF or either of the
25 individuals that you mentioned?

1                Varughese
2      A.   Yes.
3      Q.   When did you first see that
4  agreement?
5      A.   Several months later after the
6  meeting.
7      Q.   When was the meeting?
8      A.   I believe late September or October
9  of '05.
10     Q.   And several months later you saw a
11 document giving Mr. Klein the rights to
12 distribute the Eyegiene seats?
13     A.   Yes.
14     Q.   Did you ever see a document where Mr.
15 Klein transferred those rights to Clean Care
16 Technologies?
17     A.   No.
18     Q.   When you --
19     A.   As with the manufacturer you're
20 speaking of or you're talking about this
21 document?
22     Q.   I'm trying to track your
23 understanding of who had the rights to distribute
24 the Clean Care -- the Eyegiene seat and when.
25     A.   Okay.

1                Varughese
2      Q.   If I can break it into bits, if I
3  understand you correctly when you first came to
4  Clean Care Technologies you were not aware of any
5  agreement among any parties regarding the
6  distribution rights to the Eyegiene seat, is that
7  correct?
8      A.   Correct.
9      Q.   And that was at some time in the fall
10 of 2005?
11     A.   Yes.
12     Q.   And sometime in the fall of 2005 you
13 met with Mr. Klein, Mr. Nazon and the
14 manufacturers of the Eyegiene seat to discuss
15 licensing and distribution rights of the Eyegiene
16 seat, is that correct?
17     A.   Yes.
18     Q.   And sometime after that meeting you
19 came to understand that the distribution rights
20 to the Eyegiene seats would be licensed to Mr.
21 Klein personally, is that correct?
22     A.   Yes.
23     Q.   And that was approximately January of
24 2006?
25     A.   No, I believe it was even later than

1                Varughese
2  that.
3      Q.   So at some point later than January
4  of 2006 you came to understand that Mr. Klein had
5  the exclusive right to distribute the Eyegiene
6  seat in America, is that right?
7      A.   Yes.
8      Q.   When did you first start to
9  distribute information to Clean Care Technologies
10 to potential investors?
11     A.   January I think 2006.
12     Q.   So in January 2006 you did not yet
13 have any understanding as to who had the
14 exclusive distribution rights to the Eyegiene
15 seat, is that correct?
16     A.   Well, I had seen e-mails from Mr.
17 Klein with the manufacturer that said that they
18 were sending a contract out and everything was
19 already done, they were just ironing out details
20 on exactly how many seats would be bought
21 initial -- on the first order, things of that
22 nature.
23     Q.   When you say contract, you mean a
24 contract licensing the distribution rights to Mr.
25 Klein?

```
 1              Varughese
 2    A.  Correct.
 3    Q.  So in January of 2006, is it correct
 4  that there was, to your knowledge, no final
 5  agreement involving Mr. Klein or Clean Care
 6  Technologies concerning distribution rights of
 7  the Eyegiene toilet seat?
 8    A.  Yes, from my understanding, I believe
 9  so.
10    Q.  And at sometime after that you
11  understood the rights to be awarded to Mr. Klein,
12  not to Clean Care Technologies, correct?
13    A.  Correct.
14    Q.  Looking back at Exhibit 13, can you
15  tell me how many of the 4 million Series A
16  preferred membership interests were awarded to
17  the former ASC investors?
18    A.  How many shares were given to the ASC
19  investors?
20    Q.  In total?
21    A.  I wouldn't know offhand.  It was I
22  believe -- the records were already given to the
23  commission before.
24    Q.  Do you know what percentage of the
25  entire company these 4 million shares
```

```
 1              Varughese
 2  constituted?
 3    A.  Not offhand.
 4    Q.  Do you know if the offering was
 5  selling the majority of Clean Care Technologies?
 6    A.  No, majority ownership was with Mr.
 7  Klein.
 8    Q.  Do you know if -- withdrawn.  How
 9  many total shares did you personally sell of
10  Clean Care Technologies?
11    A.  I can't say, I don't know offhand.
12    Q.  Can you give me an approximate
13  number?
14    A.  I don't know.  I couldn't guess.
15    Q.  Do you know how much of -- how many
16  of the 40 million shares were sold?
17    A.  Not offhand.
18    Q.  Did you sell -- of all the shares you
19  did sell, did you sell them all for the same
20  price?
21    A.  Yes.
22    Q.  What was that price?
23    A.  I believe it was $2.50.
24    Q.  2.50?
25    A.  I believe so.  It should be in here.
```

```
 1              Varughese
 2    Q.  It is.  There was to bulk discount?
 3    A.  No.
 4    Q.  Did you ever over time, excluding
 5  what Ms. Anthony may have done after these shares
 6  were sold, did you ever over time change this
 7  memorandum?
 8    A.  Yes, just to add the pictures in the
 9  back.
10    Q.  To add pictures in the back?
11    A.  Yes, the marketing pictures and such.
12    Q.  Other than adding pictures in the
13  back, did you ever change the substance of Clean
14  Care's offering memorandum?
15    A.  No.
16    Q.  So from the time you first sent the
17  memorandum out to the last time you sent the
18  memorandum out to potential investors, it was the
19  same but for certain pictures added to the back,
20  correct?
21    A.  Right.
22    Q.  Turning to page 17 of Exhibit 13.
23  Under attractive and profitable revenue model, do
24  you see the reference to Eyegiene solution clean
25  wrap plastic refills and associated products?
```

```
 1              Varughese
 2    A.  Yes.
 3    Q.  What was Eyegiene solution?
 4    A.  That was the solution that went into
 5  the Eyegiene seats.
 6    Q.  What was clean wrap plastic refills?
 7    A.  That was initially sent from the
 8  company because they wanted to do two models, one
 9  was for the Eyegiene seat itself with the
10  solution, the second one was for the wrap seat.
11    Q.  So at one point you envisioned Clean
12  Care Technologies selling both the Eyegiene seat
13  and some other seat?
14    A.  And the wrap seat, plastic wrap seat.
15    Q.  And the plastic wrap seat was from a
16  different manufacturer?
17    A.  Yes.
18    Q.  At some point did you determine that
19  Clean Care Technologies would not sell the
20  plastic wrap seat?
21    A.  Mr. Klein did.
22    Q.  Were you part of the decision-making
23  process?
24    A.  No, he basically informed us that
25  this will be more profitable and to stick with
```

Page 150

Varughese

1
2  the Eyegiene seat itself and the solution.
3      Q.  When did he inform you of that?
4      A.  I don't recall, sometime early 2006.
5      Q.  Early 2006?
6      A.  Yes.
7      Q.  Did you at any time change the
8  reference to the Clean Care wrap plastic refills
9  in the offering memorandum to reflect the
10  decision not to sell clean wrap plastic refills?
11      A.  No, but I believe we had spoken to
12  the individuals to let them know even if they had
13  questions on it what exactly it was, that that
14  wasn't a model that we were going to pursue.
15      Q.  If an investor did not specifically
16  ask you about clean wrap plastic did you tell
17  them anything about clean wrap plastic?
18      A.  Initially, yes.  Just to let them
19  know that that was something that Mr. Klein had
20  worked with, he's familiar with the product, he
21  knows the industry as far as the Clean Care wrap
22  seat itself.
23      Q.  When it came to be that Clean Care
24  Technologies would not sell the Clean Care wrap
25  refills if an investor would not specifically ask

Page 151

Varughese

1
2  about the Clean Care wrap refills, did you ever
3  refer an investor to the offering memorandum and
4  explain that Technologies would no longer try to
5  sell those refills?
6      A.  No, not at that point.
7      Q.  The next page, page 18, you'll see a
8  reference to seasoned management team, we're
9  still in Exhibit 13.
10      A.  Yes.
11      Q.  Did you ever have any contact with
12  the Venable law firm?
13      A.  No.
14      Q.  What was your understanding as to
15  what role the Venable law firm played in Clean
16  Care's business?
17      A.  It was a contact that Mr. Klein had
18  that he may have -- he may want to pursue in the
19  future, provided that there were enough seats to
20  go into their particular -- to every veterans'
21  hospital.
22      Q.  So the Venable law firm was somebody
23  who Mr. Klein could contact as a way to approach
24  veterans' hospitals?
25      A.  Yes.

Page 152

Varughese

1
2      Q.  While you were working for Clean Care
3  did the Venable law firm ever become part of
4  Clean Care's management team?
5      A.  No.
6      Q.  Who -- was Mr. Klein part of the
7  management team?
8      A.  Yes.
9      Q.  Were you part of the management team?
10      A.  No.
11      Q.  Was anybody other than Mr. Klein part
12  of the management team?
13      A.  Brena Resnick.
14      Q.  Brena Resnick was part of the
15  management team?
16      A.  Yes.  Jeremy Klein.
17      Q.  Anybody else?
18      A.  Victor Green.
19      Q.  Who is Victor Green?
20      A.  He was one of the contacts that Mr.
21  Klein had.
22      Q.  Did you know what his background was
23  in the industry, if any?
24      A.  He actually dealt with the private
25  offerings, he dealt with the bringing private

Page 153

Varughese

1
2  companies to the public market.
3      Q.  So he was a part of the team, not so
4  much for his product experience but for his
5  investment prospective?
6      A.  I believe he had also said he had
7  contacts to JFK Airport as well.
8      Q.  Did you ever deal with Mr. Green
9  directly?
10      A.  I met him I think once or twice.
11      Q.  Did you ever discuss the business?
12      A.  Yes.
13      Q.  Tell me the content of that
14  discussion or those discussions.
15      A.  He was just giving an overview of
16  where he envisioned this company to be.
17      Q.  Where was that?
18      A.  He said he had contacts to most
19  airports.  He can get exposure for the company
20  and eventually he can even take the company
21  public.
22      Q.  Did you discuss with Mr. Klein at any
23  time whether Mr. Green should have been mentioned
24  as part of the seasoned management team?
25      A.  I believe he was in the buying part

Varughese

1            Varughese
2  of the company.
3     Q.  My question was did you discuss with
4  Mr. Klein at any time whether Mr. Green should be
5  included in the section titled seasoned
6  management company?
7     A.  I didn't have any discussion with
8  him.
9     Q.  Did you ever have any discussions as
10 to whether Mr. Brena Resnick should be included
11 anywhere in the offering memorandum?
12    A.  No.
13    Q.  Did you ever have any conversations
14 concerning whether Jeremy Klein should be
15 included for any reason in the offering
16 memorandum?
17    A.  No.
18    Q.  Was there anybody you thought should
19 be mentioned as part of the company's management
20 team that didn't end up --
21    A.  No.
22    Q.  -- in the offering memorandum?
23    A.  No.
24    Q.  Moving to page 20 of Exhibit 15.  Did
25 you play any role in drafting the competition

1            Varughese
2  section?
3     A.  No.
4     Q.  Do you know who did draft the
5  competition section?
6     A.  Mr. Klein.
7     Q.  Turn to page 22.  Do you recognize
8  this press release?
9     A.  Yes.
10    Q.  And what do you recognize this press
11 release to be?
12    A.  It was part of the industry news from
13 Kimberly-Clark.
14    Q.  Do you know what the date of this
15 press release was?
16    A.  No.
17    Q.  On page 25, I refer you to the title
18 "Market Strategy."
19    A.  Yes.
20    Q.  And the third paragraph says, "To
21 date a number of business entities and groups
22 have expressed interest in becoming master
23 dealers in South Carolina," and it continues on
24 to mention a number of states, do you see that?
25    A.  Yes.

1            Varughese
2     Q.  Did you have any personal knowledge
3  of business entities or groups that had expressed
4  interest in becoming master dealers?
5     A.  No.
6     Q.  Did you ever ask Mr. Klein about any
7  individuals or entities that had expressed
8  interest in becoming master dealers in those
9  states?
10    A.  Yes, he had said that a majority of
11 the contacts were from his dealings with Clean
12 Cover.
13    Q.  And do you know if those that
14 expressed interest in becoming master dealers
15 wanted only to deal with the Eyegiene seat or
16 wanted to deal with the Eyegiene seat and the
17 plastic seat you mentioned earlier?
18    A.  I believe just the Eyegiene seat.
19    Q.  On what do you base that belief?
20    A.  From what I was told by Mr. Klein.
21    Q.  Turning to page 28.  I refer you to a
22 title "Financial Statements."
23    A.  Yes.
24    Q.  Did you have anything to do with
25 putting this section together?

1            Varughese
2     A.  We all did as a matter of fact.  Mr.
3  Klein, Mr. Nazon and myself.
4     Q.  And what was your role in putting the
5  financial statements section together?
6     A.  I basically did the projections on
7  what the estimates will be for gross profit and
8  the rest that's in here.
9     Q.  And did those gross profits assume
10 any minimum of sales going forward?
11    A.  Yes.
12    Q.  And how did you come up with your
13 assumptions that informed your financial
14 statements?
15    A.  Basically from Mr. Klein's experience
16 and his understanding of -- based on low numbers
17 what the projections would come out to be.
18    Q.  Turning to page 29, the eight-year
19 gross profit projection.  In year one is there a
20 certain assumption here as to how many seats
21 would be sold to reach these projections?
22    A.  Yes.
23    Q.  And how many seats would have to be
24 sold to reach the projections here?
25    A.  A thousand seats the first year.

