UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,  :
                                      :
                        Plaintiff,    :
                                      :
    -against-                         :
                                      :
CLEAN CARE TECHNOLOGIES, INC.,        :
EDWARD KLEIN, AL NAZON and            :   08 Civ. 01719 (HB)
ANIL VARUGHESE,                       :   ECF CASE
                                      :
                        Defendants,   :
                                      :
            and                       :
                                      :
CLEAN CARE SYSTEMS, LLC,              :
                                      :
                   Relief Defendant.  :
-------------------------------------------------------------------x

**PLAINTIFF'S RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 400
New York, NY  10281-1022
Michael D. Birnbaum
Valerie A. Szczepanik
Attorneys for Plaintiff
(212) 336-0523 (Birnbaum)
(212) 336-1319 (fax)
birnbaumm@sec.gov

Pursuant to Local Rule 56.1, Plaintiff Securities and Exchange Commission (the "Commission") submits this statement of material, undisputed facts in support of its motion for summary judgment against defendants Edward Klein, Anil Varughese and Al Nazon ("Defendants").

Background

1. Clean Care Technologies, Inc. ("CCT") is a self-cleaning toilet seat and cleaning fluid venture created in or around November 2005. (See Ex. 1 to accompanying June 16, 2008 Declaration of Michael D. Birnbaum, November 14, 2005 Certificate of Formation for Clean Care Technologies, LLC[1]; Nazon Tr. at 63-64.[2]) Records produced by Defendant Klein indicate that CCT was first established as a limited liability company on November 14, 2005, and later later incorporated as "CleanCare Technologies, Inc." on or around March 8, 2006. (See Ex. 2, March 8, 2006 New Jersey Division of Revenue Public Records Filing for New Business Entity.) Klein signed CCT's New Jersey state filings. (See Exs. 1, 2.)

2. Defendants offered shares of CCT to the public through a $10 million offering commenced early in 2006. (See Ex. 3, CCT Private Offering Memorandum ("POM"); Nazon Tr. at 69-70; Varughese Tr. at 81.) The CCT offering raised more than $700,000 from at least 26 investors. (See Ex. 4, CCT investor list with handwritten notes added by CCT counsel.)

3. A second Clean Care entity, Clean Care Systems, LLC ("Systems"), was created on or about January 6, 2006 and organized under New Jersey law. (See Ex. 5, Jan. 6, 2006 New

---

[1] All "Ex. __" references are to documents attached to the accompanying Declaration of Michael D. Birnbaum.

[2] Citations to "Schwartz Tr. at _," "Varughese Tr. at _," "Nazon Tr. at _" and "Klein Tr. at _" shall refer to the transcripts of Schwartz's, Varughese's, Nazon's and Klein's testimony, taken on April 24, 2008, May 13, 2008, May 15, 2008 and May 20, 2008, respectively. Relevant portions of these transcripts are attached to the Birnbaum Declaration as Exhibits 21 (Schwartz), 22 (Varughese), 23 (Nazon) and 24 (Klein).

Jersey Division of Revenue Public Records Filing for New Business Entity.) Klein signed Systems' New Jersey state filings. (Id.)

4. Defendants sold an interest in Systems to Dr. Sheldon Schwartz, who, by August 2007, invested approximately $1.2 million in Systems. (See Ex. 6, Systems' July 16, 2007 Bank Statement Detail; Schwartz Tr. at 29-37; Nazon Tr. at 65-71.)

5. Defendants hid from Schwartz the existence of any Clean Care entity other than Systems, leading Schwartz to fund Systems with the understanding that he would be the only investor in any Clean Care entity. (Klein Tr. at 85-90, 98, 179-80; Schwartz Tr. at 38, 91-93.) Likewise, Defendants did not disclose to CCT investors that Systems existed. (Nazon Tr. at 79-80.)