1          Varughese
2    Q.   And all of those would need to be
3  installed?
4    A.   Yes.
5    Q.   And if those were all sold and
6  installed, you expected there to be $230,000 in
7  gross profit in the first year, is that correct?
8    A.   Yes.
9    Q.   Where it says average profit per
10 bottle, 20, on what did you base that assumption?
11   A.   Based on what the solution itself was
12 being bought for from the manufacturer compared
13 to what Mr. Klein was selling it for to a dealer
14 or to end users.
15   Q.   What was Mr. Klein selling it for?
16   A.   I believe some of them he was selling
17 for about 50 or $55 a bottle, some of them even
18 higher.
19   Q.   When you first put these projections
20 together in January of 2006, it was your
21 understanding that Mr. Klein was already selling
22 solution for upwards of $50 a bottle?
23   A.   No, these are all projections.  It
24 says profit projections.
25   Q.   Did there come some time during 2006

1          Varughese
2  where it became clear to you that Clean Care
3  Technologies would either not be able to sell
4  1,000 seats or exceed 1,000 seats or in some
5  other way stray from these projections?
6    A.   No, because in dealing with every
7  company I've dealt with, even at the last minute,
8  one investor coming in with a few million can
9  turn the whole tide around.  As a matter of fact
10 Dr. Schwartz had continually kept the promise to
11 Mr. Klein that he was going to receive seven
12 figure investments to grow the company, which
13 never happened.
14   Q.   I'm not asking you whether it's
15 possible that several million dollars could have
16 come in and saved the company, what I'm asking
17 you is a simple question relating to the
18 company's sale of seats.
19   A.   Yes.
20   Q.   Did there come a point, any time in
21 2006 or after where it became clear to you that
22 the sale of 1,000 seats for year one was a
23 projection that the company would not meet?
24   A.   Sure, towards the end of the year.
25   Q.   Approximately how many seats were

1          Varughese
2  sold in 2006?
3    A.   That, I don't know.  That number Mr.
4  Klein would have.
5    Q.   Is it safe to say less than 500 for
6  2006?
7    A.   Yes.
8    Q.   Upon learning that the company would
9  not sell more than 1,000 seats -- excuse me,
10 would not sell 1,000 seats for year one, did you
11 have any conversations with Mr. Klein or anybody
12 else at the company about changing the
13 projections in the literature being sent to
14 potential investors?
15   A.   Sure, that was a constant
16 conversation that went on.  Especially because we
17 wanted to have our financials with the company
18 with the amount of merchandise that was in stock
19 and what was out in the street, the exact numbers
20 going back to all individuals, and at some point
21 also contacted Mr. Schwartz to really see how we
22 can improve our relations between him and Mr.
23 Klein.
24   Q.   Did you recall whether it was you
25 that suggested changes to the offering memorandum

1          Varughese
2  or other literature being sent to clients -- to
3  investors?
4    A.   Mostly, yes.
5    Q.   Did somebody tell you that he thought
6  it was a bad idea to change the numbers in the
7  offering memorandum?
8    A.   No, it wasn't that -- the fact was
9  until the money was in-house, to actually do
10 audited financials it didn't make sense to change
11 anything.
12   Q.   Did anybody ever discuss whether this
13 offering memorandum needed to be changed to
14 reflect that the company had not met its year one
15 projections?
16   A.   Sure.
17   Q.   Was it ever changed to reflect that
18 the company had not met its year one projections?
19   A.   That was in the new offering
20 memorandum which was inclusive in the audited
21 financials.
22   Q.   Was it ever included in any offering
23 memorandum that was ever sent to any investor?
24   A.   No, again that was just before the
25 commission contacted us and asked us to seize any

Page 162

```
 1                Varughese
 2  communication with the clients.
 3     Q.  Which was summer of 2007?
 4     A.  Yes.
 5     Q.  So just so the record is clear, there
 6  was never any offering memorandum or other
 7  literature sent to any potential or actual Clean
 8  Care Technologies investor that disclosed that
 9  the company had not met its year one projections,
10  is that correct?
11     A.  Yes.
12     Q.  When to your knowledge did Clean Care
13  Technologies sell its first toilet seat?
14     A.  Sometime early 2006, I don't know the
15  date exactly.
16     Q.  Would you say it was early as in
17  January or closer to April or May?
18     A.  Closer probably to April, I'd say,
19  March/April.
20     Q.  From whom did Clean Care Technologies
21  purchase the seats?
22     A.  For whom?
23     Q.  From whom?  Where did Clean Care
24  Technologies get the seats?
25     A.  From Systems, I believe.
```

Page 163

```
 1                Varughese
 2     Q.  So Clean Care Technologies paid
 3  Systems money for the seats?
 4     A.  Correct.
 5     Q.  And where did Systems get the seats
 6  to your knowledge?
 7     A.  From the manufacturer.
 8     Q.  Did Systems make any profit off the
 9  seats it sold to Technologies?
10     A.  I believe so.
11     Q.  Did you disclose anywhere in the
12  offering memorandum for Clean Care Technologies
13  that Clean Care Technologies was purchasing the
14  seats at a higher price than NTF was selling
15  seats?
16     A.  No.  Well, that was understood that
17  they would be purchased and sold at a high price
18  as well.  So whatever profits were going to be
19  put back in the company would be exactly the
20  same.
21     Q.  My question is different.  My
22  question is let's start from the beginning.  NTF
23  sold seats to Clean Care Systems at a certain
24  price, correct?
25     A.  Correct.
```

Page 164

```
 1                Varughese
 2     Q.  And it's your understanding that
 3  Systems then sold those seats to Technologies,
 4  correct?
 5     A.  Correct.
 6     Q.  And those seats were sold at some
 7  markup, correct?
 8     A.  Yes.
 9     Q.  And Clean Care Technologies never
10  disclosed to investors that it was paying Systems
11  more for the seats than NTF was charging,
12  correct?
13     A.  Correct.
14     Q.  From whom did Clean Care Technologies
15  buy this fluid or solution?
16     A.  The same manufacturer.
17     Q.  Was it directly from the manufacturer
18  or was it through Systems?
19     A.  Through Systems.
20     Q.  And was it again at a markup?
21     A.  Yes.
22     Q.  And did you disclose anywhere in the
23  offering memorandum or any other documents sent
24  to investors that Clean Care Technologies was
25  paying a marked-up price for the solution?
```

Page 165

```
 1                Varughese
 2     A.  No.
 3     Q.  Was there any mention of Systems
 4  whatsoever in any of the literature you sent to
 5  any investors?
 6     A.  No.
 7     Q.  Did you discuss with Mr. Klein or Mr.
 8  Nazon or anybody else at Clean Care Technologies
 9  whether any documents sent to potential Clean
10  Care Technologies investors should include
11  mention of Systems?
12     A.  Actually I went one step beyond that,
13  I told Mr. Klein to actually have a sit-down
14  meeting with Mr. Schwartz and actually see if he
15  can reason with him to, you know, to include the
16  investors somehow as part of the company.
17     Q.  That's a different step and we can
18  discuss that in a moment, my question again was
19  different.  My question is whether you at any
20  time discussed with anybody at Clean Care whether
21  Systems should be mentioned in any of the
22  literature sent to potential investors?
23     A.  No.
24     Q.  Are you aware of anybody else at
25  Clean Care Technologies discussing whether
```

1           Varughese
2  Systems should be mentioned in any way, shape or
3  form in the information sent to investors?
4      A.  No.
5      Q.  Turning now to your earlier answer,
6  do I understand you correctly that at some point
7  you asked Mr. Klein to clarify the relationship
8  among Clean Care Systems, Mr. Klein and Clean
9  Care Technologies?
10     A.  Yes.
11     Q.  And when did you first do that?
12     A.  As soon as I found out about Dr.
13 Schwartz wanting a separate company to become
14 partners with him.
15     Q.  And when was that?
16     A.  I believe early 2007, January 2007 or
17 late 2006.
18     Q.  Looking back at Exhibit number 14, in
19 February 2006 what was your understanding of what
20 Systems was?
21     A.  It was a company wholly owned by Mr.
22 Klein.
23     Q.  So I'm failing to understand
24 something.  When you asked Mr. Klein to clarify
25 the relationship among the entities, was that

1           Varughese
2  only a problem for you once you learned of
3  something that Mr. Schwartz wanted to do with the
4  companies?
5      A.  No, even prior.  Just the fact that
6  he wanted to exclude the investors from the
7  beginning, that was an issue.
8      Q.  But you knew in February 2006 that
9  two separate companies existed?
10     A.  Yes.
11     Q.  And you knew all along that money was
12 being paid from one entity to another, correct?
13     A.  No, not from the beginning.
14     Q.  At what point did you learn that
15 Clean Care Technologies was purchasing its seats
16 from Clean Care Systems?
17     A.  Sometime in 2007.  I don't know
18 exactly.  But to my understanding the entities
19 were both owned by Mr. Klein, so all contracts
20 were held by Mr. Klein.
21     Q.  And you sought clarification from Mr.
22 Klein?
23     A.  Yes.
24     Q.  And what did he tell you?
25     A.  Well, he had said that as far as

1           Varughese
2  Systems were concerned, it's a separate company,
3  it's something that he's directly dealing with.
4  Dr. Schwartz still doesn't have anything in
5  writing as far as the contract, nothing on paper.
6  So as far as all rights and ownership is still
7  under his name.
8      Q.  His personal name?
9      A.  His personal name.
10     Q.  Who at Clean Care Technologies was
11 responsible for selling the actual seats to
12 customers as opposed to investors?
13     A.  Mr. Klein.
14     Q.  Did anybody other than Mr. Klein to
15 your knowledge sell seats?
16     A.  Jeremy Klein.
17     Q.  Is that Mr. Klein's son?
18     A.  Yes, but the sales of the seats also
19 involved Mr. Nazon and myself because some of the
20 contacts that we had we forwarded over to Mr.
21 Klein as well to have him install the seats or do
22 presentations on the seats.
23     Q.  Do you know of anybody that you found
24 that ultimately purchased any seats from Clean
25 Care Technologies?

1           Varughese
2      A.  I mean indirectly, not somebody that
3  I had spoken to personally.
4      Q.  Can you clarify what you mean by
5  indirectly?
6      A.  Let's say through an advertisement
7  through a phone call, someone had heard about the
8  company and wanted to buy a seat directly, they
9  would contact Mr. Klein.
10     Q.  My question to you was not whether
11 anybody ever purchased a seat, my question was
12 whether there was anybody that you contacted who
13 then purchased seats from Clean Care
14 Technologies?
15     A.  No, not directly.
16     Q.  Again you continue to qualify your
17 answer with "not directly."  Was there some
18 indirect way that you called somebody and they
19 ultimately bought seats?
20     A.  Yes, through advertisements, even
21 through listing it online, someone would call and
22 say they wanted to buy a seat and they'd be
23 referred on to Mr. Klein.
24     Q.  So the closest you came to selling a
25 seat was receiving a call in response to an

Page 170

| | |
|---|---|
| 1 | Varughese |
| 2 | advertisement that had been placed and passing |
| 3 | that person along to Mr. Klein? |
| 4 | A. Correct. |
| 5 | Q. To your knowledge is the same true of |
| 6 | Mr. Nazon? |
| 7 | A. Yes. |
| 8 | Q. He never sold seats directly? |
| 9 | A. No. |
| 10 | Q. At most he received calls from people |
| 11 | interested in purchasing seats and he forwarded |
| 12 | them on to Mr. Klein? |
| 13 | A. Correct. |
| 14 | Q. Was part of the company's business |
| 15 | strategy to sell seats at a significant loss in |
| 16 | order for the market to become more familiar with |
| 17 | the seats? |
| 18 | A. Absolutely not. |
| 19 | Q. Was it ever part of the company's |
| 20 | strategy to sell the seats at any price less than |
| 21 | the price Clean Care Technologies had paid for |
| 22 | them? |
| 23 | A. No, absolutely not. Actually I want |
| 24 | to clarify that on certain occasions there was, |
| 25 | if an entity or a location was visible enough and |

Page 171

| | |
|---|---|
| 1 | Varughese |
| 2 | public enough, then some of the seats were given |
| 3 | away for free, so they had an opportunity for |
| 4 | exposure. |
| 5 | And for instance, Newark Airport, |
| 6 | which is where it is currently right now or any |
| 7 | public venue where the seats were, if there was |
| 8 | enough traffic, then it was worth it to give the |
| 9 | seats away so more people would ask about the |
| 10 | product. |
| 11 | Q. So the answer to whether Clean Care |
| 12 | ever had as part of its business strategy to sell |
| 13 | seats for something less than it had paid for |
| 14 | them is yes? |
| 15 | A. Yes. |
| 16 | Q. And do you know how many seats Clean |
| 17 | Care Technologies gave away for less than what |
| 18 | Clean Care Technologies paid for it? |
| 19 | A. That I wouldn't know. |
| 20 | Q. Do you know if it was most of the |
| 21 | seats that it recorded as sales, very few, any |
| 22 | way to characterize it? |
| 23 | A. I wouldn't know. I know that the |
| 24 | main profit from day one has always been the |
| 25 | solution. The recurring sales from the solution. |

Page 172

| | |
|---|---|
| 1 | Varughese |
| 2 | Q. Did you disclose in the offering |
| 3 | memorandum or any other written materials sent to |
| 4 | investors that the company intended to give away |
| 5 | seats for free? |
| 6 | A. I believe so. As to where it is, I |
| 7 | wouldn't know. I know that a lot of the |
| 8 | investors were called about it and told that any |
| 9 | seat purchased if it's a highly visible location, |
| 10 | it would be given away for free. |
| 11 | MR. BIRNBAUM: I want to mark as |
| 12 | Exhibit 15 the finder's fee agreement that |
| 13 | you produced yesterday. |
| 14 | (Plaintiff's Exhibit 15, Finder's fee |
| 15 | agreement, was so marked for |
| 16 | identification.) |
| 17 | Q. Do you recognize the document? |
| 18 | A. Yes. |
| 19 | Q. What is this document? |
| 20 | A. It's a finder's fee between Clean |
| 21 | Care Technologies and Focus Marketing based |
| 22 | between Mr. Nazon and myself. |
| 23 | Q. Do you have a signed copy of this |
| 24 | agreement? |
| 25 | A. No. |

Page 173

| | |
|---|---|
| 1 | Varughese |
| 2 | Q. Did you ever get a signed copy of |
| 3 | this agreement? |
| 4 | A. I believe so, but I don't know where |
| 5 | it went. I believe Mr. Nazon has a copy. |
| 6 | Q. Are you confident that this is the |
| 7 | final version? |
| 8 | A. This was the first version. I |
| 9 | believe we had another agreement that was signed |
| 10 | for 15 percent but it was never executed. |
| 11 | Q. So it would not surprise you if I |
| 12 | told you that we've received a different version |
| 13 | of this finder's fee agreement with certain |
| 14 | different terms? |
| 15 | A. No. Did you say a signed copy of it? |
| 16 | Q. I didn't say signed. |
| 17 | A. To my knowledge this is the only one |
| 18 | that we had signed. |
| 19 | Q. I want to go back to the time line |
| 20 | because February 15th, 2005 seems rather early in |
| 21 | what we've been discussing. Does this document |
| 22 | refresh your recollection in any way of when you |
| 23 | first discussed Clean Care Technologies with Mr. |
| 24 | Klein? |
| 25 | A. Not really. It's a few years back. |

1              Varughese
2      Q.  Are you confident that it was at
3  least several weeks before February 15th, 2005?
4      A.  It's possible.
5      Q.  Did you create this document?
6      A.  No.
7      Q.  Did Mr. Klein create this document?
8      A.  No.  Mr. Nazon had a finder's
9  agreement.
10     Q.  Did you review this before showing it
11 to Mr. Klein?
12     A.  I glanced over it.
13     Q.  Did you express any opinion as to
14 whether the agreement should reflect the true
15 name of your Focus 4 Marketing company?
16     A.  No.
17     Q.  Did you discuss with Mr. Nazon that
18 by putting the name of the company as Focus
19 Marketing you would be able to deposit checks
20 into more than one account of a different name?
21     A.  No.  It was basically understood that
22 would be the case.
23     Q.  What did you base that understanding
24 on?
25     A.  Because, you know, the name Focus

1              Varughese
2  Marketing would still be valid.
3      Q.  But Focus Marketing wasn't the name
4  of your company, correct?
5      A.  No, that wasn't the full name.
6      Q.  In the third marked paragraph or
7  section it reads "The finder may elect at its
8  discretion and is subject to availability to
9  receive common stock in the company at the
10 closing of the financing."  Was the financing
11 ever closed?
12     A.  No.
13     Q.  Were there any other -- withdrawn.
14 Did you ever receive any stock in Clean Care
15 Technologies?
16     A.  No.
17     Q.  Did you ever receive any interest in
18 Clean Care Systems?
19     A.  No.
20     Q.  Did you ever discuss with Mr. Klein
21 that Focus Marketing could hire people other than
22 you and Mr. Nazon?
23     A.  Yes.
24     Q.  Did you ever discuss with Mr. Klein
25 whether Focus Marketing would employ registered

1              Varughese
2  broker/dealers?
3      A.  No.  I had actually discussed hiring
4  other companies, other broker/dealers, not
5  through Focus Marketing but Clean Care directly.
6      Q.  Did you receive 10 percent of all the
7  money that you brought in from investors to Clean
8  Care Technologies?
9      A.  Yes.
10     Q.  At some point did you start receiving
11 15 percent?
12     A.  Yes.
13     Q.  When you started to receive
14 15 percent was this based on an oral agreement
15 with Mr. Klein?
16     A.  Yes.
17     Q.  Did you disclose to investors that
18 you would receive 15 percent?
19     A.  No.
20     Q.  Do you know if anybody else disclosed
21 to investors that you would receive 15 percent of
22 the money they put into Clean Care Technologies?
23     A.  That I don't know.
24     Q.  I want to turn to a document we'll
25 label as Exhibit 16.