Pre-Clean Care History

6. For approximately ten years prior to meeting Klein, Nazon and Varughese had sold securities in numerous companies, through unregistered offerings, frequently through what was essentially a boiler room operation they created that was alternately called "Focus Marketing," "Focus 4 Marketing" and "Focus 44 Marketing." (Nazon Tr. at 11-27, 32-35.) Defendants used this boiler room, which operated through offices in Manhattan, to market Clean Care Securities. (Varughese Tr. at 25-32; see also Ex. 7, CCT Bank Statement Detail reflecting payments by CCT to Focus Marketing.)

7. Nazon and Varughese were first introduced to Klein in approximately August 2005 to discuss the prospect of working together to sell self-cleaning toilet seats for a company called ASC International Holdings, LLC. (Varughese Tr. at 111-114; Nazon Tr. at 55-58.) ASC, a company established by a Mr. Paul Schmidt, raised money by employing Nazon and Varughese – both of whom used the fake name "Robert Clark" when dealing with any potential

investors – to solicit investments through "cold-calls" to various "leads." (Nazon Tr. at 30-33, 56, 65; Varughese Tr. at 61-63, 102-103.) During these solicitations, investors were falsely promised guaranteed returns. (Varughese Tr. at 88-89.)

8. Soon after the August 2005 meeting among Messrs. Klein, Nazon, Varughese and Schmidt, Schmidt disappeared with all of ASC investors' funds, leaving Nazon and Varughese to answer questions from investors in ASC. (Varughese Tr. at 76-80; Nazon Tr. at 61-62; Klein Tr. at 30.)

9. Varughese and Nazon met in New York with Klein for a second time in or around October 2005 to discuss the creation of a new toilet seat venture. (Varughese Tr. at 76; Nazon Tr. at 61; Klein Tr. at 31.)

10. In or around November 2005, Nazon, Varughese and Klein agreed to create CCT, and further agreed to award former ASC shareholders free shares of the new Clean Care entity. (Varughese Tr. at 76-78, 84-86; Nazon Tr. at 61-62; Klein Tr. at 117-118.) CCT did not disclose in its offering memorandum its decision to award free shares to ASC investors. (Varughese Tr. at 84-86; see generally Ex. 3, CCT POM.)

11. Soon thereafter, Varughese and Nazon began cold-calling investors from an office they established at 111 John Street, New York, New York, which later moved to an address near 25th Street and Eighth Avenue In New York, New York. (Varughese Tr. at 25-33.)

The Creation and Operation of Two Clean Care Entities

12. Among the investors targeted by Defendants to invest in Clean Care Securities was Dr. Sheldon Schwartz, who had invested $300,000 in ASC through Varughese and Nazon. (Schwartz Tr. at 25.)

13.     When Nazon or Varughese contacted Schwartz, they did so under an assumed name, Robert Clark. (Nazon Tr. at 65; Varughese Tr. at 102-03.) Besides using a phony name, Varughese also held himself out falsely as a medical doctor when acting as an agent for CCT. (See Ex. 8, June 12, 2007 Email from Anil Varughese to roelof@eyegiene.nl.)

14.     Schwartz did not accept shares of CCT in exchange for his ASC investment. (Schwartz Tr. at 30-31; Varughese Tr. at 133-34.)

15.     Instead, Schwartz agreed to form a partnership with Klein, known as Systems, which Schwartz personally funded on the express condition that he would be the sole investor. (Schwartz Tr. at 36-41.) Schwartz understood that 100% of his investment would be used to operate Systems. (Schwartz Tr. at 47.) Klein represented to Schwartz that Systems owned the rights to be the exclusive North American distributor of the Eyegiene self-cleaning toilet seat. (Nazon Tr. at 65; Schwartz Tr. at 29-34.)