1              Varughese
2      (Plaintiff's Exhibit 16, Draft news
3      release, was so marked for
4      identification.)
5      MR. BIRNBAUM:  Before we do that, let
6      me just look at -- go back through my
7      questions about the commissions.
8      Q.  Did Mr. Nazon also receive 10 percent
9  at first?
10     A.  Yes.
11     Q.  Did he eventually move to 15 percent
12 as well?
13     A.  Yes.
14     Q.  Is the same true for Mr. Allen?
15     A.  Yes.
16     Q.  Was there anybody else that sold
17 Clean Care shares?
18     A.  No.
19     Q.  Were there commissions disclosed at
20 any time to investors?
21     A.  No, I don't believe so.
22     MR. BIRNBAUM:  Let's go off the
23     record, it's 2:50.
24     (Recess taken)
25     (Plaintiff's Exhibit 17, News release

1              Varughese
2    dated January 5th, 2000, was so marked for
3    identification.)
4         MR. BIRNBAUM:  Back on the record.
5    BY MR. BIRNBAUM:
6         Q.   Mr. Varughese, I have a question to
7    ask you about Exhibit 16, which I've placed
8    before you.  Do you recognize Exhibit 16?
9         A.   Yes.
10        Q.   What is Exhibit 16?
11        A.   It's a draft news release.
12        Q.   How do you know it's a draft?
13        A.   It was -- I see a lot of spaces and
14   there's a lot of things to fill in.  The second
15   line it says Wegman's and then just a space, it
16   was never completed.
17        Q.   Was there a space after Wegman's so
18   that things could be added to Wegman's?
19        A.   Yes.
20        Q.   So what's in here is incomplete?
21        A.   It's not just incomplete, a lot of it
22   was conversations that Mr. Klein had with dealers
23   or with other entities, some of them panned out,
24   some of them didn't.
25        Q.   The first sentence, if it's not on

1              Varughese
2    the record, it's a July 1, 2006 release, says "To
3    date the company has managed to make sales to
4    several major corporation entities."  Did I read
5    that correctly?
6         A.   Yes.
7         Q.   As of July 1, 2006 were you aware of
8    any sales to any major corporate entities?
9         A.   No, but Mr. Klein was in discussion
10   with Wegman's and a few other entities.
11   Americhem, Swisher.  Some of the times he would
12   tell us about certain things that were going to
13   happen but it never panned out, and this was one
14   of the draft releases that stated some of the new
15   things that were happening with the company but
16   wasn't complete.
17        Q.   I want to show you another exhibit,
18   Exhibit 17, January 5th, 2000 release, do you
19   recognize that document?
20        A.   Yes.
21        Q.   And what is that document?
22        A.   That's a news release that was sent
23   in January.
24        MR. BIRNBAUM:  And if I can mark 18.
25        (Plaintiff's Exhibit 18, Collection

1              Varughese
2    of documents, was so marked for
3    identification.)
4         Q.   Which I'll place in front of you.
5    It's a collection of documents from an investor,
6    and I'd ask you to take as much time as you need
7    but I'm only going to ask you questions about a
8    couple of the pages.  On the front page, February
9    14th, 2007, to whom it may concern.
10        A.   Yes.
11        Q.   Is this the kind of general letter
12   you would include in a packet to potential
13   investors?
14        A.   To potential investors, that I don't
15   know about.  But to existing investors.
16        Q.   Would you send it to somebody who had
17   expressed interest in the company?
18        A.   Only if they asked for a specific
19   valuation on what the inventory was.
20        Q.   And looking at the second page of
21   this Exhibit 18, is that your business card?
22        A.   Yes.
23        Q.   And when you worked for Clean Care
24   Technologies, did you always operate under the
25   name Anil Varughese?

1              Varughese
2         A.   Yes.
3         Q.   Never Robert Clark?
4         A.   No.
5         Q.   And would you send your business card
6    along with other information about the company
7    that you would send to potential investors or
8    others who had expressed interest?
9         A.   Sure, and brochures and such as well.
10        Q.   Now, if you turn about 17 or 18 pages
11   in, you'll see a Clean Care Technologies, "Wave
12   Bacteria Goodbye."  Do you see for immediate
13   release July 1, 2006?
14        A.   Yes.
15        Q.   And does this look like the press
16   release that you called a draft in the form
17   presented in Exhibit 16?
18        A.   Yes.
19        Q.   Was it your practice to send drafts
20   to Clean Care investors?
21        A.   No.  This is definitely not the thing
22   that I was sending with the July news release.
23        Q.   Getting back to that first sentence,
24   "To date the company has managed to make sales to
25   several major corporate entities."  Was that as

Page 182

Varughese

1
2  of July 1st, 2006 an inaccurate statement?
3      A.  Yes.
4      Q.  Sitting here today, is it yet true
5  that the company has managed to make sales to
6  several major corporate entities?
7      A.  I don't know the current state of the
8  company so I can't say.
9      Q.  Was it ever --
10     A.  But as of this sitting I'm aware of
11  the seats being at Newark Airport and a few other
12  entities, at a restaurant in midtown, Todai
13  restaurant, I believe.
14     Q.  Do you know if the company ever had
15  any major -- strike that.  Do you know whether
16  the company ever had any sales to Wegman's?
17     A.  No, it was never completed.
18     Q.  How about Americhem?
19     A.  No, that was another company that
20  wasn't completed.
21     Q.  How about Penn State University?
22     A.  No.
23     Q.  Do you know where the author of this
24  document got the specific numbers listed for each
25  of the companies where it says Americhem has

Page 183

Varughese

1
2  bought 64 seats?
3      A.  That's from Mr. Klein, he was
4  negotiating with them at that point.
5      Q.  So it was never true that they had
6  bought 64 seats, that's more of an expression of
7  what the company hoped to sell?
8      A.  I believe they had an understanding
9  but what had happened was they wanted to get the
10  seats for free and he wasn't willing to sell the
11  seats for free because Dr. Schwartz didn't want
12  to give the seats away.
13     Q.  So the only thing left to be figured
14  out in this contract was whether the seats were
15  actually paid for or given for free?
16     A.  What do you mean thing left?
17     Q.  I'm understanding you to say that
18  there was an agreement but for something, and the
19  but for I'm hearing is but Americhem wanted the
20  seats for free and Clean Care Technologies wanted
21  Americhem to pay for the seats.
22     A.  Of course.
23     Q.  So there was no agreement, correct?
24     A.  There was no finalization of the
25  agreement, correct.

Page 184

Varughese

1
2      Q.  There were discussions and nothing
3  more?
4      A.  Correct.
5      Q.  So it was never true that Americhem
6  had bought seats?
7      A.  No, like I said, this was a draft
8  news release.  It was not supposed to be sent to
9  any individuals.
10     Q.  Moving one page before this to the
11  January 5th, 2007 document, is this as best you
12  can tell the same as Exhibit 17 which you
13  identified earlier?
14     A.  Yes.
15     Q.  And am I correct in understanding
16  that Exhibit 17 you do know was sent to
17  investors?
18     A.  Yes.
19     Q.  And if you look, let's use Exhibit
20  17, to the third paragraph starting "Key trade
21  shows."
22     A.  Yes.
23     Q.  Was it true in January of 2007 that
24  Clean Care Technologies had, quote, signed on
25  numerous dealers including the Las Vegas Towel &

Page 185

Varughese

1
2  Linen Company?
3      A.  From my understanding at that point
4  it was.  But later on Mr. Klein had said that the
5  deal did not go through with Las Vegas Linen &
6  Towel.
7      Q.  When you say that it was, it was true
8  that Clean Care hoped to have an agreement or was
9  it true that the company had finalized an
10  agreement?
11     A.  No, here's the main point was with
12  the manufacturer asking for X amount of seats,
13  they could not afford to -- Clean Care could not
14  afford to just give the seats away for free,
15  which is what they wanted.  They had things in
16  writing from my understanding with these
17  companies but they couldn't fulfill the
18  obligations because to give the seats away free
19  would defeat the purpose.
20     Q.  So is it fair to say that because of
21  those differences Clean Care Technologies never
22  signed on with Las Vegas Towel & Linen Company?
23     A.  That I'm not a hundred percent about.
24  Whether it was at the end signed or not.  I don't
25  think it was followed through.

Page 194

1          Varughese
2  would, in fact that would be their major selling
3  point to actually give the seats away free
4  because their recurring revenue model would
5  depend on the solution, not on the seat.
6      Q.  When you got involved with Mr. Klein
7  and Clean Care Technologies, you understood that
8  your model was based at least in part of the
9  giving away of free seats so that companies would
10  need more fluid?
11      A.  Not initially but as time went on,
12  yes.
13      Q.  Would you say you learned that in the
14  first few weeks, you learned that sometime in the
15  last few weeks?
16      A.  The first few months I'd say.
17      Q.  Now your projections in the placement
18  memorandum, did those projections take into
19  consideration that the seats would not be sold at
20  full price?
21      A.  Um --
22      Q.  If you want to turn to Exhibit --
23      A.  I know what you're speaking of.
24  Partially.  But not -- initially, no, that wasn't
25  the case because we weren't expecting to sell the

Page 195

1          Varughese
2  seats for free.
3      Q.  Initially you did not take into
4  consideration that some of them would be given
5  away for free?
6      A.  Right.
7      Q.  And you never changed those
8  projections?
9      A.  No.
10      Q.  So how did it become at some point
11  partially?
12      A.  Because Mr. Klein had explained that
13  especially in high visibility areas to get more
14  attraction for the seat to be sold it would make
15  sense to give it away, to offer the seat either
16  at reduced prices or literally to offer it for
17  free.
18      Q.  And you understood that?
19      A.  Yes.
20      Q.  And you agreed with that?
21      A.  Yes.
22      Q.  And you understood that the PPM or
23  the offering memorandum was not changed to
24  reflect that plan?
25      A.  Yes.

Page 196

1          Varughese
2      Q.  And you continued to give out that
3  same PPM to investors in the company?
4      A.  Yes, but they were verbally told that
5  this was going to be the case, and every
6  individual that was involved actually vouched for
7  the idea.  They loved the fact that that would be
8  the case and if they could get it into their own
9  locations they expressed more interest in
10  vouching for the seat in their local areas.
11      Q.  Are you aware of any written
12  communications or other written record that
13  indicates that any investor understood the Clean
14  Care technology business model was inconsistent
15  with that relied upon in the projections in the
16  offering memorandum?
17      A.  If you're asking something news given
18  to investors?
19      Q.  I'm asking if you're aware of any
20  communication or from investors or any
21  contemporaneous record, any notes, anything
22  whatsoever that would support the claim that
23  investors were aware that Clean Care
24  Technologies' business model assumed the
25  distribution of seats at a substantial discount

Page 197

1          Varughese
2  and sometimes for free?
3      A.  No, I don't think anything was sent
4  to the investors.  Like I said, that was
5  something that was formulated in the new private
6  offering memorandum.
7      Q.  Because you thought the new one
8  needed to correct an inaccuracy?
9      A.  Correct, or to more accurately to
10  explain it in detail exactly what the plan for
11  the company was.
12      Q.  I want to walk through -- did you
13  personally tell all the investors that the seats
14  would be given away?
15      A.  Did I personally tell every investor,
16  no, not every investor.
17      Q.  Why are you confident, if you are,
18  that all investors were told?
19      A.  I was there for most of the
20  conversations for Mr. Nazon, he was there for
21  mine.  Dave Allen as well.
22      Q.  For those investors with whom you
23  spoke, did you explain to those investors that
24  your projections in the memorandum that you
25  provided to them relied on different assumptions

Page 198

Varughese

1    than those you were telling them orally?
2    A.  Sure.  Maybe not in those exact words
3    but in the sense that I told them every single
4    individual would be apprised of what the new
5    directions would be.  The new actual financial
6    would be as soon as we had the financials
7    completed.
8    Q.  If not in those exact words, did you
9    specifically inform the investors that your
10   projections in the documents you were sending
11   them were not consistent with the direction you
12   believed the company to go in?
13   A.  To some degree I'd say.  I wouldn't
14   tell them exactly this is the documentation or
15   the projection is completely incorrect.  I would
16   tell them that these are again projections.  So
17   they can change at any moment's notice.
18   Q.  But did you tell them they already
19   had changed?
20   A.  No.
21   Q.  And in fact for at least some
22   investors that you contacted later, they already
23   had changed, correct?
24   A.  Yes.