16.     Ten percent of all funds Schwartz contributed to Systems were paid as "commissions" to Nazon and Varughese. (Klein Tr. at 90-91; Varughese Tr. at 176, 202; Nazon Tr. at 94.) Defendants used Schwartz's investment to cover expenses incurred by CCT. (Klein Tr. at 15, 21-24, 89-90.) Schwartz was not informed of these facts. (Nazon Tr. at 94-95; Klein Tr. at 90-91.)

17.     By creating two parallel Clean Care Entities, Defendants guaranteed that any potential profits would be shared among two companies. Under the system Defendants devised, Systems would purchase seats and cleaning solution from a European company known as "Eyegiene"; CCT would pay Systems a premium for those seats and cleaning solution; then CCT would then try to sell the seats and solution to the public. (Klein Tr. at 101-106.)

18. In August 2007, Schwartz commenced a lawsuit in New Jersey State Court against Klein and CCT alleging, among other things, that Klein had "been diverting substantial monies from Clean Care Systems for his own improper use" and "surreptitiously formed Clean Care Technologies for the apparent and unlawful purpose of diverting the assets of Clean Care Systems." (Ex. 9, Verified Complaint in <u>Schwartz, et al. v. Klein, et al.</u> at ¶¶ 24, 25.)

19. This lawsuit, which Schwartz brought on behalf of Systems as well as on his own behalf, was settled in November 2007. (<u>See</u> Ex. 10, Settlement Agreement & Closing Statement.) Under the terms of the settlement, CCT received $225,000 from Schwartz (through Systems) in exchange for, among other things, all of CCT's toilet seat and cleaning solution inventory and Klein's surrender to Schwartz of any interest in Systems. (<u>Id.</u>)

<u>Defendants' Violations of Section 5 of the Securities Act and Section 15(a) of the Exchange Act.</u>

20. Defendants "acted as brokers [and] solicited an unregistered offering." (Ex. 11, Nazon Answer to Commission's Complaint at 2.)

21. Defendants were not registered broker-dealers or affiliated with any registered broker-dealers. (Nazon Tr. at 86; Varughese Tr. at 120-21.)

22. Defendants knew that CCT would need to file a registration statement with the Commission in order to offer and sell its securities. Varughese and Nazon informed Klein of this fact. (Varughese Tr. at 98-99; Nazon at 86-88; Klein Tr. at 36.) Varughese claims a "[l]ate registration was already under way (sic) when the Commission Staff had started [its] informal inquiry." (Ex. 12, Varughese Answer at 3.)

23. As Defendants admit, they "did not file a registration statement for their sales of securities, and a registration statement was not otherwise in effect." (<u>See</u> Exs. 11, 12 and 13,

Nazon, Varughese and Klein Answers, respectively, failing to deny quoted text from Complaint ¶ 27.)

24.     Defendants utilized interstate mail and the means of interstate commerce to solicit and collect funds from investors in Clean Care Securities throughout the United States. (Klein Tr. at 36-37; Varughese Tr. at 25-33.)

25.     Furthermore, Defendants solicited investments from both "accredited" and "non-accredited" investors. (Varughese Tr. at 36; Nazon Tr. at 98.)

26.     Klein further admits that he "aided and abetted" Nazon and Varughese in their sales efforts. (Ex. 14, May 16, 2008 Email from Klein to Michael Birnbaum.) Klein explained: "For some ungodly reason, I never bothered to ask [whether Varughese and Nazon were licensed], which was naïve on my part. Without a doubt, I should have consulted with an attorney before I hired them." (Ex. 15, April 9, 2008 Cover Letter Enclosing Klein's Answer.)