Page 199

Varughese

1    Q.  I want to turn to Exhibit 10, which
2    you identified earlier as the answer you provided
3    in this case, and I just want to walk through
4    some of the statements.
5    You said, "Had I known back then when
6    I first walked into Commonwealth Capital Group
7    that I would be in such a situation today, I
8    would have walked back out and never looked
9    back."  Why is that?
10   A.  Well, I had no idea that being a
11   finder for a company was incorrect or illegal.
12   Q.  Is that the only reason that joining
13   Commonwealth Capital is something you would
14   change?
15   A.  No, just in terms of direction of the
16   company, not being informed of situations as they
17   happened.  Never being aware of exactly what was
18   going on with the company.  All of those
19   situations.
20   Q.  You do not deny that you have never
21   been a registered broker/dealer, correct?
22   A.  Yes.
23   Q.  And you do not deny that all sales of
24   Clean Care Technologies securities with which you

Page 200

Varughese

1    were involved were not registered transactions,
2    correct?
3    A.  Yes.
4    Q.  And you do not deny that you played a
5    role in drafting the PPM that we reviewed today
6    and that was sent to numerous investors, correct?
7    A.  Yes.
8    Q.  And you do not deny that you played a
9    role in drafting the press releases we reviewed
10   today and that were sent to investors, correct?
11   A.  Well, the press releases I really
12   just reviewed them.
13   Q.  So you do not deny that you reviewed
14   the press releases before they were sent out,
15   correct?
16   A.  Correct.
17   Q.  At any time did you object to them
18   being sent out because of anything that you found
19   to be inaccurate?
20   A.  No, when Mr. Klein said a contract
21   was reached with such and such company, it was
22   assumed that it was.
23   Q.  You never asked, when you say it was
24   assumed that, did you ever ask Mr. Klein whether

Page 201

Varughese

1    you actually had any sales or whether it was one
2    of these circumstances that you describe where
3    something was maybe in the works?
4    A.  I did ask and also, you know, when
5    you went to the warehouse you could see the
6    inventory, the count, obviously more seats are
7    being pushed out, and you see just in the visual
8    sense that the company is actually doing what it
9    said it's going to do.
10   Q.  When you went to the warehouse and
11   saw the seats, how did you know whether those
12   seats belonged to Clean Care Technologies or
13   Clean Care Systems?
14   A.  Mr. Klein had them marked separately.
15   Q.  On the boxes or some paper off to the
16   side?
17   A.  No, on a sheet that was labeled.
18   Q.  Affixed to the box.  My question is
19   you could look at the seats and say those are
20   obviously Technologies' seats, those are
21   obviously Systems' seats?
22   A.  He'd have it earmarked in separate
23   locations basically.
24   Q.  Did you ever receive any commissions

Page 202

1              Varughese
2 on investments from Dr. Schwartz?
3      A.  From Clean Care Systems?
4      Q.  Did you ever receive any commissions
5 whatsoever for any investor from Dr. Schwartz?
6      A.  Yes.
7      Q.  What investor was that?
8      A.  From part of the inventory sales.
9      Q.  What inventory sales are those?
10     A.  The funds that he sent for inventory
11 sales, we would get a portion of that back.
12     Q.  Where did he send those funds?
13     A.  To Clean Care Systems.
14     Q.  And Clean Care Systems would then pay
15 you?
16     A.  No.
17     Q.  How were you paid?
18     A.  We were paid through Clean Care
19 Technologies.
20     Q.  So Mr. Klein -- withdrawn.  So Dr.
21 Schwartz would place money in a Systems account?
22     A.  Uh-huh.
23     Q.  And because you had brought Dr.
24 Schwartz into the business, Clean Care
25 Technologies would then pay you some percentage

Page 203

1              Varughese
2 of what Dr. Schwartz had invested, is that
3 correct?
4      A.  Yes.
5      Q.  Do you know whether Clean Care
6 Systems covered that for Clean Care Technologies?
7      A.  I don't understand.  What do you
8 mean?
9      Q.  I'm trying to figure out how Clean
10 Care Technologies got the money to pay you a
11 commission on Dr. Schwartz's investment, and my
12 question relates to whether or not that was taken
13 from Clean Care Systems' account into Clean Care
14 Technologies' accounts and then paid to you or
15 whether Clean Care Technologies was using Clean
16 Care Technologies' investors money to pay you or
17 something different.  So I'll shorten the
18 question to make it simpler.
19         Did the money that you were paid as a
20 commission for Dr. Schwartz's investments in
21 Clean Care Systems get paid from a Clean Care
22 Technologies account?
23     A.  Yes.
24     Q.  And do you have any idea whether
25 Clean Care Systems paid money to Clean Care

Page 204

1              Varughese
2 Technologies to cover the money -- to cover the
3 commissions paid to you?
4      A.  That I don't know.
5      Q.  So where in your answer you state
6 "According to summary section 2 it states that
7 all funds collected were freely commingled to
8 benefit defendants Mr. Nazon and myself.  Not a
9 single penny of the funds went into Mr. Nazon's
10 or Mr. Varughese's personal accounts, nor did we
11 have access to any bank accounts that held
12 investors' funds at any point."
13         Sitting here today, is the reason
14 that that's true, if it is true, because the
15 funds were deposited into Focus 4?
16     A.  No, it had nothing to do with that.
17 Meaning that investors' funds never went to our
18 accounts, nor did Systems' or Technologies', we
19 didn't have access to any of those funds.
20     Q.  Is it your testimony that Dr.
21 Schwartz invested money in Clean Care Systems,
22 and as a result of Dr. Schwartz investing money
23 in Clean Care Systems you personally were paid
24 directly or through Focus 4 a commission based on
25 Dr. Schwartz's investment?

Page 205

1              Varughese
2      A.  Yes, through Clean Care Technologies.
3      Q.  And you have no idea whether Clean
4 Care Technologies and Clean Care Systems had some
5 agreement over who would cover the money being
6 paid to you, correct?
7      A.  No, I don't know.  But the monies
8 that we used for Dr. Schwartz were actually used
9 for taking care of some of the expense for the
10 office as well as for the surveyors and such,
11 their employment expenses and such.
12     Q.  You mean employees of Clean Care
13 Technologies?
14     A.  No, I mean just the individuals that
15 would come to do surveys for us, for Mr. Nazon
16 and myself.
17     Q.  Was that to benefit you or to benefit
18 Clean Care Technologies or something different?
19     A.  Clean Care Technologies.
20     Q.  So Dr. Schwartz's investments were
21 used to pay some of Clean Care Technologies'
22 expenses?
23     A.  Indirectly, yes.
24     Q.  When you write that Mr. Klein had
25 sole ownership of both Clean Care Technologies

Page 218

```
 1              Varughese
 2     Q.  How much money was such?
 3     A.  A few thousand here and there, I
 4  don't know.
 5     Q.  What would you say the total was?
 6     A.  I don't know the exact amount.  I
 7  couldn't say.
 8     Q.  If you don't know the exact amount,
 9  give me your best approximation?  Are we talking
10  something like 15 or $20,000?
11     A.  No.
12     Q.  $100,000?
13     A.  No, I'd say less than $10,000.
14     Q.  Less than ten, more than five?
15     A.  Somewhere around there.
16     Q.  Do you know if Al Nazon has a bank
17  account other than his Focus 44 account?
18     A.  I don't know.  That's the only one I
19  know of.
20     Q.  Just some cleanup questions.  Could
21  you just state your date of birth for the record?
22     A.  3/29/76.
23     Q.  And your address is 82-61 256th
24  Street?
25     A.  41.
```

Page 219

```
 1              Varughese
 2     Q.  82-41?
 3     A.  Yes.
 4     Q.  Glen Oaks, New York, 11004?
 5     A.  Yes.
 6     Q.  And what's your Social Security
 7  number?
 8     A.  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.
 9         MR. BIRNBAUM:  I'm going to suggest
10     that we go off the record after this
11     comment.  I don't think I have much more.
12     But we'll resume in five minutes.
13         (Recess taken)
14         MR. BIRNBAUM:  We're back on the
15     record.  We have nothing further at this
16     time.  Mr. Klein I believe wants to ask a
17     question.
18         MR. KLEIN:  Yes, I'm just a little
19     confused so I have a couple of questions.
20  EXAMINATION BY MR. KLEIN:
21     Q.  Anil, you said that numerous times
22  today that you worked and were employed by Clean
23  Care.  In what capacity because I don't recall
24  that you worked for Clean Care.  My understanding
25  is that you and Allen Focus Marketing were
```

Page 220

```
 1              Varughese
 2  totally separate entities hired by Clean Care to
 3  raise money for the company.
 4         So my question is in what capacity
 5  were you employed by Clean Care?
 6     A.  As finders, but you know, according
 7  to the finder's agreement, we never had a formal
 8  employment contract, at least that was finalized.
 9     Q.  The next question is you said today,
10  I believe you said it's been about an hour or so
11  ago that you informed me right from the get-go
12  that in order to sell shares in the company that
13  the company needed to be registered?
14     A.  Sure.
15     Q.  Then why do you think I would have
16  gone ahead with it knowing that the company had
17  to be registered before we sold shares?
18     A.  There was funding that was required
19  to get the registration done.  Number one, we had
20  to fulfill the manufacturer's contract before
21  anything else could be done as far as
22  registration offer.
23     Q.  But again your contention is that
24  you're saying that you told me up front and that
25  I went ahead regardless of what you told me
```