27.     Klein never asked if Nazon, Varughese or any of their associates were registered broker-dealers. (Klein Tr. at 34-35.) Klein also failed to contact any references of Nazon and Varughese or otherwise conduct any background check into the individuals responsible for raising money for the Clean Care Entities. (Id. at 116-17.) In fact, when Klein hired Nazon and Varughese to raise money for CCT, he did not know of any experience or expertise either person had in raising capital other than the duo's work raising money for ASC, the toilet venture that Klein knew had collapsed when the company's president disappeared with the money Varughese and Nazon had collected from some of the same investors Defendants targeted for investment in Clean Care Securities. (Id.) Klein described Varughese and Nazon as "two young kids" and admitted he had no real understanding of how they would raise money for CCT. (See Ex. 16, Transcript of Klein's July 20, 2007 Investigative Testimony at 45, 51-52.) Looking back, Klein

reflected: "It is now apparent that both Nazon and Varughese have been unlawfully selling securities for many years prior to Clean Care." (Ex. 14, May 16, 2008 Klein Email.)

28. Klein also knew that Varughese and Nazon used the name "Robert Clark" when soliciting investors for CCT. (Klein Tr. at 118-119.)

Defendants' Misrepresentations and Omissions of Material Facts

29. All of the Defendants took part in drafting the POM sent to potential and actual CCT investors (Varughese Tr. at 118; 154-55; Nazon Tr. at 78; Klein Tr. at 38), though Klein maintains that he left much of the work to Varughese and Nazon because he does "not have the education, knowledge or experience when it comes to matters like [securities offerings]." (Ex. 14, May 16 Klein Email.) Each Defendant admits that the POM contained false information. (See, e.g. Exs. 11, 12 & 13, Nazon, Varughese, and Klein Answers, respectively, all admitting false statements concerning commissions and use of registered broker dealers set forth in Complaint ¶ 35.)

30. For example, CCT's POM falsely stated, alternately, that "[t]here will not be any commissions payable or paid in connection [with the offering]" and, in a separate section of the POM, that commissions would be paid to registered broker-dealers but would be capped at 10 percent. (Ex. 3, CCT POM, at 1, 8.) In fact, through Focus Marketing, Varughese and Nazon – neither of whom were registered broker-dealers – were paid commissions of up to 15 percent of monies they raised. (Klein Tr. at 58; Varughese Tr. at 176-78; Nazon Tr. at 96-97.) Investors were never told of Nazon's and Varughese's 15% commissions. (Klein Tr. at 90-91; Nazon Tr. at 94-95.)

31. Defendants all further admit that CCT's "POM misrepresented, and failed to disclose, material information," and that "Defendants also issued false press releases that contained numerous falsehoods ... ." (See Exs. 11, 12 & 13, Answers to Complaint ¶¶ 3, 4.)

32. Klein admits that, upon reflection, Varughese's and Nazon's contributions to CCT's POM "should have raised a red flag." (Ex. 14, May 16, 2008 Klein Email.) Klein also admits that, "like a fool," he simply assumed the POM was "properly done." (Klein Tr. at 38.) Furthermore, Klein answered "no" when asked whether "anybody at Clean Care Technologies [was] responsible for reviewing the substance of the offering memorandum before it was sent out to investors." (Klein Tr. at 37-38.) Klein, however, admits that he personally saw a final version of the POM before it was sent to all but a few investors. (Klein Tr. at 42-43.)

33. The POM states that CCT "exclusively distributes and markets Eyegiene Seat." (Ex. 3, POM at 19.) But CCT did not, in fact, possess the distribution rights claimed in CCT's POM. (Nazon Tr. at 78-79; Klein Tr. at 51-52; Varughese Tr. at 140.) Those rights belonged to Systems. (Klein at 51.) CCT investors were not told that Systems existed, that distribution rights belonged to Systems, or that Defendants had arranged that CCT would buy inventory from Systems at a marked up price. (Varughese Tr. at 164; Nazon Tr. at 77-80; Klein Tr. at 89.)

34. The POM also informs investors that the sale of securities through the CCT offering was "made through broker-dealers who are registered with the National Association of Securities Dealers." (Ex. 3, POM at 1.) But CCT never "use[d] any broker/dealers to sell any shares of Clean Care Technologies." (Varughese Tr. at 122.)