Page 221

```
 1              Varughese
 2  and --
 3     A.  No, you had agreed.
 4     Q.  I had agreed to sell shares -- your
 5  testimony is that I had agreed for you to sell
 6  shares even though the company has not yet
 7  registered?
 8     A.  Yes, initially you had agreed, you
 9  had said, well, yes, the registration has to be
10  done, but initially you have to have the money to
11  get the registration done.
12     Q.  In other words put the cart before
13  the horse or the chicken before the egg or
14  something like that?
15     A.  That's why we were doing a late stage
16  offering registration.
17     Q.  The next and final question I have
18  really pertains to the press releases.  Your
19  answer to Mr. Birnbaum today was that -- I
20  believe you answered that you only reviewed the
21  press releases, you did not write them.
22     A.  Correct.
23     Q.  Then my question is do you have any
24  idea who wrote them?
25     A.  I would say most of the information
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------

SECURITIES AND EXCHANGE COMMISSION,

                 Plaintiff,


       -against-             08-CV-1719


CLEAN CARE TECHNOLOGIES, INC., EDWARD
KLEIN, AL NAZON and ANIL VARUGHESE,

                 Defendants.

----------------------------------------



      DEPOSITION OF ANIL VARUGHESE, taken by

Plaintiff, pursuant to Subpoena, at the

Securities and Exchange Commission, Three World

Financial Center, New York, New York, on Tuesday,

May 13, 2008, at 10:45 a.m., before Lisa

Rosenfeld, a Shorthand Reporter and Notary

Public within and for the State of New York.

1 A P P E A R A N C E S :

2

3      SECURITIES AND EXCHANGE COMMISSION

4        Three World Financial Center

5        New York, New York 10281

6      By:   MICHAEL BIRNBAUM, ESQ.

7            VALERIE A. SZCZEPANIK, ESQ.

8

9

10

11 Also Present:

12

13      EDWARD KLEIN

14
        ANIL VARUGHESE, Pro Se
15

16                      oOo

17

18

19

20

21

22

23

24

25

Page 22

Varughese

1
2    A.  No, I don't.
3    Q.  Would you be able to get that?
4    A.  Yes.  I have it just to let you know.
5  I had an identity theft that happened a few years
6  back.  Part of that also affected my personal
7  account.
8    Q.  When was that?
9    A.  2000 or 2001.
10    Q.  Did the identity theft have anything
11  to do with Mr. Nazon or Mr. Allen?
12    A.  No.
13    Q.  Did it have anything to do with Clean
14  Care?
15    A.  No, this is prior to Clean Care.
16    Q.  And when you say it affected your
17  account, what do you mean?
18    A.  They had overdrawn my account by I
19  think some 13,000, some very large number, and
20  basically I think the account, they just froze
21  the account.
22    Q.  They being Commerce Bank?
23    A.  Yes.
24    Q.  And how did you determine that
25  somebody had stolen your identity?

Page 23

Varughese

1
2    A.  I was contacted by I think Household
3  Bank, I think it was called, and they had asked
4  me to send a whole signature form with a
5  handwriting analysis to make sure that it wasn't
6  actually me.
7    Q.  As best you know, did Mr. Allen ever
8  receive any money directly from Clean Care, that
9  is not through Focus 4?
10    A.  I don't know offhand.
11    Q.  Do you know if Mr. Nazon ever
12  received any money from Clean Care?
13    A.  Yes.
14    Q.  How would it be determined whether
15  Mr. Nazon would receive his money directly from
16  Clean Care or through Focus 4?
17    A.  He has a corporation almost
18  identical, Focus 44 Marketing Corp.  So the
19  checks are made out to Focus Marketing.  If he --
20  I need the funds directly in this account, then
21  he would deposit it in this account.
22    Q.  So the checks from Clean Care would
23  only say Focus Marketing?
24    A.  Yes.
25    Q.  You then would determine whether you

Page 24

Varughese

1
2  wanted to put it in your account or Mr. Nazon
3  would put it in his account?
4    A.  Not that I would determine it,
5  usually it would go into my account, but on
6  occasion if he needed the funds right away and he
7  wanted it out of his account then it would go
8  into his account, but mainly it was my account.
9    Q.  Were there any other Focus accounts?
10    A.  No.
11    Q.  Did you ever deposit any of the Clean
12  Care money paid to Focus Marketing into an
13  account other than Focus 44 or Focus 4?
14    A.  No.
15    Q.  Who would -- how would you determine
16  when you should put money in the Focus 44 instead
17  of Focus 4?
18    A.  Like I said, if there was an instance
19  where he needed funds right away, then a check
20  would be given to him and he would deposit it.
21    Q.  What were the circumstances when Mr.
22  Nazon needed funds immediately?
23    A.  I don't recall specifically, but you
24  know, if he said he needed funds then money was
25  given directly to him.

Page 25

Varughese

1
2    Q.  Why could you have not just written
3  the checks from Focus 4 to Mr. Nazon?
4    A.  There was a delay of a few days
5  before checks would clear.  So if he needed the
6  money urgently then if he would deposit it
7  directly he would have access to it.
8    Q.  And do you know -- withdrawn.  Why
9  did you sometimes take money that was paid by
10  Clean Care for services rendered by Mr. Nazon and
11  deposit it in your Focus 4 account?
12    A.  Sometimes if there were a need for
13  expense for the office and such, then the money
14  would be used for that as well, which is where a
15  majority of the money went to.
16    Q.  What office are you talking about?
17    A.  The office downtown.
18    Q.  Focus 4's office?
19    A.  John Street.
20    Q.  Is that 111 John Street?
21    A.  Yes.
22    Q.  Did Focus 44 have a separate office
23  from Focus 4?
24    A.  No, we were subleasing the place on
25  John Street.

Page 26

Varughese

1
2    Q.   In whose name?
3    A.   No, it was just on a handshake pretty
4    much.  It was with the individual Gabriel
5    Alvarado, he owned the company Brookstone.
6    Q.   How much did you pay for that
7    sublease?
8    A.   About 4,000 I believe a month.
9    Q.   4,000 a month?
10   A.   Yes.
11   Q.   Did you ever tell Mr. Klein that
12   there was more than one Focus entity that Clean
13   Care was being deposited to?
14   A.   Yes.
15   Q.   What did you tell him?
16   A.   That we both had a company Focus
17   Marketing, Focus 4 and Focus 44.  So we had, you
18   know, whatever funds had to be received, either
19   one of us could receive a check.
20   Q.   Were the checks sent to you
21   personally?
22   A.   No, I usually picked up the checks.
23   Q.   Did anybody else ever pick up the
24   checks?
25   A.   Mr. Nazon sometimes came with me.

Page 27

Varughese

1
2    Q.   Did Focus 4 Marketing ever perform
3    any work for a company other than Clean Care?
4    A.   No.  Prior to Clean Care?
5    Q.   At any time.
6    A.   Yes, before Clean Care we worked with
7    Veritas of China and Informercial Funding.
8    Q.   Did Focus 44 also work for those
9    companies?
10   A.   That I don't recall offhand.  I think
11   it was during Informercial Funding that Mr. Nazon
12   started Focus 44.
13   Q.   Other than Veritas and Informercial,
14   did Focus 44 work for anybody other than --
15   A.   No.
16   Q.   -- Clean Care?
17   A.   No.  Also the address 111 John
18   Street, because we were having problems with Mr.
19   Alvarado, we had moved out of the office to the
20   address I don't recall offhand, Mr. Nazon would
21   know the address by between 25th and 26th Street
22   by Eighth Avenue.
23   Q.   Did you sublease space there too?
24   A.   Yes.
25   Q.   Was that for both Focus entities?

Page 28

Varughese

1
2    A.   Yes, uh-huh.
3    Q.   What was the amount of sublease
4    there?
5    A.   I believe it was around 1200, 1500,
6    something like that.
7    Q.   From when to when did you sublease
8    that space?
9    A.   I don't recall offhand.  It's right
10   after John Street, I'd say sometime in maybe the
11   end of -- towards our I guess the middle of 2007.
12   Oh, no, maybe 2006, I think.
13   Q.   The middle of 2006?
14   A.   The middle or towards the end of
15   2006.
16   Q.   Until approximately when?
17   A.   Until July I think of '07.  July or
18   June of '07.
19   Q.   Who did you sublease from then?
20   A.   David.  He had owned a recording
21   studio there and part of the section was given to
22   us for office space.
23   Q.   When you say office space, describe
24   what kind of space you had.
25   A.   It was a room with three offices,

Page 29

Varughese

1
2    three separate rooms.
3    Q.   And did you have a personal office
4    there?
5    A.   No, I just had general offices.
6    Q.   So of these three rooms, anybody
7    could use any of the three?
8    A.   Yes.
9    Q.   Did you meet investors there?
10   A.   Well, anyone can use two of the
11   rooms, one was sectioned off for the studio.
12   Q.   So there were two offices
13   available --
14   A.   Yes.
15   Q.   -- to you?
16   A.   Yes.
17   Q.   And there was another general room
18   available to you?
19   A.   No, there was a recording studio that
20   was -- there was an open area that was available.
21   Q.   So the only area available to you
22   were two offices?
23   A.   Two offices.
24   Q.   And what business did you conduct out
25   of those offices?

Varughese

1
2    A.   Clean Care Technologies.
3    Q.   Anything else?
4    A.   No.
5    Q.   Did you ever meet any investors
6   there?
7    A.   No.
8    Q.   Did you ever have any business
9   meetings there with anybody other than Mr. Nazon?
10    A.   No.
11    Q.   Did you call potential investors from
12   there?
13    A.   Yes.
14    Q.   Did Mr. Nazon call potential
15   investors from there?
16    A.   Yes.
17    Q.   Did you employ other people to call
18   potential investors from there?
19    A.   There were a few individuals that
20   came in and out to do surveys for new individuals
21   for marketing possibilities for the product, but
22   you know, it was off and on.
23    Q.   Putting them aside for the moment,
24   did anybody else, other than you and Mr. Nazon,
25   use that space to call investors or potential

Varughese

1
2   investors for Clean Care?
3    A.   For Clean -- no.
4    Q.   How about Mr. Allen?
5    A.   Yes.
6    Q.   So you, Nazon and Allen?
7    A.   Yes.
8    Q.   Anybody else?
9    A.   No.
10    Q.   Now these individuals that you
11   mentioned that would come in to do surveys for
12   the company, were they paid by Focus?
13    A.   Yes.
14    Q.   What was their employment agreement?
15    A.   Basically they were paid by the hour
16   for the services rendered.
17    Q.   What was their job responsibility?
18    A.   Basically to call up and ask
19   individuals, you know, what they thought about
20   the restroom areas of any commercial facility,
21   the product was a self-cleaning hygiene seat, so
22   we would contact the individuals to spread word
23   about the product and market and advertise the
24   product. And to ask them their opinions on how
25   they would like the product, would they like it

Varughese

1
2   in their facilities, things of that nature.
3    Q.   How did the people you hired get the
4   numbers of who to call?
5    A.   They were provided the numbers from
6   lead cards that myself and Mr. Nazon had from
7   other companies we worked with.
8    Q.   Other janitorial services companies
9   you've worked with?
10    A.   No, just any kind of list we got on
11   individuals that owned corporations, that were
12   heads of companies, that were heads of corporate
13   entities, that had any contacts in the public
14   arena, things of that nature.
15    Q.   Did you have any relationship with
16   these individuals before they were called?
17    A.   No.
18    Q.   So these were cold calls?
19    A.   Yes.
20    Q.   Were they all heads of companies or
21   people that you knew to have contacts with heads
22   of companies?
23    A.   Yes.
24    Q.   Were they offered a chance to invest
25   in the company?

Varughese

1
2    A.   Yes. Once they heard the criterion
3   and they said this is something they would like
4   to take a look at, they were approached with an
5   opportunity to invest with the company too.
6    Q.   What opportunities were those?
7    A.   Basically accreditation standards,
8   whether they were accredited individuals, they
9   had the right contacts to put the product out,
10   and if they were able to get referrals on the
11   product as well.
12    Q.   What do you mean when you say
13   accreditation?
14    A.   Accreditation meaning that they were
15   qualified individuals that can invest with the
16   company if they see a potential in the company.
17    Q.   How did you determine whether
18   somebody was accredited?
19    A.   By a criteria that was taught to me
20   by Alexander Stelmak as a company that I had
21   worked with prior.
22    Q.   What company was that?
23    A.   It was originally called Oxford
24   Holdings, and they changed the name of the
25   company to Commonwealth Capital Group.

Varughese

1                Varughese
2      Q.  What were those criteria?
3      A.  If they had at least six figures in
4 the market, if they had -- or if they had a net
5 worth of a million dollars combined with their
6 spouse and if they were -- or if they were making
7 six figures as far as their salary.
8      Q.  And if they were not accredited,
9 would that mean that you wouldn't offer them an
10 opportunity to invest?
11     A.  They would still be given an
12 opportunity but they would be told it is a risky
13 situation because we were, you know, growing the
14 company from the ground up.
15     Q.  If people were accredited were they
16 not told it was a risky situation?
17     A.  They were told as well, but we were
18 assuming most of the individuals that we spoke
19 to, we said we're using this for accredited
20 investors, there's a chance that the company may
21 not work, but so far there's success of the
22 company.  It was already set down on paper.
23     Q.  So how, if at all, did you treat the
24 accredited investors you found differently than
25 the non-accredited investors?

Varughese

1                Varughese
2      A.  In what sense?
3      Q.  You said one of the things you tried
4 to have your people accomplish by calling these
5 people was to first figure out if they met
6 certain criteria, is that correct?
7      A.  Yes.
8      Q.  Those criteria helped you establish
9 whether you deemed them accredited, correct?
10     A.  Yes.
11     Q.  Whether they were accredited affected
12 how you approached them?
13     A.  Correct.
14     Q.  Correct?
15     A.  Yes, uh-huh.
16     Q.  How would it affect how you
17 approached them?
18     A.  Well, the individuals that were
19 accredited obviously had an opportunity to put in
20 more funds and they could really grow the company
21 compared to a non-accredited individual.
22     Q.  When you say had the opportunity, do
23 you mean you offered them the opportunity or do
24 you mean they simply had more money to invest or
25 do you mean something else?

Varughese

1                Varughese
2      A.  Yes, they had more capital to invest
3 and more of a real stake to grow the company.
4      Q.  So accredited investors you would
5 pursue more vigorously because there was a
6 potential for more investment?
7      A.  Yes.
8      Q.  Other than that distinction, is there
9 any other way you treated the accredited
10 investors differently than the non-accredited
11 investors?
12     A.  No, because all individuals whether
13 they were accredited or non-accredited had an
14 opportunity for giving us sources to put the seed
15 into both facilities.
16     Q.  The individuals you hired to make
17 these cold calls, do you recall any of their
18 names?
19     A.  Not offhand.
20     Q.  Do you have a list?
21     A.  The majority of them were hired by
22 Mr. Nazon directly.
23     Q.  Did you have any contact with any of
24 the individuals in any other capacity other than
25 Clean Care?

Varughese

1                Varughese
2      A.  No.
3      Q.  Would you be able to find a list that
4 includes any of these names?
5      A.  I don't have a list but I can try to
6 remember a few.  Offhand I'd have to think about
7 it.  I'd probably have to e-mail you.
8      Q.  Did you give these people a script?
9      A.  No, there was no script that was
10 given.  It was basic survey questions that were
11 given.
12     Q.  Where did you get -- did you call
13 them lead cards that you gave individuals?
14     A.  Yes.
15     Q.  Where did you get the lead cards?
16     A.  From prior companies that myself and
17 Mr. Nazon had worked with.
18     Q.  Do you mean when you worked directly
19 for those companies or do you mean working in a
20 capacity of somebody at one of the Focus
21 entities?
22     A.  Working both.
23     Q.  When you say you brought them from
24 prior companies, do you mean those companies gave
25 you lead cards that you then brought with you?

Page 38

Varughese

1          Varughese
2    A.  Yes, I brought the lead sheets or
3  lead cards, whatever they were, directly.
4    Q.  Did you ever discuss with any
5  individuals at those entities whether you could
6  take those lead cards?
7    A.  No, actually they were all given to
8  us directly.  So they were in our possession.
9    Q.  Do you recall who specifically gave
10  you those cards?
11    A.  I mean initially Mr. Stelmak.
12    Q.  At Commonwealth?
13    A.  At Commonwealth.
14    Q.  Anybody other than Stelmak?
15    A.  Elliot Jacobson at Infomercial
16  Funding.
17    Q.  Did you ever work with Elliot
18  Jacobson other than at Infomercial Funding?
19    A.  No.
20    Q.  What was his role at Informercial?
21    A.  He was the head of the company.
22    Q.  Did you get any lead cards from
23  anybody other than Jacobson or Stelmak?
24    A.  No.
25    Q.  The individuals that were calling,

Page 39

Varughese

1          Varughese
2  making these cold calls to these leads concerning
3  Clean Care, did you give them any materials that
4  they could send to people who were interested in
5  the company?
6    A.  No.
7    Q.  Did you tell them to respond in any
8  specific way if somebody told them they were
9  interested in investing in the company?
10    A.  No, they basically told somebody else
11  from the company, either myself or Mr. Nazon or
12  David would actually give them a call.
13    Q.  If one of the individuals you hired
14  to make these cold calls identified somebody who
15  ultimately invested in the company, did those
16  individuals receive any commission?
17    A.  No, they were given a small bonus if
18  any of the individuals did become directly
19  involved in the company.
20    Q.  How did you determine that bonus?
21    A.  It was basically anywhere between a
22  hundred to $150.  It was a set amount that was
23  basically told to them from the beginning.
24    Q.  Did it depend on how much was
25  invested?

Page 40

Varughese

1          Varughese
2    A.  No.
3    Q.  Did that come out of Focus's account?
4    A.  Yes.
5    Q.  Did you pass that cost on to Clean
6  Care?
7    A.  No, that was paid from whatever was
8  given on the finder's agreement.
9    Q.  From Clean Care?
10    A.  Yes.
11    Q.  Continuing on Attachment A, do you
12  see number 7 says "All tax returns including all
13  drafts filed by you for years 2006 and 2007 and
14  any documents relating thereto."  Did you file
15  any taxes for 2006?
16    A.  No, I had already told the commission
17  before that it was basically a loss so I didn't
18  file anything for 2006 or 2007.
19    Q.  Just so the record is clear, is it
20  correct that you never filed any tax forms for
21  2006?
22    A.  Yes.
23    Q.  And the same is true for 2007?
24    A.  Yes.
25    Q.  When was the last time you filed any

Page 41

Varughese

1          Varughese
2  tax forms?
3    A.  Several years ago, I don't remember.
4    Q.  Did you file any taxes since the year
5  2000?
6    A.  No.
7    Q.  Are you certain that you have filed
8  tax forms at some point in your life?
9    A.  Yes.
10    Q.  Did you file any tax forms at any
11  time on behalf of Focus 4 Marketing?
12    A.  No.
13    Q.  Have you filed any tax forms on
14  behalf of any company with which you are
15  involved?
16    A.  No.
17    Q.  For the money paid from Focus to
18  individuals that Focus hired to do work for the
19  company, did you ever file any documents with New
20  York State reflecting any payments made to those
21  employees?
22    A.  No.
23    Q.  Did you file any documents with any
24  entity reflecting payments made to the
25  individuals hired to call -- to place calls on

Page 42

```
1              Varughese
2  Clean Care's behalf?
3      A.  No.
4      Q.  To your knowledge did anybody ever
5  file such forms?
6      A.  Not that I know of.
7      Q.  Getting back to your work at Veritas
8  of China and Informercial, when you were at
9  Informercial, did you personally make any calls
10 to the leads you were given?
11     A.  Yes.
12     Q.  Did you offer them the opportunity to
13 invest in Informercial securities?
14     A.  Yes.
15     Q.  And at Veritas of China did you
16 personally call any of the leads?
17     A.  Yes.
18     Q.  And did you offer them the
19 opportunity to invest in any Veritas securities?
20     A.  Yes.
21     Q.  And did any investors in fact invest
22 in Informercial after you had contact with them?
23     A.  Yes.
24     Q.  And did any investors in fact invest
25 in Veritas of China after you had contact with
```

Page 43