35. CCT's financial projections are also misleading. The financial projections sent to potential CCT investors are based on sales of seats for an average $30 profit. (Ex. 3, POM at 29, 31.) But Defendants testified that part of CCT's business model was to give away a large

8

proportion of its inventory of seats for free, based on the hope that CCT would recoup any losses when purportedly satisfied purchasers bought cleaning fluid from CCT in the months and years ahead. (Klein Tr. at 46-47; Nazon Tr. at 82-83.) Nazon testified that, at some point during 2006, he knew that the projections contained in the POM "wouldn't be realistic," but Defendants continued to send investors the same projections regardless of their falsity. (Nazon Tr. at 82-86; Varughese Tr. at 195.) Though CCT warned that the projections were subject to "uncertainties" and "assumptions," (Ex. 3, POM at 28), the POM did not inform investors that the projections were not realistic. (See generally, Ex. 3, POM.)

36. Additional material misrepresentations can be found in the press releases CCT published. For example, CCT announced in a January 5, 2007 press release that "CCT has signed on numerous dealers including the Las Vegas Towel and Linen Company … Liberty Paper and Janitorial, Walsh Chemical and M & J Industrial Supply." (Ex. 17, Jan. 5, 2007 CCT Press Release.) On January 2, Klein emailed Schwartz about sales of seats to the very same M & J Industrial Supply. (See Ex. 18, Jan. 2, 2007 email from Klein (EBK2727@aol.com) to Schwartz (selmj@rcn.com); see also Klein Tr. at 66-67.) But CCT had not signed on any dealers identified in the press release or email. (Klein Tr. at 62-63; Varughese Tr. at 184-186.)

37. A July 1, 2006 CCT press release also contains blatant misrepresentations. The July 1 Release specifically identifies sales of dozens of seats to several different companies, stating that "a subsidiary of AmeriChem has bought 64 seats and 256 bottles [of cleaning fluid]," a janitorial supply company "bought 16 seats to test in Wyndham Hotel," and Ace Janitorial and Surgical Supply company … bought 70 seats and 280 bottles of solution as their initial order." (Ex. 19, July 1, 2006 CCT Press Release.) Klein described some of the same sales in a June 15, 2006 email to Scwhartz. (Ex. 20, June 15, 2006 Email from Klein to Schwartz.) But no such

sales had been made. (Varughese Tr. at 179-183; Klein Tr. at 71-73.) Indeed, the Defendants all admit the foregoing representations about purportedly finalized deals were false. (Klein Tr. at 62-63; Nazon Tr. at 92-93; Ex. 12, Varughese Answer, at 3 (failing to deny falsity of statements in Jan. 5, 2007 press release, as set forth in Complaint ¶31).)

Defendants' Unjust Enrichment

38.     Defendants were unjustly enriched by $1,933,403.75 – comprising $716,927 contributed by CCT investors and $1,216,475.75 contributed by Systems' investor. (See Ex. 4, CCT Investor List provided by CCT, including notes added by CCT counsel; Ex. 6, Systems' Bank Statement Detail reflecting payments to Systems from Schwartz.)

39.     Prejudgment interest on $1,933,403.75 is, according to the Commission's computations at the IRS underpayment rate, $125,255.48. This number is calculated by adding (i) the prejudgment interest for Schwartz's investment of $1,216,475.75 from August 2007, the month following Schwartz's last investment as reflected on Systems' records, through May 2008, and (ii) prejudgment interest for investments in CCT of $716,927, calculated from May

2007, the month following the CCT investors' last investment as reflected on CCT's records, through May 2008. (See Ex. 25, Commission's prejudgment interest calculations.)

Dated: New York, NY
       June 16, 2008

Respectfully submitted,

By: /s/ Michael D. Birnbaum

Michael D. Birnbaum
ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281
(212) 336-0523
BirnbaumM@sec.gov

Of Counsel:
Valerie A. Szczepanik
Meaghan Cheung
Teresa A. Rodriguez

11