```
1              Varughese
2  them?
3      A.  Yes.
4      Q.  And at Informercial, were you paid
5  directly or were you paid through Focus or some
6  other way?
7      A.  It went through both, personally and
8  through the corporation.
9      Q.  What determined which way you would
10 be paid?
11     A.  That I don't recall, it really was
12 Mr. Jacobson's call in terms of which way to pay.
13     Q.  Is the same true at Veritas of China,
14 did you receive money through both Focus and
15 directly?
16     A.  That I don't recall.  Veritas was
17 before Informercial so it was a while back.
18     Q.  In either case, did you receive any
19 commission for money that investors that you had
20 contacted invested in the company?
21     A.  Yes.
22     Q.  Was that true at Informercial?
23     A.  Yes.
24     Q.  Was that true at Veritas?
25     A.  Yes.
```

Page 44

```
1              Varughese
2      Q.  Was that commission determined by
3  some written agreement with the companies?
4      A.  Yes.
5      Q.  Could you describe the circumstances
6  or the details of your Informercial commissions?
7      A.  Informercial I was actually put on
8  board as one of the directors of the company and
9  I was -- it actually had a director's
10 compensation, that's how I was paid.
11     Q.  What do you mean by director's
12 compensation?
13     A.  Meaning they had a salary set aside
14 for directors.
15     Q.  When you say you received a
16 commission, do you mean in addition to the salary
17 set aside for you as a director?
18     A.  No.
19     Q.  So what did you mean when you say
20 that you were paid a commission for your work for
21 investments in Informercial?
22     A.  I would get paid based on what
23 actually came in, it would go against the salary.
24     Q.  What do you mean by go against the
25 salary?
```

Page 45

```
1              Varughese
2      A.  It would be drawn against whatever
3  was supposed to be paid on the director's salary.
4      Q.  So you were supposed to be paid some
5  director's salary per year?
6      A.  Correct.
7      Q.  Do you remember what that was?
8      A.  Offhand I don't, I think it's around
9  150 or 200,000.
10     Q.  Were you to be paid that salary
11 regardless of what investments you brought in?
12     A.  Through the investments that was
13 brought in.
14     Q.  My question is whether you were going
15 to be paid the salary only if you brought in
16 certain investments or regardless of whether you
17 brought in the investments?
18     A.  I don't know how exactly to answer
19 that.  It's through the investments that I got
20 paid as a part of the salary.
21     Q.  I want to make a distinction between
22 salary and commission as you're describing it.
23 I'm using the word "salary" to mean a fixed
24 amount.
25     A.  Correct.
```

Varughese

1
2    Q.   What does she do?
3    A.   She works as a social service worker,
4  social worker basically.
5    Q.   And where do you live right now?
6    A.   With her.
7    Q.   Where?
8    A.   In Glen Oaks, 82-41 256th Street.
9    Q.   Does she own that property?
10   A.   No.
11   Q.   Is that a rental property?
12   A.   Not really, she basically -- it's
13  with my parents, I'm back living with them.
14   Q.   Your parents own the property?
15   A.   Yes.
16   Q.   Have you transferred any assets to
17  your wife in the last two years?
18   A.   No.  I was only married a few months
19  before the commission actually contacted us.
20   Q.   When did you get married?
21   A.   October 29th of 2006.
22   Q.   I want to get to your work for Clean
23  Care in a moment.  Just before we get there, did
24  you have any post high school education?
25   A.   Yes.

Varughese

1
2    Q.   And what was that?
3    A.   Queens College.
4    Q.   Did you receive any degree from
5  Queens College?
6    A.   No.
7    Q.   How many credits did you receive from
8  Queens College, if any?
9    A.   I don't recall offhand.
10   Q.   Would you say about one year's worth?
11   A.   No, about three years' worth.
12   Q.   So you were about three quarters of
13  the way to graduating?
14   A.   Yes.
15   Q.   Did you have a concentration or a
16  major?
17   A.   It was fluctuating between computer
18  science and business.
19   Q.   Did you take any courses that focused
20  on investments?
21   A.   No, other than economics courses and
22  business courses.
23   Q.   Did you take any courses that you
24  would consider relevant to your role in running
25  Clean Care?

Varughese

1
2    A.   No, no course, just mainly through
3  work experience.
4    Q.   Following -- other than your time at
5  Queens College, did you have any other
6  coursework, either formal or otherwise, that
7  provided you with an instruction as to investing
8  and -- investing?
9    A.   No.
10   Q.   How did you first come to work for
11  Clean Care?
12   A.   I believe it was 2005.  Essentially
13  it was a contact that was given to us.  Mr. Klein
14  through Paul Schmidt, that was an individual I
15  dealt with before in the self-cleaning seat.
16   Q.   Do I understand you correctly that
17  Mr. Schmidt introduced you to Mr. Klein?
18   A.   Yes.
19   Q.   Who is Mr. Schmidt?
20   A.   Mr. Paul Schmidt is the individual
21  that owned a company called ASC International and
22  he had told us, myself and Mr. Nazon, that he
23  owned the rights to market the product for the
24  United States, the self-cleaning seat.
25   Q.   And how did you come to meet Mr.

Varughese

1
2  Schmidt?
3    A.   Through Mr. Nazon.
4    Q.   And how did you meet Mr. Nazon?
5    A.   Through working at Commonwealth
6  Group.
7    Q.   Describe for me the circumstances
8  through which you met Mr. Schmidt.
9    A.   He came down to -- he was located in
10  Georgia, Marietta, Georgia, I believe.  And he
11  came down to New York to meet Mr. Nazon and
12  myself, and we met up with him at his hotel in
13  midtown.
14   Q.   And what did you discuss?
15   A.   Basically we were discussing the
16  company, exactly what the product was, you know,
17  what our roles would be in the company, so on and
18  so forth.
19   Q.   Did you decide on that day what your
20  roles would be?
21   A.   Yes.  He had wanted us to become
22  finders for the company, market the product and
23  speak to some of the individuals that he had
24  basically spoken to before or contacted before.
25   Q.   Were you only to speak to people he

Page 62

Varughese

1
2 had spoken to before or contacted before or were
3 you to find additional investors as well?
4      A.  Find additional individuals as well.
5      Q.  Did you tell Mr. Schmidt that you had
6 some expertise in finding investors?
7      A.  Yes.
8      Q.  Did you tell him that you --
9      A.  Well, I had spoken to him about not
10 just finding the individuals but in terms of just
11 marketing the product and sufficient once we had
12 an understanding of what the product would be,
13 we'd help him grow the market.
14      Q.  So did you have a dual role, one
15 being to help market the product itself and one
16 to market the company?
17      A.  Yes.
18      Q.  And as part of your role in marketing
19 the company, were you to find investors to invest
20 in ASC securities?
21      A.  Yes.
22      Q.  And did you create any written
23 materials to provide to those potential
24 investors?
25      A.  No, any materials were provided by

Page 63

Varughese

1
2 Mr. Schmidt.
3      Q.  And did you review those materials?
4      A.  Yes.
5      Q.  And did you ever discuss those
6 materials with Mr. Schmidt?
7      A.  Yes.
8      Q.  Did you find any information in those
9 materials to be false or misleading?
10      A.  As far as I knew everything looked up
11 because he was -- actually he was listed on
12 several magazines online, he had write-ups in
13 different magazines, trade shows he went to,
14 attended.
15      Q.  When you say he, do you mean Mr.
16 Schmidt personally or do you mean the company
17 ASC?
18      A.  Mr. Schmidt personally.
19      Q.  And how did you come to seek
20 employment after ASC?
21      A.  Well, after we had actually worked
22 with Mr. Schmidt towards the -- I'd say the
23 latter part of 2005 he was nowhere to be found.
24      Q.  Nowhere to be found?
25      A.  Correct.

Page 64

Varughese

1
2      Q.  How much money had you raised for him
3 by then?
4      A.  Myself personally, I think maybe two,
5 3,000.
6      Q.  Two or $3,000?
7      A.  Yes.
8      Q.  Do you know how much Mr. Nazon
9 raised?
10      A.  I think close to 200,000 and change.
11      Q.  Were you ever compensated by ASC?
12      A.  Partially.
13      Q.  What do you mean by partially?
14      A.  There were payments that he just
15 disappeared so we never received the payments
16 that we were supposed to get.
17      Q.  How much did you receive from ASC?
18      A.  A few thousand.
19      Q.  More than you raised for the company?
20      A.  Partially, partially, because he had
21 said that he would pay us, myself and Mr. Nazon.
22 He never --
23      Q.  I'm asking a question that doesn't
24 lend itself to partially.  My question is whether
25 you received more money from ASC than you had

Page 65

Varughese

1
2 raised for the company?
3      A.  Yes.  The reason why I said partially
4 is because there were expenses in terms of
5 meeting with Schmidt, with contacting
6 individuals, you know, phone service, things of
7 that nature that I got re-compensated back.
8      Q.  So you were both compensated for your
9 work for ASC and certain expenses were paid,
10 correct?
11      A.  Yes.
12      Q.  And looking just at the compensation
13 component, separate and distinct from any
14 expenses that were paid, how much were you
15 compensated by ASC?
16      A.  I believe it was 15 percent.
17      Q.  15 percent of what?
18      A.  Of the money that was raised.
19      Q.  So 15 percent of two or $3,000?
20      A.  No, I received more than that.
21 Before expenses.
22      Q.  I asked you before how much money you
23 raised for ASC and I understood you to say two to
24 $3,000.  Am I correct in saying that you raised
25 two or $3,000 personally for ASC?

Page 66

```
 1                 Varughese
 2      A.   Correct.
 3      Q.   Did I understand you correctly that
 4  you were compensated by getting 15 percent of
 5  money you raised for ASC?
 6      A.   Correct.
 7      Q.   And am I also correct in stating that
 8  you received from ASC in compensation, separate
 9  and distinct from any expenses that were covered
10  of yours, more than the two or $3,000 that you
11  raised for ASC?
12      A.   Yes.
13      Q.   So would you agree that you were paid
14  more than just 15 percent of the two or $3,000?
15      A.   Yes, correct.
16      Q.   How was that compensation determined?
17      A.   Well, basically Mr. Nazon on some of
18  the funds that he was supposed to be paid, he had
19  loaned me some of the monies as well.
20      Q.   I'm not asking what you were loaned,
21  I'm asking what you were compensated.
22      A.   Right.
23      Q.   Did ASC write you a check directly?
24      A.   Yes.
25      Q.   Not through Focus?
```

Page 67

```
 1                 Varughese
 2      A.   Through Focus.
 3      Q.   I'm asking you very specific
 4  questions, I need you to pay attention to them.
 5      A.   Okay, sorry.
 6      Q.   When ASC compensated you did they
 7  ever write you, Anil Varughese, a check?
 8      A.   No.
 9      Q.   Did you receive compensation through
10  Focus Marketing?
11      A.   Yes.
12      Q.   Is that Focus 4 Marketing?
13      A.   Yes.
14      Q.   Was that only Focus 4 Marketing?
15      A.   That I don't recall.  I believe Mr.
16  Nazon also received for Focus 44.
17      Q.   And the money that you personally
18  received as compensation, were you paid from
19  Focus 4 Marketing, Focus 44 Marketing, something
20  else, both?
21      A.   Focus 4.
22      Q.   Only Focus 4?
23      A.   Yes.
24      Q.   How much did Focus 4 receive from
25  ASC?
```

Page 68

```
 1                 Varughese
 2      A.   I don't know the exact amount.
 3      Q.   What's the approximate amount?
 4      A.   Maybe 8,000 and change.
 5      Q.   And how was that 8,000 or so
 6  determined to be the proper compensation that ASC
 7  owed Focus 4 Marketing?
 8      A.   Based on funds that came in, even
 9  some for Mr. Nazon, he had asked Mr. Schmidt to
10  send some monies to my account.  So part of his
11  was sent to mine.
12      Q.   So you received 15 percent of all the
13  monies that you brought in and 15 percent of some
14  of the money that Mr. Nazon brought in?
15      A.   Yes.
16      Q.   Why did you receive 15 percent of
17  what Mr. Nazon brought in?
18      A.   He just wanted him to send the monies
19  directly to my account.
20      Q.   Help me with the he's?
21      A.   Mr. Nazon.
22      Q.   Mr. Nazon wanted Mr. Schmidt to send
23  the money directly?
24      A.   Yes.
25      Q.   My question to you is why?  Was this
```

Page 69

```
 1                 Varughese
 2  a gift from Mr. Nazon, was this, as you said,
 3  before a loan or something else?
 4      A.   Yes, partially it was a loan.
 5      Q.   And if it was partially a loan I
 6  assume it was partially something else?
 7      A.   Partially the compensation that I was
 8  supposed to get from the rest.
 9      Q.   Well, you were supposed to get only
10  15 percent of two or $3,000, correct?
11      A.   Yes.
12      Q.   So other than that 15 percent of two
13  or $3,000, the rest of what you received, the
14  approximately $8,000 that went into Focus 4 was
15  all a loan from Mr. Nazon?
16      A.   Yes, and payment for him as well.  He
17  would take whatever his portion of the payment
18  was as well.
19      Q.   Out of Focus 4?
20      A.   Yes.
21      Q.   Why did he get paid through Focus 4?
22      A.   Because he had been getting paid
23  through Focus 4 before we were working at
24  Infomercial Funding.
25      Q.   Did Focus 44 exist at that time?
```

1           Varughese
2    A.  I believe so.
3    Q.  Was Focus 44 paid any money from ASC?
4    A.  I believe so, I don't recall offhand.
5    Q.  Do you recall whether the total
6  compensation from ASC for you and Mr. Nazon was
7  more than $8,000?
8    A.  Yes, I believe it was.
9    Q.  So it was more than the money that
10  was paid from ASC directly to Focus 4?
11    A.  Um --
12    Q.  Let's back up.  You said Mr. Nazon
13  raised approximately $200,000 for ASC, correct?
14    A.  Correct.
15    Q.  His deal, like yours, was to receive
16  15 percent of what he brought in?
17    A.  Yes.
18    Q.  We'll agree that 15 percent of
19  approximately $200,000 is approximately $30,000?
20    A.  Yes.
21    Q.  Is it true that ASC never paid
22  Focus 4 Marketing anything close to $30,000?
23    A.  Yes, correct.
24    Q.  Do you know if Mr. Nazon was ever
25  paid any money directly to the name of Al Nazon

1           Varughese
2  from ASC?
3    A.  That I don't know.  To my knowledge,
4  no, but I don't know.
5    Q.  Did you receive compensation,
6  separate and apart from the loan Mr. Nazon may
7  have made to you and separate from any expenses
8  that were covered --
9    A.  No.
10    Q.  -- that exceeded 15 percent of two or
11  $3,000 that you raised?
12    A.  No.
13    Q.  How much money did Mr. Nazon loan
14  you?
15    A.  I don't know the exact amount.  It
16  was several years back.
17    Q.  What was the approximate amount?
18    A.  Over 5,000, I don't know.
19    Q.  Was it ever -- was that loan ever
20  documented?
21    A.  No.
22    Q.  Did you ever pay that loan back?
23    A.  Yes.
24    Q.  When did you pay that loan back?
25    A.  I believe within the same year in

1  2005.
2           Varughese
3    Q.  How did you pay that loan back?
4    A.  Through money coming in through Clean
5  Care.
6    Q.  Did you write a check to Mr. Nazon?
7    A.  No, because funds coming in for Clean
8  Care if they were clients of his then a portion
9  of it was just kept in the account.
10    Q.  So you considered the money that Mr.
11  Nazon made from Clean Care as money you were
12  using to repay your 5,000 dollar or so debt?
13    A.  Part of it, yes.
14    Q.  Was there another part of it?
15    A.  Meaning he would pay it over time.
16    Q.  Was there any way you would repay
17  your debt to Mr. Nazon other than giving him a
18  percentage of what he raised for Clean Care?
19    A.  No.
20    Q.  How did you identify people to call
21  as potential investors in ASC?
22    A.  Through lead lists.
23    Q.  And who provided those lead lists?
24    A.  It was the other firm, the same ones
25  from Infomercial Funding from Veritas, from

1           Varughese
2  Schmidt himself had provided us some of the names
3  that he had as well.
4    Q.  Did you bring those names to Clean
5  Care?
6    A.  Yes, some of them.
7    Q.  Now at some point you said Mr.
8  Schmidt set up a meeting with Mr. Klein, is that
9  correct?
10    A.  Yes.
11    Q.  This is Ed Klein, the same Ed Klein
12  that's here today?
13    A.  You said that Mr. Nazon had set up a
14  meeting?
15    Q.  Mr. Schmidt.
16    A.  Yes.
17    Q.  You tell me how it happened?
18    A.  Yes, Mr. Schmidt set up a meeting and
19  he asked Mr. Nazon and myself to come down and
20  meet Mr. Klein.
21    Q.  What was that meeting -- what were
22  you told that meeting would be about?
23    A.  He was going to bring Mr. Klein on
24  board as an individual to expand the territory of
25  sales for the seat, and because of Mr. Klein's

Page 74

Varughese

1
2  experience in the industry and his contact base,
3  he was considered to be a valuable asset to add
4  on.
5      Q.  When you say the seat, was there a
6  name for the seat?
7      A.  It was called a Eyegiene seat.  I
8  think he had a different name for it but the main
9  manufacturer's name was Eyegiene seat.
10     Q.  At ASC?
11     A.  At ASC.
12     Q.  Is that the same seat that you
13 ultimately sold at Clean Care?
14     A.  The same type of seat but not the
15 same manufacturer.
16     Q.  Was the --
17     A.  It was -- I'm sorry, it was CWS, that
18 was the name of the company that manufactured the
19 seat for Schmidt.
20     Q.  And Eyegiene was the seat that was
21 sold through Clean Care, correct?
22     A.  Correct, yes.
23     Q.  Who was at the meeting between you --
24 who was at the meeting you described where you
25 first met Mr. Klein?

Page 75

Varughese

1
2      A.  Mr. Schmidt, myself, Mr. Nazon.
3      Q.  Anybody else?
4      A.  No.
5      Q.  Where did this meeting take place?
6      A.  It was at the Hilton, I believe on
7  42nd in Times Square.
8      Q.  What did you discuss?
9      A.  Basically Mr. Klein coming aboard to
10 expand the company.
11     Q.  Were you in favor of that idea?
12     A.  Yes, especially with Mr. Klein's
13 experience and, you know, his -- he had shown us
14 contracts that he had procured from Chicago
15 O'Hare Airport so we knew his contact base was
16 substantial.
17     Q.  Did you say contacts or contracts?
18     A.  Contract.
19     Q.  So it was your understanding at that
20 time Mr. Klein had contracts with Chicago O'Hare
21 Airport?
22     A.  He had a contract on a previous
23 company that he was working with called Clean
24 Cover and that was a plastic wrap seat and he had
25 wanted to come on board with this company of ASC.

Page 76

Varughese

1
2      Q.  When is the next time you spoke with
3  Mr. Klein?
4      A.  After the meeting, I'd say maybe a
5  month or two went by or maybe a month.  And when
6  myself and Mr. Nazon could not reach Mr. Schmidt,
7  we contacted Klein to see if he had any knowledge
8  of his whereabouts.
9      Q.  And what were you told?
10     A.  He said he had the same problem.  He
11 said he could not reach him either.
12     Q.  Did you ever hear from Mr. Schmidt
13 again?
14     A.  No.
15     Q.  How did it come to pass that you went
16 into business with Mr. Klein?
17     A.  Since there were investors myself and
18 Mr. Nazon were directly responsible for, we had
19 spoken to Mr. Klein and to come meet and see if
20 there was something that we could do to maybe
21 start a new entity to allow them to come on
22 board, you know, rather than just calling them
23 and telling them, well, sorry, we can't find the
24 individual and you've lost your money.
25     Q.  Did you create a new entity?

Page 77

Varughese

1
2      A.  Yes.
3      Q.  What was that entity?
4      A.  Clean Care Technologies.
5      Q.  Did you give the investors from ASC
6  any stake in Clean Care Technologies?
7      A.  Yes.
8      Q.  And did you collect any additional
9  money in exchange for that stake in Clean Care
10 Technologies?
11     A.  No.
12     Q.  What was the total stake you gave the
13 investors that you brought over from ASC in Clean
14 Care Technologies?
15     A.  I don't remember.  All the records
16 were given to Laura Anthony, and also Mr. Schmidt
17 had given the investors that were in ASC dividend
18 checks and any balance checks or any balance
19 amounts that were supposed to be given back to
20 them were converted to shares in Clean Care
21 Technologies.
22     Q.  How were they converted?
23     A.  They were just given a valuation on
24 their shares.
25     Q.  Who did that valuation?

Page 78

Varughese

A. Basically it was an understanding between myself and Mr. Nazon and Mr. Klein on how much to give to these individuals as shares.

Q. The three of you decided together let's take some percentage of Clean Care Technologies, give the former investors in ASC some portion of Clean Care Technologies?

A. Yes.

Q. And it was the three of you together that determined what that portion would be?

A. Uh-huh, yes.

Q. And was it a pro rata or some other kind of distribution?

A. It was one for one, for every dollar that they invested they were receiving shares in Clean Care Technologies, that they put into ASC they received the same in Clean Care Technologies.

Q. Had you collected any money for Clean Care Technologies at the time you decided to give shares of Clean Care Technologies to these investors?

A. No.

Q. Could we refer to them just generally

Page 79

Varughese

as the former ASC investors will understand what we're talking about?

A. Yes.

Q. Do you know if anybody else collected any money for Clean Care Technologies prior to your collective decision to give share to the ASC investors?

A. Not to my knowledge, no.

Q. Is it fair to say that Clean Care existed in name only at that time?

A. No, it was a corporation. It was --

Q. Did the corporation have any assets at that time?

A. No.

Q. Did you contact the ASC investors to explain to them what they were receiving?

A. Yes.

Q. What did you tell them they were receiving?

A. That management was being replaced and that Clean Care Technologies would now be the entity that would take the company forward.

Q. Did you explain to them that it would be a new company?

Page 80

Varughese

A. Yes.

Q. Did you explain to them that the new company had no assets?

A. No.

Q. At some point did you decide to raise money for Clean Care?

A. Yes.

Q. How did that come to pass?

A. At the meeting with Mr. Klein, after Mr. Schmidt disappeared, with the conversion of their shares and such, we had said, well, obviously to expand the business and to grow the company we'd have to have new individuals come on board to invest with the company to build it up. And so we worked on a whole memorandum, basically product placement memorandum.

Q. When you say we, you mean you, Mr. Nazon and Mr. Klein?

A. Yes.

Q. Anybody else?

A. No.

Q. Did you at that time decide how many shares of Clean Care you would try to sell?

A. Yes.

Page 81

Varughese

Q. And how many shares did you decide?

A. I believe it was 2.5 million shares.

Q. 2.5 million?

A. I believe so.

Q. It's whatever the memorandum says?

A. Yes.

Q. Did you decide what percentage of Clean Care you would make available to the outside investors?

A. Yes, it's also in the memorandum, I don't remember offhand.

Q. We can turn to the memorandum in a moment but I just want to make sure I understand the relationship between those shares, and the ASC holders' shares. Whatever number of shares you were offering through the memorandum, was that -- did that represent different shares than you had awarded to the ASC investors?

A. No, but they received the shares without actual payment for them. The new individuals coming on board would have to pay for the actual shares. These individuals would receive the shares.

Q. But were there 2.5 million or

Page 82

Varughese

1
2    whatever the memorandum says, new shares
3    available or was it the total amount minus
4    whatever you had already distributed to the ASC
5    investors?
6        A.  Well, it's 2.5 million total and part
7    of that was for ASC for the individuals at ASC.
8        Q.  I want to mark a few documents that
9    we can walk through.  This has been pre-marked as
10   Exhibit 11, a letter addressed to Honorable
11   Harold Bear, Jr.  The re line is 08-CV-1719.
12       I ask you to take a look at it,
13   before I ask you anything in detail, does this
14   represent your answer filed in this action?
15       A.  Yes.
16       MR. BIRNBAUM:  I also want to mark as
17   Exhibit 11 a document titled "Clean Care
18   Technologies."
19       (Plaintiff's Exhibit 11, Document
20   titled "Clean Care Technologies", was so
21   marked for identification.)
22       Q.  If you would take a brief look at
23   that Clean Care Technologies document, does that
24   look like the memorandum or some version of the
25   memorandum you just mentioned?

Page 83

Varughese

1
2        A.  I believe so.  It may be the new one.
3    There was a new memorandum that was worked on by
4    Laura Anthony.  I think a portion of this may be
5    from -- there was a new memorandum that was
6    worked on by Ms. Laura Anthony.  I think a
7    portion might be from there as well.
8        Q.  And Laura Anthony was counsel in some
9    capacity to Clean Care at one point?
10       A.  Yes, she was the attorney that was
11   hired to do a late stage registration offering
12   for the company.
13       Q.  I don't want to get into any
14   communications that you had with Ms. Anthony on
15   behalf of the company.  But just so I'm clear
16   about what you mean about what this document
17   might be, is it your testimony that there was
18   some point at which you prepared along with Mr.
19   Klein and Mr. Nazon an offering memorandum and
20   some later point that you understand Ms. Anthony
21   worked on a new version of that memorandum?
22       A.  Yes.
23       Q.  Do you know if that new version was
24   ever sent to investors?
25       A.  No, because I was contacted by the

Page 84

Varughese

1
2    administration staff prior to that being sent out
3    to any individuals.
4        Q.  So if this document before you was
5    sent to an investor, it's fair to say that it was
6    something that you worked on?
7        A.  Yes.
8        Q.  When you put together this document,
9    did you discuss how you would mention, if at all,
10   the investments of ASC investors?
11       A.  No.
12       Q.  Do you recall mentioning anywhere in
13   any version of the offering memorandum that
14   ASC -- former ASC investors would be given a
15   share of the new company for free?
16       A.  No, but the new offering actually had
17   provisions for those investors.
18       Q.  By new offering do you mean the one
19   that was to be sent out at some future date but
20   was never sent out?
21       A.  That was completed but it wasn't sent
22   out.
23       Q.  I want to focus only on what went out
24   to investors and what was actually used for now.
25       A.  Okay.

Page 85

Varughese

1
2        Q.  Is it true that nowhere in this
3    memorandum did you mention that any share or
4    percentage of Clean Care would be awarded to
5    former ASC investors?
6        A.  It wasn't mentioned.
7        Q.  Did you ever send ASC investors any
8    documents explaining to them what investment they
9    would hold in the new company?
10       A.  Yes, they were given basically
11   letters stating that their shares had been
12   converted and they owned X amount of shares,
13   whatever that value was, in Clean Care
14   Technologies.
15       Q.  Who drafted that letter?
16       A.  That was basically Mr. Nazon, myself
17   and then Mr. Klein had signed off on it.
18       Q.  Did the letter explain to the ASC
19   investors how their investment in Clean Care
20   Technologies would be calculated?
21       A.  Yes.
22       Q.  And how was that?
23       A.  It just had a fixed amount of shares
24   that was given --
25       Q.  So if you owned ten shares in ASC you

Page 86

Varughese

1          Varughese
2  would then own ten shares in Clean Care?
3          A.  Yes.
4          Q.  Would that be the same percentage of
5  the company, meaning was ten shares in ASC the
6  same percentage of the total ASC company entity,
7  as ten shares of Clean Care was to the total
8  Clean Care company?
9          A.  No, because the valuation for ASC was
10  different.  I don't remember how many shares were
11  issued but they would receive their amount of
12  whatever the dollars that they invested, they
13  received that in shares.
14         Q.  By dollars?
15         A.  Yes, dollar to share version.
16         Q.  So if I owned ten shares in ASC I
17  wouldn't then own ten shares in Clean Care, I'd
18  own something other than ten shares in Clean
19  Care, correct?
20         A.  You'd receive your dollars that you
21  invested and the amount of money that Schmidt had
22  as a balance that was supposed to be paid to them
23  on their dividends as shares.
24         Q.  As shares in Clean Care?
25         A.  Yes.

Page 87

1          Varughese
2          Q.  So is it correct that it would not be
3  an identical number of shares as the investor had
4  previously owned in ASC?
5          A.  Correct, it would be on the dollars.
6          Q.  Do you remember which shares were
7  worth more, that is if one owned ten shares in
8  ASC, would that person end up with more than ten
9  shares in Clean Care or fewer than ten shares in
10  Clean Care?
11         A.  More, more than that because they had
12  a value that was coming back to them as a
13  dividend payment so that was calculated as well.
14         Q.  How did you determine what the value
15  dollar should be of shares in Clean Care?
16         A.  For the conversion?
17         Q.  Correct.
18         A.  There wasn't a dollar value that was
19  given to it, it was just a share value.  It was a
20  dollar value from ASC that was just converted as
21  share value to Clean Care Technologies.
22         Q.  I'm missing something here.  There
23  were individuals who invested let's say $1,000 in
24  ASC and received a certain amount of shares,
25  correct?

Page 88

1          Varughese
2          A.  Correct.
3          Q.  And at some point you told those
4  individuals by letter, you no longer own shares
5  in ASC, you own shares in Clean Care, correct?
6          A.  Correct.
7          Q.  And you determined, along with Mr.
8  Nazon and Mr. Klein, how many shares that person
9  would own in Clean Care, correct?
10         A.  Yes.
11         Q.  And you determined that by looking at
12  how much they had invested in ASC, correct?
13         A.  Yes.
14         Q.  And for the person who invested
15  $1,000 in ASC, putting aside for a moment
16  dividend issues, you would determine how much
17  $1,000 worth of shares in ASC -- withdrawn.
18         A.  It was based on -- I know what you're
19  saying.  It was based on what Schmidt had
20  promised the investors that would be paid back as
21  income to them.
22         Q.  So the person who had invested $1,000
23  in ASC was promised a certain income stream?
24         A.  Yes.
25         Q.  And would that income stream be more

Page 89

1          Varughese
2  than a thousand dollars?
3          A.  Yes.
4          Q.  Do you know what it would be on a
5  thousand dollar investment?
6          A.  I think he was giving them about
7  15 percent or something or maybe a little more.
8          Q.  By a certain time?
9          A.  Yes.
10         Q.  Was that time one year out, five
11  years out, ten years out?
12         A.  I think it was two years.
13         Q.  So an investor in ASC was told for
14  your dollar you will receive in approximately two
15  years 15 or more percent profit --
16         A.  Correct.
17         Q.  -- on your investment, correct?
18         A.  Yes.  And Schmidt actually had
19  accounts set up for them that there were
20  compounded interest accounts and he would pay
21  them interest on the accounts as well.
22         Q.  Those were the disbursements you
23  mentioned?
24         A.  Yes, uh-huh.
25         Q.  So at some point you decided that the

Page 90

Varughese

1      Varughese
2  person who invested in ASC would have their
3  investment exchanged for shares of Clean Care,
4  correct?
5      A.  Yes.
6      Q.  And you'd do that for the person who
7  had invested let's say $1,000, you would
8  determine how much they were promised, correct?
9      A.  Correct, yes.
10     Q.  And to do that you would see how much
11 their investment plus 15 or so percent would be?
12     A.  Yes, based on what Schmidt had as a
13 return promised back to them.
14     Q.  You would say how much would that buy
15 them in Clean Care shares, correct?
16     A.  No, it would just be valid whatever
17 that dollar amount would be valid as shares in
18 Clean Care.
19     Q.  So would an ASC investor be told you
20 have this many shares or would they be told you
21 have this many dollars worth of shares or would
22 they be told something else?
23     A.  You have this many shares.
24     Q.  How would you figure out how many
25 shares to award an ASC investor?

Page 91

1      Varughese
2      A.  By like I said, if Schmidt had
3  promised them let's say for like you said if it's
4  a thousand dollar investor and he was supposed to
5  get back 1500, then the 1500, that dollar amount
6  would be converted into shares in Technologies.
7      Q.  A dollar a share, ten dollars a
8  share, a penny a share, how would you do it?
9      A.  Whatever the value for the Clean Care
10 Technologies shares were.
11     Q.  So it would be at the same price that
12 you were offering the Clean Care Technologies
13 shares to the general public?
14     A.  Yes.
15     Q.  But it was at a time that Clean Care
16 Technologies did not yet have any assets,
17 correct?
18     A.  Yes.
19     Q.  Let's take a look at Exhibit 11 for a
20 moment.  On page 3, and this is -- actually there
21 are some missing pages from this so I'm pointing
22 to page 3 of the document but it is titled page
23 5, there is a subscription agreement.
24     A.  Yes.
25     Q.  Is this something that an investor in

Page 92

Varughese

1      Varughese
2  Clean Care would fill out?
3      A.  Yes.
4      Q.  Did the ASC investors have to fill
5  this out?
6      A.  I don't think they had to fill it
7  out, I think some may have filled it out, I don't
8  know offhand.
9      Q.  I want to -- did you anywhere in this
10 document indicate that some of the shares being
11 offered here were being given away without
12 bringing any additional money into the company?
13     A.  No.
14     Q.  Is it the case that with the ASC
15 investors you were giving them some of the shares
16 offered in this memorandum?
17     A.  Yes.
18     Q.  Without requiring them to pay any new
19 money into the company?
20     A.  Yes.
21     Q.  Other than the letter you sent to the
22 ASC investors explaining to them that their
23 investment would now be made in Clean Care, were
24 there any other written communications between
25 you and the ASC investors?

Page 93

1      Varughese
2      A.  As far as the conversion of shares?
3      Q.  Let's start with that.
4      A.  No.
5      Q.  Were there any other communications
6  from anyone on Clean Care's behalf to the former
7  ASC investors?
8      A.  Regarding conversion?
9      Q.  Regarding the conversion other than
10 the one letter you just mentioned.
11     A.  No.  There was verbal communication.
12     Q.  Before we get to verbal
13 communication, were there any other written
14 communications to the former ASC investors on
15 behalf of Clean Care or any of its
16 representatives about any topic, whether the
17 conversion or other, in writing?
18     A.  Yes.
19     Q.  Describe those communications to me.
20     A.  The news releases in the future that
21 were written by Clean Care, mainly documentation
22 or anything that had to do with trade shows and
23 such were given to all the existing ASC
24 investors.
25     Q.  And those are the same documents

Page 94

Varughese

1
2  given to the other investors in Clean Care as
3  well, correct?
4      A.  Yes.
5      Q.  So other than documents the ASC
6  investors got, as Clean Care investors, were
7  there any documents they were sent that did not
8  go to other Clean Care investors?
9      A.  No.  You mean was there a separate
10 set sent to them and then another set sent to the
11 Clean Care investors?
12     Q.  I'll rephrase, I realize that was
13 vague.  What I want to figure out is what written
14 communications went to the ASC investors after
15 you stopped working at ASC.  So my question to
16 you is, other than the letter you sent to the ASC
17 investors describing the conversion --
18     A.  Correct.
19     Q.  -- were there any written
20 communications sent on Clean Care's behalf to the
21 ASC investors --
22     A.  No.
23     Q.  -- excluding those that were just
24 sent to all investors generally?
25     A.  No.

Page 95

Varughese

1
2      Q.  None at all?
3      A.  No, except for the conversion list.
4      Q.  Except for that one letter you
5  described?
6      A.  Correct.
7      Q.  Were there any phone calls made to
8  those investors to explain the conversion of
9  their ASC shares --
10     A.  Yes.
11     Q.  -- to Clean Care shares?  Did you
12 personally make those calls?
13     A.  One or two calls myself and Mr. Nazon
14 did the rest.
15     Q.  With whom did you speak?
16     A.  I spoke to Mr. Read, George Read, and
17 I spoke to Mr. Thomas Wencl.
18     Q.  Could you spell that?
19     A.  W-e-n-c-l.
20     Q.  What did you tell Mr. Wencl?
21     A.  We told him basically the ASC shares
22 were being converted to Clean Care Technologies.
23 There was new management on board.  Mr. Schmidt
24 is no longer with the company.
25     Q.  You said we told him, do you mean you

Page 96

Varughese

1
2  specifically told him?
3      A.  Yes, and Mr. Nazon as well.
4      Q.  Did Mr. Wencl call you or did you
5  call him?
6      A.  I called him.
7      Q.  How about Mr. Read, what did you tell
8  him?
9      A.  The same.
10     Q.  Why did you call those two
11 individuals in particular?
12     A.  Those are the ones I spoke to
13 initially.
14     Q.  You had brought them into the ASC
15 investments?
16     A.  Yes.
17     Q.  And those are the only people you
18 brought into the ASC investment?
19     A.  I believe so.  I think Dr. Fleming as
20 well, Dr. John Fleming.
21     Q.  Did they request any additional
22 information, either of them?
23     A.  No.
24     Q.  Did they complain to you that this
25 wasn't an acceptable arrangement?

Page 97

Varughese

1
2      A.  No.
3      Q.  Did either person ask you any
4  questions?
5      A.  Basically about what's going to
6  happen with the company, the growth of the
7  company, what's the new direction for the
8  company.
9      Q.  And how did you respond?
10     A.  I told them exactly what was
11 happening.  We were in the process of getting a
12 new manufacturer.  We were going to go to a trade
13 show once we get the manufacturer, you know.
14 This was all after meeting with the manufacturer
15 with Mr. Klein.
16     Q.  Did you tell them about any company
17 assets?
18     A.  No.
19     Q.  Did you tell them about any company
20 sales?
21     A.  No.
22     Q.  Did you tell them that the securities
23 in Clean Care would be registered with the -- on
24 any exchange or with any government entity?
25     A.  No.  I said it wasn't registered, it

Page 98

Varughese

1  will be registered at a future date.
2
3      Q.   It wasn't but it would be in the
4  future?
5      A.   Yes.
6      Q.   Did you tell them when in the future?
7      A.   No.
8      Q.   Had you already taken steps to
9  register the Clean Care shares?
10     A.   We were looking for new attorneys and
11 such to register the shares.  But at that point
12 there was money required for the growth of the
13 company to keep the company alive.
14     Q.   What, if any, concerns did you have
15 concerning Clean Care concerning registration of
16 the shares?
17     A.   Well, ASC was a registered company,
18 it was on the ASC website so I knew Clean Care
19 Technologies would have to go through the same
20 steps and register the offering.
21     Q.   And at some point did you decide to
22 do the offering without registering the shares or
23 the transactions?
24     A.   We didn't decide, we were already,
25 you know, contacting the individuals about the

Page 99

Varughese

1
2  opportunity of the company.
3      Q.   So you sold shares before you took
4  any further registration -- steps relating to
5  registration?
6      A.   Yes.
7      Q.   At any time did you explain to Mr.
8  Klein your understanding that Clean Care would
9  have to register --
10     A.   Sure.
11     Q.   -- its shares or transactions?
12     A.   Sure, since the first meeting.
13     Q.   And what did you tell him?
14     A.   The company would have to be
15 registered, all states would have to be
16 registered.
17     Q.   What was Mr. Klein's response?
18     A.   He had said once the funding is in
19 that it would be not a problem.
20     Q.   Did you have an understanding that
21 you were supposed to go through the steps for
22 registration before raising money?
23     A.   No.
24     Q.   Did you consult anybody about what
25 steps needed to be taken concerning registration?

Page 100

Varughese

1
2      A.   We contacted a few SEC attorneys to
3  see what steps could be taken and we finally had
4  come across Laura Anthony, and we had several
5  meetings with her to register the offering and do
6  a late stage registration and rescission offer
7  for all the individuals.
8      Q.   Why did you determine that you would
9  do a rescission?
10     A.   She had told us that would be
11 required.
12     Q.   Without getting into any advice Ms.
13 Anthony gave you, did you at some point come to
14 an understanding that there was something
15 improper about the way you had conducted the
16 offering?
17     A.   Yes.
18     Q.   What was it that you came to
19 understand was improper?
20     A.   Well, basically when we had received
21 a call from the commission staff and I had come
22 in voluntarily to find out what was going on.
23     Q.   That was the first time you had found
24 out that anything was wrong with Clean Care's
25 offering?

Page 101

Varughese

1
2      A.   Yes.
3          MR. BIRNBAUM:  Let's take a break,
4  it's 12:32, going off the record.
5          (Discussion off the record)
6          (Lunch recess:  12:33 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 102

```
1                  Varughese
2            Afternoon Session
3               1:19 p.m.
4    A N I L   V A R U G H E S E, having been
5    previously duly sworn, was examined and testified
6    further as follows:
7            (Plaintiff's Exhibit 12, e-mail from
8        L. Paul Schmidt to R dot Clark at ASC
9        Holdings.com, was so marked for
10       identification.)
11           MR. BIRNBAUM: We're back on the
12       record at 1:20.
13   EXAMINATION (Continued)
14   BY MR. BIRNBAUM:
15       Q.   Mr. Varughese, I want to turn your
16   attention to an exhibit marked Exhibit 12.  It is
17   an e-mail printed on two pages from an L. Paul
18   Schmidt to an R dot Clark at ASC Holdings.com.
19   Do you recognize this e-mail?
20       A.   Yes.
21       Q.   Is this the Paul Schmidt that you
22   said earlier was at the head of ASC?
23       A.   Yes.
24       Q.   Who is R dot Clark?
25       A.   That's the name he had asked us to
```

Page 103

```
1                  Varughese
2    contact the individuals with.
3        Q.   Who is us?
4        A.   Myself and Mr. Nazon.
5        Q.   So you both would use the name R.
6    Clark?
7        A.   Yes.
8        Q.   What would R stand for?
9        A.   Robert.
10       Q.   What was the context of your being
11   told to use a fake name?
12       A.   Because he had said that the
13   individuals that he had already contacted, those
14   individuals were to be contacted under a Robert
15   Clark.
16       Q.   They had already been contacted under
17   Robert Clark?
18       A.   No, by his name, by Paul.  He said
19   these are individuals that he had already spoke
20   to and to contact them under Robert Clark.
21       Q.   But why did he tell you to use Robert
22   Clark?
23       A.   I assumed it was because he already
24   spoke to them, he didn't want any affiliation
25   directly with himself so he wanted us to call on
```

Page 104

```
1                  Varughese
2    his behalf.
3        Q.   But is there a real Robert Clark?
4        A.   No, not that I know of.
5        Q.   So my question to you is why wouldn't
6    you call and say this is Anil?
7        A.   I did for the investors that I spoke
8    to directly, I called them as myself, but the
9    ones that he had given us he said call them under
10   Robert because those are his contacts.
11       Q.   What is your understanding of why
12   those being his contacts would require you to use
13   a fake name?
14       A.   Basically he had asked us to on any
15   individuals that he had given us to contact them
16   with the name Robert Clark.  As far as why, I
17   don't know.
18       Q.   You never asked why?
19       A.   I had assumed because he might have
20   contacted them before someone else contacted
21   them, and he wanted, you know, Robert Clark is a
22   name that they knew, I don't know.
23       Q.   Let's start with my question, did you
24   ever ask him why you should use a fake name?
25       A.   No.
```

Page 105

```
1                  Varughese
2        Q.   Did he ever explain to you why you
3    should use a fake name?
4        A.   No, not really.  He had some sort of
5    half explanation.
6        Q.   What was that?
7        A.   Basically he said this is the name
8    that these individuals would be familiar with so
9    just call them under Robert.
10       Q.   And when you called them, were they
11   familiar with a Robert Clark?
12       A.   They seemed to be.
13       Q.   So it was your understanding that
14   those individuals had already been told the name
15   Robert Clark?
16       A.   Yes.
17       Q.   Do you know if they had ever spoken
18   to anybody that went by the name Robert Clark?
19       A.   For a fact, no.  I had assumed that
20   was the case.
21       Q.   If an investor was contacted by
22   Robert Clark, somebody calling himself Robert
23   Clark, how would they know if it was you or Mr.
24   Nazon or somebody else?
25       A.   How would they differentiate between
```